IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | CASE NO. 17-32186, *et seq.* |
| | § | CHAPTER 11 |
| UPLIFT RX, LLC, | § | |
| | § | |
| Debtors. | § | |
| _____ | § | |
| | § | |
| MARK SHAPIRO, Liquating Trustee | § | ADV. PROC. NO. 21-03936 |
| of Alliance Health Liquidating Trust, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| BROWN & FORTUNATO, P.C., a Texas | § | |
| Professional Corporation | § | |
| | § | |
| Defendant. | § | |

## <u>DEFENDANT'S MOTION TO DISMISS UNDER RULES 12(b)(6) and 9(b)</u>

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

**There will be a hearing on this motion on February 8, 2022 at 9:00 a.m. in courtroom 404, 515 Rusk Avenue, Houston, Texas 77002.**

## TABLE OF CONTENTS

**Page**

I.   Introduction ........................................................................................................ 1

II.  Plaintiff's Allegations ....................................................................................... 4

    A.   The Relevant Players .............................................................................. 4

    B.   Alliance's Fraudulent Billing Practices ................................................. 6

    C.   Brown advised Alliance in December 2012 that the Questionable Business Practices were illegal, carried civil and criminal risk, and should be stopped. ...... 6

    D.   Brown again advised Alliance in May and July 2013 that the Questionable Billing Practices were illegal, carried civil and criminal risk, and should be stopped. ...... 9

    E.   Alliance Whistleblowers Report the Questionable Business Practices ................ 12

    F.   Alliance Disregarded Brown's Advice and Decided to Continue the Illegal Practices ....................................................................................... 13

    G.   Plaintiff's Other Allegations About Brown ......................................... 16

    H.   What Alliance Knew About the Questionable Business Practices and When ... 19

III. Legal Standard ................................................................................................ 21

    A.   Rule 12(b)(6) ........................................................................................ 21

    B.   Rule 9(b) .............................................................................................. 22

IV.  Texas, Not Utah Law Applies to Plaintiff's Malpractice Claim Against Brown ............. 23

V.   Argument & Authorities .................................................................................. 26

    A.   Plaintiff fails to state a claim for legal malpractice (Count I) .............................. 26

        1.   Plaintiff pleads facts that establish Brown was not negligent .................. 26

        2.   Plaintiff's negligence claim is barred by limitations. .............................. 28

        3.   Plaintiff fails to plead any "but for" causal link between Brown's alleged negligence and Plaintiff's alleged damages. ............................................. 31

        4.   Plaintiff fails to plead any recoverable damages of Alliance from Brown's alleged negligence. ................................................................................... 33

5.      Plaintiff cannot pursue a negligence claim against Brown on behalf of non-clients. ................................................................................. 34

B.      Plaintiff fails to state a claim for breach of fiduciary duty (Count II). ................ 35

C.      Plaintiff fails to state a claim for statutory contribution (Count III) .................... 39

D.      Plaintiff, as Assignee of the Test Strip Manufacturers, fails to state a claim for negligent and/or fraudulent misrepresentation or aiding and abetting the same (Counts IV and V). ............................................................................... 40

1.      The representation-based claims are barred by the attorney immunity doctrine. ............................................................................... 40

2.      Plaintiff fails to plead facts of any negligent and/or fraudulent misrepresentation by Brown. ................................................... 41

3.      Plaintiff fails to plead its negligent/fraudulent misrepresentation claim with particularity. ...................................................... 43

E.      Plaintiff, as Assignee of the Test Strip Manufacturers, fails to state a claim for conspiracy to violate federal RICO ....................................................... 43

VI.     Prayer ............................................................................................ 48

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

ABC Arbitrage Plaintiffs Group v. Tchuruk,
  *291 F.3d 336 (5th Cir.2002)* ......................................................................... 23

*Akin, Gump, Strauss, Hauer & Feld, LLP v. Nat'l Dev. & Research Corp.*,
  299 S.W.3d 106 (Tex. 2009) ......................................................................... 32

Alexander v. Turtur & Assocs., Inc.,
  *146 S.W.3d 113 (Tex. 2004)* ......................................................................... 26

*Alpert v. Crain, Caton & James, P.C.*,
  178 S.W.3d 398 (Tex. App.—Houston [1ˢᵗ Dist.] 2005, pet. denied) ...................................... 41

*Apex Towing Co. v. Tolin*,
  41 S.W.3d 118 (Tex. 2001) ......................................................................... 28

*Armstrong v. Am. Home Shield Corp.*,
  2001 WL 34119165 (N.D. Tex. 2001)
  *aff'd*, 333 F.3d 566 (5th Cir. 2003) ......................................................................... 24

*Bank of Texas, N.A. v. Ravkind*,
  2013 WL 1281860 (Tex. App.—Dallas Mar. 12 2013, no pet.) ...................................... 42

*Beck v. Law Offices of Edwin J. (Ted) Terry, Jr., P.C.*,
  284 S.W.3d 416 (Tex. App.—Austin 2009, no pet.) ...................................... 37

*Bell Atl. Corp. v. Twombly*,
  127 S. Ct. 1955, 167 L. Ed. 2d 929, 550 U.S. 544 (2007) ...................................... 21

*Benchmark Elecs., Inc. v. J.M. Huber Corp.*,
  343 F.3d 719 (5th Cir.)
  *modified on denial of rehearing on other grounds,*
  355 F.3d 356 (5th Cir.2003) ......................................................................... 24

*Cantey Hanger, LLP v. Byrd*,
  467 S.W.3d 477 (Tex. 2015) ......................................................................... 35, 41

Capital Parks, Inc. v. Southeastern Advertising and Sales System, Inc.,
  *30 F.3d 627 (5th Cir.1994)* ......................................................................... 23

*Caton v. Leach Corp.*,
  896 F.2d 939 (5th Cir. 1990) ......................................................................... 24

*Causey v. Sewell Cadillac-Chevrolet, Inc.*,
    394 F.3d 285 (5th Cir. 2004) ........................................................................... 22

*Collins v. Morgan Stanley Dean Witter*,
    224 F.3d 496 (5th Cir. 2000) ........................................................................... 22

*Deutsch v. Hoover, Bax & Slovacek, L.L.P.*,
    97 S.W.3d 179 (Tex. App. - Houston Dist.] 2002, no pet.) ..................... 37

*Doe v. Boys Clubs, Inc.*,
    907 S.W.2d 472 (Tex. 1995) ........................................................................... 32

Dorsey v. Portfolio Equities, Inc.,
    *540 F.3d 333 (5th Cir.2008)* ........................................................................ 23

*Duerr v. Brown*,
    262 S.W.3d 63 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ..................... 36, 37

*El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*,
    344 F. Supp.2d 986 (S.D. Tex. 2004) ........................................................... 24

*Erikson v. Renda*,
    590 S.W.3d 557 (Tex. 2019) ..................................................................... 30, 31

Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.,
    *565 F.3d 200 (5th Cir.2009)* ........................................................................ 23

*Green v. McKay*,
    376 S.W.3d 891 (Tex. App.—Dallas 212, pet. denied) ............................... 32

*Haase*,
    404 S.W.3d ......................................................................................................... 36

In *re Katrina Canal Breaches Liti.*,
    495 F.3d 191 (5th Cir. 2007) ........................................................................... 22

*In re Today's Destiny, Inc.*,
    388 B.R. 737 (Bankr. S.D. Tex. 2008) ........................................................... 39

*Isaacs v. Schleier*,
    356 S.W.3d 548 (Tex. App.—Texarkana 2011, pet. denied) ..................... 36

*Jones v. Bock*,
    549 U.S. 199 (2007) ........................................................................................... 21

*Kimleco Petroleum, Inc. v. Morrison & Shelton*,
    91 S.W.3d 921 (Tex. App. - Worth 2002, pet. denied) ............................... 37

*Mayo v. Hartford Life Ins. Co.*,
   354 F.3d 400 (5th Cir.2004) ................................................................................ 24

*McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*,
   991 S.W.23d 787 (Tex. 1999) ............................................................................. 42

*McClure v. Allied Stores, Inc.*,
   608 S.W.2d 901 (Tex. 1980) ............................................................................... 32

*Miller v. Stonehenge/Fasa-Texas JDC, LP*,
   993 F. Supp., 461 (N.D. Tex. 1998) .................................................................... 41

*Murphy v. Gruber*,
   241 S.W.3d 689 (Tex. App.—Dallas 2007, pet. denied) .................................. 37, 38

*Murphy v. Mullin, Hoard & Brown, L.L.P.*,
   168 S.W.3d 288 (Tex. App.—Dallas 2005, no pet.) ........................................... 38

*Papasan v. Allain*,
   478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) ..................................... 21

Peeler v. Hughes & Luce,
   *909 S.W.2d 494 (Tex. 1995)* ............................................................................. 26

*Pierre v. Steinbach*,
   378 S.W.3d 529 (Tex. App.—Dallas 2012, no pet.) ........................................... 31

*Pineda*,
   535 S.W.3d at 160 ............................................................................................... 38

*Ramming v. U.S.*,
   281 F.3d 158 (5th Cir. 2001) .............................................................................. 29

*Rogers v. Zanetti*,
   518 S.W.3d 394 (Tex. 2017) ........................................................................... 32, 33

*Schlanger v. Clements*,
   939 S.W.2d 183 (Tex. App.—Houston [14th Dist.] 1996, writ denied) ............... 32

*Shoemake v. Fogel, Ltd.*,
   826 S.W.2d 933 (Tex. 1992) ............................................................................... 40

*Stanfield*,
   494 S.W.3d at 97 ................................................................................................. 32

Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.,
   *975 F.2d 1134 (5th Cir.1992)* ........................................................................... 22

*Texas Taco Cabana, L.P. v. Taco Cabana of New Mexico,*
  304 F. Supp. 2d 903 (W.D. Tex. 2003) ..................................................................... 24

*Trousdale v. Henry,*
  261 S.W.3d 221 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) ..................................... 36

Tuchman v. DSC Commc'ns Corp.,
  *14 F.3d 1061 (5th Cir.1994)* ................................................................... 22, 23

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.,*
  987 F.2d 429 (7th Cir. 1993) ........................................................................... 22

*Walker v. Beaumont Indep. Sch. Dist.,*
  938 F.3d 724 (5th Cir. 2019) ....................................................................... 24, 38

*West Fork Advisors,*
  437 S.W.3d at 921 ................................................................................... 42

Williams v. WMX Techs., Inc.,
  *112 F.3d 175 (5th Cir.1997)* ................................................................... 23, 43

*Willis v. Maverick,*
  760 S.W.2d 642 (Tex. 1988) .......................................................................... 28

*Wright v. Sydow,*
  173 S.W.3d 534 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ................................... 42

*Zenith Star Ins. Co. v. Wilkerson,*
  150 S.W.3d 525 (Tex. App.—Austin 2004, no pet.) ...................................................... 32

**Statutes**

11 U.S.C. § 108(a)(2) .................................................................................. 29

Tex. Civ. Prac. & Rem. Code § 16.003(a) ............................................................... 28

Tex. Civ. Prac. & Rem. Code § 33 ...................................................................... 39

Tex. Civ. Prac. & Rem. Code § 33.011(3) ............................................................... 39

Tex. Civ. Prac. & Rem. Code § 33.016(a) ............................................................... 39

Tex. Civ. Prac. & Rem. Code § 33.016(b) ............................................................... 39

**Rules**

Fed R. Civ. P. 9(b) ........................................................................ 1, 4, 22, 23, 43

Fed. R. Civ. P. 12(b)(6) ..................................................................... 1, 21, 22, 23

## <u>DEFENDANT'S MOTION TO DISMISS UNDER RULES 12(b)(6) and 9(b)</u>

Defendant Brown & Fortunato, P.C. ("Brown"), by and through its counsel, Gordon Rees Scully Mansukhani LLP moves to dismiss the causes of action in Plaintiff's Adversary Complaint [Doc. 1] under Federal Rules of Civil Procedure 12(b)(6) and 9(b), and, in support thereof, states:

## I.     <u>Introduction</u>

1.     Plaintiff spends nearly 100 pages in the Complaint to tell a story that can be summarized in one sentence – Alliance Medical Holdings, LLC ("Alliance") knowingly engaged in fraud and deliberately continued the fraud after being told it was illegal by its lawyers, Brown.

