United States Bankruptcy Court
Southern District of Texas
**ENTERED**
June 27, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § § | CASE NO: 17-32186 |
| UPLIFT RX, LLC, *et al.*, | § § | CHAPTER 11 |
| Debtors. | § § | |
| MARK SHAPIRO, | § § | |
| Plaintiff, | § § | |
| VS. | § § | ADVERSARY NO. 21-3936 |
| BROWN & FORTUNATO, P.C., | § § | |
| Defendant. | § § | |

### REPORT & RECOMMENDATION TO WITHDRAW REFERENCE

The parties seek the District Court's withdrawal of this adversary proceeding's referral to the Bankruptcy Court. Through this adversary proceeding, Mark Shapiro, Trustee of the Alliance Health Liquidating Trust, accuses Brown & Fortunato, P.C., Alliance's former outside counsel, of aiding and abetting Alliance's fraudulent business practices. The Trustee's claims arise predominately under non-bankruptcy law and are accompanied by jury rights. Rather than consent to this Court's resolution of the Trustee's claims, the parties exercised their rights to request a recommendation from this Court urging the District Court to withdraw this proceeding's reference.

The Trustee asserts primarily non-core claims, all with accompanying jury rights, against Brown & Fortunato. The District Court offers a more appropriate forum for those claims' *final* resolution. And the claims' final resolution before the District Court will not hinder the administration of Alliance's bankruptcy case. The Court recommends that the District Court withdraw the reference.

## BACKGROUND

Alliance Medical Holdings, LLC and its affiliate debtors[1] owned and operated a national network of retail pharmacies. (Case No. 17-32186, ECF No. 6 at 6–7). Within 10 years of its incorporation, Alliance's success earned it national recognition as one of America's fastest-growing companies. (Case No. 17-32186, ECF No. 6 at 6). When it filed bankruptcy, Alliance's annual revenue exceeded $150 million. (Case No. 17-32186, ECF No. 6 at 8). In early 2017, the FBI stopped Alliance's growth in its tracks. (Case No. 17-32186, ECF No. 6 at 8). The FBI executed search warrants on Alliance, freezing Alliance's assets and business. (Case No. 17-32186, ECF No. 6 at 8). This raid precipitated Alliance's collapse as its banks declared Alliance in default under the terms of Alliance's loan obligations. (Case No. 17-32186, ECF No. 6 at 8). Within months, Alliance was in chapter 11 bankruptcy.

### *Alliance's "Questionable Business Practices"*

A Department of Justice inquiry into Alliance's purchase of "secondary market diabetic testing strips" led to the FBI raid. (Case No. 17-32186, ECF No. 1085 at 8). According to the Trustee, the DOJ investigated Alliance because Alliance defrauded insurance companies and testing strip manufacturers by reselling mis-identified diabetic testing strips. (ECF No. 1 at 4–5, 17–18).

In the diabetic testing strip industry, a patient's insurance generally dictates the price at which testing strips are sold. (ECF No. 1 at 14). Some patients use a "pharmacy benefit" to cover the cost of testing strips; others rely on a "durable medical benefit" (DME) to offset costs. (ECF No. 1 at 14). Testing strips covered by pharmacy benefits are sold to patients through retail pharmacies and may be sold to anyone (including patients without insurance). (ECF No. 1 at 14).

---

[1] More than 50 other entities filed for bankruptcy along with Alliance Medical Holdings, LLC (collectively, "Alliance"). (ECF No. 29 at 1 n.1).

In contrast, patients relying on a DME generally purchase testing strips from distributors specializing in DME-intended testing strips. (ECF No. 1 at 14). These distributors purchase DME strips under contracts with manufacturers. (ECF No. 1 at 14). DME testing strip packaging, specifically, includes a label indicating the strips are not intended for retail sale. (ECF No. 1 at 14–15).

