United States Bankruptcy Court
Southern District of Texas

**ENTERED**
August 21, 2023
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 17-32186** |
| **UPLIFT RX, LLC,** *et al.,* | § | |
| | § | **CHAPTER 11** |
| Debtors. | § | |
| | § | |
| **YVETTE AUSTIN,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 21-3936** |
| | § | |
| **BROWN & FORTUNATO, P.C.,** | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORDANDUM OPINION</u>

Yvette Austin, the trustee of the Uplift Liquidating Trust filed this adversary proceeding against the former attorneys of Debtors in this chapter 11 case.  The complaint brings claims for legal malpractice, knowing participation in a breach of fiduciary duty, aiding and abetting and/or participation in fraudulent misrepresentation, fraud (including aiding and abetting or conspiracy to commit fraud), RICO offenses, contribution, and turnover.  Brown & Fortunato filed a motion to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  For the reasons stated below, the motion to dismiss is granted.  Austin is granted leave to amend her claims for knowing participation in or aiding and abetting a breach of fiduciary duty, fraud (including aiding and abetting and conspiracy to commit fraud), RICO violations, contribution, and turnover.

## BACKGROUND

The thrust of the Austin's claims for relief center around the idea that Brown & Fortunato, a law firm, acted inappropriately by providing legal advice and assistance to a client, Alliance (a

1 / 39

debtor in these chapter 11 cases).  Austin alleges that Brown & Fortunato's advice enabled Alliance to continue its business while it was engaged in fraudulent business practices.  The complaint outlines Alliance's fraudulent scheme and details various points at which Brown & Fortunato allegedly assisted Alliance in its fraud.

I.    THE PARTIES

Austin is the Liquidation Trustee of the Liquidating Trust established by the Debtors' chapter 11 Plan.  (ECF No. 52 at 7).  Under the Plan, the Liquidation Trust inherited the Debtors' causes of action, including tort, breach of contract, and avoidance claims.  (ECF No. 52 at 7).  Via a Court-approved Stipulation and an Amended Liquidating Trust Agreement, the Test Strip Manufacturers conveyed to Austin all of their claims against Brown & Fortunato.  (Case No. 17-32186, ECF No. 1395-2 at 7).

The Test Strip Manufacturers, including LifeScan and Roche, are the entities that supplied Alliance with test strips and sued the Debtors for the fraudulent scheme detailed below.  (ECF No. 52 at 15).

Brown & Fortunato is a Texas law firm which represented certain of the Debtor organizations.[1]  (ECF No. 52 at 8).  Bradley Howard was a shareholder and director of Brown & Fortunato.  (ECF No. 52 at 22).  Jeffrey Baird was a shareholder of Brown & Fortunato and Chairman of its Health Care Group.  (ECF No. 52 at 22).  Lisa Smith was an attorney in Brown & Fortunato's Health Care Group.  (ECF No. 52 at 23).

The Debtors (collectively, "Alliance") operated pharmacies which filled prescriptions to patients with diseases such as diabetes.  (ECF No. 52 at 8).  The complaint categorizes the Debtors into three buckets: the Corporate Debtors (various LLCs which performed the administrative

---

[1] The parties dispute exactly which Debtors Brown & Fortunato represented.

functions of Alliance); the Distribution Company Debtors (LLCs which assisted in distribution for Alliance); and the Pharmacy Debtors (LLCs which owned and operated the pharmacies within the Alliance Network).  (ECF No. 52 at 9).

The complaint alleges that despite this seemingly segregated structure, the Debtors were collectively owned and operated and were controlled by largely the same managers, officers, and directors.  (ECF No. 52 at 9).  Jeffrey Smith was the Chief Executive Officer of Alliance.[2]  (ECF No. 52 at 10).  David Grant served as Alliance's general counsel.[3]  (ECF No. 52 at 14).

The complaint, at times, collectively refers to "certain former officers, directors, and employees of the Debtors" as well as unnamed investment funds and "their agents on Alliance's Board of Directors" as the "Scheme Participants."  (ECF No. 52 at 3).  The former officer/director alleged Scheme Participants include Jeffrey Smith, Steven Hadlock, Sahily Paoline, David Grant, Justin Leavitt, Blaine Smith, Travis Hughes, Alison Wistner, Adam Koopersmith, and Lee Rosebush.  (ECF No. 52 at 3).  It is unclear from the complaint whether this list encompasses every board member or controlling person at Alliance or whether there are non-Scheme Participant officers, directors, or managers.

## II.    THE FRAUD

The fraudulent scheme involved improper billing and reporting to the Test Strip Manufacturers.  Alliance allegedly took actions designed to conceal (and therefore perpetuate) the fraudulent scheme.

---

[2] It is unclear from the complaint which Alliance entity Smith served as CEO.

[3] The complaint does not specify which Alliance entity it is referencing here.

### A. The Scheme

The Pharmacy Debtors distributed diabetic test strips (which patients use to monitor their blood glucose levels) to patients.  (ECF No. 52 at 19).  For billing purposes, test strips are categorized as either "retail" or "not-for-retail."  (ECF No. 52 at 19).  The distinction is central to the alleged fraudulent conduct.  Not-for-retail strips are dispensed to a patient through the patient's medical equipment-benefit insurance, and retail strips are typically dispensed through a patient's pharmacy-benefit insurance.  (ECF No. 52 at 19).  When a distributor (like Alliance) purchases test strips from a Test Strip Manufacturer, they purchase either retail or not-for-retail strips—the designation is made before the strips are in the hands of the distributor.  (ECF No. 52 at 19).  The distinction is relevant to the Test Strip Manufacturers for two reasons.  First, the retail test strips are sold at a higher price than the not-for-retail strips.  (ECF No. 52 at 19).  Second, Test Strip Manufacturers pay pharmacy-benefit insurers rebates on retail strips distributed to patients through a pharmacy-benefit plan.  (ECF No. 52 at 14).  For this reason, the contracts between distributors and manufacturers require distributors to only distribute not-for-retail strips to patients with medical equipment-benefit insurance and retail strips to those with pharmacy-benefit insurance. (ECF No. 52 at 19).

Alliance's alleged fraud involved purchasing not-for-retail strips and distributing them as though they were retail strips.  (ECF No. 52 at 19).  Alliance then submitted insurance claims to pharmacy-benefit insurers, falsely representing that they had distributed retail strips to pharmacy-benefit patients when, in reality, they had purchased and dispensed not-for-retail strips.  (ECF No. 52 at 19).  This caused the pharmacy-benefit insurers to reimburse the dispensing Alliance-affiliated pharmacy improperly based on the false claim.  (ECF No. 52 at 4).  The Test Strip Manufacturer would then pay the rebate to the pharmacy-benefit insurer.  (ECF No. 52 at 14).  In

doing so, Alliance reaped a double benefit from its fraud.  Alliance paid lower rates for the not-for-retail strips than it would have had it properly purchased and distributed retail strips, and Alliance received a higher insurance reimbursement rate by submitting pharmacy-benefit claims to insurers than it would have received had it submitted those claims as medical equipment-benefit claims.  (ECF No. 52 at 4).

The effect on the Test Strip Manufacturers was twofold: (i) they were deprived of the higher price Alliance would have had to pay for retail strips had it properly acquired them; and (ii) they paid insurers rebates based on the distribution of strips which were improperly reported to insurers as retail strips distributed through a pharmacy-benefit plan.  (ECF No. 52 at 19).  The effect was material.  The rebate paid by a Test Strip Manufacturer on not-for-retail strips improperly distributed through a pharmacy benefit is higher than the total price the Test Strip Manufacturer receives on a sale of the not-for-retail strips.  (ECF No. 52 at 19).

The packaging on boxes of not-for-retail and retail strips differentiates between strips designated for the two alternate distribution channels by marking each with a different National Drug Code.  (ECF No. 52 at 18).  In order to receive the reimbursement for dispensed retail strips from the insurer, a pharmacy submits a reimbursement claim using the code from the packaging.  (ECF No. 52 at 19).  As part of its deceptive scheme, Alliance intentionally provided insurers with the code for retail strips even though the packaging on the strips it dispensed indicated a code for not-for-retail strips.  (ECF No. 51 at 19).