2.     Plaintiff stands in the shoes of Alliance, a company that knowingly and admittedly engaged in health insurance billing fraud from 2010 through 2017, despite being told by Brown, its lawyers, as early as December 2012 that such practices were illegal, exposed Alliance to civil and criminal liability, and must be stopped. With full knowledge of the risks associated with its practices, Alliance chose to ignore Brown's advice and continue its illegal practices until its headquarters was raided by the FBI in February 2017. With no access to funds and in the face of significant liability to third parties, Alliance and its affiliates filed bankruptcy on April 7-9, 2017. Now, after allegedly receiving over $100 million in ill-gotten funds, Alliance tries to shift the blame to Brown under the theory that Brown's lawyers allegedly committed malpractice by failing to inform Alliance that its billing practices were illegal, exposed Alliance to risk, and to stop the practices. Yet, Plaintiff admits over and over in the Complaint that Brown did exactly what Plaintiff now claims it failed to do – Brown told Alliance its practices were illegal, exposed it to civil and criminal liability, and must be stopped.  That is not malpractice. This critical concession by Plaintiff is reinforced by the admission in the Complaint that Alliance deliberately chose to disregard Brown's advice and continue its fraudulent practices.

3.      This is not the case where a client needed its lawyer to advise it of illegal conduct, though Brown gave that advice several times. Instead, this lawsuit results from a deliberate scheme by Alliance to defraud pharmacies and insurers and nothing Brown or anyone else could have done would have made a difference.

4.      In the Complaint, Plaintiff asserts claims against Brown on behalf of two interests – on behalf of Alliance – and – as an assignee of the very diabetic test strip manufactures that Alliance allegedly defrauded in the first place.

5.      Plaintiff, on behalf of Alliance, asserts claims against Brown for legal malpractice (Count I), breach of fiduciary duty or aiding and abetting Alliance's officers' alleged breach of fiduciary duties (Count II), and statutory contribution (Count III).

6.      Plaintiff, as assignee of the test strip manufacturers, asserts claims against Brown for negligent/fraudulent misrepresentation or aiding and abetting negligent/fraudulent misrepresentation (Count IV), fraud including aiding and abetting fraud and conspiracy to commit fraud (Count V), and conspiracy to violate federal RICO (Count VI).[1]

7.      All of Plaintiff's causes of action against Brown fail for several reasons.

8.      First, Plaintiff's legal malpractice claim (Count I) is barred by the statute of limitations. The two-year limitations period ended on April 7-9, 2019. Plaintiff filed this action on October 11, 2019, six months after limitations expired.[2] Further, apart from the limitations argument, Plaintiff also fails to state a claim for legal malpractice because Plaintiff admits Brown did not breach any duty to Plaintiff, but rather gave the exact advice Plaintiff claims was not given. Plaintiff also fails to plead any facts establishing proximate cause between Brown's alleged

---

[1] Plaintiff also asserts claims to avoid certain of Alliance's payments for legal services to Brown.
[2] Although the Complaint was filed on October 26, 2021, the parties entered into a series of tolling agreements that provided a filing by the Trustee against Brown would be deemed filed on October 10, 2019.

negligence and Plaintiff's alleged damages. Plaintiff fails to plead facts of any of damages of Alliance that are recoverable from Brown. Finally, the majority of the Debtors on behalf of whom Plaintiff brings this action were not clients of Brown and therefore cannot assert a legal malpractice claim against Brown as a matter of law.

9.      Second, Plaintiff's breach of fiduciary duty or aiding and abetting breach of fiduciary duty claim (Count II) fails pursuant to the anti-fracturing rule in Texas, which prohibits a plaintiff from pursuing a malpractice claim by artfully pleading it as something else, like breach of fiduciary duty. Here, Plaintiff repleads its malpractice claim and merely calls it breach of fiduciary duty in direct violation of the anti-fracturing rule.

10.     Third, Plaintiff's contribution claim (Count III) fails to state a claim because Brown does not have derivative liability to the Test Strip Manufacturers, which is an essential element of a statutory contribution claim under Chapter 33 of the Texas Civil Practice and Remedies Code. Because the Test Strip Manufacturers cannot and have not asserted a viable claim against Brown (nor has Plaintiff alleged a viable claim as assignee of the Test Strip Manufacturers), Plaintiff has no statutory right to contribution from Brown.

11.     Fourth, the Test Strip Manufacturers' claim for negligent/fraudulent misrepresentation or aiding and abetting negligent/fraudulent misrepresentation and fraud, including aiding and abetting fraud and conspiracy to commit fraud (Counts IV and V) fails to state a claim because the attorney-immunity doctrine prohibits non-clients from suing lawyers based on representations made by the lawyer. Plaintiff fails to plead facts of the essential elements of the misrepresentation claims. Plaintiff also fails to plead that Brown (not Alliance) made a misrepresentation and that such misrepresentation was made to the Test Strip Manufacturers (not a pharmacy benefit plan or insurer). Plaintiff's misrepresentation claims also fail to meet the

heightened pleading standard of Rule 9(b). Plaintiff's claim for conspiracy to commit fraud fails because there is no viable underlying tort.

12.     Fifth, the Test Strip Manufacturers' claim for conspiracy to violate federal Rico (Count VI) fails to state a claim because Plaintiff has not plead facts of a RICO conspiracy and the facts plead actually prove that Brown was not a participant in Alliance's scheme.

13.     Accordingly, the Court should dismiss all Plaintiff's causes of action against Brown with prejudice.

## II.     Plaintiff's Allegations

### A.  The Relevant Players

14.     Alliance, together with its affiliates, owned, controlled, and/or operated a network of pharmacies around the country.[3] The single entity known as Alliance[4] (as compared to the Plaintiff's use of the name as a collection of more than 60 entities)[5] is the successor entity of Warner Diabetic, LLC d/b/a Ingram Medical, which was a successor to Medsource Rx Pharmacy, LLC.[6]

15.     Alliance's senior management includes Jeffrey Smith ("Smith") (Chief Executive Officer), David Grant (General Counsel), Candace Czerny (Vice President – Acquisition Marketing), and Justin Leavitt (Chief Executive Officer).[7] Plaintiff aptly describes Alliance's management as "deceitful."[8]

16.     Brown is a Texas law firm that served as outside counsel to Alliance on an intermittent basis from 2010 to 2017. Brown lawyers Jeffrey Baird ("Baird"), Bradley Howard

---

[3] Complaint at ¶ 31.
[4] *Id.* at ¶¶ 31, 65, and 68.
[5] *Id.* at ¶ 31.
[6] *Id.* at ¶ 65.
[7] *Id.* at ¶ 5, footnote 2, and ¶ 70.
[8] *Id.* at ¶ 4.

("Howard"), Lisa Smith, Elizabeth Jepson, and others on the team provided "health care regulatory" and other legal services to Alliance concerning a limited number of issues.[9] Plaintiff alleges that Brown provided legal services to Alliance from 2010 to 2017.[10]

17.     LifeScan, Inc., Roche Diagnostics Corp., and Roche Diabetes Care, Inc. are manufacturers of diabetic testing strips.[11] They are collectively referred to in the Complaint as the "Test Strip Manufacturers."[12]

18.     For the Court's convenience, Defendant identifies the following acronyms frequently used in this Motion, together with their meaning:

- "NDC" means National Drug Code. An NDC is a unique numerical identifier recorded by the U.S. Food and Drug Administration.[13]

- "NFR" means not for retail sale. In this case, that refers to diabetic testing strips manufactured and packaged for sale by mail order to beneficiaries of insurance plans that cover test strips under a medical benefit, typically a durable medical equipment or "DME" benefit.[14] On the other hand, retail testing stripe are intended for sale to patients with pharmacy-benefit insurance and are packaged and labeled as retail products for distribution to retail pharmacies.[15]

- "PBM" means Pharmacy Benefit Managers, which are companies that manage prescription drug benefits on behalf of health insurers.

---

[9] *Id.* at ¶¶ 68 and 70.
[10] *Id.* at ¶ 3.
[11] *Id.* at ¶ 2.
[12] *Id.*
[13] *Id.* at ¶57.
[14] *Id.* at ¶ 52.
[15] *Id.* at ¶ 54.

### B. Alliance's Fraudulent Billing Practices

19.     Plaintiff alleges Alliance's "deceitful management" and others working in concert with them operated, managed, and financed a sophisticated insurance scheme that caused more than $100 million in damages[16] According to the Complaint, Alliance purchased diabetic testing strips that were packaged and labeled as "not for retail sale" (or "NFR") on the gray market, as opposed to buying them directly from the Test Strip Manufacturers.[17] Plaintiff alleges Alliance sold NFR strips to patients but billed for retail strips, which resulted in Alliance being paid a higher reimbursement rate.[18] This practice of delivering one product but billing for another was the "foundational practice" of Alliance and was an "integral part of [its] business model."[19] The Complaint generally refers to Alliance's fraudulent billing practices as the "Questionable Business Practices."[20]

### C. Brown advised Alliance in December 2012 that the Questionable Business Practices were illegal, carried civil and criminal risk, and should be stopped.

20.     Plaintiff alleges Brown "performed extensive legal and non-legal services to … Alliance… from 2010 to 2017."[21]

21.     In November 2012, Alliance asked Brown to research whether there were any cases where retail strips were sold and NFR strips were shipped.[22] Brown assigned an attorney to research the question.[23] Before the research assignment was complete, Howard asked Alliance whether the reimbursement rate was different for the retail and NFR strips.[24] This question by

---

[16] *Id.* at ¶ 4.
[17] *Id.* at ¶¶ 10 and 43.
[18] *Id.*
[19] *Id.* at ¶ 12.
[20] *Id.* at ¶¶ 4, and 64-67.
[21] *Id.* at ¶ 3.
[22] *Id.* at ¶78.
[23] *Id.*
[24] *Id.* at ¶79.

Howard is critical to what Brown's lawyers knew and when. By asking the question, it is clear Howard did not know the intricacies of Alliance's billing practices at that time (and how they were fraudulent), which completely undermines Plaintiff's theory that Brown was a part of a larger conspiracy. Brown assigned the research project to an associate attorney.[25] That attorney "concluded that the company's "NDC Issue" – Alliance's Questionable Business Practice of shipping of NFR products while billing retail products – constituted fraud . . . ."[26]

22.    Brown then advised Alliance of the conclusions from its research in two phone calls between Brown lawyer Jeffrey Baird and Alliance's CEO Jeffrey Smith on December 10 and 11, 2012.[27] Their discussions are memorialized in an email Baird sent to Howard after the calls.[28]

23.    In the December 10 call, Smith admitted to Baird that the Alliance entities are "billing under one NDC when they should be billing under another NDC."[29] And while Plaintiff accurately reports the email that memorialized the phone discussions, Plaintiff deliberately omits the critical portions of the email where Baird told Smith about the legality of the Questionable Business Practices and what Smith/Alliance needed to do moving forward.[30] Baird told Smith in their December 10 phone call that Alliance needed to be governed by two "guiding principles" – one, the entities must bill under the NDC of the product that is actually delivered to the patient – and – two, if the entities are aware of, or should be aware of, restrictions placed on products purchased by the entities, then the entities need to ensure that the products they sell do not violate the restrictions.[31] According to Baird, this caused Smith to panic.[32] On the one hand, Smith

---

[25] *Id.* at ¶81.
[26] *Id.* at ¶81.
[27] *Id.* at ¶83-84
[28] *Id.* at ¶83-84.
[29] *Id.* at ¶83.
[30] Exhibit A.
[31] *Id.*
[32] *Id.*

admitted to Baird he knew the Questionable Business Practices were "suspect from a legal standpoint" and acknowledged that his entities must be governed by the two "guiding principles" stated by Baird.[33] That portion of the email states: [34]

> Smith acknowledges that his entities must be governed by the two "guiding principles" that we shared with him yesterday: (i) the entities must bill under the NDC of the product that is actually delivered to the patient and (ii) if the entities are aware of (or should be aware of) restrictions placed on products purchased by the entities, then the entities need to insure that the products that they sell do not violate the restrictions. Smith wants to "fix the problem." One part of him wants to fix the problem now. However, he does not want to act in haste.....or overact......thereby making the problem worse. For example, Smith said that if the entities immediately start following the two guiding principles, then PBMs/commercial insurers will start cancelling contracts with the entities. I do not know what Smith means by this. As another example, Smith said that the entities could "fix" the problem now by moving thousands of patients from "one contract to another" or from "one manufacturer to another"......or something like that. In other words, if Smith starts taking immediate action, then it may cause some "shock waves" in the industry that may come back to bite the entities. In short, Smith wants to "fix" the problems but wants to be smart about it. At the same time, now that Smith knows that some of the entities' practices are improper, he does not want to be dilatory in taking action......because he does not want to be accused of continuing on with improper operations when he knows that the operations are improper. Smith says that he needs to make some immediate decisions because he has some immediate operational decisions he needs to make (e.g., extend a lease on physical space).