Insurers reimburse retail pharmacies, like those Alliance operated, for strips sold to patients with pharmacy-benefit insurance. (ECF No. 1 at 14–15). Manufactures then pay rebates to pharmacy-benefit insurers under the insurers' contracts with manufacturers. (ECF No. 1 at 15). DME insurers reimburse DME strip distributors for testing strips sold to patients with DME insurance. (ECF No. 1 at 15). Manufacturers sell DME strips at a much lower price than pharmacy-benefit strips (between $30 and $50 less than pharmacy-benefit strips), but do not rebate distributors or insurers for DME strips sold. (ECF No. 1 at 14–15). Manufacturers' revenue for both DME and pharmacy-benefit strips is about $20 per package. (ECF No. 1 at 14–15).

In addition to packaging and pricing differences, testing strips intended for purchase with different insurance benefits have different National Drug Codes (NDC). (ECF No. 1 at 15). Insurers reimburse testing strip sellers (*e.g.,* pharmacies or DME distributors) based on the NDC the seller reports to the insurer. (ECF No. 1 at 16). That is, insurance plans cover specific NDCs; if an NDC is not covered by a plan, the insurer will not reimburse the seller. This reporting process is called adjudication. (ECF No. 1 at 15–16). Accuracy in the adjudication process is critical in the testing strip industry because pharmacy-benefit strips are reimbursed (or rebated) at different rates than DME strips. (ECF No. 1 at 14–15).

The Trustee alleges that Alliance entities purchased DME strips on the "gray market." (ECF No. 1 at 25). Alliance chose to purchase DME strips because of their lower cost. (ECF No.

1 at 25). But, to maximize its profits, Alliance did not sell the DME strips to patients with DME insurance. (ECF No. 1 at 12, 25). Instead, Alliance sold the DME strips through its retail pharmacies to patients with pharmacy-benefit insurance. (ECF No. 1 at 12, 25). When it came time to adjudicate claims for the sales, Alliance reported NDCs for pharmacy-benefit strips to insurers. (ECF No. 1 at 26). Alliance's inaccurate reporting caused insurers to reimburse Alliance for the DME strips as if Alliance had sold pharmacy-benefit strips. (ECF No. 1 at 26). Alliance thus received a significant profit on the DME strips it sold because Alliance received higher pharmacy-benefit reimbursements. (ECF No. 1 at 41).

### *The Trustee's Claims*

The Trustee asserts claims arising from Alliance's DME scheme against Alliance's lawyers, Brown & Fortunato, P.C. (the "Law Firm"). The Law Firm began representing Alliance in mid-2010. (ECF No. 1 at 18). The Trustee alleges the Law Firm knew of Alliance's scheme from the beginning of the Law Firm's representation. (ECF No. 1 at 18). Because the Law Firm knew of Alliance's questionable business model, the Trustee argues the Law Firm was obliged to immediately withdraw from its representation. (ECF No. 1 at 23). The Law Firm's failure to withdraw serves as the basis for the Trustee's claims.

Further, the Trustee asserts that the Law Firm actively aided and abetted Alliance's wrongful conduct. (*See* ECF No. 1 at 69–70). The Trustee claims that the Law Firm's communications with Alliance indicate the Law Firm knew of Alliance's plan to set up independent pharmacies to "circumvent the legal obligations" imposed by Alliance's contracts with insurers. (ECF No. 1 at 33–34). The Trustee also accuses the Law Firm of advising Alliance to restrict the disclosure of its business model to independent-pharmacy investors. (ECF No. 1 at 37–39, 50–51). The Law Firm also allegedly assisted Alliance in covering up its questionable

practices during audits conducted by testing strip manufacturers, distributors, and insurers. (ECF No. 1 at 41–50).