### B.  Alliance's Attempts to Avoid Detection

Austin alleges that this scheme was the core function of the Alliance entities.  She further alleges that Alliance's profitability and its entire business model depended on the practice.  (ECF No. 52 at 21).  Alliance allegedly sought out and served primarily patients with pharmacy-benefit

insurance and employed internal mechanisms designed to pursue leads for only "low risk" new patients. (ECF No. 52 at 28). The "low risk" designation referred to a lower risk presented by a patient lead in relation to potential detection of Alliance's scheme by insurers and Test Strip Manufacturers. (ECF No. 52 at 28).

Alliance allegedly purchased the not-for-retail strips through "unauthorized channels" to avoid detection of its fraudulent billing practices. (ECF No. 52 at 29). Third-party "diverters," for example, obtain not-for-retail strips from distributors in breach of the distributors' contract with a Test Strip Manufacturer. (ECF No. 52 at 29). Diverters sell—and Alliance purchased— these not-for-retail strips on the "gray" market. (ECF No. 52 at 29).

Alliance purchased the strips through subsidiary entities. (ECF No. 52 at 29). Once it obtained the not-for-retail strips, Alliance falsely identified them as retail trips in its internal inventory system. (ECF No. 52 at 19). This way, the Alliance entities could improperly identify the strips as retail strips in the reports it generated in order to perpetuate its false billing scheme. (ECF No. 52 at 29). Should a party demand an audit, an Alliance entity could produce a false invoice as "evidence" that the pharmacy had purchased a "retail" strip from the Alliance entity. (ECF No. 52 at 30). Alliance concealed the fact that both entities (the entity producing the false invoice and the pharmacy) were part of the Alliance group. (ECF No. 52 at 30).

Further, Alliance set up a network of pharmacies under different names to conceal the fact that they predominately distributed not-for-retail test strips through the mail because it was necessary to trick insurers into thinking they dispensed the strips at a brick-and-mortar location in order to receive the pharmacy-benefit reimbursement for retail strips. (ECF No. 52 at 30). Multiple pharmacy entities were ultimately set up to account for the high distribution volume. (ECF No. 52 at 31). Each pharmacy had a separate contract with an insurer to avoid a situation

where the insurer discovered the scheme as it related to one pharmacy and canceled its contracts with all Alliance pharmacies.  (ECF No. 52 at 31).  By keeping the entities separate and concealing their joint operation and that they were all part of the larger Alliance enterprise, Alliance avoided an insurer's cancellation of one contract with one pharmacy from upsetting its entire system.  (ECF No. 52 at 31).  If an insurer cancelled its contract with one pharmacy, Alliance would simply shift those patients to another pharmacy.  (ECF No. 52 at 34).  Alliance also gave the person in charge of each pharmacy a 10% stake in the pharmacy to make it appear independently owned.  (ECF No. 52 at 36).

The complaint further alleges that on multiple occasions, senior management and employees at Alliance swept whistleblower complaints under the rug.  (ECF No. 53 at 54-62). However, Austin's lengthy description of the whistleblower saga does not contain a single allegation regarding any actions or communications involving attorneys from Brown & Fortunato related to the company's alleged attempts to silence whistleblowers.

## III.    BROWN & FORTUNATO'S ACTIONS

The body of the complaint only identifies Alliance Medical Holdings, LLC as Brown & Fortunato's actual client by name.  (ECF No. 52 at 72).  Billing entries attached as Exhibit 2 to the amended complaint identify two of the entities in the "Corporate Debtors" bucket as clients of Brown & Fortunato as early as 2010: Alliance Health Networks, Inc. and Medsource RX Pharmacy, LLC.[4]  (ECF No. 52-2).

The complaint further alleges that Brown & Fortunato served as outside counsel for "certain other Alliance debtors" without specifying which Alliance entities in particular had an

---

[4] Alliance Health Networks, LLC is noted in the complaint as also doing business as Medsource Rx Pharmacy, LLC.

actual attorney-client relationship with Brown & Fortunato.  (ECF No. 52 at 20).  Instead, throughout the complaint, Austin refers to the amorphous "Alliance" as Brown & Fortunato's client, arguing that Brown & Fortunato had an implied relationship with every relevant entity within that structure because all the Alliance entities involved in the fraud operated as a common enterprise.  In support of this allegation of implied representation, the complaint cites to multiple Brown & Fortunato time entries which reference pharmacies and research and other assignments involving pharmacies.  (ECF No. 52 at 73).  Few of the time entries identify a pharmacy by name, and those that do contain no indication that the work was completed for the benefit or even with the knowledge of that pharmacy.  (ECF No. 52 at 73).

In January of 2011, Howard, a Brown & Fortunato attorney, allegedly spoke with an Alliance employee about its sales of test strips marked "not for retail."  (ECF No. 52 at 22).  During this interaction, Howard drafted an email for Alliance to send to a Test Strip Manufacturer in response to a request for information concerning the National Drug Code on the packages of test strips it distributed.  (ECF No. 52 at 22).  The email stated:

> Jeffrey Smith and I have conferred, and we do not believe it is necessary or appropriate for our company to provide its sales and other data to other companies.  We believe it is important to maintain confidentiality about the terms and conditions of our business relationships with other manufacturers, wholesalers, and patients, including sales and order data.  We normally do not disclose such information to other companies in the industry absent some very compelling need.

(ECF No. 52 at 23).  According to the complaint, Brown & Fortunato supplied this as a "pretextual" reason to avoid having to provide information concerning the codes to the Test Strip Manufacturers when it knew the real reason that Alliance wanted to avoid doing so: to avoid detection of its fraud.  (ECF No. 52 at 23).

In February 2011, Howard then asked another attorney at Brown & Fortunato, Lisa Smith, to look into the "NDC issue in billing [the pharmacy-benefit insurers] with Retail with one [drug

code] but shipping another" drug code.  (ECF No. 52 at 23).  To assist Ms. Smith with her research,

Alliance sent her a spreadsheet showing that Alliance billed the insurance companies for different

products than the ones they had dispensed to patients.  (ECF No. 52 at 24).  Specifically, the

spreadsheet showed that they were shipping not-for-retail strips and billing them as retail strips.

(ECF No. 52 at 24).

In August of 2011, Ms. Smith, in response to an inquiry from Alliance's CFO, informed

Alliance that its billing practices constituted a breach of contract.  (ECF No. 52 at 24).  In a follow-

up email, Alliance asked Ms. Smith for guidance on the legal ramifications of its billing practices

should an insurer audit an Alliance pharmacy.  (ECF No. 52 at 25).  The complaint does not provide

what response, if any, Brown & Fortunato provided, but it points to handwritten notes kept by

Brown & Fortunato which read, "Same products, same reimbursement.  Lisa said not fraudulent;

can't buy retail product & make profit."  (ECF No. 52 at 25).

In November of 2012, Jeffrey Smith asked Howard whether an insurer or Test Strip

Manufacturer had ever successfully sued a pharmacy for distributing a not-for-retail strip but

billing it as a retail strip.  (ECF No. 52 at 25).  Howard assigned an associate to research the issue

after asking Jeffrey Smith to clarify whether the reimbursement rate received by the pharmacy

differed between the strips.  (ECF No. 52 at 25).  An internal memo at Brown & Fortunato dated

December 3, 2012 concluded that Alliance's practice constituted fraud under the False Claims Act

for distributions to federal beneficiaries and possible state law violations for non-federal

beneficiaries.  (ECF No. 52 at 25-26).  That same day, Jeffrey Smith responded to Howard's

request for clarification with the following email:

> I may be able to give a little more color on the Abbott issue.  One of our leading vendors
> works with Abbott.  Abbott buys leads from them and sends the leads to pharmacies to
> fulfill.  Abott's [sic] frustrated that they send leads to pharmacies and the pharmacies will
> switch the patient to another product in some cases, so they were looking to work with

> someone like us to keep the patients on the Abbott product. They looked up our history and noticed we were billing the retail [code], but didn't have any record of us buying the product anywhere. They want to work out a direct deal, but we will lose our shirt. So they seem to want us to buy in a more normal way from them as opposed to second sourcing product. They don't really believe we can get that much retail product second source, so I think they believe we are probably using the [not-for-retail code].

(ECF No. 52 at 26). A few days later, Baird (another Brown & Fortunato attorney) told Howard about a conversation he had with Jeffrey Smith in which Smith seemed worried about the potential that Alliance's billing practices would be exposed. (ECF No. 52 at 26). In that conversation, Jeffrey Smith allegedly conveyed a desire to "fix the problem" while not acting in haste or harming Alliance or its affiliate pharmacies. (ECF No. 52 at 26). Jeffrey Smith allegedly expressed doubt that Alliance could afford to stop the practice and bring the entities involved in the scheme into compliance with the "not for retail" restrictions on the products it purchased. (ECF No. 52 at 26).