24.    On the other hand, while "Smith knows that some of the entities' practices are improper," he did not want to "act in haste" and make the problem worse.[35] Instead, Smith wanted "to be smart about it" because "he [did] not want to be accused of continuing on with improper operations when he knows that the operations are improper."[36] Smith and Baird then discussed "possible 'go forward' steps" for Alliance to implement Baird's advice.[37] Smith proposed four alternatives to "fix" the problem, all of which required Alliance follow Baird's advice and stop the Questionable Business Practices:[38]

---

[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*

- Sell all of the assets of the entities, close the doors of the entities, pay off the creditors, pay off the investors, and "move on down the road."
- Same as the preceding bullet except that the buyer will take over (or "inherit") the entities' marketing platform. This will result in a number of the entities' employees going to work for the buyer. According to Smith, the entities' marketing platform is impressive and is attractive to purchasers.
- Same as the preceding bullet except that the entities will also serve as the "fulfillment house" for the buyer. That is, the entities will ship out products for and on behalf of the buyer.
- Terminate the business operations that are suspect from a legal standpoint and continue on with the operations that are <u>not</u> suspect from a legal standpoint. This might entail a partial sale of assets. Smith doubts that he can afford to do this.

25.     The importance of the communications between Brown and Smith on December 10-11, 2012 cannot be understated.  They confirm that Brown concluded, for the first time, in December 2012 that Alliance's Questionable Business Practices constituted fraud. They also confirm that Brown advised Alliance of the illegality of the practices (although it is clear Smith already had that knowledge) and advised Alliance on how to move forward in compliance with the law. These communications vitiate Plaintiff's malpractice theory because Brown did exactly what Plaintiff now wants to claim Brown failed to do.

**D.  Brown again advised Alliance in May and July 2013 that the Questionable Billing Practices were illegal, carried civil and criminal risk, and should be stopped.**

26.     Five months after Brown advised Smith to correct the Questionable Business Practices, Brown advised "Candace Czerny, a senior Alliance employee"[39] and "Justin Leavitt, the Chief Financial Officer of Alliance"[40] on May 2, 2013, about possible liabilities inherent with Alliance's Questionable Business Practices.[41] Alliance was negotiating a sale of shares to one of its investors and asked Brown about certain disclosures included in the transaction documents.[42] Alliance sent the proposed disclosure to Howard on April 29, 2013.[43] In the proposed disclosure, Alliance admitted that it continued to "bill patients under the retail pharmacy benefit but ship mail

---

[39] Complaint at ¶ 70.
[40] Id. at ¶ 76. Justin Leavitt is one of the former officers and directors of Alliance referenced in the Complaint. (Doc. 1, p. 3, footnote 2).
[41] Id. at ¶¶ 176-177.
[42] Id. at ¶¶ 171-173.
[43] Id. at ¶ 173.

order diabetic testing supplies nationwide."[44] Howard then asked for, and was provided, a copy of the December 2012 legal research memorandum where Brown concluded this exact practice constituted fraud.[45] Howard told Alliance he wanted to talk about the disclosure.[46] On May 2, 2013, Howard emailed Alliance and "strongly advised them against making this disclosure [that Alliance was selling retail strips but shipping NFR strips]."[47] According to the Complaint, "*Howard gave Leavitt and Czerny his advice on the proposed disclosure, telling them that "the business practice that you've outlined above in writing may be contrary to the representation you're making below . . . that the company is not in violation of any health care laws.*"[48] Howard further advised Alliance:

> *There is considerable risk to memorialize the above-referenced business practice in writing because the company seems to essentially admit that that it operates in violation of its PBM contracts*. Having worked against various PBMs including ESI/Medco and CVS in audit matters, *I am concerned that if any of those entities obtains a copy of the documentation including this representation, they could seek to terminate your contracts, recoup all monies paid under those contracts, pursue any additional contractual and statutory remedies, and possibly turn you into the government (civil or criminal) for false claims and other violations of state, federal, and various insurance laws.* While I think the likelihood of a PBM or some other concerned individual taking this action may not be significant, if this occurred the results for your company could be very problematic. Therefore, *you might wish to consider whether it is worth the benefit of obtaining additional financing to make a risky written disclosure that seems to admit the company has been violating its contracts with payors.* On the other side of the coin, *if you do not make a legally sufficient disclosure and an audit or investigation ensues, then your financier/investor would have a very strong claim against you for fraud and other legal claims*. It is problematic to make the disclosure and very risky not to make the disclosure. *The only safe option is not to pursue this financing/investment at this time* so

---

[44] *Id.*
[45] *Id.* at ¶¶ 174-175.
[46] *Id.* at ¶ 175
[47] *Id.* at ¶ 177.
[48] *Id.* at ¶ 176.

that it's not necessary to make a decision on these and other risky disclosure issues.[49]

27.     This is yet another critical admission in the Complaint that **Brown consistently advised Alliance of possible civil and criminal liability with the Questionable Business Practices**.

28.     On July 30, 2013, Brown again advised against Alliance's Questionable Business Practices.[50] According to the Complaint, Alliance reached out to Brown in July 2013 to discuss a new business model where Alliance would "fulfill prescriptions through third-party owned pharmacies" and Alliance would "provide administrative services" to those pharmacies, and those pharmacies would each "obtain a PBM contract."[51] Alliance asked Brown whether this structure would "raise federal healthcare law issues."[52] On July 30, 2013, Brown attorney Baird sent Alliance a memorandum on Alliance's proposed new business model.[53] The memorandum provided:

> The "issue" of "retail contracts vs. mail order contracts" will still exist "assum[ing] that a pharmacy (to which [Alliance] provides services signs a contract with a PBM in which the pharmacy represents that almost all of its sales of diabetic testing supplies is 'over-the-counter'" though "most of the pharmacy's sales are, in fact, mail-order."
>
> **Submission of inventory that is "restricted use" could result in liability, especially if the "pharmacy's claims include NDCs that are different than the NDCs initially assigned to the 'restricted use' inventory." Such submissions could constitute "unprofessional conduct/unlawful conduct," and may violate Utah's proscription against "procurement of a drug by fraud, deceit, misrepresentation or subterfuge or concealment of a material fact."[54]**

---

[49] *Id.* at ¶ 177.
[50] *Id.* at ¶ 127.
[51] *Id*. at ¶ 125.
[52] *Id*. at ¶ 126.
[53] *Id*. at ¶ 127.
[54] *Id.*

29.    Here, Brown told Alliance that the proposed new business plan still had the "'issue' of 'retail contracts vs. mail order contracts'" that Brown advised against in December 2012 and May 2013.[55] Importantly, Brown again told Alliance that such practice "could result in liability," "could constitute 'unprofessional conduct/unlawful conduct" and may constitute fraud.[56] This is the third key admission by Plaintiff in the Complaint that Brown told Alliance the Questionable Billing Practices were illegal and exposed Alliance to significant legal risk.

### E.  Alliance Whistleblowers Report the Questionable Business Practices

30.    In early 2014, much of Alliance's senior management and directors were well aware of the illegal billing practices. But the practices were further exposed by several whistleblowers at Alliance.[57] While Brown had no involvement with respect to the whistleblowers, the information reported and Alliance's handling of the reports makes it clear that the knowledge of the illegality was rampant within Alliance and Alliance was going to do whatever it could to sweep the whistleblowers under the rug and continue the Questionable Business Practices. As shown above, at this point, Brown had advised Alliance on at least three separate occasions that the practices exposed Alliance to civil and criminal liability, yet Alliance's internal emails (which Brown knew nothing about) prove that Alliance understood Brown's advice but chose to disregard it by attempting to silence the whistleblowers to Alliance could continue the Questionable Business Practice.[58]

---

[55] *Id.*
[56] *Id.*
[57] *Id.* at ¶¶ 178-210.
[58] *Id.* at ¶¶ 181- 184, 191, 195-196, 201-203, 206, 209, 211.

### F. Alliance Disregarded Brown's Advice and Decided to Continue the Illegal Practices

31.     Perhaps the most damning admission Plaintiff makes in the Complaint happened in 2015 when Alliance's management and Board of Directors undertook an in-depth study of the legal liability it faced as a result of the Questionable Bulling Practices.[59] According to the Complaint, **"[d]espite knowing that Alliance was committing the Questionable Billing Practices and faced substantial liability for doing so, Alliance's senior management concluded that abandoning the Questionable Billing Practices would be financially unfeasible. They therefore chose to continue the Questionable Billing Practices.**"[60] In other words, Alliance had been told by Brown the practices were illegal, Alliance knew they were illegal, but Alliance continued the practices anyway. This was made clear in a November 2015 memorandum drafted by Alliance's General Counsel David Grant that was provided to Alliance's Board of Directors where he admitted, again, that Alliance was "engaged in what was described as a 'massive insurance fraud scheme.'"[61] Grant was so bold to "confirm that it was Alliance's practice to submit the improper insurance claims that misstated the NDC number on the products that Alliance had dispensed to customers."[62]

32.     But rather than following Brown's advice and stopping the illegal billing practices, Grant advised Alliance's Board of Directors that "changing Alliance's foundational practice of the Questionable Business Practices would be 'extremely difficult if not impossible' because obtaining retail strips through legitimate channels was too expensive."[63] Further, "Grant advised Alliance's

---

[59] *Id.* at ¶ 211.
[60] *Id*. at ¶ 211 (emphasis added).
[61] *Id*. at ¶¶ 214-215.
[62] *Id.*
[63] *Id*. at ¶217.

Board that purchasing retail strips at their regular price would cause strips to become a 'loss leader' rather than a golden goose."[64] The Complaint aptly summarized Grant's memorandum:

> 219.   In other words, Grant advised Alliance management and the Board that Alliance had two choices: (1) continue its practice of improper adjudication and accept the risk of liability, or (2) stop improperly adjudicating test strips and accept the resulting loss of revenue, which would not be financially feasible.
[65]

33.    As they had done for years, Alliance's management decided to continue the Questionable Business Practices knowing full well they were illegal.