The Law Firm's allegedly wrongful conduct underlies the Trustee's eight claims against the Law Firm:[2]

(1) *Professional Negligence and Legal Malpractice* based on the Law Firm's failure to adequately advise Alliance about the illegality and risks associated with Alliance's questionable business practice, (ECF No. 1 at 77–78);

(2) *Aiding and Abetting Breach of Fiduciary Duty* based on the Law Firm's failure to adequately advise Alliance's officers and directors that Alliance's business practices were illegal, which led Alliance's officers and directors to breach their fiduciary duties to Alliance, (ECF No. 1 at 78–83);

(3) *Contribution* resulting from Alliance's and its senior management's liability for "negligently, recklessly, and/or intentionally defrauding Test Strip Manufacturers," which the Law Firm facilitated, (ECF No. 1 at 83–84);

(4) *Aiding and Abetting Negligent and Fraudulent Misrepresentation* based on Alliance's submission of false and misleading statements to pharmacy-benefit insurers to secure reimbursement for testing strips sold, (ECF No. 1 at 84–85);[3]

(5) *Fraud (Including Aiding and Abetting Fraud and Conspiracy to Commit Fraud)* based on Alliance's "knowing[] and intentional[]" sale of DME strips as pharmacy-benefit strips as a means of increasing profits through increased insurance reimbursements, from which the Law Firm allegedly benefited, (ECF No. 1 at 86–88);

(6) *Conspiracy to Violate Federal RICO* based on the Law Firm's alleged participation in Alliance's "enterprise" of "racketeering activity" (*i.e.,* Alliance's "scheme" to defraud manufacturers and insurers through the sale of mis-identified testing strips), (ECF No. 1 at 88–92);

(7) *Avoidance of Avoidable Transfers* under 11 U.S.C. §§ 544, 548, and 550 based on the Law Firm's receipt of legal fees for its representation of Alliance because that representation was allegedly deficient (*i.e.,* not of reasonably equivalent value), (ECF No. 1 at 92–93); and

---

[2] The Trustee alleges his claims arise under Texas, Utah, or federal law. (ECF No. 1 at 77–78, 83, 88).

[3] The Trustee does not specify how the Law Firm aided and abetted Alliance's submission of false and misleading information. (*See* ECF No. 1 at 84–85).

(8) *Turnover and Disgorgement of Fees* paid to the Law Firm between 2012 and the petition date under 11 U.S.C. § 542 based on the "faithless servant doctrine," (ECF No. 1 at 93–94).

The Trustee requests a jury trial on all issues and explicitly disclaims his consent to a jury trial before the Bankruptcy Court. (ECF No. 1 at 94).

The Law Firm responded to the Trustee's Complaint with a Motion to Dismiss. There, the Law Firm argues that the Trustee's Complaint makes clear the Law Firm upheld its legal and ethical obligations by continuously informing Alliance that its business practices were illegal. (ECF No. 20 at 8). The Law Firm asserts that Alliance continuously ignored the Law Firm's advice. (ECF No. 20 at 8). In the Law Firm's estimation, the Trustee's suit is simply an attempt to shift the blame for Alliance's wrongful conduct. (ECF No. 20 at 8). Primarily, the Law Firm seeks dismissal by arguing that the Trustee fails to state a claim on which relief can be granted. (ECF No. 20 at 9–11).

### *Proceedings Thus Far*

Along with its Motion to Dismiss, the Law Firm filed a "Motion for Withdrawal of Reference." (ECF No. 22). The Trustee responded to the Motion to Dismiss and the Motion for Withdrawal. (ECF Nos. 29, 31). The Trustee does not oppose the Law Firm's request for withdrawal of the reference, but requests that such withdrawal be conditioned on this Court's retention of the proceeding for all pre-trial matters. (ECF No. 29 at 2).

The Court held a hearing on both the Motion to Dismiss and the Motion for Withdrawal of Reference. Before that hearing, the parties submitted a proposed "Agreed Order on Defendant's Motion to Withdraw the Reference." (ECF No. 40). The Agreed Order purported to grant the Law Firm's Motion for Withdrawal but limited that withdrawal to a trial on the Trustee's claims. (ECF No. 40 at 1). At the hearing, the Court informed the parties it could not direct the District

Court to withdraw this proceeding's referral to the Bankruptcy Court. (ECF No. 45 at 5:18–23). The Court assured the parties it would take the Law Firm's Motion for Withdrawal under advisement and issue an appropriate report and recommendation to the District Court. (ECF No. 45 at 74:17–19).