Regarding the multiple actions taken by Alliance to deceive the insurers and Test Strip Manufacturers once its fraudulent scheme was in place, the complaint alleges that Brown & Fortunato knew of Alliance's anti-detection measures and the reason for their necessity. (ECF No. 52 at 36). In support of this allegation, the complaint notes that in 2010, Baird (a Brown & Fortunato attorney) exchanged a series of emails with Alliance in which Baird (i) asked for clarification on Alliance's billing practices and (ii) recommended that it would be "complicated, expensive, and inefficient" to set up a structure of independent pharmacies in the manner described in the above section. (ECF No. 52 at 36-37).

In 2013, Alliance asked Brown & Fortunato for guidance on whether the independent pharmacy structure would raise legal issues or expose it to liability. (ECF No. 52 at 38). Baird sent a memo noting that, under such a structure: (i) the retail versus not-for-retail strip issue would still exist; (ii) the proposed practices could expose Alliance to liability, particularly as it concerned the submission of incorrect Drug Codes for dispensed strips; and (ii) suggested that more research

was necessary in order to address concerns over federal regulations and pharmacy-owner liability arising from the application for a license and termination of the contracts with insurers.  (ECF No. 52 at 39).

In August of 2013, Leavitt, an Alliance employee, emailed other Alliance employees and Brown & Fortunato suggesting that Alliance wanted to ensure that the new structure did not "become an even bigger problem that the one it's trying to solve (disclosure of ownership on [insurer] applications)."  (ECF No. 52 at 39).  The email indicated that Brown & Fortunato was still researching issues of liability concerning the "mail order versus retail billing" as it affected the pharmacy owners.  (ECF No. 52 at 39).  Alliance's internal notes on a meeting with Baird reflected that Alliance "want[ed]/need[ed] to revisit the independent ownership idea again, but set it up in a legitimate manner."   (ECF No. 52 at 40).   Jepson, another Alliance employee, subsequently emailed Baird expressing concerns over the improper Drug Code issues and how it would look to have an Alliance entity indemnify a pharmacy "for any trouble they get into with respect to violating the mail order vs. non-mail order provisions of" the contracts.  (ECF No. 52 at 40).

Baird responded to the concerns raised by Alliance by providing feedback on the proposed term sheet for setting up the pharmacies.  (ECF No. 52 at 40).  Baird made suggestions about how a new pharmacy could "honestly take the position that it does not have a direct or indirect ownership/control relationship" with Alliance and its employees.  (ECF No. 52 at 40).  Among this advice, for example, were suggestions regarding how to structure inter-company lending between an Alliance entity and the new pharmacies.  (ECF No. 52 at 40).  Baird further advised Alliance against making the following disclosure to the owners of the new pharmacies:

> It is intended that the Pharmacy be licensed as a retail pharmacy because each of the [insurers], with whom the Pharmacy will be contracting, owns its own mail order

companies and will not contract with the Pharmacy if the Pharmacy is licensed as a mail order pharmacy.  In fact, most of the contracts that the Pharmacy will enter into with [insurers] prohibit all mail order fulfillment of prescriptions.  Rather, such contracts require that the contracting pharmacy fill and sell prescriptions via a retail, storefront location.  However, as contemplated, most, if not all, of the Pharmacy's business will be through mail order fulfillment.  In addition, it is contemplated that the Pharmacy will bill the patient's insurance under the retail pharmacy benefit but ship mail order diabetic testing supplies nationwide to the patients.  Due to such contemplated practices of the Pharmacy, it is possible that a[n] [insurer] may terminate its relationship with the Pharmacy and seek contractual and other remedies against the Pharmacy.

(ECF No. 52 at 41).  Instead, Baird advised Alliance to simply inform the new pharmacy of its obligations under the contracts and obligations to correctly bill the insurers.  (ECF No. 52 at 41).

Alliance then began spinning off its pharmacies into the "independent" pharmacy model. One of the agreements involved in those transactions disclosed Alliance's billing practices.  (ECF No. 52 at 41).  Baird advised that the section of the agreement should be removed entirely, reasoning that "it is not appropriate to include a discussion of *potentially*-improper business practices in any of the transaction documents.  If anything, the documents should state that the pharmacy is required to comply" with the law and the contracts with insurers.  (ECF No. 52 at 42) (emphasis added).

The complaint alleges that Brown & Fortunato played a role in Alliance's attempts to avoid the insurers' detection of its practices.  CVS/Caremark audited an Alliance pharmacy in the Fall of 2011 because the "drug wholesaler invoices [were] not sufficient to support [the] quantities billed." (ECF No. 52 at 45).  After an Alliance employee reached out for advice on how to handle the audit, Howard sent Alliance the following advice when asked for assistance in whether or how Alliance could redact documentation before sending it to Caremark:

. . . we can offer the following guidelines for your production, though we must emphasize that some of our advice here borders on speculation because we don't know what documentation will satisfy the Caremark auditors:

1. Be consistent in your redactions . . . because if you're called on it then it will look like you were altering the invoice rather than redacting it. . .

2. We agree that you should redact non-Roche information, which might make the blotchy looking copies a little more understandable and something we can more readily explain if they ask.

3. Don't you think you'll need to leave the "count" number following the product name? The problem with this redaction is in some cases the count is after the designation for mail order, so your redaction would leave a noticeable white gap in the middle of the description. However, one possible way around this is to include a cover letter with the production explaining that none of the products shipped have less than a 50 count per box, and then you'd need to be sure that the "amount shipped" assuming all boxes were at least 50/ct will satisfy their questions about whether MedSource RX had sufficient quantities to fill the orders. If you leave the 50/ct and 100/ct info in the descriptions then you'll have to redact around them and again that will present questions about large gaps in the middle of the description. You will have to make some judgment calls about what information you're willing to provide them at this stage, but if the redactions are consistent enough then with any follow up on their part, we can explain generally the types of information that were redacted and the reasons. We're glad to consider any examples you prepare, if you'd like, or to answer any specific questions you might have after you determine how much information you are willing to disclose with these invoices.

(ECF No. 52 at 45). Howard suggested that Alliance send the information to Caremark in the manner described above along with an explanation that the documents had been redacted to exclude specific information (like company names) that Alliance was bound to protect under agreements with various suppliers. (ECF No. 52 at 46). According to the complaint, the confidentiality issue was pretextual, and Howard's advice was instead designed to assist Alliance in continuing to hide its fraudulent practices. (ECF No. 52 at 46).

In April of 2012, Jeffrey Smith expressed concern to Howard over the billing issue as "potential fraud." (ECF No. 52 at 47). Alliance and Brown & Fortunato considered hiring an outside party to conduct an audit, but ultimately did not. (ECF No. 52 at 47). In July, Howard asked Jeffrey Smith for more information concerning what information Caremark was provided concerning the "mail order/retail business." (ECF No. 52 at 48). That month, a billing entry reflects that a Brown & Fortunato attorney spent time researching fraud statutes and criminal liability for false information. (ECF No. 52 at 48). It appears that an attorney at Brown & Fortunato found it "possible" that Alliance was subject to liability concerning misrepresentations

made to Caremark. (ECF No. 52 at 48). Though the attorney passed this information to Howard, it is unclear whether anyone at Brown & Fortunato communicated the findings of that research to Alliance.

On another occasion in April of 2013, an insurer asked Alliance to show that it obtained its strips from a "legitimate source." (ECF No. 52 at 49). Howard allegedly assisted Alliance in redacting "confidential" information from an invoice in order to satisfy the insurer. (ECF No. 52 at 49). The redactions excluded the item code, description, and price from the invoice—seemingly the details which might alert the insurer that Alliance purchased not-for-retail strips rather than retail strips. (ECF No. 52 at 49).

In response to assistance with yet another audit, Howard advised Alliance that it was "a business decision . . . not a legal opinion" whether Alliance chose to provide an insurer with information regarding the network of pharmacies' relationship to one another and to Alliance. (ECF No. 52 at 50). Attorneys from Brown & Fortunato allegedly assisted multiple audits, at times making edits and suggestions the trustee argues were designed to make the pharmacies and Alliance entities seem separate from one another when, in fact, they operated as a common enterprise. (ECF No. 52 at 50-52).