> 220.   In response, the Individuals, including Jeffrey Smith, Blaine Smith, Grant, Hughes, Wistner, and Koopersmith, chose the former option. They made the business decision to continue Alliance's Questionable Business Practices, accepting the risk of liability over the devastating loss of net revenue that would result from ceasing the Questionable Business Practices.
[66]

34.    On October 29, 2015, Grant emailed the draft memorandum to several board members, Barry Johnson of Bennett Tueller (Alliance's primary law firm in Utah), and Brown lawyer Howard.[67] Grant asked the two lawyers to let him "know what additional information or disclaimers you would like me to include in the memo.  Notably, Grant did not ask Brown to conduct any research or provide a legal opinion."[68] Grant wanted to provide a memorandum to the Alliance Board of Directors "that is useful in analyzing any exposure to the company, particularly in light of a suggestion or what disclaimers you would like added to the document . . . ."[69]

---

[64] *Id.*
[65] *Id.* at ¶219.
[66] *Id.* at ¶220.
[67] *Id.* at ¶ 229.
[68] *Id.*
[69] *Id.*

35.     Howard reviewed Grant's memorandum and provided redline revisions.[70] Howard emailed Grant to tell him his revisions included "qualifying language" and "added a few comments for your eyes only just to encourage you to scale back a couple of the comments in your memo."[71] Howard concluded that he "want[ed] to encourage [Grant] to make slightly less bold statements in a few places since [*sic*] [Brown] ha[dn't] researched those issues thoroughly."[72] For example, Grant stated in the memo that "utilizing an NDC for billing purposes that has been assigned to identical product but packaged for a different distribution channel" does not "necessarily violate[] any state or federal statute or regulation."[73] Howard commented, stating, "This is a very strong statement, and our firm has not thoroughly researched the issue."[74] In another example, Grant stated that he "found no evidence or case law to indicate any regulatory enforcement surrounding this [NDC] issue, **or potential exposure in a civil lawsuit** . . ."[75] Howard again commented "[t]his is a very strong statement, and our firm has not thoroughly researched the issue."[76] Howard clearly advised Grant against making some of his statements as they were presented in the draft memo.[77] Yet Plaintiff contends Howard "failed to property advise Alliance that the company could face potential criminal exposure in respect of its NDC" in his comments on the draft memorandum.[78] Of course, Grant did not request a legal opinion from Brown relative to the memorandum. Even further, Howard told Grant that his statements were "very strong" and that Brown would need to more thoroughly research the issue to provide further comment.[79] But, more importantly, Brown

---

[70] *Id*. at ¶230.
[71] *Id.*
[72] *Id.*
[73] Exhibit B.
[74] *Id.*
[75] *Id.* (emphasis added).
[76] *Id.*
[77] *Id.*
[78] Complaint at ¶ 232.
[79] Exhibit B.

had already told Alliance several times that the Questionable Billing Practices were illegal and should be stopped. It is disingenuous for Plaintiff to complain that Brown did not do more in this instance when it gave the very same advice to Alliance on three prior occasions and, on each occasion, Alliance knowingly and deliberately disregarded Brown's advice and continued with the scheme.

### G.  Plaintiff's Other Allegations About Brown

36.      Prior to Brown concluding in December 2012 that the Questionable Business Practices were illegal and exposed Alliance to potential civil and criminal liability, Alliance requested Brown's assistance in dealing with some audits.[80] Plaintiff conclusively alleges Brown engaged in this work under the subheading, **<u>Deceiving Auditors and Doctoring Invoices</u>**,[81] as if Brown had full knowledge of the Questionable Business Practices at that time, which it did not as Plaintiff concedes in the Complaint.[82] Specifically, Plaintiff alleges that Alliance worked with Brown and others "to prevent auditors and inspectors from discovering its Questionable Billing Practices, including that it was shipping NFR strips by mail order and billing PBMs for retail strips . . . ."[83] Plaintiff thereafter conclusively alleges, "[b]elow are a few examples of Brown providing both legal and non-legal services and advice to Alliance to help Alliance deceive PBMs so that its Questionable Business Practices could continue unabated and undetected."[84] Notably, there are no factual allegations to support the conclusion that "non-legal services" were provided by Brown. As shown below, Plaintiff simply draws this legal conclusion from Howard's distinction between a legal opinion and business decision to be made by Alliance.

---

[80] *Id*. at ¶¶ 41-46, 145-161.

[81] *Id*. at ¶ 41.

[82] As shown above, if Brown concluded in December 2012 that the Questionable Billing Practices were illegal after researching the issue, then it necessarily did **not** have that same knowledge before December 2012, which disproves Plaintiff's theory that Brown was a willing and knowing participant in Alliance's scheme.

[83] *Id*. at ¶ 145.

[84] *Id*. at ¶ 146.

37.     Specifically, Plaintiff cites Brown's participation in Alliance's redacting invoices for the CVS Caremark audit in October 2011.[85] Plaintiff alleges that Howard requested that Candace Czerny, a senior Alliance employee,[86] "email us 2-3 examples of invoices in their current form and then the redacted copies of the same invoices that exclude the identifying information you want to protect."[87]

38.     Czerny responded as follows:

150.    Czerny responded, "I will send you copies of the invoices that you requested, however we would much rather give the summary because then we aren't redacting NDC's (which we feel might look a little incriminating)."[88]

151.    On October 24, 2011, Czerny sent Howard the invoices in an email with the subject line: "consolidator (loose product)." Czerny told Howard that "all of the retail product we did buy came from vendors like these." In other words, Czerny told Howard that rather than buying through authorized distributors, Alliance was purchasing test strips as "loose product" from unauthorized "consolidators."[89]

39.     Plaintiff then alleges, "Howard responded with detailed instructions about how to redact invoices to avoid exposing Alliance's Questionable Business Practices to CVS/Caremark,"[90] as if Howard knows the intricacies of Alliance's Questionable Business Practices, despite no factual allegations from which one can fairly draw this legal conclusion. In this respect, October 2011 is fourteen months before December 2012 when Plaintiff contends "***Brown concluded no later than December 2012, that the (Questionable Business Practices) were illegal and exposed Alliance to civil, and possibly criminal liability.***"[91]

---

[85] *Id*. at ¶ 147.
[86] *Id*. at ¶ 70.
[87] *Id*. at ¶ 149.
[88] *Id*. at ¶ 150.
[89] *Id*. at ¶ 151.
[90] *Id*. at ¶ 152.
[91] *Id*. at ¶ 13 (emphasis added).

40.    Howard responded, "we can offer the following guidelines for your production, ***though we must emphasize that some of the advice borders on speculation because we don't know what documentation will satisfy the Caremark auditors.***"[92] Before delivering the redacted invoices to CVS/Caremark, Howard also drafted a cover letter for Alliance to send with the redacted invoices, advising CVS/Caremark of the redactions, as follows:

> 153.   On February 14, 2012, Howard sent Alliance a letter he drafted on Alliance's behalf for Alliance to send to CVS/Caremark. Howard, as Alliance, wrote that the invoices Alliance would provide would be "***redacted to exclude confidential information, including the company names. Disclosure of this very specific confidential information is precluded by Medsource Direct's business agreements with its suppliers, and it is not required by the Provider Manual.***"[93]

It makes no sense that Howard would be so forthcoming with the redactions if he was knowingly participating in the Questionable Business Practices, and yet Plaintiff alleges as a legal conclusion, and completely devoid of any facts, that:

> When he wrote this, Howard knew that any Alliance "confidentiality" concerns were pretextual and that Alliance did not want to provide unredacted invoices because it would expose Alliance's Questionable Business Practices.[94]

41.    Plaintiff thereafter alleges on April 16, 2012, Smith sent Howard an email describing his concern about potential fraud relative to the NDC issue.[95] Based thereon, "Alliance and Brown discussed hiring Ernst & Young to conduct an 'independent' audit,"[96] which is a reasonable response for a law firm given the concerns expressed by Smith. The "contemplated 'audit' by Ernst & Young was not completed",[97] but there is no allegation Brown was even aware of Smith's decision.

42.    Plaintiff further alleges:

---

[92] *Id.* at ¶ 152 (emphasis added).
[93] *Id.* at ¶ 43 (emphasis added).
[94] *Id.*
[95] *Id.* at ¶ 156.
[96] *Id.* at ¶ 155.
[97] *Id.*

156.    On July 12, 2012, Howard emailed Jeffrey Smith, "[w]e are working on the research regarding criminal exposure based on the allegation in Brighton's termination letter that you provided false information to CVS Caremark during the enrollment process." Howard asked Smith to provide Brown "with some additional facts on what, if any, information would have been provided to CVS about the percentages of mail order/retail business conducted Brighton."[98]

43.    It is important to note the status of Howard's learning curve at this time that eventually leads to the level of understanding demonstrated in the events of December 2012, described above.

44.    Suffice it to say, Brown's dealings with Alliance were all in the context of providing legal advice to its client and cautioning its client from engaging in the Questionable Business Practices.   While Alliance undoubtedly knew the ins and outs of its scheme, the Complaint confirms that Brown lacked such knowledge.

## H.  What Alliance Knew About the Questionable Business Practices and When

45.    As shown above, Plaintiff's Complaint admits over and over that Alliance, its officers, its general counsel, and its Board of Directors unquestionably knew that the Questionable Billing Practices were fraudulent and illegal before, during, and after Brown's representation. Nobody at Alliance needed Brown tell it something it already knew (*i.e.*, that the Questionable Business Practices were illegal), even though Brown gave that advice on at least three separate occasions. Nonetheless, the gravity and extent of Alliance's knowledge and its deliberate continuation of the fraud scheme, contrary to Brown's advice, speaks volumes about Plaintiff's frivolous attempt to divert obvious fault by Alliance and shift blame to its lawyers, under the misguided theory that Brown needed to tell Alliance something it already knew.

46.    Alliance's acknowledgement of its own wrongdoing is summarized as follows:

---

[98] *Id*. at ¶ 156.

- 8/2/11 – Alliance CFO Justin Leavitt admitted Alliance knew it was "supposed to only sell the product through a DME benefit and not through a Pharmacy Benefit as [Alliance] originally intended.[99]

- 5/9/12 – An internal Alliance Board of Directors' slide presentation described Alliance's "productive paranoia" as "The Company's plan for 'protecting the golden goose'," the improper adjudication of NFR strips as retain strips.[100]

- 12/10/12 – Brown told Alliance CEO that the Questionable Business Practices were illegal and should be stopped[101]

- 4/10/13 – Jeffrey Smith emailed Alliance's senior management about the "ever-present risk that PBMs would cancel their contracts with the Alliance Pharmacies as a result of Alliance's deceptive practices."[102]

- 7/30/13 – Brown provided a memorandum to Alliance that said the Questionable Billing Practices "could result in liability."[103]

- 2/10/14 – Chad Gulber, a pharmacy technician, reported the NDC issue to senior management. Alliance's internal emails discussed a plan to avoid the NDC issue raised by Gulber.[104]

- 4/8/14 – Pharmacist Masum Amin emailed Alliance senior management that he was concerned about delivering NFR strips as retail strips. Amin sent a similar email to David Grant and Amy McMurtry on 6/16/16. Amin later testified that the expectation that Alliance pharmacists were expected to knowingly/intentionally dispense NFR strips while billing for retail strips was imposed by "[a]ll of the management" at Alliance starting with Amim's "direct management all the way to David Grant."[105]

- 4/23/14 – Alliance employee Tammy Hermansen accessed Gulber's email account and forwarded Gulber's emails to Alliance senior management.[106]

- 10/22/15 – An internal Alliance email noted that Alliance "was getting higher reimbursements by 'illegally billing PBMs for products as if it was retail even though it is mail order.'"[107]

---

[99] *Id*. at ¶ 76.
[100] *Id*. at ¶ 139.
[101] *Id*. at ¶¶ 81-84.
[102] *Id*. at ¶140.
[103] *Id*. at ¶ 127.
[104] *Id*. at ¶ 180.
[105] *Id*. at ¶¶ 192-196, 199, 202.
[106] *Id*. at ¶ 190.
[107] *Id*. at ¶ 212.

- 10/26/15 – David Goldsmith, Alliance's Vice President of Corporate Strategy and Business Development "blew the whistle on Alliance's Questionable Business Practices in 2015." Goldsmith emailed Alliance's Board of Directors about his concerns with the Questionable Business Practices and that the practices are "without question unethical, and quite possibly illegal." Goldsmith further stated he "simply cannot work in an environment so ripe for regulatory and legal scrutiny one in which the risk of civil, and potentially more serious penalties, appears quite significant."[108]

- 11/4/15 – David Grant, Alliance's General Counsel, drafted a memorandum that stated: it was a fact that Alliance was selling NFR testing strips and billing them as if they were packaged for retail distribution, continuing the Questionable Business Practices came with risk,[109] and that he and others at Alliance "had long known that this was Alliance's practice."[110]

### III.    Legal Standard

#### A.  Rule 12(b)(6)

47.    Federal Rule of Civil Procedure 12(b)(6) allows dismissal if a plaintiff fails to state a claim upon which relief can be granted. Restated, "[a] complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief." *Jones v. Bock,* 549 U.S. 199 (2007).

48.    The analysis under Rule 12(b)(6) requires taking the factual allegations as true while distinguishing legal conclusions which the court is not bound to accept. "Although for the purposes of this (Rule 12(b)(6)) motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265 286 (1986); *see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007).