Aside from issuing a report and recommendation on the Motion for Withdrawal, the Court abated this proceeding pending a decision on the Motion for Withdrawal. (ECF No. 45 at 74:17–19). Still, the parties elected to proceed with oral argument on the Motion to Dismiss. (ECF No. 45 at 7:25–8:7).

## JURISDICTION

The District Court derives its jurisdiction over this proceeding from 28 U.S.C. § 1334(b). This proceeding was referred to this Court under General Order 2012-06 consistent with 28 U.S.C. § 157(a). The majority of the Trustee's claims are not "core" proceedings identified in § 157(b)(2). Here, the parties seek the District Court's withdrawal of this proceeding. Section 157(d) commits to the District Court the decision to withdraw a bankruptcy proceeding. 28 U.S.C. § 157(d) (2020); Fed. R. Bankr. P. 5011(a). Hence, the Court may only issue a report and recommendation to the District Court about whether this proceeding should be withdrawn.

## DISCUSSION

The nature of the Trustee's claims warrants withdrawal. District courts may refer bankruptcy cases and bankruptcy-related proceedings to bankruptcy judges. 28 U.S.C. § 157(a). An ability to withdraw these references complements district courts' referral power. § 157(d).

Section 157(d) provides parties with a mechanism to request a bankruptcy reference's withdrawal. *Id.*

Section 157(d) requires the District Court to withdraw some proceedings and affords the District Court discretion to withdraw other proceedings. *Id.* The District Court *must* withdraw proceedings (1) that involve "a substantial and material question of both Title 11 and non-Bankruptcy Code federal law," (2) in which "the non-Code federal law has more than a de minimis effect on interstate commerce." *Benjamin v. United States (In re Benjamin)*, No. 17-33255, 2021 WL 3861615, at *2 (Bankr. S.D. Tex. Apr. 30, 2021) (quoting *U.S. Gypsum Co. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 145 B.R. 539, 541 (N.D. Tex. 1992)) (internal quotation marks omitted).

The District Court *may* withdraw proceedings "for cause." *Id.* at *3 (citing *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 999 (5th Cir. 1985)). The existence of "cause" for withdrawal depends on six considerations: "(i) promoting uniformity in bankruptcy administration; (ii) reduction of forum shopping and confusion; (iii) economical use of debtors' and creditors' resources; (iv) expediting the bankruptcy process; (v) the presence of a jury demand; and (vi) core versus non-core matters." *Id.* (citing *Holland*, 777 F.2d at 999). The most important consideration is whether the matters referred are core or non-core. *S. St. Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755, 762 (2d Cir. 1996).

### A.  Mandatory Withdrawal

The Law Firm argues that this proceeding must be withdrawn because the Trustee's RICO claim presents "substantial and material questions" of non-bankruptcy federal law. The Trustee disagrees with the Law Firm's application of the "substantial and material" standard. (ECF No. 29 at 7–8). According to the Trustee, his RICO claim does not present "substantial and material

questions" because its resolution requires only a "mere application" of non-bankruptcy law.  (ECF No. 29 at 8).

Claims that present "substantial and material questions" of non-bankruptcy federal law require an interpretation of the federal law, not a "mere application."  *Benjamin*, 2021 WL 3861615, at *2 (quoting *In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 954 (7th Cir. 1996)) (internal quotation marks omitted); *see also Levine v. M & A Custom Home Builder & Developer, LLC*, 400 B.R. 200, 203 (S.D. Tex. 2008) (Rosenthal, J.) ("Courts generally interpret the mandatory withdrawal provision restrictively, granting withdrawal of the reference when the claim and defense entail material and substantial consideration of non-Bankruptcy Code federal law."). Novelty alone does not present a "substantial and material" question of non-bankruptcy law. *Vicars Ins.*, 96 F.3d at 954.

The Trustee's RICO claim requires only a straight-forward application of federal law.  The Law Firm offers no argument or authority contrary to that conclusion.  (ECF No. 22 at 4–5). Because the Trustee's action does not require a resolution of "substantial and material questions" of federal non-bankruptcy law, 28 U.S.C. § 157(d) does not mandate this proceeding's withdrawal. *See Benjamin*, 2021 WL 3861615, at *3 (concluding that the district court was not required to withdraw a proceeding because the Court did not need to "interpret federal non-bankruptcy law or undertake [a] complicated analysis of unresolved [federal] regulations").