Brown & Fortunato also allegedly assisted Alliance in crafting disclosures to investors and potential investors. On one occasion, Howard appeared to suggest that a disclosure Alliance proposed to make in which it outlined its billing practices contradicted a statement in the same disclosure which claimed that "the company is not in violation of any health care laws." (ECF No. 52 at 53). Howard advised against making any disclosure concerning the details of Alliance's business practices, allegedly after reviewing an internal memo at Brown & Fortunato which found Alliance's business practices illegal. (ECF No. 52 at 53). Howard advised Alliance that "the only

safe option is not to pursue this financing/investment at this time so that it's not necessary to make a decision on these and other risky disclosure issues." (ECF No. 52 at 54).

Brown & Fortunato then assisted Alliance after a Test Strip Manufacturer began an investigation into Alliance, in response to which Alliance decided to sue the Test Strip Manufacturer. (ECF No. 52 at 64). Howard informed Alliance that another client had received a demand letter from the Test Strip Manufacturer the prior year which claimed that the other client was liable to the Test Strip Manufacturer by submitting claims to insurers using the incorrect drug code, causing the Test Strip Manufacturer to pay rebates to insurers on boxes of not-for-retail test strips which had been sold as retail strips. (ECF No. 52 at 64). In an email from Howard to Alliance addressing the other client's dispute with the same Test Strip Manufacturer, Howard clarified "I don't know how much I can read into our situation based on theirs." (ECF No. 52 at 64).

In October of 2015, Grant (general counsel for Alliance) sent Howard a draft of a memo intended for circulation to the Alliance board members, seeking Brown & Fortunato's input. (ECF No. 52 at 66). Howard provided a redline to the memo, encouraging Grant to "scale back" some of the language in the memo and "to make slightly less bold statements" concerning issues the firm had not yet thoroughly researched. (ECF No. 52 at 67). The portions of the draft memo which Howard suggested needed to be "scaled back" allegedly consisted primarily of statements claiming that Alliance's drug code/billing practice did not violate any laws. (ECF No. 52 at 67). Ultimately, Howard signed off on a version of the memo which properly disclosed the company's practice. (ECF No. 52 at 68). The memo also noted, based presumably on Howard's intel, that another company had been sued by a Test Strip Manufacturer for a similar issue, but the Test Strip Manufacturer had ultimately dropped the matter. (ECF No. 52 at 68). By signing off on the memo,

Brown & Fortunato allegedly agreed with Grant that it was appropriate to advise the board that it would be financially harmful to the company to cease the questionable practices.  (ECF No. 52 at 69).  The trustee claims that this memo convinced the board of Alliance not to discontinue its fraudulent practices.  (ECF No. 52 at 69).

There are no allegations in the complaint of any communication between an attorney from Brown & Fortunato and any entity other than a Corporate Debtor.

## IV.    PROCEDURAL HISTORY

Based on the above fraud, the Debtors entered into stipulations with the Test Strip Manufacturers allowing the Test Strip Manufacturers' claims in the bankruptcy case in the aggregate amount of $129,394,573.00.  (ECF No. 52 at 15).

In October 2019, the trustee and Brown & Fortunato entered into the first of several tolling agreements which ultimately pushed the filing deadline as to certain of the trustee's claims against Brown & Fortunato to October 31, 2021.  (ECF No. 52 at 77).  By its language, that agreement applied only to claims which had not expired as of the first tolling agreement:

> All statutes of limitations and defenses based upon the passage of time *that have not expired before the Effective Date* including, without limitation, laches, applicable to any and all Claims by the TRUSTEE against B&F are and shall be tolled from the Effective Date through and including January 31, 2020 at 11:59 p.m. ET, unless extended in writing by the Parties. . . . Notwithstanding the foregoing*, nothing in this Agreement shall revive any claim or cause of action that was time barred prior to the Effective Date*, nor does this Agreement modify, abridge, effect, or constitute a waiver with respect to any defenses, including, without limitation, contract, notice, statutes of limitations and/or statutes of repose, laches, waiver, or other time-related defenses, to the extent such defenses were viable prior to the Effective Date.

(ECF No. 20-4 at 2) (emphasis added).  The "Effective Date" is defined as October 11, 2019.  (ECF No. 20-4 at 1).

The trustee filed this adversary proceeding on October 26, 2021.  (ECF No. 1).  The Court held a hearing on Brown & Fortunato's motion to dismiss and took the matter under advisement on March 27, 2023.  (ECF No. 64).

## JURISDICTION AND AUTHORITY

The Court has jurisdiction under 28 U.S.C. § 1334.  The Court has authority over all pretrial matters in this proceeding pursuant to the Order of the United States District Court for the Southern District of Texas.  (ECF No. 55).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) affords defendants relief from a plaintiff's defective complaint.  FED. R. CIV. P. 12.  Federal Rule of Bankruptcy Procedure 7012(b) applies Rule 12(b) to adversary proceedings.  FED. R. BANKR. P. 7012(b).

Under Rule 8, a plaintiff must provide a "short and plain statement showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  To defeat a 12(b)(6) motion, the plaintiff must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *George v. SI Grp., Inc.*, 36 F.4th 611, 619 (5th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A complaint plausibly states a claim for relief when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "Plausibility," at the Rule 12(b)(6) stage, does not mean "possibility."  *Id.* at 679.  A complaint that offers bare legal conclusions, unsupported by well-pleaded factual allegations tending to establish a plausible basis for relief, must be dismissed. *See id*. at 679–80 (citing *Twombly*, 550 U.S. at 551, 555, 565–67, 570) (explaining that legal conclusions cannot be taken as true without factual support).  The Court reviews motions under Rule 12(b)(6) "accepting all well-pleaded facts as true and viewing those

facts in the light most favorable to the plaintiffs." *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007).

The complaint brings several claims for fraud, which are subject to a heightened pleading standard under Rule 9. FED. R. CIV. P. 9. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Id*. This means that a plaintiff alleging fraud must plead, with particularity, the "who, what where, when, and why" of the allegedly fraudulent behavior. *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003), *opinion modified on denial of reh'g*, 355 F.3d 356 (5th Cir. 2003) (citing *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir.1997)). This puts a greater burden on a plaintiff bringing a claim for fraud than the Rule 8 standard. The Fifth Circuit has emphasized that what is necessary to meet the heightened standard is case and context specific. *Id*.

## DISCUSSION

The parties dispute whether Texas or Utah law would apply to the trustee's claims. That is a choice of law issue not appropriate for the Court to decide on a motion to dismiss. The Court must instead analyze whether the complaint plausibly pleads enough facts to support the legal conclusion that the trustee is entitled to recovery. Whatever the answer to the choice of law issue may be, the complaint fails to plausibly plead a factual basis to support its claims for relief as to each count in the complaint. Brown & Fortunato's motion to dismiss is granted; on several issues, Austin is granted leave to amend.

## I.   LEGAL MALPRACTICE

Count I of the complaint argues that the Trust is entitled to damages for legal malpractice in the amount of $129,394,573.00, the aggregate amount of the allowed claims of the Test Strip Manufacturers. (ECF No. 52 at 82). The complaint alleges that the trustee brings the claim on behalf of Alliance Medical Holdings, LLC, Alliance Medical Administration, Inc., Alliance Health

Networks, LLC, Alta Distributors, LLC, and Stonybrook Pharmacy, LLC, which the complaint collectively refers to as the "Client Debtors." (ECF No. 52 at 82). The complaint claims that Brown & Fortunato owed a duty to the Client Debtors and breached that duty through a series of failures to properly advice Alliance enumerated in the complaint. (ECF No. 52 at 82-83).

The motion to dismiss raises Texas's two-year statute of limitations as a defense to the trustee's ability to bring this action. The Court finds that the legal malpractice claim is barred by the statute of limitations.

Under the *Erie* doctrine, federal courts apply federal procedural law and state substantive law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Federal courts treat the statute of limitations question as a matter of substantive law, so the Court looks to state law to decide which statute of limitations applies. *See Ellis v. Great Sw. Corp.*, 646 F.2d 1099, 1103 (5th Cir. 1981). Because Texas state law treats statutes of limitations questions as procedural rather than substantive, federal courts sitting in Texas need not undertake a choice of law analysis—the Court simply enforces Texas's limitations periods. *In re BP p.l.c. Securities Litig.*, 51 F. Supp. 3d 693, 697 (S.D. Tex. 2014) (citing *Robinson v. Crown Cork & Seal Co., Inc.*, 335 S.W.3d 126, 141 (Tex.2010)).