---

[108] *Id*. at ¶ 205.
[109] *Id*. at ¶ 48.
[110] *Id.* at ¶ 215.

49.      Further, as stated in *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498-99

(5th Cir. 2000), the court may consider documents attached to the Complaint, and any documents

attached to the motion to dismiss referenced in the Complaint that are central to Plaintiff's claim.

> In considering a motion to dismiss for failure to state a claim, a district court must
> limit itself to the contents of the pleadings, including attachments thereto. Fed. R.
> Civ. P. 12(b)(6). …
>
> We note approvingly, however, that various other circuits have specifically allowed
> that "[d]ocuments that a defendant attaches to a motion to dismiss are considered
> part of the pleadings if they are referred to in the plaintiff's complaint and are central
> to her claim." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431
> (7th Cir. 1993). In so attaching, the defendant merely assists the plaintiff in
> establishing the basis of the suit, and the court in making the elementary
> determination of whether a claim has been stated.

"When a defendant attaches documents to its motion that are referred to in the complaint

and are central to the plaintiff's claims, the court may also properly consider those documents.

*Causey v. Sewell Cadillac-Chevrolet, Inc*., 394 F.3d 285, 288 (5th Cir. 2004); *In re Katrina Canal*

*Breaches Liti*., 495 F.3d 191, 205 (5th Cir. 2007).

**B.   Rule 9(b)**

50.      Rule 9(b)  provides, in relevant part, that "[i]n alleging fraud or mistake, a party

must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).

A complaint alleging fraud must specify the "time, place, and contents of the false representations,

as well as the identity of the person making the misrepresentation and what [the person] obtained

thereby." *Tuchman v. DSC Commc'ns Corp.,* 14 F.3d 1061, 1068 (5th Cir.1994) (quoting *Tel–*

*Phonic Servs., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1139 (5th Cir.1992)). "This Circuit's precedent

interprets Rule 9(b) strictly, requiring the plaintiff to 'specify the statements contended to be

fraudulent, identify the speaker, state when and where the statements were made, and explain why

the statements were fraudulent.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU*

22

*Corp.,* 565 F.3d 200, 207 (5th Cir.2009) (quoting *Williams v. WMX Techs., Inc.,* 112 F.3d 175, 177 (5th Cir.1997)). "Put simply, Rule 9(b) requires the complaint to set forth the 'who, what, when, where, and how' of the events at issue." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 339 (5th Cir.2008) (quoting *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 350 (5th Cir.2002)). This Rule should be applied "with force, without apology." *Williams,* 112 F.3d at 178.

51.    In the Fifth Circuit, a Rule 9(b) motion to dismiss is reviewed under the same standard applied to a Rule 12(b)(6) motion to dismiss for failure to state a claim. *United States ex rel. Russell v. EPIC Healthcare Mgmt. Group,* 193 F.3d 304, 308 (5th Cir.1999). Accordingly, when considering a motion to dismiss for failure to plead fraud with the requisite particularity under Rule 9(b), the court accepts all well-pleaded facts as true, and views them in the light most favorable to the nonmovant. *Russell,* 193 F.3d at 308;  *Capital Parks, Inc. v. Southeastern Advertising and Sales System, Inc.,* 30 F.3d 627, 629 (5th Cir.1994) (citations omitted). A motion under Rule 9(b) should be granted only if it appears beyond doubt that the plaintiff could prove no set of facts in support of his claim that would entitle him to relief. *Russell,* 193 F.3d at 308**;** *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994).

## IV.    <u>Texas, Not Utah Law Applies to Plaintiff's Malpractice Claim Against Brown</u>

52.    Plaintiff alleges, without applicable facts, authority, or explanation that Utah law applies to its legal malpractice claims against a Texas law firm and its lawyers who are licensed to practice law in Texas.[111] There is no factual or legal basis for this Court to apply Utah law to any of the Plaintiff's claims.

53.    When the laws of two or more states may apply to the various claims in a federal diversity action, the court must apply the choice of law rules of the forum state. *Mayo v. Hartford*

---

[111] *Id.* at ¶ 283.

*Life Ins. Co.,* 354 F.3d 400, 403 (5th Cir.2004); *see also Benchmark Elecs., Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 726 (5th Cir.), *modified on denial of rehearing on other grounds,* 355 F.3d 356 (5th Cir.2003). Texas law generally gives effect to contractual choice of law provisions. *Caton v. Leach Corp.*, 896 F.2d 939, 942 (5th Cir. 1990). "Texas has adopted the Restatement (Second) of Conflicts approach to contractual choice of law provisions. Under Texas law, the parties' choice of law will be enforced unless the chosen law has no substantial relationship to the parties or the transaction or application of the law chosen would be contrary to a fundamental policy of a state that has a materially greater interest than the chosen state in the determination of a particular issue." *Texas Taco Cabana, L.P. v. Taco Cabana of New Mexico*, 304 F. Supp. 2d 903, 908 (W.D. Tex. 2003). A contractual provision that broadly applies to the parties' relationship should be extended to cover tort claims. *See, e.g. El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, 344 F. Supp.2d 986, 989 (S.D. Tex. 2004).

54.    Further, questions regarding statute of limitations are procedural legal questions under Texas choice of law doctrine. *See Armstrong v. Am. Home Shield Corp.*, 2001 WL 34119165, at *10 (N.D. Tex. 2001) *aff'd*, 333 F.3d 566 (5th Cir. 2003) ("Because statutes of limitation are generally procedural for choice-of-law purposes, the forum state's statute of limitations applies even if the parties' contract designates the substantive law of another state."). Texas law applies for this additional reason for those claims that Brown contends are barred by limitations.

55.    Plaintiff alleges Brown is a Texas law firm with multiple locations in multiple cities in Texas.[112] Plaintiff alleges that Brown and Medsource RX Pharmacy, LLC ("Medsource"), an Alliance predecessor entity,[113] entered into an engagement letter agreement on August 20, 2010,

---

[112] *Id.* at ¶¶ 3, 26.
[113] *Id.* at ¶ 65.

for "Health Care Regulatory Matters," which forms the basis of the attorney–client relationship.[114]

Plaintiff alleges Alliance was represented by Brown as outside "health care regulatory" counsel.[115]

56.     The August 20, 2010 engagement letter agreement between Brown and Medsource is filed in support hereof as Exhibit C. It states on page 2 in relevant part:

> Our office is located in Texas, and our attorneys are licensed in Texas. …
> Finally, to the extent permitted by local law and rules of professional
> responsibility, ***you agree that any disputes regarding representation or fees
> will be adjudicated in the courts of a state where the attorney is admitted and
> under the law of the state where the attorney is admitted***.[116]

57.     The engagement agreement also states:

> Finally, to the extent permitted by local law and rules of professional responsibility,
> ***you agree that any disputes regarding representation*** or fees ***will be adjudicated
> in the courts of a state where the attorney is admitted and under the law of the
> state where the attorney is admitted.[117]***

58.     The parties' broad contractual choice of law provision is valid and enforceable. It provides Texas law will apply to ***any disputes*** about Brown's representation. All of the claims Plaintiff asserts against Brown fall within the scope of Brown's representation.

59.     Plaintiff pleads no facts that indicate Utah has any relationship to this case, much less a substantial relationship, other than the fact that Alliance is a Utah company. Plaintiff's conclusory allegation that Utah law applies should be disregarded and this Court should enforce the parties' agreement on choice of Texas law to govern this dispute.

---

[114] *Id.* at ¶ 68.
[115] *Id.* at ¶ 8
[116] Exhibit C, p. 2 (emphasis added).
[117] *Id.*

# V.   Argument & Authorities

## A.  Plaintiff fails to state a claim for legal malpractice (Count I).

60.     Plaintiff asserts Count I Professional Negligence/Legal Malpractice against Brown as follows:

> the firm breached its duties of loyalty and/or care to Alliance by, inter alia: (i) failing to fully or properly advise Alliance regarding the lack of legality of the Questionable Business Practices; (ii) failing to fully or properly advise Alliance regarding the potential risks and harm to Alliance in respect of the Questionable Business Practices; and (iii) failing to fully or properly advise Alliance whether the company was required by law to immediately cease and desist from engaging in the Questionable Business Practices.[118]

61.     A legal malpractice action requires proof of four elements: (1) the attorney owed the plaintiff a duty; (2) the attorney breached that duty; (3) the breach proximately caused the plaintiff's injuries; and (4) damages occurred. *Alexander v. Turtur & Assocs., Inc.,* 146 S.W.3d 113, 117 (Tex. 2004); *Peeler v. Hughes & Luce,* 909 S.W.2d 494, 496 (Tex. 1995).

### 1.  Plaintiff pleads facts that establish Brown was not negligent

62.     Plaintiff's malpractice claim is based on the allegation that Brown failed to advise Alliance about the legality of its billing practices, the risks associated with the practices, and whether Alliance was required by law to stop engaging in the practices[119] But Plaintiff's allegations throughout the Complaint state the complete opposite and admit that Brown advised Alliance of each of those items, but Alliance simply chose to ignore Brown's advice. Plaintiff admits in the Complaint that:

- In September 2011, Alliance asked Brown about its exposure for billing NFR strips as retail strips.[120]

---

[118] *Id.* at ¶ 285.
[119] *Id.*
[120] *Id.* at ¶ 77.

26

- In December 2012, Brown determined Alliance's practice of shipping NFR strips while billing retail products constituted fraud.[121]

- On December 10, 2012, Brown lawyer Baird spoke with Alliance CEO Jeff Smith by phone. Smith admitted to Baird that Alliance was buying "'restricted use' products and selling for 'other uses'" and that Alliance's investors might feel they were defrauded.[122]

- In the December 10 phone call, Baird told Smith that his entities must be governed by the two "guiding principles" – (i) the entities must bill under the NDC of the product that is actually delivered to the patient, and (ii) if the entities are aware of restrictions placed on products, then the entities need to ensure the products they sell do not violate those restrictions.[123]

- Smith told Baird on the call that he wanted to "fix" the problem by following Baird's "guiding principles" but wanted to "be smart about it" to avoid "making the problems worse." Smith proposed possible go forward steps, including "terminating the business operating that are suspect from a legal standpoint" to selling the assets of all the entities and closing business.[124]

- In April 2013, Brown attorney Howard "explained the potential liabilities inherent with Alliance's Questionable Business Practices" to its CFO Justin Leavitt and senior manager Candace Czerny.[125]

- On May 2, 2013, Brown attorney Baird told Alliance that Alliance's practices could result in liability, including fraud.[126]

63.     Plaintiff further admits in the Complaint that:

- "In 2015 . . . [d]espite knowing that Alliance was committing the Questionable Billing Practices and faced substantial liability for doing so, Alliance's senior management concluded that abandoning the Questionable Billing Practices would be financially unfeasible. They therefore chose to continue the Questionably Business Practices."[127]

64.     Simply put, Alliance admits Brown did the very things it contends the firm's

lawyers failed to do. Alliance's factual allegations establish that Brown's legal advice was

---

[121] *Id.* at ¶ 81.
[122] Exhibit A.
[123] *Id.*
[124] *Id.*
[125] Complaint at ¶ 76.
[126] *Id.* at ¶ 176-77.
[127] *Id.* at ¶ 211.

appropriate and in line with the requisite standard of care. Because the factual allegations in the Complaint conclusively disprove the element of breach of a duty by Brown, Alliance fails to state a claim for professional malpractice/negligence and Count I should be dismissed.

### 2. Plaintiff's negligence claim is barred by limitations.

65.    Texas has a two-year statute of limitations for legal malpractice/professional negligence. "[A] two-year statute of limitations governs legal-malpractice claims, whether they sound in tort, contract, or other theory. See TEX. CIV. PRAC. & REM. CODE § 16.003(a); *Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex. 1988)." *Apex Towing Co. v. Tolin,* 41 S.W.3d 118, 120 (Tex. 2001). As further stated in *Apex Towing Co.,* "[l]imitations generally begins to run when the cause of action accrues, which we have determined means when facts have come into existence that authorize a claimant to seek a judicial remedy." *Id.*

66.    Limitations on most of Plaintiff's malpractice allegations against Brown expired before the bankruptcy petition was filed on April 7-9, 2017.  The limitations period for each of the following claims Plaintiff makes against Brown expired before the filing of the bankruptcy petition and are thus barred by limitations.