### B.    Permissive Withdrawal

The parties agree that permissive withdrawal is appropriate.  Additionally, the parties request that the Bankruptcy Court retain this proceeding until the time of trial. (ECF No. 40 at 1–2).  However, the decision to withdraw this reference, as well as the timing of withdrawal are

decisions committed to the District Court. 28 U.S.C. § 157(d); FED. R. BANKR. P. 5011(a). Here, withdrawal of the reference is appropriate.

The six consideration that guide the withdrawal decision are: (1) "whether the proceeding is core or non-core;" (2) whether the parties are entitled to a jury trial; (3) "reducing forum shopping;" (4) "promoting uniformity in the bankruptcy administration;" (5) "conservation of the debtors' and creditors' resources;" and (6) "expediting the bankruptcy process." *Benjamin*, 2021 WL 3861615, at *3.

### 1. *The Trustee Asserts Mostly Non-Core Claims*

Of the eight claims alleged in the Trustee's Complaint, only two are core matters under 28 U.S.C. § 157(b)(2). (ECF No. 1 at 77–94). The Trustee's avoidance claim is core under § 157(b)(2)(F). The Trustee's disgorgement claim is core, at least in part, under § 157(b)(2)(E). The remaining claims arise under Utah, Texas, or federal non-bankruptcy law, and they do not arise from bankruptcy rights or implicate the bankruptcy process. *See Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."). The Court could not statutorily enter a final order disposing of these remaining claims. 28 U.S.C. § 157(c). Because non-core matters predominate this adversary proceeding, withdrawal is appropriate. *Morrison v. Amway Corp. (In re Morrison)*, 409 B.R. 384, 392 (S.D. Tex. 2009) ("Though the complaint may present both core and non-core claims, the Court finds that the core versus non-core permissive withdrawal factor favors

withdrawal. . . . Even if the core claims are asserted, they will likely be claims for legal fees that will be ancillary to resolution of Plaintiffs' non-core claims.").

        2.     *The Trustee Demanded a Jury Trial on all Claims*

The Trustee included a demand for a jury trial in the Complaint, and disclaimed consent to a bankruptcy court trial of the Trustee's claims. (ECF No. 1 at 94). The Law Firm does not challenge the Trustee's jury demand and asserts its own right to a jury trial on each of the Trustee's claims, except the avoidance claims. (ECF No. 22 at 8).

A jury right attaches to "controvers[ies]" that seek enforcement of statutory rights that arise from common-law analogues. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989); *see also Levine,* 400 B.R. at 205 (Rosenthal, J. adopting the bankruptcy court's report and recommendation to withdraw reference). A suit at common law generally involved the assertion of "legal rights," as opposed to "equitable rights." *Granfinanciera*, 492 U.S. at 42. An attendant monetary remedy "strongly indicates" that a claim is legal, not equitable, in nature and accompanied by a jury right. *Arena Energy, LP v. W&T Offshore, Inc. (In re Arena Energy, LP)*, No. 20-34215, 2021 WL 8016713, at *4 (Bankr. S.D. Tex. Apr. 27, 2021) (citing *Levine*, 400 B.R. at 205). Moreover, a jury right may attach to actions arising under the Bankruptcy Code, if those actions are based on common-law rights—specifically, preference and fraudulent transfer actions. *Granfinanciera*, 492 U.S. at 43, 49.

Here, the Trustee seeks monetary relief, as opposed to equitable relief, on each of his claims. The claims arise from legal rights rather than equitable rights. A jury right attaches to most, if not all, of the Trustee's claims. *See Curtis v. Loether*, 415 U.S. 189, 196 n.11 (1974) ("[I]f this legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact."). The Trustee's and the Law Firm's entitlement

to a jury trial supports withdrawal of this adversary proceeding's reference. *Arena*, 2021 WL 8016713, at *5.