Texas law applies a two-year statute of limitations to claims for legal malpractice. *Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex. 1988) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a) (Vernon 1986)); *Apex Towing Co. v. Tolin*, 41 S.W.3d 118, 120 (Tex. 2001). Section 108(a) of the Bankruptcy Code extends the statute of limitations after a party files a bankruptcy petition in limited circumstances:

> (a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of--

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
(2) two years after the order for relief.

11 U.S.C. § 108(a).  This Code provision sets the deadline to file a complaint to the later of two years after the petition date or whenever the period would run under the applicable limitations period under state law—whichever is longer.  *Id*.  The two-year extension past the petition date only applies for claims which have "not expired before the date of the filing of the petition."  *Id*. This means that the trustee's deadline to file a malpractice action was the later of either April 7, 2019 (two years after the petition date) or whenever the statute of limitations on the claim ran under applicable law.  This proceeding was filed on October 26, 2021.  The tolling agreements were effective as of October 11, 2019 and, by the language of that first agreement, only as to claims which had not expired as of that date.  (ECF No. 20-4 at 2).  So, for the malpractice claim to not run afoul of the statute of limitations, the trustee's cause of action cannot not have accrued earlier than October 11, 2017.

In order to properly determine whether the legal malpractice claim was timely filed under these provisions (i.e., whether the Court must look to the April 7, 2019 date as the filing deadline or to some later date), the Court must first determine when the cause of action accrued.  "The general rule is that a cause of action accrues when a wrongful act causes some legal injury."  *Span Enterprises v. Wood*, 274 S.W.3d 854, 859 (Tex. App.--Hous. [1st Dist.] 2008) (citing *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex.1996)).  To successfully bring a claim for legal malpractice under both Utah and Texas law, the trustee would need to prove that (i) an attorney-client relationship existed, (ii) the attorney breached his duty to that client, and (iii) the attorney's breach of his duty actually and proximately caused the client harm.  *Christensen & Jensen, P.C. v. Barrett & Daines*, 194 P.3d 931, 937 (Utah 2008) (citing *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1290 (Utah

Ct.App.1996)); *Alexander v. Turtur & Associates, Inc.*, 146 S.W.3d 113, 117 (Tex. 2004) (citing *Peeler v. Hughes & Luce*, 909 S.W.2d 494, 496 (Tex.1995)).

The latest action plead by the trustee in the complaint for which the trustee alleges Brown & Fortunato should be held liable for malpractice is the Grant memo.  According to the trustee, Brown & Fortunato failed to act as reasonable attorney in advising its client on the legal ramifications of circulating a memo in which Brown & Fortunato should have advised the board to discontinue the fraudulent scheme, but instead allegedly condoned the behavior.  Brown & Fortunato signed off on the memo on or around October 29, 2015.  This would mean the statute of limitations deadline to bring a malpractice claim would have been on or about October 29, 2017.  The tolling agreements were effective on October 11, 2019.   The state-law deadline of October 29, 2017 had expired before the tolling agreement was signed.  Nevertheless, Austin could still bring the claims if she was allowed to do so by 11 U.S.C. § 108.

Because the Debtor filed its petition on April 7, 2017, § 108 of the bankruptcy code extended the statute of limitations through April 7, 2019.

Under the most generous possible reading of the complaint, the cause of action accrued at the petition date under the theory that the bankruptcy itself was the "legal injury," and the claim cannot have accrued until the plaintiff suffered that legal injury.  Even given that leeway, however, the trustee would have had to file the complaint by April 7, 2019 in order to satisfy the two-year statute of limitations.  The § 108 extension would not apply.

While the statute of limitations argument raised by Brown & Fortunato is an affirmative defense, the Court may consider it at the 12(b)(6) stage where it is apparent on the face of the complaint and the plaintiff fails to properly raise a basis for tolling.  *Acad. of Allergy & Asthma in*

*Primary Care v. Quest Diagnostics, Inc.*, 998 F.3d 190, 200 (5th Cir. 2021) (citing *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 440 (5th Cir. 2009)).

One basis raised for tolling in the complaint was the agreement referenced above. Alternatively, the complaint argues that the discovery rule tolled all the claims brought in the complaint, including the claim for legal malpractice. The discovery rule applies in legal malpractice claims, and "accrual is deferred until the client discovers, or should discover, the wrongful act and injury." *Erikson v. Renda*, 590 S.W.3d 557, 563 (Tex. 2019). The complaint alleges that Alliance and the Scheme Participants knew its practices were illegal and enlisted the help of Brown & Fortunato to continue to conceal its scheme. On the facts plead in the complaint, there is no argument that any of Brown & Fortunato's actions concealed any of Alliance's own fraudulent activity from itself. The facts plead reflect that Brown & Fortunato told Alliance on more than one occasion that its practices were fraudulent and advised Alliance on how to avoid liability for its fraud once it became apparent Alliance could not afford to correct its billing practices. The argument for tolling suggests no facts to the contrary of that narrative. Instead, this section of the complaint focuses on concealing the fraud with respect to the Test Strip Manufacturers, but not Alliance. It is true that third parties like the Test Strip Manufacturers might have a "discovery rule" defense to claims made by them; but they were not Brown & Fortunato's client. As to the malpractice claim, the discovery rule would require a demonstration that Alliance was unaware of the illegality of its own conduct. That concept is missing from the Amended Complaint.

Because the malpractice claim expired before the effective date of the tolling agreement (October 11, 2019), the agreement did not toll this malpractice action. Though the discovery rule is generally plead, it does not apply to the malpractice claim on these facts. The complaint does

not plausibly plead a factual basis upon which any interpretation or version of the malpractice claim is not time-barred by the statute of limitations.  The claims for legal malpractice are dismissed.

## II.     AIDING AND ABETTING/KNOWING PARTICIPATION IN A BREACH OF FIDUCIARY DUTY

The trustee brings an action for aiding and abetting or knowing participation in the Former Officers' breach of fiduciary duty on behalf of the Alliance Debtors.  Texas recognizes a cause of action for knowing participation in a breach of fiduciary duty.  Utah law recognizes a cause of action for aiding and abetting a breach of fiduciary duty.  However, the trustee's claims are not plausibly plead under the laws of either state.

### A.  Texas Law

The complaint brings "a claim for knowing participation in and/or aiding and abetting breach of fiduciary duty" on behalf of the Debtors.  (ECF No. 52 at 84).  The Fifth Circuit has not recognized a cause of action for aiding and abetting breach of fiduciary duty, and it has cautioned federal courts in the circuit that until a Texas state court recognizes one, it is not appropriate for a federal court applying Texas law to treat it as a viable cause of action.  *Midwestern Cattle Mktg., L.L.C. v. Legend Bank*, N. A., 800 Fed. Appx. 239, 250 (5th Cir. 2020)(unpublished); *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018).

Texas courts do, on the other hand, recognize a cause of action for knowing participation in a breach of fiduciary duty.  Knowing participation is a derivative claim, relying on a plaintiff's ability to prove the predicate breach.  "To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of a fiduciary relationship."  *D'Onofrio v. Vacation Publications, Inc.*,

888 F.3d 197, 216 (5th Cir. 2018) (citing *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (applying Texas law)).

With respect to the predicate breach of fiduciary duty, the complaint alleges that certain officers and directors had and breached fiduciary duties to "Alliance." Specifically, Jeffrey Smith, David Grant, Sahilyu Paoline, Justin Leavitt, and Blaine Smith (the "Former Officers") held positions as directors and officers or managers at Alliance as laid out in the background section above. Through those positions, the trustee claims the Former Officers owed fiduciary duties to Alliance. *See Straehla v. AL Glob. Services, LLC*, 619 S.W.3d 795, 804 (Tex. App.--San Antonio 2020) (explaining that Texas law imposes fiduciary obligations on executives of an LLC, but not necessarily to members or managers). The complaint then goes on to detail multiple instances in which, by designing, perpetuating, and continually concealing the fraudulent scheme, the Former Officers breached that duty.