- Brown learned of the Questionable Business Practices by February 10, 2011.[128]

- Brown conducted legal research in December 2012 which determined Alliance's billing practices were fraudulent.[129]

- Brown counseled Alliance in December 2012 about the legality of its business practices.[130]

---

[128] *Id.* at ¶ 75.
[129] *Id.* at ¶ 81.
[130] *Id.* at ¶ 82-85.

67.     Plaintiff's allegations based on conduct in February 2011 and December 2012 are barred by limitations. For that matter, any alleged malpractice attributable to Brown that occurred on or before April 6, 2015 is barred by limitations because the period expired before the bankruptcy petition was filed.

68.     With respect to any malpractice allegations against Brown that arose after April 6, 2015, Plaintiff had two years from the filing of the bankruptcy petition to assert those claims against Brown pursuant to Section 108(a) of the Bankruptcy Code, which states:

> (a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of —
>
> > (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
> >
> >  (2) two years after the order for relief.

11 U.S.C. § 108(a) (1993).

69.     The "order for relief" is the date Alliance filed the bankruptcy petition. *Ramming v. U.S.*, 281 F.3d 158, 163-64 (5th Cir. 2001).

70.     The Debtors filed a bankruptcy petition on April 7-9, 2017.  Pursuant to 11 U.S.C. § 108(a)(2), Plaintiff had until April 7-9, 2019, to commence an action against Brown that had not expired as of the Petition Date.

71.     Plaintiff did not file any action against Brown before the April 7-9, 2019 deadline.

72.     However, on October 14, 2019, more than 6 months after the two-year limitations period expired, Plaintiff and Brown entered into several agreements that tolled limitations on claims that had not otherwise expired.[131]

---

[131] *Id.* at ¶ 256.

73.     The October 14, 2019 Tolling Agreement states:

All statutes of limitations and defenses based upon the passage of time that have not expired before the Effective Date including, without limitation, laches, applicable to any and all Claims by the TRUSTEE against B&F are and shall be tolled from the Effective Date through and including January 31, 2020 at 11:59 p.m. ET, unless extended in writing by the Parties.[132]

74.     The Effective Date is defined on page one of the agreement as October 11, 2019.[133]

75.     The only allegation of malpractice against Brown that arguably did not expire before the bankruptcy petition was filed involves the November 2015 memorandum drafted by Alliance General Counsel David Grant. Plaintiff alleges that Brown should have provided additional comments in response to the Grant memo to "fully or properly advise Alliance that the company could face potential criminal exposure in respect of its NDC."[134]

76.     Pursuant to Section 108(e), Plaintiff was required to file any malpractice claims against Brown based on the Grant Memo by April 7-9, 2019.

77.     Plaintiff filed the Adversary Complaint on October 26, 2021. Pursuant to the parties' tolling agreement, the Complaint was therefore deemed filed on October 11, 2019, which is more than 6 months after the April 7-9, 2019 date by which Plaintiff was required to assert a claim based on conduct for which limitations had no expired when the bankruptcy petition was filed.

78.     Plaintiff attempts to skirt the clear limitations bar by generally pleading the discovery rule.[135]

79.     The Texas Supreme Court addressed the discovery rule in a legal malpractice case in *Erikson v. Renda,* 590 S.W.3d 557 (Tex. 2019):

---

[132] Exhibit D.
[133] *Id.* at p. 1.
[134] Complaint at ¶232.
[135] *Id.* at ¶94.

The statute of limitations for legal malpractice is two years after a cause of action accrues. A legal injury is incurred, and a cause of action accrues, when faulty professional advice is taken. But because the discovery rule applies to legal-malpractice claims, accrual is deferred until the client discovers, or should discover, the wrongful act and injury. By adopting the discovery rule for legal-malpractice claims, we have accepted that such claims are inherently undiscoverable because "'[i]t is unrealistic to expect a layman client to have sufficient legal acumen to perceive an injury at the time of the negligent act or omission of his attorney.'"

80.      Plaintiff's assertion of the discovery rule should be disregarded because, unlike the paragraphs alleging "the discovery rule applies to delay the accrual of the Test Strip Manufacturers claims of fraud (including adding and abetting fraud and conspiracy to commit fraud),"[136] there are no factual allegations to support the conclusion the discovery rule applies to Alliance's Count I, and for good reason. As shown above, the discovery rule does not apply to Alliance's malpractice claim because Alliance was fully aware that the Questionable Billing Practices were illegal. Alliance knew what advice Brown did and did not provide and whether that advice was consistent with its clear knowledge and understanding that what it was doing was illegal. Indeed, Alliance's General Counsel cavalierly admitted that Alliance was engaged in a "massive fraud scheme."[137] Alliance's Board of Directors and senior management also had that knowledge.[138]

81.      "Because the discovery rule applies to legal-malpractice claims, accrual is deferred until the client discovers, or should discover, the wrongful act and injury." *Erikson v. Renda,* 590 S.W.3d 557, 563 (Tex. 2019). Accordingly, Count I is barred by limitations.

**3.  Plaintiff fails to plead any "but for" causal link between Brown's alleged negligence and Plaintiff's alleged damages.**

82.      To bring a claim for legal malpractice, the plaintiff must establish that the attorneys acted negligently. *Pierre v. Steinbach*, 378 S.W.3d 529, 533 (Tex. App.—Dallas 2012, no pet.)

---

[136] *Id.* at ¶¶ 257-280.
[137] *Id.* at ¶251.
[138] *Id.* at ¶¶ 127, 137, 139-43, 171-77, 191, 197, and 203.

(citing *Akin, Gump, Strauss, Hauer & Feld, LLP v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 112) (Tex. 2009)). The plaintiff must establish a causal link between the attorneys' specific negligence and the alleged harm. *Id.* at 534. Proximate cause may be determined as a matter of law if the circumstances are such that reasonable minds could not arrive at a different conclusion. *Green v. McKay*, 376 S.W.3d 891, 898 (Tex. App.—Dallas 212, pet. denied); *Zenith Star Ins. Co. v. Wilkerson*, 150 S.W.3d 525, 533 (Tex. App.—Austin 2004, no pet.); *Schlanger v. Clements*, 939 S.W.2d 183, 187 (Tex. App.—Houston [14th Dist.] 1996, writ denied).

83.     Proximate cause consists of two elements: (1) cause in fact; and (2) foreseeability. *Rogers v. Zanetti*, 518 S.W.3d 394, 402 (Tex. 2017). The plaintiff must prove both elements to establish liability. *Doe v. Boys Clubs, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). These elements cannot be established by mere conjecture, guess, or speculation. *McClure v. Allied Stores, Inc.*, 608 S.W.2d 901, 903 (Tex. 1980). "Cause in fact means that the act or omission was a substantial factor in bringing about the injury and without which no harm would have occurred." *Id.* In *Rogers v. Zanetti*, the Texas Supreme Court confirmed the meaning of "cause in fact" to "require[] not only that the act or omission be a substantial factor but also requires that it be a but-for cause of the injury or occurrence." *Rogers*, 518 S.W.3d at 403. "Whether a negligent lawyer's conduct is the cause in fact of the client's claimed injury requires an examination of the hypothetical alternative; What would have happened if the lawyer had not been negligent?" *Id.*

84.     The second element of proximate cause if foreseeability. *Doe*, 907 S.W.2d at 477. In a legal malpractice cause, the "plaintiff proves foreseeability of the injury by establishing that a 'person of ordinary intelligence should have anticipated the danger created by a negligent act or omission.'" *Stanfield*, 494 S.W.3d at 97.

85. Plaintiff places no facts of proximate cause between Brown's alleged negligence and Plaintiff's alleged damages. To answer the *Rogers* Court's question – what would have happened if Brown had not allegedly been negligent – **nothing**. Plaintiff admits throughout the Complaint that Alliance already knew that the Questionable Business Practices were fraudulent. Alliance did not need Brown to tell it something it already knew. This is even more evident by Plaintiff's crucial admission that: "Despite knowing that Alliance was committing the Questionable Business Practices and faced substantial liability for doing so, Alliance's senior management concluded that abandoning the Questionable Business Practices would be financially unfeasible. They therefore chose to continue the Questionable Business Practices."[139]

86. An axiomatic aspect to the practice of law is that while a law firm advises its client regarding the risks and benefits associated with a course of action, it is the client, and not the law firm, that ultimately decides whether to pursue the course of action. Here, as shown above, Plaintiff repeatedly admits in the Complaint that, "Alliance's Board of Directors decided to continue the Questionable Business Practices"[140] *after* receiving legal advice to the contrary from Brown in December 2012, May 2013, July 2013, and November 2015. The critical admission by Plaintiff disproves proximate cause as a matter of law and is an independent basis for dismissal of the negligence claim.

### 4. Plaintiff fails to plead any recoverable damages of Alliance from Brown's alleged negligence.

87. Plaintiff has not plead any facts of recoverable damages sustained by Alliance as a result of Brown's alleged negligence, an essential element of the cause of action.

---

[139] *Id.* at ¶ 211.
[140] *Id.* at ¶¶ 48, 67, 82, 104-105, 112-116, 139-144, 191, 203, 206, 211-212, and 214-220.

88.     Plaintiff concludes in the Complaint that the Questionable Billing Practices "caused more than $100 million in damages to the Debtors, the estates of the Debtors, the Trust Estate, and the assignors, the Test Strip Manufacturers."[141] This conclusion is based on Plaintiff's bankruptcy schedules which disclose liabilities of $50 to $100 million, with the Test Strip Manufacturers "being owed in the aggregate in excess of $97 million."[142]

89.     But Plaintiff does not plead that Alliance sustained any out-of-pocket loss. Alliance may have contingent liabilities to third-party creditors, but Plaintiff does not plead that Alliance paid a single cent to the Test Strip Manufacturers, or anyone else, related to the Questionable Business Practices. The Complaint does not state that Alliance paid any monies to a creditor pursuant to a settlement or judgment. Instead, Alliance kept its ill-gotten gains and is using this lawsuit as an attempt to force Brown to pay those third-parties for Alliance's wrongdoing, giving Alliance a tremendous windfall of not only avoiding repaying the fraudulently obtained money, but having someone else repay it on its behalf. Plaintiff's failure to plead facts of any recoverable damages of Alliance from Brown's alleged negligence is an independent basis for dismissal of the malpractice claim.

### 5.  Plaintiff cannot pursue a negligence claim against Brown on behalf of non-clients.

90.     Plaintiff asserts claims against Brown on behalf of over 40 companies that are collectively referred to as "Alliance" in the Complaint, many of which are subsidiaries and affiliates of Alliance.[143] Brown did not represent most of these companies. The only attorney-client relationship plead by Plaintiff is between Brown and Medsource Rx Pharmacy, LLC, together with Medsource's successors Warner Diabetic, LLC d/b/a Ingram Medical and Alliance Medical

---

[141] *Id.* at ¶ 4.
[142] *Id.* at ¶ 32, 46.
[143] *Id.* at p. 1, footnote 1.

Holdings, LLC.[144] Plaintiff does not allege an attorney-client relationship between Brown and any

of the other "large network of companies"[145] Plaintiff pleads no facts that the dozens of affiliate

and subsidiary companies were ever clients of Brown.

91.     Texas follows the bright-line rule that an attorney owes no duty to non-clients.

*Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015).

92.     Because Plaintiff does not allege an attorney-client relationship between Brown and

any company other than Medsource Rx Pharmacy, LLC (and its successors), Plaintiff fails to plead

a cause of action for malpractice on behalf of the non-client entities, necessitating dismissal of all

claims made on behalf of those other entities.

### B. Plaintiff fails to state a claim for breach of fiduciary duty (Count II).

93.     Plaintiff asserts a claim for breach of fiduciary duty against Brown for its alleged

aiding and abetting the alleged breaches of fiduciary duty by Alliance's former officers.