### 3. There is No Evidence of Forum Shopping

The request for withdrawal is not an attempt to find "a more favorable decision maker." *Id.* (quoting *Veldekens v. GE HFS Holdings, Inc.*, 362 B.R. 762, 769 (S.D. Tex. 2007)). Instead, the request is simply aimed at streamlining this dispute's resolution, as this Court is unable to finally adjudicate the majority of the Trustee's claims. A risk of forum-shopping does not undermine the request for withdrawal.

### 4. The Remaining Considerations Suggest Withdrawal is Appropriate

The remaining considerations focus on how this proceeding's withdrawal could affect the uniform and efficient administration of Alliance's bankruptcy.

The Court's familiarity with the main bankruptcy case and its underlying facts suggests that the Court's retention of this proceeding will promote uniformity. *Arena*, 2021 WL 8016713, at *5 (quoting *Johnson v. Williamson (In re British Am. Props. III, Ltd.)*, 369 B.R. 322, 327 (Bankr. S.D. Tex. 2007)) ("If a bankruptcy court is already familiar with the facts of the underlying action, then allowing that court to adjudicate the proceeding will promote uniformity in the bankruptcy administration."). However, Alliance's Plan was confirmed almost three years ago. (Case No. 17-32186, ECF No. 1267). And the Trustee has not identified any issues he might face distributing recoveries should he succeed on his claims before the District Court. Thus, the District Court's withdrawal of this proceeding will have little effect on the uniform administration of Alliance's estate. *See Arena*, 2021 WL 8016713, at *5.

Similarly, the District Court's withdrawal of this case now or following this Court's resolution of all pre-trial matters will not result in inefficiency. Of course, the Court's familiarity

with the facts underlying the Trustee's claims could enable the Court to resolve any pre-trial disputes more efficiently. Nevertheless, this case has yet to progress beyond the Rule 12 stage, leaving much to be done before the District Court tries the case. At bottom, withdrawal will not inject inefficiency into this dispute's resolution. *See, e.g., British Am. Props.*, 369 B.R. at 328 (recognizing that a proceeding's lack of progress before the bankruptcy court belies withdrawal-related efficiency concerns).

Finally, this proceeding's withdrawal will not affect the pace at which Alliance's bankruptcy case is resolved. Alliance's Plan was confirmed three years ago, and Alliance's retained assets transferred to the Liquidating Trust. (Case No. 17-32186, ECF No. 1267 at 24–25). The Trustee's claims are assets of the Liquidating Trust and any recovery based on those claims will be distributed to the Liquidating Trust beneficiaries. That recovery will be delayed so long as the Trustee's claims remain unliquidated. But withdrawal at this early stage will not hinder the claims' liquidation (or reduction to judgment), much less confirmation of Alliance's Plan. *See, e.g., Arena*, 2021 WL 8016713, at *6 ("Because [the debtor's] bankruptcy case is closed and its chapter 11 plan is confirmed, resolution of this adversary proceeding in the district court cannot delay administration of the bankruptcy case.").

Given these considerations, the District Court should withdraw this adversary proceeding. However, the parties request that withdrawal be delayed until the case is ready for trial, leaving this Court to resolve all pre-trial matters. This Court's familiarity with the facts underlying the Trustee's claims supports the parties' request to delay this proceeding's withdrawal. *See id.* at *3 (quoting *Off. Comm. of Unsecured Creditors of KP Eng'g v. Steele*, No. 19-34698, 2020 WL 5947916, at *2 (Bankr. S.D. Tex. Aug. 27, 2020)) ("Bankruptcy courts frequently operate as magistrate courts with respect to pre-trial matters in litigation proceedings that involve bankruptcy

issues when the bankruptcy court is familiar with the case and bankruptcy issues predominate." (internal quotation marks omitted)).

## CONCLUSION

The District Court should withdraw this adversary proceeding's referral to this Court. Withdrawal should be delayed until the case is trial-ready.

SIGNED 06/27/2022

                                                 Marvin Isgur
                                   United States Bankruptcy Judge