The complaint pleads that Brown & Fortunato was aware of the Former Officers' duties because it was aware of the position the officers held at the company. Brown & Fortunato argues that the complaint does not plead enough of a factual basis to support a finding that the officers owed a fiduciary duty to "Alliance" because the complaint does not match officer to entity. The complaint explains that it generally refers to the entities in the Alliance network as "Alliance" and refers to the Former Officers as officers of "Alliance." The complaint references "Alliance's Board of Directors," but it is unclear which Alliance entity in particular is being referenced. Because the complaint fails to allege which duties to which entities the officers breached, Brown & Fortunato alleges that it does not plausibly plead that Brown & Fortunato was aware of or actively participated in that breach.

The complaint instead claims that all the relevant Alliance entities were "collectively owned, managed, operated, and/or controlled by the same group of overlapping managers, officers, directors, and/or control persons." (ECF No. 52 at 9). This is not specific enough to meet the pleading standard. For example, "managing" or "operating" an Alliance entity is not sufficient to allege the relationship or position necessary to give rise to the fiduciary duty necessary to properly alleging the predicate breach. The complaint does not explain how or why the Former Officers supposedly held fiduciary duties. The assertion that they had fiduciary duties because they were some sort of "control person" of the greater "Alliance" enterprise is insufficient to support the legal conclusion that they owed a fiduciary duty to any Alliance entity.

**B.  Utah Law**

Alternatively, the trustee pleads Utah law as a plausible answer to the choice of law question. Utah recognizes a cause of action for aiding and abetting a breach of fiduciary duty.

To state a claim for relief for aiding and abetting a breach of fiduciary duty under Utah law, a plaintiff must show "(1) a breach of a fiduciary duty owed to the plaintiff; (2) the defendant's knowing participation in the breach; and (3) damages." *Real Est. Sch. of Nevada v. Kapp*, 2015 WL 4729132 at *3 (D. Utah Aug. 10, 2015). The court in *Real Estate School of Nevada* dismissed a claim for aiding and abetting breach of fiduciary duty where the complaint did not demonstrate that the defendant had actual knowledge of the alleged actions which constituted the breach. *Id*. at *5. Utah courts have further clarified that "'simply giving legal advice, even in the face of knowledge of the breach of the fiduciary duty' is not enough to show that [the defendant-lawyer] participated in the breach." *Cattani v. Drake*, 424 P.3d 1131, 1146 (Utah App. 2018).

Assuming the complaint plausibly pleads the predicate breach of fiduciary duty, Brown & Fortunato argues it does nothing more than allege, as the plaintiff in *Cattani* did, that Brown &

Fortunato proffered its legal services and advice to a client who committed a breach of fiduciary duty. Under Utah law, this is not enough to state a claim for relief on the theory that Brown & Fortunato aided and abetted or otherwise knowingly participated in a breach of fiduciary duty. But a fact issue remains as to whether Brown & Fortunato merely proffered legal services or knew of the breach of fiduciary duty and intended to aid that breach. The complaint goes beyond alleging that Brown & Fortunato provided legal advice to a client when it explains, for example, that Brown & Fortunato assisted Alliance in doctoring invoices and documents to conceal its fraud from the insurers and Test Strip Manufacturers.

However, because the predicate breach has not been plausibly plead, the claim for knowing participation in and/or aiding and abetting breach of fiduciary duty should be dismissed for failure to state a claim upon which relief can be granted. Austin is granted leave to replead the factual basis to support the predicate breach of fiduciary duty in order to properly state the claim under Texas or Utah law.

III.   AIDING AND ABETTING NEGLIGENT AND/OR FRAUDULENT MISREPRESENTATION

The trustee next brings a claim against Brown & Fortunato for aiding and abetting negligent and/or fraudulent misrepresentation, a claim conveyed to the Trust by the Test Strip Manufacturers. (ECF No. 52 at 91). The trustee argues that the Scheme Participants and Former Officers misrepresented to the insurers that they were selling retail strips though they actually sold not-for-retail strips. (ECF No. 52 at 92). The complaint alleges that the Former Officers and Scheme Participants knew that the Test Strip Manufacturers would rely on these representations to the insurers in issuing rebates. (ECF No. 52 at 92). The complaint alleges further that the Test Strip Manufacturers actually relied on those misrepresentations and that Brown & Fortunato's

rendering of legal services and advice constituted aiding and abetting the fraudulent misrepresentation.  (ECF No. 52 at 93).  For the reasons stated below, these claims fail.

### A.  Texas Law

Brown & Fortunato argues that the attorney immunity doctrine bars the trustee from bringing this action under Texas Law.  The Court agrees.

The attorney immunity doctrine provides that "as a general rule, a party may not sue opposing counsel under any theory of recovery for 'acts or omissions undertaken as part of the discharge of their duties as attorneys to opposing parties.'"  *Miller v. Stonehenge/Fasa-Texas, JDC, L.P.*, 993 F. Supp. 461, 464 (N.D. Tex. 1998) (quoting *Taco Bell Corp. v. Cracken*, 939 F.Supp. 528, 532 (N.D.Tex.1996)).  While the rule does not "provide absolute immunity for every tort committed by a lawyer," it does shield an attorney acting within her role as an attorney.  *Id*.  The rule stems from the fact that an attorney does not typically owe duties of professional care to non-client third parties.  *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015).  As a matter of public policy, this allows attorneys to pursue their clients' legal rights and render advice to clients without being "forced to constantly balance his own potential exposure against his client's best interest."  *Id*. at 483 (citing *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405 (Tex. App.--Hous. [1st Dist.] 2005)).  While an attorney may be liable for fraud falling outside the scope of her representation of a client, wrongful conduct which falls within the scope of client representation is protected by the doctrine.  *Id*.

Here, the complaint alleges that, acting within its role at attorney, Brown & Fortunato provided a client with legal advice which was allegedly used to perpetuate a fraudulent scheme. As the court details in the background section above, the allegations in the complaint each involve Brown & Fortunato rendering advice considering the legality of Alliance's actions in dealing with

the insurers or otherwise operating its business. Though the complaint alleges that the advice and assistance rendered by Brown & Fortunato was both wrong and wrongful, *Cantey Hanger* holds that even wrongful behavior is captured by the immunity doctrine. *Id*. None of the factual allegations in the complaint show that Brown & Fortunato did anything outside the scope of its role as the attorney for certain Alliance entities. *See, e.g., Alpert*, 178 S.W.3d at 407 (finding that none of the acts alleged in a complaint constituted conduct other than the ordinary duties of an attorney in order to "facilitate the rendition of legal services"). Therefore, the claim for aiding and abetting fraudulent misrepresentation is barred under Texas Law by the attorney immunity doctrine.

### B.  Utah Law

Utah has not recognized a cause of action for aiding and abetting fraudulent or negligent misrepresentation. *Mower v. Simpson*, 278 P.3d 1076 (Utah App. 2012). There is, however, Utah case law to suggest that rather than an aiding and abetting claim, a plaintiff could establish that the defendant owed an independent duty of care to the plaintiff. *Rabo Agrifinance, Inc. v. Bliss*, 227 F. Supp. 3d 1249 (D. Utah 2017) (holding that financial consultants were not liable to a lender for misrepresentations made by a borrower on a financial statement). In order to plead an action for negligent misrepresentation, the plaintiff must show that the defendant had some duty to the harmed party. *Smith v. Frandsen*, 94 P.3d 919, 922 (Utah 2004).

The complaint neither sufficiently argues that Utah law recognizes a cause of action for aiding and abetting fraudulent or negligent misrepresentation nor does it plead factual allegations to support the claim on the alternative, direct-duty theory. The count merely alleges that Alliance is liable for fraudulent or negligent misrepresentation, and, because Brown & Fortunato acted as its attorney and rendered legal advice to Alliance, it is liable for aiding and abetting that

misrepresentation.  That alone is not sufficient to show that Brown & Fortunato owed a duty to the

Test Strip Manufacturers (the parties who conveyed this claim to the trustee).  Further, there is no

allegation in the complaint that Brown & Fortunato ever made a direct representation or

communicated in any way with the Test Strip Manufacturers.  The claim for aiding and abetting

fraudulent misrepresentation is not supported by and therefore not plausibly plead under Utah law.