Specifically, Plaintiff alleges:

> 301.     Among other acts and omissions engaged in by Brown, the firm aided and
> abetted the breaches of fiduciary duties of the Former Officers by, inter alia: (i)
> failing to fully or properly advise Alliance regarding the lack of legality of the
> Questionable Business Practices; (ii) failing to fully or properly advise Alliance
> regarding the potential risks and harm to Alliance in respect of the Questionable
> Business Practices; and (iii) failing to fully or properly advise Alliance whether the
> company was required by law to immediately self-disclose and/or forthwith cease
> and desist from engaging in the Questionable Business Practices.[146]

94.     Plaintiff's factual allegations against Brown for the negligence and fiduciary-based

claims are the same:

---

[144] *Id.* at ¶¶ 68, 31, and 65.
[145] *Id.* at ¶ 65.
[146] *Id.* at ¶ 301.

> ### Plaintiff's Negligence Allegations[147]
>
> 285.   Among other acts and omissions engaged in by Brown, the firm breached its duties of loyalty and/or care to Alliance by, *inter alia*: (i) failing to fully or properly advise Alliance regarding the lack of legality of the Questionable Business Practices; (ii) failing to fully or properly advise Alliance regarding the potential risks and harm to Alliance in respect of the Questionable Business Practices; and (iii) failing to fully or properly advise Alliance whether the company was required by law to immediately cease and desist from engaging in the Questionable Business Practices.
>
> ### Plaintiff's Fiduciary Duty Allegations[148]
>
> 301.   Among other acts and omissions engaged in by Brown, the firm aided and abetted the breaches of fiduciary duties of the Former Officers by, *inter alia*: (i) failing to fully or properly advise Alliance regarding the lack of legality of the Questionable Business Practices; (ii) failing to fully or properly advise Alliance regarding the potential risks and harm to Alliance in respect of the Questionable Business Practices; and (iii) failing to fully or properly advise Alliance whether the company was required by law to immediately self-disclose and/or forthwith cease and desist from engaging in the Questionable Business Practices.

95.   Texas courts prohibit plaintiffs from "dividing or fracturing a negligence claim" into additional causes of action, like breach of fiduciary duty. *Trousdale v. Henry*, 261 S.W.3d 221, 227 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *Isaacs v. Schleier*, 356 S.W.3d 548, 556 (Tex. App.—Texarkana 2011, pet. denied); *Duerr v. Brown*, 262 S.W.3d 63, 70 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The anti-fracturing "rule does not mean that a client is limited to pursuing only negligence causes of action[,] **but the client must do more than merely reassert the same claim for legal malpractice under an alternative label**." *Haase,* 404 S.W.3d at 82 (emphasis added).

---

[147] *Id.* at ¶ 285.
[148] *Id.* at ¶ 301.

96.     Determining whether allegations against a lawyer - labeled as breach of fiduciary duty, fraud, or some other cause of action - are actually claims for professional negligence is a question of law to be determined by the court. *Duerr v. Brown,* 262 S.W.3d 63, 70 (Tex. App. - Houston [14th Dist.] 2008, no pet.).

97.     When deciding whether an allegation states a claim for negligence or some other cause of action, courts are not bound by the plaintiff's own characterization of the pleadings. *Beck v. Law Offices of Edwin J. (Ted) Terry, Jr., P.C.,* 284 S.W.3d 416, 427-28 (Tex. App.—Austin 2009, no pet.). Courts are not bound by the labels the parties place on their claims, but must discern the real substance of the claims. *Murphy v. Gruber,* 241 S.W.3d 689, 697 (Tex. App.—Dallas 2007, pet. denied). Characterizing conduct as a "misrepresentation" does not alone transform what is really a professional negligence claim into a breach-of-fiduciary-duty claim. *Id.* "'Regardless of the theory a plaintiff pleads, as long as the crux of the complaint is that the attorney did not provide adequate legal representation, the claim is one for legal malpractice." *Kimleco Petroleum, Inc. v. Morrison & Shelton,* 91 S.W.3d 921, 924 (Tex. App. - Worth 2002, pet. denied). If the gist of a client's complaint is that the attorney did not exercise that degree of care, skill, or diligence as attorneys of ordinary skill and knowledge commonly possess, then that complaint should be pursued as a negligence claim, rather than some other claim. *Deutsch v. Hoover, Bax & Slovacek, L.L.P.,* 97 S.W.3d 179, 189 (Tex. App. - Houston Dist.] 2002, no pet.). The plaintiff must present a claim that goes beyond what traditionally has been characterized as legal malpractice. *Duerr,* 262 S.W.3d at 70.

98.     "In determining whether a breach of fiduciary duty claim exists independently from a negligence claim," courts should bear in mind that "a breach of fiduciary duty claim considers whether an attorney obtained an improper benefit from representing the client, while a negligence

claim focuses on whether the lawyer represented a client with the requisite level of skill." *Walker,* 2009 WL 3763779, at *4. Allegations that an attorney breached professional duties, standing alone, do not support an independent claim for breach of fiduciary duty. *Pineda,* 535 S.W.3d at 160. A client's dissatisfaction with an attorney's professional handling of her case or dissatisfaction with the work is a legal malpractice claim, not one for breach of fiduciary duty. *See, e.g.*, *Murphy*, 241 S.W.3d at 698-99 (failing to improperly advise, inform, and communicate with clients constituted legal malpractice, rather than breach of fiduciary duty); *Murphy v. Mullin, Hoard & Brown, L.L.P.*, 168 S.W.3d 288, 289-90 n.1 (Tex. App.—Dallas 2005, no pet.) (negligent review and drafting of documents coupled with failure to timely inform clients of defects in documents raises claim for legal malpractice.).

99.     Plaintiff's negligence and breach of fiduciary claims are one in the same. Both claims allege that Brown failed to fully advise Alliance about the Questionable Billing Practices.[149] Plaintiff did not plead any allegations that do not involve whether Brown's alleged or omissions met the standard of care. Further, Plaintiff failed to plead any allegations of "self-dealing, deception, or misrepresentations that go beyond the mere negligence allegations in a malpractice action" that are required to properly plead a breach of fiduciary duty claim against an attorney. Based on the identical allegations, Count II should be dismissed pursuant to the anti-fracturing doctrine because Plaintiff's fiduciary duty claim against Brown is simply a recast claim for legal malpractice.

100.     Plaintiff's breach of fiduciary duty claim should also be dismissed based on lack of proximate cause and no damages for the same reasons stated above for the negligence claim.

---

[149] *Id.* at ¶¶ 285, 301.

## C.  Plaintiff fails to state a claim for statutory contribution (Count III)

101.    Plaintiff asserts a statutory contribution claim against Brown under Chapter 33 of the Texas Civil Practice and Remedies Act.[150] A claim for contribution is essentially a defendant's claim for reimbursement if that defendant pays more than its apportioned share of damages to a claimant. Section 33.016(a) provides: "In this section, 'contribution defendant' means any defendant, counter-defendant, or third-party defendant from whom any party seeks contribution with respect to any portion of damages for which that party may be liable, but from whom claimant seeks no relief at the time of submission." Section 33.016(b) defines who may assert contribution claims and when, under what circumstances, contribution claims may be brought. The provision provides:

> Each liable defendant is entitled to contribution from each person who is not a settling person and **who is liable to the claimant** for a percentage of responsibility but from whom the claimant seeks no relief at the time of submission. A party may assert this contribution right against any such person as a contribution defendant in the claimant's action." (emphasis added).

102.    Section 33.011(3) defines who may be a "liable defendant," stating "liable defendant means a defendant against whom a judgment can be entered to at least a portion of the damages awarded to the claimant." Thus, contribution is dependent upon shared liability to a common plaintiff; in this case, the Test Strip Manufacturers. That is, Alliance's right to contribution from Brown is derivative of the Test Strip Manufacturers' right to recover damages from Brown. As this Court stated in *In re Today's Destine*, "[u]nder a derivative principle, a Trustee cannot assert a contribution claim if the injured party could not assert a claim against the party against whom the Trustee is seeking contribution." *In re Today's Destiny, Inc.*, 388 B.R. 737, 763 (Bankr. S.D. Tex. 2008). Consequently, if the injured party's claim is dismissed or

---

[150] *Id.* at ¶ 306.

otherwise defeated by an affirmative defense, the Trustee cannot assert a contribution claim. *Shoemake v. Fogel, Ltd.*, 826 S.W.2d 933, 935 (Tex. 1992).

103.     To establish a right to contribution from Brown, Plaintiff must establish all elements of a cause of action invoking liability of Brown to the Test Strip Manufacturers. Plaintiff does not properly plead any viable causes of action the Test Strip Manufacturers would have against Brown. Instead, Plaintiff merely states that Alliance and Brown were "joint tortfeasors in negligently, recklessly, and/or intentionally defrauding the Test Strip Manufacturers in respect of the Questionable Business Practices, and for the other wrongful acts and omissions as described herein."[151] To the extent Plaintiff refers to the representation-based claims it asserts against Brown, as assignee of the Test Strip Manufacturers, in Counts IV and V, the contribution claim fails for the same of reasons those assigned claims fail, as discussed below. Further, Plaintiff fails to plead that it settled with the Test Strip Manufacturers or is obligated to pay any claim based on a judgment in favor of the Test Strip Manufacturers. For all these reasons, Plaintiff's Complaint fails to state a claim for statutory contribution against Brown.

**D.  Plaintiff, as Assignee of the Test Strip Manufacturers, fails to state a claim for negligent and/or fraudulent misrepresentation or aiding and abetting the same (Counts IV and V).**

104.     Plaintiff asserts a claim for negligent and/or fraudulent representation or aiding and abetting the negligent and/or fraudulent representation,[152] as assignee of the Test Strip Manufacturers' claims.

**1.  The representation-based claims are barred by the attorney immunity doctrine.**

105.     Generally, an attorney cannot be held liable to a third party for conduct that requires "the office, professional training, skill, and authority of an attorney." *Miller v. Stonehenge/Fasa-*

---

[151] *Id.* at ¶ 33.
[152] Count IV is contradictory in which claim the Trustee is bringing.

*Texas JDC, LP*, 993 F. Supp., 461, 464 (N.D. Tex. 1998). Incorrect, meritless, and even frivolous conduct is not actionable if it satisfied this standard. *Id.* Under Texas law, an attorney may be liable for injuries to parties when his or her conduct is "foreign to the duties of an attorney." *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477 (Tex. 2015). In *Cantey Hanger*, the Texas Supreme Court explained that attorney immunity turns on the kind – and not the nature – of the attorney's conduct. The court held that attorney immunity applies to any acts taken within the scope of client representation, so long as those acts are not foreign to the duties of an attorney. The court further states that "[m]erely labeling an attorney's conduct 'fraudulent' does not and should not remove it from the scope of client representation or render it 'foreign to the duties of an attorney.'" This is because "[a]n attorney is given latitude to 'pursue legal rights that he deems necessary and proper' precisely to avoid the inevitable conflict that would arise if he were 'forced constantly to balance his own potential exposure against his client's best interest.'" *Id.*; *see also Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("Absent any allegation that Crain Caton committed an independent tortious act or misrepresentation, we decline Alpert's invitation to expand Texas law to allow a non-client to bring a cause of action for aiding and abetting a breach of fiduciary duty based on the rendition of legal advice to an alleged tortfeasor client.").

### 2. Plaintiff fails to plead facts of any negligent and/or fraudulent misrepresentation by Brown.

106.     An essential element of both negligent misrepresentation and fraud causes of action is a false statement of fact by one party (here, Brown) to another (here, the Test Strip Manufacturer) on which the other relied. The Complaint does not identify a single communication between Brown and the Test Strip Manufacturers, much less any false representation made to them by Brown. The referenced communications are all between Alliance and insurers, not with the Test Strip

Manufacturers. The Test Strip Manufacturers cannot assert fraud claims based on statements Alliance, not Brown, may have made to parties other than the Test Strip Manufacturers.