### C.  New Jersey Law

In her response in opposition to the motion to dismiss, the trustee, for the first time, argues

that New Jersey law may apply, and New Jersey law recognizes a cause of action for aiding and

abetting fraud and misrepresentation.  The response provides no factual basis to support the idea

that New Jersey law should apply to this claim.  There are no facts on the face of the complaint

which would tend to support the application of New Jersey Law.[5]  While the choice of law issue

is not ripe at this stage, the complaint must still plead a sufficient factual basis to support its theory

of recovery.  To accomplish that, it is insufficient for a complaint to argue that some law might

apply which would entitle the plaintiff to relief in some state.  The basis for the relief must be

plead.  Throwing New Jersey law in at the eleventh hour with little to no supporting argument or

facts does not plausibly plead that New Jersey law applies or that there are sufficient facts in the

complaint to survive dismissal under New Jersey law.  Austin's claim for aiding and abetting

fraudulent or negligent misrepresentation is dismissed.

### IV.  THE FRAUD CLAIMS

The trustee brings claims against Brown & Fortunato for fraud, including aiding and

abetting fraud and conspiracy to commit fraud.  These causes of action were conveyed by the Test

---

[5] By contrast, the complaint alleges specific ties between both Alliance and Brown & Fortunato with Texas, Utah, and Delaware.

Strip Manufacturers to the trustee.  For the reasons stated below, these claims fail to provide a plausible factual basis on which relief can be granted.  Therefore, the fraud claims are dismissed.

### A.  Fraud/Aiding and Abetting Fraud

Under Texas law, the attorney immunity doctrine bars a claim brought by a non-client against an attorney for aiding and abetting wrongful conduct by the attorney's client.  The case law clarifies that there is no fraud exception.  *Cantey Hanger, LLP*, 467 S.W.3d at 483.  The only exception is where an attorney acts outside the scope of her role.  *Id*.  While committing "independently fraudulent activities" falls outside the scope of an attorney's role, the complaint does not allege that Brown & Fortunato committed a fraud on its own behalf.  There are no allegations in the complaint suggesting that Brown & Fortunato did anything other than provide legal advice and services to the Alliance entities.  The allegation is not that it rendered this advice fraudulently, but rather that the advice assisted its client in perpetuating a fraud.  Therefore, the doctrine applies, and this claim is barred under Texas law.

As to the fraud claim, a plaintiff must show that the defendant made a material, false representation to the plaintiff to establish liability under Texas law.  *CBE Group , Inc. v. Lexington L. Firm*, 993 F.3d 346, 350 (5th Cir. 2021).  There are no allegations that Brown & Fortunato made a single representation to any of the Test Strip Manufacturers.  Therefore, the complaint fails to state a claim for relief because it pleads no facts to support the first element in bringing a claim for fraud.

To the extent the trustee argues that a theory of "indirect reliance" could apply on these facts, the argument fails.  (ECF No. 62 at 28).  Under this theory, a defendant is liable for its fraudulent misrepresentation where an injured third party "acts in justifiable reliance upon" the misrepresentation.  *Hawkins v. Upjohn Co.*, 890 F. Supp. 609, 612 (E.D. Tex. 1994) (citing

RESTATEMENT (SECOND) OF TORTS § 533). This is true even where the misrepresentation is not made by the defendant directly to the third party, so long as the defendant "intends or has reason to expect that . . . it will influence" the third party. *Id*.

The theory is ill-fitting on the facts plead. In making the argument, the trustee does not identify which communications it is arguing the Court should apply the indirect reliance theory to, so the Court is left to guess at which communications allegedly fall under this theory of liability. The trustee could mean to apply this theory generally to communications between Brown & Fortunato and Alliance in the course of Brown & Fortunato's representation of Alliance. But Brown & Fortunato did not mislead its own client, which then caused the Test Strip Manufacturers to rely on a false statement—the pattern the theory would apply to. The complaint does not allege that Brown & Fortunato made a false representation to anyone. The complaint instead demonstrates that Brown& Fortunato frequently advised Alliance that its actions were legally questionable and advised it on how to avoid disclosing behavior for which it could be held liable. None of those "communications" are a "false representation" which was then relayed to the Test Strip Manufacturers. The claim for fraud is insufficiently plead.

Utah does not recognize a cause of action for aiding and abetting fraud. *DiTucci v. Ashby*, 2020 WL 956890 at *5 (D. Utah Feb. 27, 2020) (declining to consider a claim for aiding and abetting fraud because no Utah court has recognized that cause of action). The aiding and abetting fraud claim is not plausibly plead under Utah law.

With respect to the fraud claim against Brown & Fortunato, Utah, like Texas, requires a plaintiff to demonstrate that the defendant made a

> (1) a representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in

ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.

*Giusti v. Sterling Wentworth Corp.*, 201 P.3d 966, 977 n. 38 (Utah 2009), *holding modified by C. Utah Water Conservancy Dist. V. King*, 297 P.3d 619 (Utah 2013); *see also Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 2023 WL 2665894 (D. Utah Mar. 28, 2023), *motion for relief from judgment denied sub nom. Gaddy v. Church of Jesus Christ of Latter-day Saints*, 2023 WL 4763981 (D. Utah July 26, 2023).  For the same reason the fraud claim fails under Texas law, it fails under Utah law.  There is no allegation that Brown & Fortunato ever made a representation to the Test Strip Manufacturers or that the Test Strip Manufacturers relied on any representation made by Brown & Fortunato to any party.  There is not even an allegation that the Test Strip Manufacturers were aware of Brown & Fortunato's involvement or representation of Alliance.  It cannot be inferred from the facts plead that the Test Strip Manufacturers were somehow influenced by the fact of Brown & Fortunato's involvement in relying on Alliance's false representations.  The complaint fails to state a claim for relief for fraud.

### B.  Conspiracy to Commit Fraud

Both Texas and Utah recognize a claim for conspiracy to commit fraud (civil conspiracy) with predominantly the same elements.

In Texas,

[t]he required elements of a civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result. A 'civil conspiracy requires specific intent' to agree 'to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.

*JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 420 (Tex. App.--Hous. [1st Dist.] 2011) (citing *Gary E. Patterson & Assocs., P.C. v. Holub*, 264 S.W.3d 180, 204 (Tex.App.-Houston [1st

Dist.] 2008, pet. denied)); *see also P. McGregor Enterprises, Inc. v. Hicks Const. Group, LLC*,
420 S.W.3d 45 (Tex. App.--Amarillo 2012).

    Likewise, in Utah,

> civil conspiracy requires proof of five elements: (1) a combination of two or more persons,
> (2) an object to be accomplished, (3) a meeting of the minds on the object or course of
> action,  (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof.

*Pohl, Inc. of Am. v. Webelhuth*, 201 P.3d 944, 954 (Utah 2008).

    The complaint does not plausibly plead the elements necessary to support a claim for
conspiracy against Brown & Fortunato.  The complaint fails to plead factual allegations to show
the "meeting of the minds" element required in both states.  To satisfy the meeting of the minds
element for conspiracy, the trustee would need to allege that Brown & Fortunato and Alliance had
the 'specific intent to agree to accomplish an unlawful purpose or to accomplish a lawful purpose
by unlawful means.' " *Conceal City, L.L.C. v. Looper L. Enf't, LLC*, 917 F. Supp. 2d 611, 617
(N.D. Tex. 2013) (quoting *Wackman v. Rubsamen*, 602 F.3d 391, 408 (5th Cir.2010)); *see also In
re Enron Corp. Securities, Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 809 (S.D. Tex. 2009)
(finding that to hold a defendant liable for conspiracy to commit fraud a "plaintiff must establish
(1) that there was such a conspiracy and (2) that the particular defendant. . . agreed with one or
more of the conspirators about the claimed illegal object of the conspiracy and intended to have it
brought about").  To be a co-conspirator, a defendant must have been aware of the harm from the
inception of the fraud or unlawful activity.  *Conceal City, L.L.C.*, 917 F. Supp. 2d at 617.  While
circumstantial evidence may allow the inference of a conspiracy, it must be more that "mere
suspicion." *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 623 F. Supp. 2d at 809.

    Nowhere does the complaint allege that Brown & Fortunato agreed to defraud the Test
Strip Manufacturers other than the count itself which simply restates the elements for conspiracy
to commit fraud in a conclusive fashion.  It certainly does not plausibly allege that Brown &

Fortunato was aware of or helped craft the fraud from the inception of the billing scheme.  This is apparent in the fact that it was only through its internal process of investigation and legal research (as reflected in an internal legal memo) that Brown & Fortunato realized that its client could be liable for fraud based on its billing practices.