107.    To the extent the Test Strip Manufacturers allege that Brown made a representation to Alliance which then made a representation to the Test Strip Manufacturers, that claim is likewise deficient. To establish such claim, Plaintiff must plead facts that (i) Brown was aware of the Test Strip Manufacturers and intended that the Test Strip Manufacturers rely on Brown's representation, and (ii) the Test Strip Manufacturers justifiably relied on Brown's representation of material fact. *McCamish, Martin, Brown & Loeffler v. F.E. Appling* Interests, 991 S.W.23d 787, 793-94 (Tex. 1999); *Bank of Texas, N.A. v. Ravkind*, 2013 WL 1281860, at *3 (Tex. App.—Dallas Mar. 12 2013, no pet.) (mem. op.) (holding there was no evidence that attorney intended for verification of deposit form to reach the specific bank that relied on it); *Wright v. Sydow*, 173 S.W.3d 534, 554 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (stating that "nonclient cannot rely on attorney's misrepresentations unless attorney invites that reliance."). Plaintiff's Complaint is devoid of any facts on either of the two bases for a non-client to bring a negligent misrepresentation claim against an attorney.

108.    Even if Plaintiff's claim is one for aiding and abetting, rather than a direct misrepresentation, the claim still fails. Participatory liability for aiding and abetting generally requires that the defendant must act with unlawful intent and give substantial assistance and encouragement to a wrongdoer in a tortious act. *West Fork Advisors*, 437 S.W.3d at 921. Plaintiff pleads no facts that support the intent element of an aiding or abetting claim or a fraud claim.

109.    Because Plaintiff fails to plead facts of the essential elements of its negligent misrepresentation and fraud claim, it should be dismissed.

### 3. Plaintiff fails to plead its negligent/fraudulent misrepresentation claim with particularity.

110.    Plaintiff fails to plead facts of any alleged negligent[153] or fraudulent misrepresentation by Brown under the heightened pleading standard of Rule 9(b). Plaintiff's conclusory allegations fall short of the requirements of Rule 9(b). In Counts IV and V, Plaintiff does not identify a single statement made by Brown, when it was made, to whom it was made, the contents of the statement, and why the statement was fraudulent. Because Plaintiff fails to meet the specific pleading requirements of Rule 9(b), Counts IV and V should be dismissed.

### E. Plaintiff, as Assignee of the Test Strip Manufacturers, fails to state a claim for conspiracy to violate federal RICO.

111.    Plaintiff alleges various elements of this Federal Racketeer Influenced and Corrupt Organizations Act ("RICO") claims against Alliance (as described in paragraph 65 of the Complaint, which includes the numerous entities referenced in footnote 5[154]) and the Scheme Participants[155] Thereafter, Plaintiff alleges the RICO claims as to Brown, as follows:

> 347.    Brown was associated with the Alliance enterprise described above, and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through the pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962(d).[156]

112.    As shown below, the factual allegations in the Complaint fail to show Brown "agreed and conspired to violate 18 U.S.C. § 1962(c)," or "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). On the contrary, the factual allegations vindicate Brown.

---

[153] The Fifth Circuit has applied Rule 9(b) to negligent misrepresentation claims when based upon the same factual allegations as a fraud claim. *WMX Techs, Inc.*, 112 F.3d at 177.
[154]  Complaint at ¶ 340.
[155] *Id.* at ¶¶ 341-346.
[156] *Id.* at ¶ 347.

113.     In its simplest terms, subsection c states, "a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity." *Crowe v. Henry*, 43 F.3d 198, 203 (5th Cir. 1995). The *Crowe* court also explained that:

> any RICO claim necessitates "1) a person who engages in 2) a pattern of racketeering activity, 3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir.1988); cert. denied, 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989) (emphasis in original). See also, *Calcasieu Marine Nat. Bank v. Grant*, 943 F.2d 1453, 1461 (5th Cir.1991).

*Id.* at 204. The meaning of "person" was also clarified follows:

> The statute defines the RICO person as including "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. Sec. 1961(3). This is a very broad definition. However, this Court has recognized that if we are to restrict RICO to the type of conduct that Congress intended to proscribe, the RICO person must be ***one that either poses or has posed a continuous threat of engaging in acts of racketeering.... The continuous threat requirement may not be satisfied if no more is pled than that the person has engaged in a limited number of predicate racketeering acts***.

*Crowe*, 43 F.3d at 204 (emphasis added).

114.     Plaintiff's factual allegations fail to show Brown is a person under *Crowe*, or that Brown conducted the "affairs of the enterprise through a pattern of racketeering activity."

115.     For the most part, Plaintiff's allegations against Brown are simply a recitation of the statute. For example, Plaintiff alleges "Brown was associated with the Alliance enterprise . . . and agreed to conspire to violate 18 U.S.C. §1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through the pattern of racketeering activity described herein . . . ."[157] Plaintiff alleges no facts of any purported agreement between Alliance and Brown, much less when the agreement was made, what lawyers at Brown

---

[157] *Id.* at ¶ 347.

were parties to the agreement, and the contents of any such agreement. Plaintiff devotes two conclusory sentences of Brown's alleged "overt acts in furtherance of the conspiracy."[158]

116.    First, Plaintiff alleges "Brown advised the Alliance enterprise to conceal its scheme from PBMs by stonewalling their requests for information and altering documents they requested."[159] Plaintiff does not explain what "stonewalling" was done and by which lawyers at Brown. Plaintiff presumably refers to Alliance's communications with Brad Howard in connection with the October 2011 audit by CVS Caremark and the redacted invoices Alliance provided or may have provided to CVS Caremark. Of course, by Plaintiff's own admission, Brown did not know that Alliance's practices were illegal at that time since that determination was not made until December 2012.[160] Therefore, Brown did not have the knowledge of any "scheme," much less how or why it would need to be concealed from PBMs. The fact that Howard communicated with Alliance about whether to redact certain information on invoices, in and of itself, is not an overt act by Brown in furtherance of an alleged conspiracy, much less that any facts Howard (or another Brown lawyer) posed a continuous threat of engaging in racketeering.

117.    Second, Plaintiff alleges Brown "helped the Alliance enterprise further its scheme by advising Alliance to omit truthful disclosures about the nature of its business to pharmacies Alliance sought to acquire."[161] Again, there are no facts plead that Brown knew the intricacies of Alliance's scheme, much less any intent by Brown that its advice to Alliance was in furtherance of any scheme. This portion of Count VI is devoid of any specific factual allegations pertaining to Brown. Plaintiff appears to refer to the communications between Jeffrey Baird and Alliance about Alliance's planned expansion through third party owned pharmacies.

---

[158] *Id.*
[159] *Id.*
[160] *Id.* at ¶¶ 82-85
[161] *Id.*

118.   In July 2013, Alliance advised Brown it was expanding the use of third-party pharmacies to expand its Questionable Business Practices. Jeffrey Baird responds on July 30, 2013, advising Alliance and the Bennett law firm in Utah that the planned expansion through "third party owned pharmacies" is fraught with serious liability issues, as follows:

127.   A few days later, on July 30, 2013, Baird sent Alliance and Bennett a memo on Alliance's "Interim Business Model/Permanent Business Model." The memo noted, inter alia:

- The "issue" of "retail contracts vs. mail order contracts" will still exist "assum[ing] that a pharmacy (to which [Alliance] provides services signs a contract with a PBM in which the pharmacy represents that almost all of its sales of diabetic testing supplies is 'over-the-counter'" though "most of the pharmacy's sales are, in fact, mail-order."

- ***Submission of inventory that is "restricted use" could result in liability***, especially if the "pharmacy's claims include NDCs that are different than the NDCs initially assigned to the 'restricted use' inventory." ***Such submissions could constitute "unprofessional conduct/unlawful conduct," and may violate Utah's proscription against "procurement of a drug by fraud, deceit, misrepresentation or subterfuge or concealment of a material fact.***[162]

Once again, nothing improper here.

119.   On August 14, 2013, Baird advised to not "take a secured note from [the new pharmacy] in which the collateral securing the note equals 5% or more of the value of [the new pharmacy's] assets" (Doc. 1, p. 37, ¶ 131), to maintain proper independence from new third party pharmacies. Baird concludes his advice writing: "My advice is for the Ingram Entity not to give this disclosure. My advice is for the Ingram Entity (i) to inform [the new pharmacy] regarding its obligations/representations under its PBM contracts and (ii) to inform [the new pharmacy] of its obligations to correctly bill the commercial insurers."[163] Thus, Baird advises the pharmacies be told to comply with the PBM contracts and correctly bill the commercial insurers, which is proper, as

---

[162] *Id.* at ¶ 127 (emphasis added).
[163] *Id.* at ¶ 132.

compared to Alliance's proposed disclosure that perpetuates the Questionable Business Practices, as follows:

> most of the contracts that the Pharmacy will enter into with PBMs prohibit all mail order fulfillment of prescriptions. Rather, such contracts require that the contracting pharmacy fill and sell prescriptions via a retail, storefront location. However, as contemplated, most, if not all, of the Pharmacy's business will be through mail order fulfillment. In addition, it is contemplated that the Pharmacy will bill the patient's insurance under the retail pharmacy benefit but ship mail order diabetic testing supplies nationwide to the patients. Due to such contemplated practices of the Pharmacy, it is possible that a PBM may terminate its relationship with the Pharmacy and seek contractual and other remedies against the Pharmacy.[164]

120.    Notwithstanding Baird's advice, when the new plan was implemented, Alliance included the following disclosure that perpetuated the Questionable Business Practices:

> "Acknowledgment of Purchaser:" "Such companies may purchase and ship diabetic testing supplies labeled with a mail order NDC but bill the patient's insurance for such diabetic testing supplies under a retail pharmacy NDC, which practices may subject such companies or their owners to criminal liability."[165]

Baird responded the same day addressing Smith and copying the Alliance and Bennett Tueller teams, stating:

> this "section of the [agreement] should be removed entirely. As we have stated before, *it is not appropriate to include a discussion of potentially-improper business practices in any of the transaction documents*. If anything, *the documents should state that the pharmacy is required to comply with state and federal laws, as well as PBM contract provision.*[166]

121.    Thus, Brown continuously provides proper legal advice to steer Alliance away from Questionable Business Practices, but Alliance chooses to ignore it.

122.    Without the necessary factual allegation to properly pled a RICO claim, Count VI must be dismissed.  "'[B]ecause the core of a RICO civil conspiracy is an agreement to commit

---

[164] *Id.*
[165] *Id.* at ¶ 135.
[166] *Id.* at ¶ 137 (emphasis added).

predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement.' *Tel-Phonic*, 975 F.2d at 1140 (*citing Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25 (2d Cir.1990))." *Crowe v. Henry,* 43 F.3d 198, 206 (5th Cir. 1995). In this regard, Plaintiff's allegations fall short, in the same fashion as the allegations against the defendants in *Crowe*. "While Crowe has pled the conclusory allegation that the defendants herein 'conspired,' nowhere does he allege facts implying any agreement to commit predicate acts of racketeering. Therefore, Crowe's claim under 18 U.S.C. Sec. 1962(d) must also fail." *Crowe,* 43 F.3d at 206. Brown therefore requests that Plaintiff's Count VI be dismissed.

## VI.    <u>Prayer</u>

Plaintiff has affirmatively demonstrated that he cannot state claims against Brown which makes repleading futile. For this and based on the foregoing, Defendant Brown & Fortunato, PC requests the Court to grant this Motion, dismiss Plaintiff's causes of action against Brown with prejudice, and for such further relief to which it may be entitled.

Respectfully submitted,

Gordon Rees Scully Mansukhani LLP

By:  */s/ Megan M. Adeyemo*
    Megan M. Adeyemo (TX Bar No.: 24099595)
    Annie C. Matthews (TX Bar No.: 24115058)
    2200 Ross Avenue, Suite 3700
    Dallas, Texas  75201
    Telephone:  (214) 231-4726
    madeyemo@grsm.com
    amatthews@grsm.com
    Christopher M. Raney (TX Bar No.: 24051228)
    Mark Thayer (TX Bar No.: 19826050)
    1900 West Loop South, Suite 1000
    Houston, Texas 77027
    Telephone: (713) 490-4823
    craney@grsm.com
    mthayer@grsm.com

Attorneys for Defendant Brown & Fortunato, P.C.

## CERTIFICATE OF SERVICE

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served this 20th day of December 2021, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5.

By: */s/ Megan M. Adeyemo*
    Megan M. Adeyemo