The trustee instead argues that Brown & Fortunato became a co-conspirator by offering "assistance," which supposedly evidences the allegation that Brown & Fortunato "unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to defraud" the Test Strip  Manufactures.   (ECF No. 52 at 94).  On the face of the complaint, this language, sprinkled into the claim against Brown & Fortunato for civil conspiracy, does not meet the heightened requirements of Rule 9.  *Benchmark Elecs., Inc.*, 343 F.3d at 724 (holding that, to satisfy Rule 9, a plaintiff must plead with particularity the "who, what, where, when, and why" of the fraud).  It does not explain how *Brown & Fortunato* agreed to and aided in the inception of the fraudulent scheme.

The complaint focuses on the *Scheme Participants' and Former Officers'* inception and implementation of the fraudulent scheme.  In fact, the complaint highlights the fact that Brown & Fortunato was unaware of the scheme at its inception and took steps to inform Alliance of its potential liability once it discovered the details of Alliance's billing practices.  That these efforts were fruitless does not indicate an intent to agree to the fraud.  *See Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56, 82 (Tex. App.--Hous. [14th Dist.] 2004) ("mere knowledge and silence are not sufficient to establish conspiracy. . . . because of the attorney's duty to preserve client confidences, there must be some indication that the attorney agreed to the fraud.").

Likewise, the complaint fails to plead that Brown & Fortunato did anything unlawful in furtherance of the alleged conspiracy.  Providing legal advice to a client is not illegal.  The

complaint paints a picture of attorneys who knew of its client's fraudulent activities (though perhaps not their full extent) and continued to offer legal services and advice to that client. The Court could draw the inference from that picture that Brown & Fortunato agreed to conspire to perpetuate the fraud. But the Supreme Court has reasoned that even where factual allegations, if true, allow a court to draw an inference of wrongdoing on the plaintiff's part, inference does not entitle a party to relief. *Iqbal*, 556 U.S. at 682.

For example, the complaint asserts that in 2011, an attorney for Brown & Fortunato drafted an email for Alliance to send to Test Strip Manufacturers explaining that they did not want to divulge information concerning the National Drug Code on packages of test strips it distributed in order to protect its sales practice and maintain confidentiality with "other manufacturers, wholesalers, and patients." (ECF No. 52 at 22). The complaint asserts that this explanation was "pretextual" and that the Brown & Fortunato attorney knew it was pretextual. But that is an inference. The situation could be read as Brown & Fortunato supplying the information as pretext, but it could also be read as Brown and Fortunato's true understanding of its client's preferences concerning handling information concerning its business practices based on what it was told by the client.

Similarly, when Alliance enlisted Brown & Fortunato's aid in 2013 while deciding how to restructure its pharmacy operations, Alliance told Brown & Fortunato that it did not want the new structure to become "an even bigger problem than the one it was trying to solve (disclosure of ownership on [insurer] applications." (ECF No. 52 at 39). It could be inferred that this meant that Alliance enlisted Brown & Fortunato's help in deceiving the insurers; it could just as easily mean that, to Brown & Fortunato's knowledge, Alliance wanted legal advice on how to create the new

structure *without* breaking any laws.  Here, too, the complaint asks the Court to infer a conspiracy to commit fraud where the actual, non-conclusory factual allegations could cut the other way.

A final example is the 2015 Grant memo with which the trustee takes issue.  Brown & Fortunato's advice in relation to the memo was to cut language concerning the risk of liability with respect to certain of Alliance's business practices.  (ECF No. 52 at 66).  The reason Brown & Fortunato gave for making that choice was not to deceive anyone, but rather to temper a legal claim Brown & Fortunato had not yet fully researched.  (ECF No. 52 at 66).  Again, even if the Court draws the inference pushed in the complaint that the given reason for the edit was "pretextual," this act does not necessarily reflect that Brown & Fortunato conspired to defraud the Test Strip Manufacturers or that it intended to adopt the fraudulent goals of its client.  This was an internal memo directed at Alliance's board, not a representation intended for Test Strip Manufacturers or other third parties.[6]

The trustee, in response to the motion to dismiss, points to the idea that New Jersey law may apply with respect to the fraud and conspiracy claims.  For the reasons already stated, the application of New Jersey law is not sufficiently plead to survive a motion to dismiss, and therefore the Court does not consider New Jersey law in deciding whether the complaint pleads a plausible basis to support its claim for relief.

The complaint fails to state a claim for relief upon which relief can be granted as to the claims for fraud, aiding and abetting fraud, and conspiracy to commit fraud.  These claims are dismissed because, without more, the inferences addressed above do not rise to either a Rule 9 or

---

[6] The complaint does not allege, for example, that there were control persons with access to the memo who were not already aware of the fraud and who did not already condone the company's scheme.

a plausibility standard under *Iqbal.  See Iqbal*, 556 U.S. 662.  Austin is granted leave to amend her

complaint to assert allegations that simultaneously meet Rule 9 and are plausible.

## V.    THE RICO CLAIMS

The complaint does not sufficiently allege a factual basis to support the trustee's claim that

Brown & Fortunato "agreed and conspired to violate 18 U.S.C. § 1962(c)."  (ECF No. 52 at 98).

A plaintiff may recover from a defendant in a civil suit for RICO violations.  18 U.S.C.

§ 1964.  Section 1962(c) of the RICO statute provides that

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged
> in, or the activities of which affect, interstate or foreign commerce, to conduct or
> participate, directly or indirectly, in the conduct of such enterprise's affairs through a
> pattern of racketeering activity or collection of unlawful debt.

§ 1962(c).  Section 1962(d) prohibits the act of conspiring to violate § 1962(c), among other

provisions of the statute.  § 1962(d).  In order to properly allege a RICO conspiracy, the trustee

must plausibly allege that (i) two or more people agreed to commit the acts which constitute the

RICO violation and (ii) that Brown & Fortunato, as the defendant, "knew of and agreed to the

overall objective of the RICO offense."  *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th

Cir. 2010) (citing *United States v. Sharpe*, 193 F.3d 852, 869 (5th Cir.1999)).  Merely alleging that

a party associated with conspiring parties does not satisfy the "agreement" requirement of a RICO

conspiracy claim.  *Id.*  "A conspirator must at least know of the conspiracy and 'adopt the goal of

furthering or facilitating the criminal endeavor.'"  *Id.* (quoting *Salinas v. United States*, 522 U.S.

52, 65 (1997)).

Though some facts plead might support the facilitation element of a RICO conspiracy

claim, the facts do not show that Brown & Fortunato's actions were pervasive enough to support

a claim for relief under RICO.  There are few allegations which tend to support the proposition

that Brown & Fortunato can be said to have "adopted the goal" of furthering the scheme.  On some

occasions, Brown & Fortunato might have given assistance that arguably went beyond mere advice. In particular, offering assistance in doctoring documents during insurer audits makes it appear that perhaps Brown & Fortunato did adopt the goal of facilitating the fraud. While it could be that Brown & Fortunato knew of and helped facilitate Alliance's racketeering activity, it is unclear from the complaint how pervasive that behavior was.

The Supreme Court has carefully parsed the language and legislative history of the statute and held that to be found liable under § 1962(c), the defendant must have "participated in the operation or management of the enterprise itself to be subject to liability." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). For this reason, the Fifth Circuit found no liability, for example, on the part of a law firm who "appear[ed] only a few times in [the] drama" of its client's racketeering activity. *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995). The Fifth Circuit held that the "sporadic" involvement of a law firm that did little more than advise a client on how to fill out forms or draw up documents did not present the threat Congress intended the RICO provisions to address, so it was inappropriate to hold the law firm in that case liable. *Id*. The facts are similar here. Brown & Fortunato's level of involvement in the scheme cannot be said to have risen to the level necessary for Brown & Fortunato to be held liable for a RICO offense or conspiring to commit a RICO offense—even on the assumption that the Scheme Participants and Former Officers' actions could. Austin is granted leave to amend her complaint to demonstrate the pervasive nature of Brown & Fortunato's control.

## VI.    The Claims for Contribution and Turnover

The trustee's claims for contribution and turnover rely on theories of recovery under the other counts in the complaint. (ECF No. 52 at 90-91.) Because the Court finds that those claims are not plausibly plead, neither are the claims for contribution and turnover.

## CONCLUSION

The defendant's motion to dismiss is granted.  A separate order will be entered.

 SIGNED 08/21/2023

Marvin Isgur
United States Bankruptcy Judge
