UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
(HOUSTON DIVISION)

In re:

UPLIFT RX, LLC,

      Debtors.

CASE NO. 17-32186, et seq. CHAPTER 11

Yvette Austin, Liquidating Trustee of the
Alliance Health Liquidating Trust,

      Plaintiff,

v.

BROWN & FORTUNATO, P.C., a Texas
professional corporation,

      Defendant.

ADV. NO. 21-03936

**TRUSTEE'S RESPONSE IN OPPOSITION TO DEFENDANT'S
RENEWED MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND SUMMARY OF THE ARGUMENT ...................................................1

ALLEGED FACTS SUPPORTING THE RESPONSE ................................................................4

I.      Background of the Debtors. .................................................................................................4

II.     The Debtor's Insiders and Fiduciaries .................................................................................5

III.    Brown's Participation in the Scheme ...................................................................................6

IV.     Alliance's Bankruptcy .........................................................................................................7

V.      The Plan and Disclosure Statement .....................................................................................8

VI.     The Roche and LifeScan Stipulations ..................................................................................8

VII.    The Assigned Claims ...........................................................................................................9

ARGUMENT ..................................................................................................................................9

I.      A Choice of Law Determination is Premature...................................................................10

II.     The Aiding and Abetting / Knowing Participation Claim (Count I) is Fully and
        Properly Pled.......................................................................................................................11

        A.      Texas Recognizes a Cause of Action for Aiding and Abetting and/or
                Knowingly Participating in Another's Breach of Fiduciary Duty. ........................11

        B.      The Trustee Alleges that Brown Knowingly Participated in a Breach of
                Fiduciary Duty. .....................................................................................................12

        C.      The Aiding and Abetting/Knowing Participation Claim is Not Time-Barred.
                ...............................................................................................................................17

        D.      The Knowing Participation Claim is Not a Fractured Malpractice Claim.............21

        E.      Defendant's "Contribution Bar" argument is wrong. ...........................................24

III.    The Turnover/Disgorgement Claim is Fully and Properly Pled. .......................................26

IV. The Aiding and Abetting/Knowing Participation in Fraud Claim (Count III) Was Not Dismissed With Prejudice....................................................................27

V. The Assigned Claims Are Not Time-Barred. ...................................................28

    A. Statute of Limitations........................................................................28

        1. Statute of Limitations should not be decided on a motion to dismiss in this case...............................................................28

        2. Tolling Agreements apply to both direct and assigned claims. .................29

        3. Brown's argument regarding the inapplicability of the discovery rule due to Manufacturers' alleged knowledge of an injury must be rejected. ...............................................................30

        4. RICO is subject to federal limitations law, which does not bar claims. ...............................................................35

VI. The Fraud Claim (IV) is Fully and Properly Pleaded. .......................................37

    A. The fraud claim is not barred by attorney immunity. ..............................37

VII. The Manufacturers Indirectly Relied on Brown's Misrepresentations.............................39

VIII. The Conspiracy to Commit Fraud Claim (V) is fully and properly pleaded. ...................42

IX. The RICO Conspiracy is fully and properly pled and supported under the law................48

CONCLUSION.................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Affiliated Cap. Corp. v. Com. Fed. Bank*,
 834 S.W.2d 521 (Tex. App.—Austin 1992, no pet.) ............................................................30

*Askanase v. Fatjo*,
 828 F. Supp. 465 (S.D. Tex. 1993) ....................................................................................18

*Baylor Scott & White v. Project Rose MSO, LLC*,
 633 S.W.3d 263 (Tex. App.—Tyler Aug. 30, 2021, pet. denied)...........................................12

*BP Am. Prod. Co. v. Marshall*,
 342 S.W.3d 59 (Tex. 2011).................................................................................................34

*Brett v. First Fed. Sav. & Loan*,
 461 F.2d 1155 (5th Cir. 1972) ............................................................................................45

*Bull. Displays, LLC v. Regency Outdoor Advert., Inc.*,
 518 F. Supp. 2d 1182 (C.D. Cal. 2007) ..............................................................................33

*C&C Inv. Props., L.L.C. v. Trustmark Nat'l Bank*,
 838 F.3d 655 (5th Cir. 2016) ..............................................................................................28

*Cardon v. Jean Brown Research*,
 2014 UT App 35, 327 P.3d 22 (Utah App. 2014)..................................................................40

*Catney Hanger, LLP v. Byrd*,
 467 S.W.3d 477 (Tex. 2015)...............................................................................................38

*CBE Grp., Inc. v. Lexington Law Firm*,
 993 F.3d 346 (5th Cir. 2021) ..............................................................................................40

*Chaney v. Dreyfus Service Corp.*,
 595 F.3d 219 (5th Cir. 2010) ..............................................................................................48

*Coker v. Coker*,
 650 S.W.2d 391 (Tex. 1983)...............................................................................................30

*Conceal, L.L.C. v. Looper L. Enf't, LLC*,
 917 F. Supp. 2d 611 (N.D. Tex. 2013) ................................................................................46

*Crowe v Henry*,
 43 F.3d 198 (5th Cir. 1995) ................................................................................................49

*D'Onofrio v. Vacation Publications, Inc.*,
   888 F.3d 197 (5th Cir. 2018) ................................................................12

*Drees v. Philadelphia Am. Life Ins. Co.*,
   No. CV H-20-3607, 2021 WL 3674976 (S.D. Tex. Feb. 11, 2021) .......................10

*Etan Indus., Inc. v. Lehmann*,
   359 S.W.3d 620 (Tex. 2011)................................................................33

*F.D.I.C. v. Shrader & York*,
   991 F.2d 216 (5th Cir. 1993) ..............................................................18

*FG Holdings, Inc. v. London Am. Risk Specialists, Inc.*,
   No. 09-05-522 CV, 2007 WL 4341408 (Tex. App.—Beaumont Dec. 13, 2007, pet.
   denied)..................................................................................26

*Floyd v. Hefner*,
   556 F. Supp. 2d 617 (S.D. Tex. 2008) .....................................................23

*Frame v. City of Arlington*,
   657 F.3d 215 (5th Cir. 2011) (en banc) ...................................................28

*George v. SI Grp., Inc.*,
   36 F.4th 611 (5th Cir. 2022) .............................................................9, 10

*Greenberg Traurig of New York, P.C. v. Moody*,
   161 S.W.3d 56 (Tex. App. 2004).............................................................47

*Hawkins v. Upjohn Co.*,
   890 F. Supp. 609 (E.D. Tex. 1994).......................................................41, 42

*Haynes & Boone, LLP v. NFTD, LLC*,
   631 S.W.3d 65 (Tex. 2021).................................................................38

*Hemmerdinger Corp. v. Ruocco*,
   976 F. Supp. 2d 401 (E.D.N.Y. 2013) ......................................................33

*Hill v. Day (In re Today's Destiny, Inc.)*,
   388 B.R. 737 (Bankr. S.D. Tex. Apr. 11 2008) ...........................................3, 26

*In re Black Elk Energy Offshore Operations, LLC*,
   No. 15-34287, 2022 WL 1589190 (Bankr. S.D. Tex. May 19, 2022).........................46

*In re Boy Scouts of Am. & Delaware BSA, LLC*,
   642 B.R. 504 (Bankr. D. Del. 2022) .......................................................25

*In re Catfish Antitrust Litig.*,
   826 F. Supp. 1019 (N.D. Miss. 1993) ......................................................36

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
623 F. Supp. 2d 798 (S.D. Tex. 2009) ...................................................................46

*In re Juliet Homes, LP*,
No. 07-36424, 2011 WL 6817928 (Bankr. S.D. Tex. Dec. 28, 2011) (Isgur, J.)
.........................................................................................................3, 17, 18, 35

*In re Mollie Enterprises, Inc.*,
559 B.R. 501 (N.D. Ill. 2016) ..............................................................................19

*In re Morrison*,
419 B.R. 314 (Bankr. S.D. Tex. 2009) .................................................................10

*In re Today's Destiny, Inc.*,
No. 05-90080, 2009 WL 1232140 (Bankr. S.D. Tex. May 1, 2009) (Isgur, J.)......................18

*In re W.J. Bradley Mortg. Cap., LLC*,
598 B.R. 150 (Bankr. D. Del. 2019) .....................................................................15

*Int'l Bankers Life Ins. Co. v. Holloway*,
368 S.W.2d 567 (Tex. 1963)...............................................................................46

*Janvey v. Proskauer Rose LLP*,
C.A. No. 3:13-CV-0477-N, 2015 WL 11121540 (N.D. Tex. June 23, 2015) ........................23

*Jernigan v. Wainer*,
12 Tex. 189 (1854)............................................................................................45

*JSC Neftegas-Impex v. Citibank, N.A.*,
365 S.W.3d 387 (Tex. App.—Hous. [1st Dist.] 2011) .....................................43, 44

*Labaty v. UWT, Inc.*,
121 F. Supp. 3d 721 (W.D. Tex. 2015)..................................................................36

*Landry's, Inc. v. Animal Legal Def. Fund*,
631 S.W.3d 40 (Tex. 2021)...........................................................................38, 39

*Love v. Nat'l Med. Enterprises*,
230 F.3d 765 (5th Cir. 2000) ......................................................................31, 34, 37

*Markwardt v. Tex. Indus., Inc.*,
325 S.W.3d 876 (Tex. App.—Houston [14th Dist.] 2010, no pet.)..........................34

*Morgan v. Chapman*,
629 F. Supp. 3d 616 (S.D. Tex. 2022) .........................................................28, 33, 37

*Moss v. Parr Waddoups Brown Gee & Loveless*,
285 P.3d 1157 (UT 2012) ....................................................................................38

*Motorola Mobility, Inc. v. Tivo Inc.*,
Case No. 5:11-cv-053, 2013 WL 12040725 (E.D. Tex. Jan. 25, 2013)..................................28

*Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*,
Civil Action No. 3:12-CV-4641-N, 2015 WL 13741905 (N.D. Tex. Feb. 4, 2015)
..................................................................................................................................15, 44

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*,
9 F.4th 247 (5th Cir. 2021) ..................................................................................... passim

*PHP Agency, Inc. v. Martinez*,
No. 3:21-CV-00418-X, 2022 WL 93937 (N.D. Tex. Jan. 10, 2022)......................................10

*Pohl, Inc. of Am. v. Webelhuth*,
201 P.3d 944 (Utah 2008)................................................................................................43, 44

*Real Est. Sch. of Nevada v. Kapp*,
2015 WL 4729132 (D. Utah Aug. 10, 2015). ........................................................................12

*Richardson v. Ariz. Fuels Corp.*,
614 P.2d 636 (Utah 1980) ....................................................................................................15

*Ritchie v. Rupe*,
443 S.W.3d 856 (Tex. 2014)..................................................................................................15

*Rotella v. Wood*,
528 U.S. 549 (2000)..............................................................................................................35

*Russell/Packard Dev., Inc. v. Carson*,
2003 UT App 616 (Utah CA 2003) ...................................................................................41, 42

*Seville Indus. Mach. Corp. v. Southmost Machinery Corp.*,
742 F.2d 786 (3d Cir. 1984)..................................................................................................45

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG*,
277 F. Supp. 3d 521 (S.D.N.Y. 2017)....................................................................................36

*Straehla v. AL Glob. Servs., LLC*,
619 S.W.3d 795 (Tex. App.—San Antonio 2020, pet. denied) ...............................................12

*Test Masters Educ. Servs., Inc. v. Singh*,
428 F.3d 559 (5th Cir. 2005) ..................................................................................................9

*Texas v. Allan Constr. Co., Inc.*,
851 F.2d 1526 (5th Cir. 1988) ..........................................................................................35, 37

*Triplex Commc'ns, Inc. v. Riley*,
900 S.W.2d 716 (Tex. 1995)..........................................................................................46, 47, 48

*U.S. ex rel. Johnson v. Shell Oil Co.*,
    183 F.R.D. 204 (E.D. Tex. 1998)........................................................................................10, 45

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
    20 F. Supp. 2d 1017 (S.D. Tex. 1998) ...............................................................................10

*United States v. Farrell*,
    921 F.3d 116 (4th Cir.), cert. denied, 140 S. Ct. 269 (2019) ..................................49

*United States v. Sharpe*,
    193 F.3d 852 (5th Cir. 1999) ...............................................................................................48

*Youngkin v. Hines*,
    546 S.W.3d 675 (Tex. 2018)...............................................................................................38

## STATUTES

Chapter 11 of the Bankruptcy Code...............................................................................8, 19

RICO .......................................................................................................................... passim

## OTHER AUTHORITIES

Federal Rule of Bankruptcy Procedure...............................................................1, 9, 10

Federal Rules of Civil Procedure ..................................................................... passim

TEX. CIV. PRAC. & REM. § 33.001 .......................................................................................24

Plaintiff Yvette Austin ("Plaintiff" or the "Trustee"), Liquidating Trustee of the Alliance Health Liquidating Trust (the "Liquidating Trust"), pursuant to the Federal Rules of Civil Procedure 8, 9, 12(b) and 15, as incorporated by Federal Rules of Bankruptcy Procedure 7008, 7009, 7012, and 7015, files this Response in Opposition to the Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint. Doc. 90 (the "Motion").

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

This lawsuit seeks to recover money for victims of a fraud that was aided and abetted by defendant Brown & Fortunato, P.C. ("Brown" or "Defendant"). With Brown's assistance, Alliance defrauded manufacturers of diabetes test strips, specifically LifeScan, Inc., Roche Diabetes Care Inc., and Roche Diagnostics Corp. (collectively, the "Manufacturers"), by purchasing "Not For Retail Sale" test strips ("NFR Strips") on the secondary market, then billing them at higher reimbursement rates as retail test strips ("Retail Strips") to pharmacy benefit managers ("PBMs") (the "Questionable Business Practices"). Knowing that Alliance was engaged in fraud, Brown nevertheless took a leading role in aiding and abetting the Questionable Business Practices. Brown helped develop Alliance's corporate structure and independent pharmacy network to "spread the risk" and conceal the fraud. Brown recommended that Alliance redact NDC information from invoices requested by PBMs and gave Alliance lengthy instructions on how to do so. Brown hid information from Alliance's auditors to prevent them from discovering the fraud. Brown offered to show Alliance compliance directors how to redact "confidential information," that it knew was not actually confidential, from documents requested by PBMs. Brown drafted and submitted fraudulent audit appeals directly to PBMs, despite the fact it knew Alliance was committing fraud. And, Brown failed to advise Alliance to pursue alternate business opportunities which, if pursued, would have prevented Alliance's bankruptcy.

These allegations are all set forth in the Trustee's Second Amended Complaint, which, in response to the Court's Memorandum Opinion, has been supplemented and revised to address concerns, among other issues, choice of law, Alliance's corporate structure, the fiduciary relationships of its various Insiders, and causation.

Notwithstanding the well-pled allegations in the Second Amended Complaint, Brown confuses the alleged facts, asks the Court to assume facts in its favor and resolve issues of fact against the Trustee, asserts inapposite case law, and otherwise seeks dismissal on unavailing grounds. The Trustee responds to Brown's flawed arguments in turn, and respectfully asks the Court to deny the Motion.

Brown brings its Motion under Texas law, but that law conflicts with the law of Utah, which should apply to this lawsuit. The complaint is based on Brown's conduct with a Utah-based company and Utah-based fiduciaries breaching their duties in Utah. Moreover, the Court has already recognized that whether Texas or Utah law applies "is a choice of law issue not appropriate for the Court to decide on a motion to dismiss. Doc. 81 (Memorandum Opinion) at 18. Brown's use of Texas law should be rejected at this stage of the proceeding.

Brown argues that the Second Amended Complaint fails to show Brown knowingly participated or aided and abetting in breaches of fiduciary duty to Alliance. However, in response to the Opinion, the Amended Complaint clarifies the exact fiduciaries in question, their positions, and the entities to which they owed and breached fiduciary duties, and contains additional factual allegations further demonstrating Brown's knowing, substantial assistance in specific fiduciary breaches by specific Alliance Fiduciaries to specific Debtor entities. Moreover, Brown's claim that it did not know that the directors and officers with whom it engaged were fiduciaries to Alliance

is utterly disingenuous and incredible, and Brown's arguments are otherwise unavailing and should be rejected.

Brown also argues that the Trustee's knowing participation claim is time-barred because the statute of limitations should have begun running in 2013. However, under *In re Juliet Homes*, the discovery rule tolls the accrual of the cause of action until the filing of the bankruptcy. No. 07-36424, 2011 WL 6817928, at *16 (Bankr. S.D. Tex. Dec. 28, 2011) (Isgur, J.). Absent the tolling agreements, the Trustee therefore had until April 7, 2021 to bring the knowing participation claim, and the tolling agreements that encompassed the knowing participation claim were entered into on October 14, 2019. Thus, Brown's statute of limitations argument must be rejected.

Brown also argues that the Trustee's knowing participation claim is a fractured malpractice claim. However, Brown's argument misconstrues the clear allegations in the Second Amended Complaint and improperly relies on Texas caselaw that is nevertheless inapplicable to the facts in this case.

The same is true of Brown's argument regarding the "causation bar" doctrine. Brown claims that the Trustee's knowing participation claim is barred under Texas law. This argument fails; Brown relies on a non-binding, unpublished intermediate court decision that is irreconcilable with the Court's ruling in *Hill v. Day (In re Today's Destiny, Inc.)*, 388 B.R. 737 (Bankr. S.D. Tex. Apr. 11 2008), and because the Trustee's knowing participation claim includes additional damages that are not derived from the stipulated allowed claims and is thus distinct from a contribution claim.

Brown next argues that the Trustee's assigned claims are barred under the applicable statutes of limitation. This argument must be rejected because dismissal based on limitations would be improper at this stage in the litigation, Brown has failed to show that the statute of limitations

has run based on the face of the Second Amended Complaint, the tolling agreements apply to the assigned claims, and if they didn't, the discovery rule, federal limitations law, and the doctrines of fraudulent concealment and separate accrual toll the Trustee's claims.

Brown argues that the Trustee's fraud claim is barred by attorney immunity, but this argument fails because the applicable state law of Utah does not recognize an attorney immunity defense, and even under Texas law, Brown's conduct was entirely foreign to the duties of an attorney rendering the defense inapplicable. Brown also argues that the Trustee has failed to show that the Manufacturers indirectly relied on Brown's misrepresentations, but the Second Amended Complaint alleges each element of fraud under both Utah *and* Texas law, and in particular, clearly pleads the Manufacturer's indirect reliance on, among others, the fraudulent appeals submitted by Brown on behalf of Alliance.

Brown finally argues that the Trustee's conspiracy to commit fraud and RICO conspiracy claims are insufficiently pled. However, the Second Amended Complaint fully pleads each element of both; namely, that Brown, knowing that the Questionable Business Practices were unlawful, nonetheless conspired and agreed with the Alliance Fiduciaries to work together to perpetuate and conceal the Questionable Business Practices.

For these reasons, as well as those set forth in more detail below, each of Brown's arguments in the Motion are unavailing and must be rejected.

## ALLEGED FACTS SUPPORTING THE RESPONSE

### I.      BACKGROUND OF THE DEBTORS.

Prior to the Petition Date, the Debtors owned and operated a network of entities and pharmacies across the United States that specialized in providing diabetes test strips to patients (the "Alliance Healthcare Network"). Second Amended Complaint ("SAC") ¶¶ 1, 3, 42. The parent entity, Debtor Alliance Medical Holdings, LLC ("Alliance Medical Holdings"), was a Delaware

limited liability holding company based in Utah. SAC ¶ 43. Alliance Medical Holdings owned, controlled, and/or operated a network of over 100 debtor and non-debtor affiliated entities and shell companies. *Id.* The origins and development of the Alliance Healthcare Network are explained in paragraphs 34 to 50 of the Second Amended Complaint. Alliance Medical Holdings, the other Debtors, and their Affiliates[1] were collectively owned, managed, operated, and/or controlled by the same group of overlapping Insiders out of their Utah headquarters. SAC ¶¶ 34-50.

The Debtors and their Affiliates were formed and/or otherwise operated as alter egos of one another and of the Alliance Healthcare Network's owners as evidenced by, inter alia, the failure to maintain minutes, books, records of accounts and intercompany obligations, and corporate formalities among numerous Debtors and Affiliates (other than limited corporate minutes maintained by the parent Alliance Medical Holdings). SAC ¶¶ 46-50.

## II.    THE DEBTOR'S INSIDERS AND FIDUCIARIES

Alliance had a cadre of officers and directors that managed Alliance's business, and as Brown knew, Jeff Smith was the principal owner and fiduciary. SAC ¶ 51. Starting in 2007 and through the period of the Questionable Business Practices, Jeff Smith was the founder, CEO, and a member of the board of directors of Alliance's parent company, Alliance Medical Holdings, LLC.[2] *Id.* In addition to Jeff Smith, Justin Leavitt, Blaine Smith and others were each directors or officers of Alliance's parent company. *Id.* ¶¶ 52-60. All of them held positions, and owed fiduciary

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the Second Amended Complaint.

[2] Alliance's parent company changed names three times over the relevant time period; MedSource Direct from 2007-2012, Warner Diabetic d/b/a Ingram Medical from 2012-2014, and Alliance Medical Holdings d/b/a Alliance Health from 2014 to bankruptcy. SAC at ¶ 51.

duties to, a series of numerous Alliance subsidiaries set forth in paragraphs 51 to 64 of the Second Amended Complaint (the "Fiduciary Entities").

Of these Insiders, at least Jeff Smith, David Grant, Justin Leavitt, Sahily Paoline, Geoff Swindle, Kassie Thomas, Travis Hughes, Steven Hadlock, Adam Koopersmith, Blaine Smith, and Alison Wistner, were involved in or had direct knowledge of Alliance's ongoing fraudulent conduct and owed and breached fiduciary duties to the Fiduciary Entities, as set forth in paragraph 60 of the Amended Complaint and Appendix to the Second Amended Complaint. Brown aided and abetted breaches of fiduciary duty by these Alliance Fiduciaries.

Other Insiders appear to have had no or limited knowledge of the Questionable Business Practices, including Greg Duncan, Kurt Reinjes, and Matthew Simas, (the "Innocent Insiders"), as is set forth in paragraph 62 of the Second Amended Complaint.

## III.    BROWN'S PARTICIPATION IN THE SCHEME

Alliance defrauded the Manufacturers by purchasing NFR Strips on the secondary market, then billing them at higher reimbursement rates as Retail Strips to PBMs. SAC ¶¶ 90-95. The Questionable Business Practices resulted in millions of dollars in improper reimbursements to Alliance that were funded by rebates paid by the Manufacturers to the PBMs. SAC ¶¶ 11, 16, 91, 281. The Questionable Business Practices also harmed Alliance by increasing its liabilities, reducing its enterprise value, and diverting its resources from lawful business opportunities. *Id.* ¶¶ 284, 354-56. The Questionable Business Practices are alleged in more detail at paragraphs 65-95 of the Second Amended Complaint.

During the course of the Questionable Business Practices, PBMs would ask for proof from Alliance-affiliated pharmacies that they were selling pedigreed Retail Strips to the extent stated in the pharmacies' invoices. *Id.* ¶ 71. Because the pharmacies were actually selling NFR Strips, they could provide no such genuine pedigree. Accordingly, Alliance sought assistance from Brown, to

assist it in hiding the Questionable Business Practices from PBM auditors. *Id.* ¶¶ 90-102. Had Brown used its position to stop, rather than assist, the fraud, Alliance would have heeded that advice. *Id.* ¶ 312.

Brown attorneys knew that Jeff Smith and the other Alliance Fiduciaries owed fiduciary duties to Alliance Medical Holdings and the many Alliance Fiduciary Entities set forth in paragraphs 51 through 64 of the Second Amended Complaint. Brown also knew that Alliance's entire corporate structure was controlled and run as a single business enterprise by Alliance's parent company, Alliance Medical Holdings, and its directors and officers. *Id.* ¶ 51.

Brown took a leading role in aiding and abetting the Alliance Fiduciaries in perpetrating and concealing the Questionable Business Practices. Brown helped develop Alliance's corporate structure and independent pharmacy network to "spread the risk" and further conceal the fraud (SAC ¶¶ 144-61); recommended that Alliance redact NDC information from invoices requested by PBMs and gave Alliance lengthy instructions on how to do so, in order to hide the fraud (*id.* ¶¶ 190-202); hid information from Ernst & Young auditors "to look less shady" and keep them from discovering the fraud (*id.* ¶¶ 178-79); offered to show Alliance compliance directors how to redact "confidential information," that was not actually confidential, from documents requested by PBM to further conceal the fraud (*id.* ¶¶183-185); drafted and submitted fraudulent audit appeals directly to PBMs, despite the fact it knew Alliance was committing fraud (*id.* ¶¶ 196-99, 203); and failed to advise Alliance to pursue alternate business opportunities which could have saved Alliance and its various debtor entities from bankruptcy (*id.* ¶¶ 308-312).

## IV.    ALLIANCE'S BANKRUPTCY

With Brown's assistance, Alliance successfully hid the Questionable Business Practices until February 23, 2017, when the FBI and U.S. Postal Inspection Service raided Alliance's headquarters, warehouses, and various Alliance-owned pharmacies, and seized Alliance's bank

accounts. SAC ¶¶ 276-78. Unable to access its accounts, on April 7, 2017, Alliance and a number of its affiliates filed voluntary bankruptcy petitions thereby commencing the underlying chapter 11 proceedings (the "Chapter 11 Cases"). On April 18, 2017, the Court ordered the appointment of a Chapter 11 trustee. Bankr. Doc. 37. On May 18, 2017, a Chapter 11 trustee was appointed. Bankr. Doc. 307.

## V.     THE PLAN AND DISCLOSURE STATEMENT

On June 10, 2019, the Debtors filed the Amended Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code of Uplift Rx, LLC and its Debtor Affiliates (the "Amended Plan") Bankr. Doc. 1124. The Amended Plan provided for the formation of the Liquidating Trust and identified "causes of action" that would be transferred to the Liquidating Trust upon the Effective Date. Bankr. Doc. 1126. The Amended Plan was confirmed on August 8, 2019 (the "Confirmation Order") (Bankr. Doc. 1267), and the Effective Date was September 13, 2019, (Bankr. Doc. 1319). The Confirmation Order appointed Mark Shapiro as the Liquidating Trustee of the Liquidating Trust, and Plaintiff later became the successor Liquidating Trustee. Bankr. Doc. 1267, ¶10, Bankr. Doc. 1468.

## VI.    THE ROCHE AND LIFESCAN STIPULATIONS

During the Chapter 11 Cases, LifeScan and Roche filed multiple proofs of claim against the Debtors' estates based upon the wrongful acts and omissions of the Debtors, including the Questionable Business Practices. On July 10, 2019, the Debtors entered into separate stipulations with LifeScan and Roche (Bankr. Docs. 1176, 1178) allowing their claims and extending the voting deadline so that the Test Strip Manufacturers could vote on the Amended Plan (collectively, the "Claims Stipulations"). The Claims Stipulations were approved by the Court on August 5, 2019. Bankr. Docs. 1232, 1233.

## VII.   THE ASSIGNED CLAIMS

On May 22, 2020, the Trustee filed a Motion to Approve Stipulation by and between LifeScan, Roche, and the Trustee (A) Resolving Assertion of Privilege by Trustee and (B) Further Amending Liquidating Trust Agreement (the "Second Motion to Amend"). Bankr. Doc. 1395. Attached as Exhibit B to the Second Motion to Amend was a stipulation by and between LifeScan, Roche, and the Liquidating Trustee (a) resolving an assertion of privilege by the Liquidating Trustee in respect of certain privileged documents and (b) further amending the Liquidating Trust Agreement (the "Privilege Stipulation"). The Privilege Stipulation provided, *inter alia*, that, Roche and LifeScan agreed not to assert certain claims against various potential defendants and, upon execution of the Privilege Stipulation, conveyed their rights to assert those claims to the Liquidating Trustee, including claims against Brown. Privilege Stipulation ¶¶ 6-8.

On June 20, 2020, the Court approved the Privilege Stipulation (the "Privilege Stipulation Approval Order") Bankr. Doc. 1403, with no objections filed by any creditor or party in interest. Now, Brown is arguing that the assignment of claims contemplated in the Privilege Stipulation was invalid.

## ARGUMENT

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), made applicable by Federal Rule of Bankruptcy Procedure 7012(b), are "viewed with disfavor and are rarely granted." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *George v. SI Grp., Inc*., 36 F.4th 611, 619 (5th Cir. 2022)(citations omitted)."A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.*(citations omitted). In deciding a motion to dismiss under Rule 12(b)(6), the court "accepts as true those well-pleaded factual allegations in the complaint." *Id.*

"A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is treated as a Rule 12(b)(6) dismissal for failure to state a claim." *In re Morrison*, 419 B.R. 314, 324 (Bankr. S.D. Tex. 2009). Rule 9(b) requires the circumstances constituting fraud to be pled with "particularity." Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009. Under Rule 9(b)'s particularity requirement, the party asserting the fraud claim must allege "the existence of acts and circumstances sufficient to warrant the pleaded conclusion that fraud ha[s] occurred." *Id.* (citing *In re Haber Oil Co.*, 12 F.3d 426, 439 (5th Cir.1994)). However, the particularity requirement is less stringently applied where, as here, the alleged fraud was complex, occurred over a period of time, and involved "corporate fraud" because, under these circumstances, one "cannot be expected to have personal knowledge of the facts constituting the wrongdoing." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1039 (S.D. Tex. 1998); *see U.S. ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 206 (E.D. Tex. 1998) ("where the fraud allegedly was complex and occurred over a period of time, the requirements of Rule 9(b) are less stringently applied.").

For the reasons discussed below, Brown has not established that this is the rare case where dismissal at the pleading stage is appropriate.

## I.     A CHOICE OF LAW DETERMINATION IS PREMATURE.

Choice of law determinations are fact-intensive inquiries, and it would be premature for the Court to decide the applicable law in the context of a motion to dismiss. *See PHP Agency, Inc. v. Martinez*, No. 3:21-CV-00418-X, 2022 WL 93937, at *4 (N.D. Tex. Jan. 10, 2022) (denying motion to dismiss and holding "choice of law determinations are fact intensive inquiries that would be premature to resolve at the motion-to-dismiss stage"); *Drees v. Philadelphia Am. Life Ins. Co.*,

No. CV H-20-3607, 2021 WL 3674976, at *3 (S.D. Tex. Feb. 11, 2021) (holding that inadequate factual basis existed at motion to dismiss stage for making the choice-of-law determination without prejudice to being reargued after the factual record had been adequately developed).

In fact, in this case the Court has already recognized that whether Texas or Utah applies "is a choice of law issue not appropriate for the Court to decide on a motion to dismiss." Doc. 81 (hereinafter, the "Memorandum Opinion") at 18. Brown offers no reason to upset that ruling, and the Court should decline Brown's invitation to determine Texas law applies to each of the issues in the Trustee's claims.[3]

Regardless of the appropriateness of these arguments at the motion to dismiss stage, Brown's assumption that Texas law applies to all of the claims asserted in the Second Amended Complaint is also incorrect. The allegations in the Second Amended Complaint involve conduct by Texas attorneys directed toward Utah-based companies that conducted business across multiple states.

## II.  THE AIDING AND ABETTING / KNOWING PARTICIPATION CLAIM (COUNT I) IS FULLY AND PROPERLY PLED.

The Trustee's claim for aiding and abetting/knowing participation in a breach of fiduciary duty is properly pled, under both Texas and Utah law.

### A.  Texas Recognizes a Cause of Action for Aiding and Abetting and/or Knowingly Participating in Another's Breach of Fiduciary Duty.

Brown's argument that Count I fails because "aiding and abetting" is not a recognized cause of action in Texas falls flat. The Trustee's claim is for aiding and abetting/knowing participation in a breach of fiduciary duty. SAC ¶¶ 343-356. Texas law recognizes a cause of action

---

[3] *See also* Trustee's previous Response in Opposition to Brown's Motion to Dismiss (Doc. 31), incorporated herein by reference, at 27-36.

for knowing participation in a breach of fiduciary duty, and Texas courts use the language "aiding or abetting" and "knowing participation" synonymously in the context of a claim for knowingly participating in another's breach of fiduciary duty. *See Baylor Scott & White v. Project Rose MSO, LLC*, 633 S.W.3d 263, 284 (Tex. App.—Tyler Aug. 30, 2021, pet. denied) (describing "aiding or abetting breach of fiduciary duty" as "knowing participation in a breach of fiduciary duty"); *Straehla v. AL Glob. Servs., LLC*, 619 S.W.3d 795, 804 (Tex. App.—San Antonio 2020, pet. denied) ("It is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such.") (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942)). Thus, if Texas law were to apply, the Trustee has sufficiently alleged a claim for knowing participation in a breach of fiduciary duty in Count I.

### B.    The Trustee Alleges that Brown Knowingly Participated in a Breach of Fiduciary Duty.

The Second Amended Complaint alleges that Brown knowingly participated in the Alliance Fiduciaries' breaches of fiduciary duties. To establish a claim for knowing participation in a breach of fiduciary duty under Texas law, a plaintiff must assert: "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of a fiduciary relationship." *D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 216 (5th Cir. 2018) (citation omitted). Alternatively, under Utah law, a plaintiff must show "(1) a breach of a fiduciary duty owed to the plaintiff; (2) the defendant's knowing participation in the breach; and (3) damages." *Real Est. Sch. of Nevada v. Kapp*, 2015 WL 4729132 at *3 (D. Utah Aug. 10, 2015). In the Memorandum Opinion, the Court found that the Trustee's allegation that the Alliance entities were collectively owned and controlled by the same group of overlapping insiders was not enough to satisfy the first element.

Doc. 81 at 25. The Trustee's Second Amended Complaint remedies this concern by identifying the specific fiduciaries (the Alliance Fiduciaries), their positions, and the entities to which they owed fiduciary duties. Even Brown admits that the additional facts pled by the Trustee support a finding on this first element. *See* MTD ¶ 74. More specifically, the Second Amended Complaint provides detailed allegations, demonstrating that the Alliance Fiduciaries owed fiduciary duties to Debtor Alliance Medical Holdings and its various Debtor subsidiaries. *See* SAC ¶¶ 51-59, 61, 63-64. For example, the Trustee identified the following fiduciary relationships, among numerous others:

- Jeff Smith, the key individual and fiduciary at Alliance, owed fiduciary duties to the following Alliance Debtor entities: Alliance Medical Holdings, LLC,  Alliance Medical Administration, Inc. (director and officer), Alliance Health Networks, LLC (CEO), Ollin Pharmaceutical, LLC (CEO), Alta Distributors, LLC (manager), New Life Pharmacy, LLC (manager), Stonybrook Pharmacy, LLC (manager), Canyon Medical, LLC (manager). SAC ¶ 51.

- Justin Leavitt was the CFO of MedSource-Direct, Inc., CFO of Warner Diabetic, LLC d/b/a Ingram Medical, CFO and member of the Board of Directors of Alliance Medical Holdings, LLC d/b/a Alliance Health. SAC ¶ 52.

- Blaine Smith was the Executive VP of Sales of MedSource-Direct, Inc., Executive VP of Sales of Warner Diabetic, LLC d/b/a Ingram Medical, a member of the Board of Directors of Alliance Medical Holdings, LLC d/b/a Alliance Health and also became its CRO. SAC ¶ 53.

- Sahily Paoline was Alliance Medical Holdings, LLC's Chief Pharmacy Officer and a board member of Alliance Health Networks, LLC. SAC ¶ 54.

- The following individuals were also board members of Alliance Medical Holdings, LLC: Travis Hughes, Alison Wistner, Geoff Swindle, Kassie Thomas, Greg Duncan, Kurt Reintjes, BJ Forsgren, Adam Koopersmith, Matthew Simas, and Lee Rosebush. SAC ¶¶ 56-58.

The Second Amended Complaint also explains that these Alliance Fiduciaries were involved in and had direct knowledge of the ongoing fraudulent conduct[4] and breached their

---

[4] SAC ¶¶ 60-62, 64.

fiduciary duties.  Appendix 1 to the Second Amended Complaint sets out the specific fiduciaries and their breaches of fiduciary duty to Alliance.

Brown claims the Trustee failed to sufficiently allege that Brown knew of a breach and intended to aid that breach, but the Court *has already held* that the Trustee sufficiently alleged these elements, presenting an issue of fact not properly resolved on a motion to dismiss:

> But a fact issue remains as to whether Brown & Fortunato merely proffered legal services or knew of the breach of fiduciary duty and intended to aid that breach. The complaint goes beyond alleging that Brown & Fortunato provided legal advice to a client when it explains, for example, that Brown & Fortunato assisted Alliance in doctoring invoices and documents to conceal its fraud from the insurers and Test Strip Manufacturers.

Doc. 81 (Memorandum Opinion) at 26.

Yet, Brown again argues that the Trustee has not alleged that Brown knew that each of the directors and officers it engaged with were fiduciaries, stating, for example, that "simply stating that Blaine Smith was the Executive VP of Sales of MedSource-Direct, Inc. does not equate to facts that Brown *knew* that fiduciary relationship existed." MTD at ¶ 33 (emphasis original). This argument is disingenuous and improper for a motion to dismiss. The allegations and fair inferences show that Brown knew that Smith and the other fiduciaries were fiduciaries.  For one, Smith was the CEO, a director, or both of nearly every Alliance entity for which Brown performed services. SAC ¶ 51. The Trustee alleged that Smith was on the Board of Directors for the following entities:

- MedSource-Direct, Inc.
- Warner Diabetic, LLC d/b/a Ingram Medical
- Alliance Medical Holdings, LLC d/b/a Alliance Health
- Alliance Medical Administration, Inc.
- Alliance Health Networks, LLC
- Warner Diabetic, LLC

SAC ¶ 53. The Trustee similarly identified the fiduciary roles for the other Alliance Fiduciaries alleged in the Second Amended Complaint. SAC ¶¶ 51-58.   The adverse inference that Brown

asks the Court to make in the face of the alleged facts is improper for a motion to dismiss. It is clearly implausible that Brown, as regulatory and corporate counsel to Alliance and its officers and directors, did not understand that the directors and officers were Alliance Fiduciaries who owed fiduciary duties to the companies they served. *Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, Civil Action No. 3:12-CV-4641-N, 2015 WL 13741905, at *8 n.12 (N.D. Tex. Feb. 4, 2015) (denying motion to dismiss knowing participation in breach of fiduciary duty claim and rejecting law firm's argument it was unknowable whether an attorney had knowledge of fiduciary relationship because the attorney "may well have access to more facts supporting the existence of a fiduciary relationship than does the Court at this stage").[5] Yet, Brown asks the Court to assume the implausible.

Brown next claims the Trustee "fails to sufficiently allege that Brown *knew* it was participating in the fiduciaries' breaches." MTD at ¶ 74 (emphasis in original). While acknowledging that the Trustee provided a table listing each fiduciary and alleged breaches, Brown claims there are no facts stating that Brown *knew* it was participating in those breaches.

To make this argument, Brown ignores the numerous allegations of its knowing participation in breaches of fiduciary duty contained in the Second Amended Complaint. The Second Amended Complaint contains many allegations regarding Brown's knowing assistance in

---

[5] *See also, e.g.*, *In re W.J. Bradley Mortg. Cap., LLC*, 598 B.R. 150, 163 (Bankr. D. Del. 2019) ("Delaware law is clear that officers, directors, and managers owe a company they serve the traditional triad duties of care, loyalty and good faith."); *Ritchie v. Rupe*, 443 S.W.3d 856, 874 n.27 (Tex. 2014) (same); *Richardson v. Ariz. Fuels Corp.*, 614 P.2d 636, 639 (Utah 1980) (same).

the Alliance Fiduciaries' various breaches[6] and that Brown clearly knew of[7] and participated[8] in specific breaches.[9]

For example, the Second Amended Complaint alleges that Jeff Smith owed fiduciary duties to the Alliance entities and that Brown assisted Jeff Smith in his fiduciary breaches by *knowingly* redacting certain data from invoices that would have alerted PBMs to fraudulent invoices. SAC at ¶¶ 51, 297. And when David Grant took over as Alliance's General Counsel, Brown attorneys got him "up to speed" on the "NDC discrepancies, meaning that [Alliance] had been engaged in providing one product but billing for another." *Id.* at ¶ 298. In other words, Brown introduced David Grant's to the Questionable Business Practices and assisted his fiduciary breaches. As another example, Justin Leavitt owed fiduciary duties to the Alliance entities, and Brown advised Leavitt to conceal the Questionable Business Practices by not disclosing them when perpetuating the fraud by seeking financing for Alliance and entering into PBM contracts. *Id.* at ¶¶ 51, 160-61, 209-11.

Thus, the Second Amended Complaint pleads (1) the existence of fiduciary relationships between the Alliance Fiduciaries and Alliance Medical Holdings, LLC, and its various subsidiaries;[10] (2) that Brown knew of the fiduciary relationship;[11] (3) that Brown was aware that

---

[6] *See, e.g.,* SAC at ¶¶ 3, 64, 95, 116, 196-97, 259, 290-91.

[7] *See, e.g.,* SAC at ¶¶ 100-16, 142-43, 146, 189-91, 202, 290-99.

[8] *See, e.g.,* SAC at ¶¶ 144-61, 171-79, 183-91, 194-99, 201-204, 211, 252, 290-91, 300-307.

[9] And, as the Court has previously recognized, the Trustee has already established a fact issue as to Brown's knowledge, including by pleading that Brown "assisted Alliance in doctoring invoices and documents to conceal its fraud[.]" Doc. 81 (Memorandum Opinion) at 26; *see also* App'x to SAC at 2 (stating that Brown and Jeff Smith participated in redacting data from invoices).

[10] SAC ¶¶ 51-64.

[11] SAC ¶¶ 63-64.

it was participating in the breaches of fiduciary duties by advising and assisting the Alliance Fiduciaries in the Questionable Business Practices;[12] and (4) damages.[13] The elements for the Trustee's aiding and abetting / knowing participation claim are accordingly satisfied under both Utah and Texas law, and the Motion on this ground should be denied.

### C.   The Aiding and Abetting/Knowing Participation Claim is Not Time-Barred.

The Trustee's aiding and abetting/knowing participation claim is not time-barred. Brown argues that the statute of limitations for the Trustee's knowing participation claim began running in 2013 and therefore expired "no later than September 24, 2017." MTD at ¶ 81. Brown's argument ignores the fact that the discovery rule tolls accrual of a cause of action until "the plaintiff [(1)] discovers or should have discovered, in the exercise of reasonable care and diligence, the nature of the injury, or (2) had knowledge of such facts as would cause a reasonably prudent person to make an inquiry that would lead to discovery of the cause of action." *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.,* 9 F.4th 247, 253 (5th Cir. 2021). As applied to bankruptcy trustees, the discovery rule tolls the accrual of the cause of action until the filing of bankruptcy. *In re Juliet Homes, LP,* No. 07-36424, 2011 WL 6817928, at *16 (Bankr. S.D. Tex. Dec. 28, 2011) (Isgur, J.).

In *In re Juliet Homes*, the Court held that the trustee's claim was not subject to dismissal based on statute of limitations because the trustee could not have been aware of the cause of action until the petition date. *Id.* The court explained, "[a]lthough the Trustee steps into the shoes of the [bankrupt] company, it is not in a position, prior to the filing of the bankruptcy action, to be aware of potential claims arising from injuries to the bankrupt company." *Id.* at *15 (internal citation

---

[12] SAC ¶¶ 64, 100-116, 142-43, 170-312.

[13] SAC ¶¶ 7, 307.

omitted). Thus, "[a] reasonable person in the Trustee's position could not be aware of, or reasonably be expected to discover, injuries to [the debtor] prior to the filing of the bankruptcy petition." *Id*. As in *In re Juliet*, here, the statute of limitations for the Trustee's knowing participation claim did not begin to run until the Petition Date, April 7, 2017. Accordingly, absent the tolling agreements, the Trustee had until April 7, 2021 to bring the knowing participation claim against Brown.

As Brown acknowledges, however, the Trustee and Brown entered into a series of tolling agreements that extended the limitations period on any unexpired claims. *See* MTD at ¶¶ 46-47. Because the knowing participation claim had not expired by October 14, 2019, the date of the first tolling agreement, it was tolled by the parties' tolling agreements. Brown's argument that the Trustee's knowing participation claim on behalf of the Debtors was not encompassed by the tolling agreements fails.

In addition, the limitations were tolled under the adverse domination doctrine. The "adverse domination rule generally tolls the statute of limitations for a corporation's claims against board members where the board was dominated by members who were not disinterested." *In re Today's Destiny, Inc.*, No. 05-90080, 2009 WL 1232140, at *15 (Bankr. S.D. Tex. May 1, 2009) (Isgur, J.). Tolling is appropriate, in this context, "because where culpable directors and officers control a corporation, they are unlikely to initiate lawsuits or investigations for fear that such actions would simply focus attention on their own wrongdoing." *Askanase v. Fatjo*, 828 F. Supp. 465, 471 (S.D. Tex. 1993). The doctrine tolls "until a majority of disinterested directors discover or are put on notice of a cause of action." *Id.; see also F.D.I.C. v. Shrader & York*, 991 F.2d 216, 227 (5th Cir. 1993) (holding the adverse domination doctrine toll the statute of limitations until

the culpable directors and officers of a corporation "**relinquish control of the institution**")
(emphasis added).

As alleged in the Second Amended Complaint, Alliance's board "was dominated by
members who were not disinterested during Brown's involvement with Alliance and beyond.[14] A
majority of Alliance's directors and officers were actively engaged in Alliance's fraudulent invoice
scheme. Moreover, the Second Amended Complaint alleges sufficient facts to show that these
culpable directors and officers controlled the corporation until its bankruptcy.[15] It was not until the
Bankruptcy Court ordered the appointment of a Chapter 11 trustee, on April 18, 2017, that the
culpable directors and officers relinquished control of Alliance. Bankr. Doc. 37; *see In re Mollie
Enterprises, Inc.*, 559 B.R. 501, 506 (N.D. Ill. 2016) ("[T]he adverse domination rule applies and
tolls the statute of limitations until the Trustee was appointed in 2012 and Hanson was no longer
in control of the Debtor."). Because the knowing participation claim had not expired by October
14, 2019, the date of the first tolling agreement, it was tolled by the Trustee and Brown's tolling
agreements. Brown's argument that the Trustee's knowing participation claim was not
encompassed by the tolling agreements thus fails multiple times over.

Brown argues, instead, that the court should dismiss the knowing participation claim based
on an incorrect application of the discovery rule Brown impermissibly extends from this Court's
prior ruling on the Trustee's legal malpractice claim. MTD ¶¶ at 53-54. Brown claims that in order

---

[14] The Second Amended Complaint alleges that "at least Jeff Smith, David Grant, Sahily Paoline,
Geoff Swindle, Kassie Thomas, Travis Hughes, Steven Hadlock, Blaine Smith, Alison Wistner,
Justin Leavitt, Adam Koopersmith, and Lee Rosebush . . . were involved in or had direct
knowledge of Alliance's ongoing fraudulent conduct, and owed and breached fiduciary duties to
the Fiduciary Entities . . . ." SAC ¶ 60. For an explanation of the roles these individuals held within
Alliance and its various subsidiaries see paragraphs 51-64 of the Second Amended Complaint.

[15] SAC ¶¶ 51, 53, 58 (alleging a number of Alliance Insiders who were engaged in the fraud were
present "from the onset of Brown's engagement to the bankruptcy").

to state a claim for knowing participation, the Trustee was required to plead that "Alliance did not know Brown was participating in breaches of fiduciary duties by certain Alliance officers and directors." MTD at ¶ 54. The only basis Brown provides for this argument is an out-of-context quotation from this Court's Memorandum Opinion discussing the discovery rule as applied to the Trustee's malpractice claim. MTD at ¶¶ 53-54. Brown ignores the fact the Court applied a discovery rule in a manner unique to malpractice claims. Doc. 81 at 22. ("The discovery rule applies in legal malpractice claims, and 'accrual is deferred until **the client** discovers, or should discover, the wrongful act and injury.') (emphasis added) (citing *Erikson v. Renda,* 590 S.W.3d 557, 563 (Tex. 2019)).The Court used this application of the discovery rule stating: "**As to the malpractice claim**, the discovery rule would require a demonstration that Alliance was unaware of the illegality of its own conduct." *Id.*  (emphasis added). The Court was clear that this application of the discovery rule is unique to the malpractice claim and the Court did not apply its legal malpractice statute of limitations reasoning to Brown's knowing participation claim. Instead, the Court dismissed the knowing participation claim without prejudice, on other grounds. Doc. 82 at 26. The Court did not dismiss the knowing participation claim based on limitations because the law does not support dismissal.

For the reasons stated above, the Court must reject Brown's argument that the Trustee was required to plead facts that *Alliance* did not know Brown was participating in breaches of fiduciary duties in order for the statute of limitations to toll under the discovery rule.

**D.      The Knowing Participation Claim is Not a Fractured Malpractice Claim.**

Brown also argues that the Trustee's knowing participation claim "is an attempt to revive the dismissed legal malpractice cause of action by labeling it something else."[16] MTD ¶ 26. Brown claims that the knowing participation claim is nothing more than a legal malpractice claim because it is based only on Brown's "failing to advise Alliance that the conduct was fraudulent or illegal." MTD ¶¶ 57-58. Thus, Brown asserts that the Trustee's knowing participation claim should be dismissed as a fractured malpractice claim under Texas law. Brown's argument must be rejected for three reasons.

*First*, Brown's argument relies on a Texas law doctrine, and, as is discussed herein, the Trustee's knowing participation in breach of fiduciary duty claim is governed by Utah law. The aiding and abetting of the breaches of fiduciary duty was directed toward and occurred in Utah, as that is where the breaches took place. The Trustee has been not located any similar doctrine of fracturing under Utah law, and Brown has not cited any.

*Second*, the Trustee *has alleged* that Brown did more than "failing to advise," including that Brown took affirmative actions that go beyond traditional lawyer-client duties. Brown's argument requires ignoring these allegations of the Second Amended Complaint. Notably, Brown selectively omits key allegations that describe how Brown intentionally and knowingly participated in the Alliance Fiduciaries' breaches of fiduciary duty. MTD at ¶ 58. That paragraph from the Second Amended Complaint, with the allegations Brown omitted in bold, reads as follows:

> knowingly participated in and/or otherwise aided and abetted the Alliance Fiduciaries' breaches of fiduciary duties of loyalty and/or care to the Fiduciary Entities by, inter alia: **(i) assisting the Alliance Fiduciaries in engaging in,**

---

[16] The Trustee notes that both the malpractice and knowing participation claims were brought together in the Original Complaint. Doc. 1 at 77-78.

**furthering, perpetuating, and concealing the Questionable Business Practices**; (ii) failing to fully or properly consult and advise the Alliance Fiduciaries, Innocent Insiders, or the Fiduciary Entities regarding the fraudulent nature or illegality of the Questionable Business Practices; (iii) failing to fully or properly consult and advise the Alliance Fiduciaries, Innocent Insiders or the Fiduciary Entities regarding the potential risks and harm to the Fiduciary Entities in respect of the Questionable Business Practices; (iv) failing to fully or properly advise the Alliance Fiduciaries, Innocent Insiders or the Fiduciary Entities to pursue alternative revenue streams available to the Fiduciary Entities throughout the relevant period and pivot away from the Questionable Business Practices; (v) failing to fully or properly consult and advise the Alliance Fiduciaries, Innocent Insiders or the Fiduciary Entities whether the company was required by law to immediately self-disclose and forthwith cease and desist from engaging in the Questionable Business Practices; (vi) failing to advise or notify the Alliance Fiduciaries, Innocent Insiders or the Fiduciary Entities that Brown was withdrawing its legal advice and opinions, including those related to the Questionable Business Practices, and such advice and opinions could no longer be relied upon by the Fiduciary Entities; **(vii) creating the corporate ownership structures with the aim of perpetuating the Questionable Business Practices; (viii) covering up the Questionable Business Practices through misrepresentations and omissions to PBMs and the Manufacturers; (xi) counseling and assisting the Alliance Fiduciaries in conduct that Brown knew was fraudulent and exposed the Fiduciary Entities to third-party liability**; (x) failing to inform the Boards of Directors of the Fiduciary Entities and/or the Innocent Insiders that the Company was engaged in blatantly illegal activity; and (xi) failing to withdraw from its representation of the Fiduciary Entities in light of its continued illegal activities or otherwise advise the Alliance Fiduciaries or the Innocent Insiders that it could not assist in the fraud.

SAC ¶ 354 (emphasis added to allegations not quoted by Brown); MTD at ¶ 58.

As shown above, in addition to the allegations with which Brown takes issue in its Motion, the Trustee alleged that "among other acts and omissions," Brown "assist[ed] the Alliance Fiduciaries in engaging in, furthering, perpetuating, and concealing the Questionable Business Practices," "creat[ed] the corporate ownership structures with the aim of perpetuating the Questionable Business Practices," "cover[ed] up the Questionable Business Practices through misrepresentations and omissions to PBMs and the Manufacturers," and "counsel[ed] and assist[ed] the Alliance Fiduciaries in conduct that Brown knew was fraudulent and exposed the Fiduciary Entities to third-party liability." SAC ¶ 354.  The Second Amended Complaint alleges

additional details supporting each of those allegations. *See, e.g.,* SAC ¶¶ 170-204. These detailed allegations show that Brown aided and abetted the breaches and was not merely engaged in negligent malpractice.

*Third*, even if Texas law applied, it does not support Brown's position. The cases of *Floyd v. Hefner* and *Janvey v. Proskauer Rose LLP* are on point. *Floyd v. Hefner*, 556 F. Supp. 2d 617, 659 (S.D. Tex. 2008); *Janvey v. Proskauer Rose LLP*, C.A. No. 3:13-CV-0477-N, 2015 WL 11121540 at *4 (N.D. Tex. June 23, 2015). In *Floyd*, the lawyer-defendants argued that the plaintiff's aiding and abetting breach of fiduciary duty and conspiracy claims impermissibly fractured the negligence claim. *Floyd*, 556 F. Supp. 2d at 659. The *Floyd* court rejected this argument, finding that the conspiracy and aiding and abetting claims were not negligence claims because they concerned the lawyers' actions vis-à-vis the directors' breaches of fiduciary duties. *Id*. Noting that "Texas law permits a party to bring both a malpractice action based on his lawyer's breach of independent duties and a separate claim for the lawyer's assistance with the breach of another's fiduciary duties," the court found that the aiding and abetting and conspiracy claims were not fractured. *Id*.

In *Janvey*, defendant lawyers also argued that a claim for aiding and abetting breaches of fiduciary duties was duplicative of the plaintiff's malpractice claims, and thus impermissibly fractured. *Janvey*, 2015 WL 11121540 at *4-5. The *Janvey* court rejected the argument, again noting that malpractice "based on [a] lawyer's breach of independent duties" was separate and distinct from "a claim for the lawyer's assistance with the breach of another's fiduciary duties." *Id*. at *5.

Accordingly, for the reasons set forth above, Brown's fracturing arguing is unavailing and should be rejected.

E.      **Defendant's "Contribution Bar" argument is wrong.**

Despite the fact that the Trustee is not seeking recovery by way of contribution, Brown claims that the Trustee's knowing participation in a breach of fiduciary duty claim is barred because it is supposedly a contribution claim under another label. MTD at ¶¶ 62-70. This argument gets the law wrong and misstates the Trustee's claims. The Trustee's fiduciary duty claim must be assessed on its own merits.

First of all, Texas law does not apply, and the Trustee has not alleged a contribution claim against Brown under Texas law. Thus, Brown's reliance on an unpublished, Texas intermediate court decision is misplaced.[17] MTD at ¶ 68 (citing *FG Holdings, Inc. v. London Am. Risk Specialists, Inc.*, No. 09-05-522 CV, 2007 WL 4341408 (Tex. App.—Beaumont Dec. 13, 2007, pet. denied)). As Brown's tortious activity was undertaken for a Utah-based client, the Trustee's claims are governed by Utah law, not by Texas law. And Brown points to no Utah law that would bar the Trustee's claims.

Brown's argument is also factually incorrect. It is premised on the view that the Manufacturers "settled" their claims against Alliance under the Proportionate Responsibility Statute (TEX. CIV. PRAC. & REM. § 33.001 *et seq.*). There are important considerations precluding a ruling that the allowance of the Manufacturers' claims constituted a "settlement."

In support of its flawed argument, Brown points to the Manufacturers' Claims Stipulations in the main bankruptcy proceeding. MTD at ¶¶ 62-70. The stipulations, however, were not approved pursuant to Rule 9019 and implicate different considerations from the Proportionate Responsibility Statute. The Manufacturers' Claims Stipulations were not settlements because they

---

[17] *FG Holdings* involved a claim for indemnity from an insurer. It is an unpublished opinion that is not binding, and was decided on summary judgment on a fully developed factual record.

served only to fix the claims and authorize the Manufacturers to vote on the Amended Plan, paving the way for confirmation.[18] Importantly, they are not labeled settlements, were not filed for approval by the Court pursuant to Rule 9019 and the criteria established for approving settlements.[19] And, the Court did not approve them pursuant to Rule 9019.

If resolution of allowed claims in bankruptcy were treated as *de facto* settlements for purposes of the Proportionate Responsibility Statute, that would cause far-reaching consequences for the efficient administration of the Estate, where claims are often allowed to facilitate plan confirmation and avoid unnecessary disputes and delay, all for the benefit of creditors. Brown's position would impose an unnecessary and improper burden upon estate representatives. The primary estate asset is often the claims against the debtor's directors, officers, and third-party advisors who perpetrated or aided and abetted the fraud to the debtor's wrongful conduct. Allowing a creditor's claim against the debtor based upon fraud, without allowing the debtor or trustee to pursue aiding and abetting claims or any other claims against third parties contributing to the fraud, would be inimical to the trustee's obligations to facilitate plan confirmation while also maximizing potential recoveries for the debtor's creditors. It is logical and contrary to the purposes of the bankruptcy process to tie the hands of the trustee in this way.

---

[18] "Not every resolution of a disagreement in a bankruptcy case is a settlement for purposes of Bankruptcy Rule 9019." *In re Boy Scouts of Am. & Delaware BSA, LLC*, 642 B.R. 504, 562 (Bankr. D. Del. 2022) (explaining that certain mediated "settlement agreements," "are not truly settlement agreements, but rather consensual resolutions of Plan terms or resolutions of confirmation objections").

[19] In contrast to the treatment of the Claims Stipulations, which were not submitted for 9019 review, the Debtors filed numerous 9019 motions to approve compromises and settlements during the Bankruptcy Cases, including *thirteen (13)* separate 9019 motions *filed on the same day* as the Claims Stipulations. *See* Bankr. Docs. 1172, 1173, 1175, 1177, 1179, 1180, 1181, 1182, 1183, 1184, 1185, 1186, 1187 (all filed July 10, 2019).

Thus, Brown's position is irreconcilable with the Court's court ruling in *Hill v. Day (In re Today's Destiny, Inc.)*, 388 B.R. 737, 2008 Bankr. LEXIS 1499 (Bankr. S.D. Tex. Apr. 11 2008). In *In re Today's Destiny*, the trustee alleged that the injury and damages included in the customers' proofs of claim were the result of the debtors' fraud and that the defendant lenders aided and abetted that fraud. As in scores of other cases, the trustee was entitled to proceed with its contribution claims against the lenders based on the liability and the damages established by the customers allowed proofs of claim against the debtor. *Id.* at *750-757.

Finally, even if there was a "settlement" for purposes of the Proportionate Responsibility Statute, the Trustee's fiduciary duty claims seek additional damages that are both *independent* from and *beyond* the LifeScan and Roche allowed claims. The Trustee is asserting independent claims for malpractice and knowing participation that involve conduct and events broader than those addressed in the amount of allowed claims to LifeScan and Roche, including, among others, disgorgement of fees, increased liabilities, pre-bankruptcy loss of assets and enterprise value, and the loss of business opportunities in the form of Alliance's decision not to pursue viable, legal alternative businesses based on Brown's continued support of the fraudulent scheme. These damages are not derived from the stipulated allowed claims. Accordingly, the Trustee is not in the same position as the plaintiff in *FG Holdings*, who conceded that the only damages it sought were "derivative" of the damages paid in settling an earlier suit. 2007 WL 4341408, at *7.

## III.   THE TURNOVER/DISGORGEMENT CLAIM IS FULLY AND PROPERLY PLED.

Brown argues that if the Court dismisses the Trustee's knowing participation claim (Count I), it must dismiss the turnover/disgorgement claim because such claim is based on the knowing participation claim. As explained above, the knowing participation claim must survive dismissal, and so too must the turnover claim.

## IV.   THE AIDING AND ABETTING/KNOWING PARTICIPATION IN FRAUD CLAIM (COUNT III) WAS NOT DISMISSED WITH PREJUDICE.

Brown alleges that the Trustee's Count III is impermissible as having been already dismissed with prejudice. Not so. Count III asserts a cause of action for aiding and abetting/knowing participation in fraud or fraudulent misrepresentation. SAC, Count III. This claim is one of three fraud claims that the Court previously ruled could be re-pled. Doc. 81 at 36-37. In this Court's prior opinion, the Court ruled that the Original Complaint failed to state "claims for fraud, aiding and abetting fraud, and conspiracy to commit fraud." *Id.* However, the Court expressly stated that with regard to these three claims, "Austin is granted leave to amend her complaint to assert allegations that simultaneously meet Rule 9 and are plausible." *Id*. The Trustee therefore filed the Second Amended Complaint, re-pleading the three fraud claims: aiding and abetting fraud (Count III), fraud (Count IV), and conspiracy to commit fraud (Count V).

Brown's confusion likely stems from the fact that the Court dismissed the Trustee's claim for aiding and abetting negligent or fraudulent misrepresentation. Doc. 81 at 36-39. That claim, unlike Count III in the Second Amended Complaint, specifically encompassed negligence and negligent misrepresentation. In contrast, Count III asserts a claim for aiding and abetting or knowing participation in fraud or fraudulent misrepresentation, which the Court did not dismiss[20]

---

[20] While Count III in the Second Amended Complaint is titled "Aiding and Abetting/Knowing Participation in Fraud/Fraudulent Misrepresentation," there are two inadvertent references to negligence under Court III, which incorrectly describes the count as one for "negligent and/or fraudulent misrepresentation." SAC ¶¶ 361, 369. The references to negligence and negligent misrepresentation were a scrivener's error.

## V.     THE ASSIGNED CLAIMS ARE NOT TIME-BARRED.

### A.     Statute of Limitations

#### 1.     Statute of Limitations should not be decided on a motion to dismiss in this case.

Brown seeks dismissal of the Assigned Claims based upon the statute of limitations defense, arguing the claims against LifeScan and Roche began to accrue by 2014 and 2015, respectively. MTD at ¶ 80. The statute of limitations is an affirmative defense under Fed. R. Civ. P. 8(c)(1) that normally "must be resolved through discovery and summary judgment or trial." *Frame v. City of Arlington,* 657 F.3d 215, 240 (5th Cir. 2011) (en banc). This is because the Trustee need not plead around an affirmative defense, and "a Rule 12(b)(6) motion typically cannot rely on evidence outside the complaint." *C&C Inv. Props., L.L.C. v. Trustmark Nat'l Bank,* 838 F.3d 655, 660 (5th Cir. 2016). "To dismiss a complaint under Rule 12(b)(6) as barred by the statute of limitations, the face of the complaint must show **beyond doubt** that the statute of limitations period has run." *Motorola Mobility, Inc. v. Tivo Inc.,* Case No. 5:11-cv-053, 2013 WL 12040725, at *3 (E.D. Tex. Jan. 25, 2013) (emphasis added); *Morgan v. Chapman*, 629 F. Supp. 3d 616, 623 (S.D. Tex. 2022) ("the live pleading must show 'beyond doubt' that the plaintiff cannot overcome the statute of limitations defense.") (citing B*ell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 320 (5th Cir. 2022)); *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.,* 998 F.3d 190, 200 (5th Cir. 2021) (holding dismissal based on limitations "is proper only where it is evident from the complaint that the action is barred and the complaint fails to raise some basis for tolling").

The Second Amended Complaint does not allege facts showing that the statute of limitations period has run, and *has* alleged a basis for tolling, so Brown's statute of limitations defense should be rejected.

**2.      Tolling Agreements apply to both direct and assigned claims.**

On October 14, 2019, Brown entered into a Tolling Agreement with Plaintiff's predecessor trustee, Mark Shapiro, extending the statute of limitations for all claims against Brown. Both parties executed an amendment to the Tolling Agreement on March 15, 2020, and second on June 19, 2020, (the "June Amendment") extending the claims.[21] The June Amendment establishes that the Trustee is entering the agreement "as assignee of certain claims of LifeScan, Inc., Roche Diagnostics Corp., and Roche Diabetes Care, Inc. pursuant to that certain Stipulation by and between LifeScan, Roche, and the Trustee." Ex. A.

Despite entering into the Tolling Agreement that stated that the Liquidating Trustee was acting "as assignee of" the Manufacturers' Assigned Claims, Brown now contends the Tolling Agreements never tolled the Manufacturers' Assigned Claims. Brown has moved to dismiss the complaint twice before, but Brown did not raise this argument either time—because Brown knows that was not the meaning or intention of the tolling agreement. Brown only belatedly raised this argument after Baker & Hostetler moved to dismiss their adversary proceeding and claimed that the Assigned Claims were not tolled by a similar agreement. But, Brown did not and cannot now believe that is the actual intent of its tolling agreement. And, the fact that Brown did not previously make its new-found argument is further evidence that Baker's reading is also incorrect.

Brown hinges its argument on a reading of the June Amendment that improperly deprives the terms of the June Amendment of meaning. In particular, Brown disregards, and in fact does not even discuss, the language referring to the Trustee "as assignee of" the Manufacturer's claims or the reference to the Stipulation that assigned the Manufacturers' claims to the Trustee

---

[21] Brown and the Trustee would eventually agree to seven amendments to the Tolling Agreement in total, the last executed on July 26, 2021 extending claims until October 31, 2021.

The "as assignee of" language, however, cannot be ignored or rendered meaningless. Under Texas law, "[c]ourts must favor an interpretation that affords some consequence to each part of the instrument so that none of the provisions will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983); *see also Affiliated Cap. Corp. v. Com. Fed. Bank*, 834 S.W.2d 521, 526 (Tex. App.—Austin 1992, no pet.) ("The court in construing the contract must look at the entire writing and try to harmonize all provisions so that none is rendered meaningless."). The "as assignee of" text has only one logical purpose and meaning—to toll the assigned Manufacturer claims; otherwise, it would be rendered meaningless. Mr. Shapiro had two distinct roles, and the June Amendment mentioning his role as assignee was unnecessary unless the agreement was intended to cover the Assigned Claims. By including in the Tolling Agreement Mr. Shapiro's role as assignee, and the Stipulation that assigned the Manufacturers' claims to the Trustee, the June Amendment tolled the assigned claims. For these reasons, the Court should give the "as assignee of" language its plain intended meaning and toll the assigned claims. Thus, the Assigned Claims were tolled from June 14, 2020 forward.[22]

### 3. Brown's argument regarding the inapplicability of the discovery rule due to Manufacturers' alleged knowledge of an injury must be rejected.

The Trustee's Second Amended Complaint alleges facts establishing that the discovery rule prevented the accrual of the Manufacturers' claims. For example, the Trustee alleges that Alliance's fraudulent claims adjudications were kept hidden from the Manufacturers and PBMs

---

[22] Because Brown has not previously claimed that the tolling agreements did not toll the Assigned Claims, the Trustee did not amend its Second Amended Complaint to include a claim for mutual mistake or other basis for reformation. The Trustee requests leave to do so if necessary to preserve the intended meaning of the tolling agreement.

and that Brown and Alliance concealed the Questionable Business Practices from PBM auditors and the Manufacturers by the following:

- creating an independent pharmacy network to disguise the fraud (SAC ¶¶ 144-61);

- redacting invoices requested by PBMs to hide the fraud (SAC ¶¶ 171-177);

- redacting information on documentation requested by PBMs that Brown incorrectly claimed was "confidential information" to hide the fraud (SAC ¶¶ 183-185);

- appealing PBM audits Brown and Alliance knew correctly found fraudulent conduct by Alliance pharmacies (SAC ¶¶ 196-99, 203); and

- conspiring to conceal information from in person CVS audits in order to continue hiding the fraud. (SAC ¶ 201).

Brown argues that the discovery rule is inapplicable because the Manufacturers allegedly knew of the fraudulent scheme in 2014 (LifeScan) and 2015 (Roche). MTD ¶ 89. But this misconstrues the critical inquiry.

First, a suspicion of fraud is very different from knowledge of an actionable injury caused by fraud. According to the Fifth Circuit, under the injury-discovery rule of accrual, claims do not accrue when plaintiff becomes aware of "allegedly fraudulent conduct," but rather accrue only when the plaintiff "knew, or should have known, that it suffered an injury caused by the allegedly fraudulent conduct." *Love v. Nat'l Med. Enterprises*, 230 F.3d 765, 777 (5th Cir. 2000). That is, mere knowledge that Alliance or Alliance-affiliated entities were engaged in fraud is not sufficient for the running of the statute of limitations. Instead, Brown must show conclusively when the Manufacturers became aware of particular injuries from the fraud.

In the context of medical insurance fraud, like the fraud here, the Fifth Circuit has also observed that the injury is not the fraudulent scheme as a whole, but instead an injury accrues separately each time the plaintiff "became obligated to pay a fraudulent (assumed) insurance claim submitted" by the defendant. *Id.* at 775. Brown cannot rely on high level allegations that the

Manufacturers were suspicious of fraudulent conduct generally or even fraudulent conduct of Alliance or Alliance-affiliated entities. Instead, Brown must show that the pleadings demonstrate beyond doubt that LifeScan and Roche had awareness of each and every false insurance claim that Alliance or its affiliated entities submitted during the limitations period. Brown has not (and cannot) make such a showing. Accordingly, dismissing the Amended Complaint on the basis of statute of limitations would be improper. Indeed, *Love* found that it was improper to resolve these issues in a similar context even at the summary judgment stage.

Second, Brown's argument also improperly raises disputed issues of fact in a motion to dismiss. Brown assumes that the information allegedly available to LifeScan and Roche in 2014 and 2015, respectively, was sufficient as a matter of law for them to know of the specific injuries they suffered. The statements cited by Brown do not actually show knowledge of Alliance's fraudulent scheme, let alone knowledge of particular injuries stemming from the fraud. The first statement cited by Brown comes from the 2017 LifeScan Complaint. This does not, however, evince any knowledge by LifeScan of any specific fraudulent rebate paid based on a fraudulent insurance claim.

Brown has not demonstrated that as a matter of law LifeScan would have uncovered the injuries it was suffering through the exercise of reasonable diligence. The inquiry notice standard requires that a plaintiff exercising reasonable diligence would have been able to uncover the factual bases for the claims against Alliance at the time. *See Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 256 (5th Cir. 2021) ("Nor can it be said as a matter of law that a reasonably diligent investigation at the time, without the benefit of a full audit or the details of Padilha's plea agreement, would have uncovered the basis for Petrobras's fraud claim."). The allegations that

Brown cites demonstrate that, despite efforts to investigate, LifeScan could not uncover its injuries, and that at each turn, Alliance frustrated LifeScan's efforts to investigate and discover its injury.

Despite the PBMs' and Manufacturers' diligent efforts to investigate, the Second Amended Complaint alleges that the Manufacturers did not uncover their injuries from the fraudulent scheme until July 19, 2017. SAC ¶¶ 321-331. Consistent with these allegations, LifeScan did not file a complaint related to Alliance's fraudulent scheme until July 28, 2017. SAC ¶ 280. Moreover, the Manufacturers were not aware of Brown's involvement until even later because of Brown's attempts to resist discovery and conceal its role. *See* SAC ¶¶ 333-341. As discussed below, Brown's concealment of its involvement is sufficient to toll the statute of limitations for claims against it. At most, the Manufacturers were suspicious and diligently investigated a cause of action that they simply could not uncover. But mere suspicion of a potential injury is not in itself enough to begin the clock on the statute of limitations. Under Texas law, suspicion of a potential injury would begin the limitations period only where inquiry "would lead to discovery of the concealed cause of action.'" *Etan Indus., Inc. v. Lehmann,* 359 S.W.3d 620, 623 (Tex. 2011); *see also Hemmerdinger Corp. v. Ruocco,* 976 F. Supp. 2d 401, 408 (E.D.N.Y. 2013) ("Mere suspicion will not suffice; rather, a plaintiff must have 'knowledge of the fraudulent act.'"); *Bull. Displays, LLC v. Regency Outdoor Advert., Inc.,* 518 F. Supp. 2d 1182, 1186 (C.D. Cal. 2007) ("[M]ere suspicion . . . would not have led him to reasonably believe that he had a cause of action under RICO").

At bottom, none of the statements cited by Brown demonstrate beyond doubt that when LifeScan or Roche had knowledge of the injuries they suffered from Alliance's fraud. *See Morgan*, 629 F. Supp. 3d at 623 ("[T]he live pleading must show 'beyond doubt' that the plaintiff cannot overcome the statute of limitations defense.") (citing *Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 320 (5th Cir. 2022)). Further, Alliance and its affiliated pharmacies, which

were constantly changing as a way to mask the fraud, continued to submit additional fraudulent claims until Alliance's bankruptcy in 2017. Each of these submissions constituted a separate injury to the Manufacturers that started their own statute of limitations. In 2014 or 2015, the Manufacturers could not have had knowledge of these additional fraudulent claims that Alliance-affiliated entities had not yet submitted. *See Love*, 230 F.3d at 775 ("Until it became so obligated, it had not suffered an injury as the result of the submission of that claim. Obviously, for that submittal, it could not have suffered any injury before Appellees submitted the claim for payment."). Accordingly, Brown's citation to the above statements "at best raises fact questions not suitable for disposition under Rule 12(b)(6)." *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 256 (5th Cir. 2021) (reversing dismissal on statute of limitations grounds of a RICO claim based on allegations of fraud in which the defendant "camouflaged" its involvement despite).

Because Brown cannot show that Manufacturers had the requisite knowledge, its defense to the allegations supporting the discovery rule fails. MTD at ¶¶ 88, 90.

<u>Fraudulent Concealment</u>

But even if discovery rule was inapplicable to toll of the Trustee's claims, the doctrine of fraudulent concealment sterilizes Brown's statute of limitations defense. The Second Amended Complaint alleges fraudulent concealment, which tolls the statute of limitations after a cause of action accrues. *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 67 (Tex. 2011). The elements of fraudulent concealment are: (1) existence of an underlying tort; (2) the defendant's knowledge of the tort; (3) the defendant's use of deception to conceal the tort; and (4) the plaintiff's reasonable reliance on the deception. *Markwardt v. Tex. Indus., Inc.,* 325 S.W.3d 876, 895 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The doctrine "is an equitable doctrine, and its application is

fact-specific." *In re Juliet Homes, LP,* No. 07-36424, 2011 WL 6817928, at *16 (Bankr. S.D. Tex. Dec. 28, 2011) (Isgur, J.).

Here, the Second Amended Complaint alleges each of the elements.[23] The Second Amended Complaint alleges that neither the PBMs nor the Manufacturers could, with reasonable diligence, discover whether any injury had taken place. As explained above, Brown made misrepresentations that hid the injury itself, not just Brown's role in the injury, and prevented the PBMs and Manufacturers from discovering that the sales of retail strips listed on Alliance's fraudulent invoices were actually incorrect.

Accordingly, the Second Amended Complaint has alleged facts sufficient to invoke the fraudulent concealment doctrine, and Brown's statute of limitations affirmative defense must fail.

### 4.     RICO is subject to federal limitations law, which does not bar claims.

Defendant moves to dismiss the Trustee's RICO claims under Texas statute of limitations law, but federal law, not Texas law, governs the statute of limitations and tolling rules with respect to the assigned RICO claims. *Rotella v. Wood,* 528 U.S. 549, 553-59 (2000). Under the federal fraudulent concealment doctrine, the applicable statute of limitations is tolled if the plaintiff shows that: "(1) the wrongdoer fraudulently conceals the facts forming the basis for the claim, ***including the wrongdoer's own identity as the wrongdoer***; and (2) the plaintiff cannot access these facts through reasonably diligent investigation." *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd*., 9 F.4th 247, 253 n.4 (5th Cir. 2021) (emphasis added) (internal quotation marks omitted) (citing *Texas v. Allan Constr. Co.*, *Inc.*, 851 F.2d 1526, 1533-34 (5th Cir. 1988)). The concealment element is satisfied through evidence that either the wrong was self-concealing or that the defendant took affirmative steps to conceal its existence. *Allan Constr. Co.*, *Inc.*, 851 F.2d at 1528-

---

[23] SAC ¶¶ 313-41

33. "In the Fifth Circuit, a self-concealing wrong is one in which[] deception is an essential element for some purpose other than merely to cover up the act." *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1030 (N.D. Miss. 1993) (internal quotation marks and citation omitted).

Under federal law, that a defendant concealed its involvement in fraud is sufficient to toll the statute of limitations. See *Petrobras*, 9 F.4th at 253 n.4; *see also Labaty v. UWT, Inc.*, 121 F. Supp. 3d 721, 750 (W.D. Tex. 2015) ("[A] potential defendant's alleged concealment of its involvement in the fraud means the defendant concealed enough information about 'the conduct complained of' or 'the facts at issue' to toll the statute of limitations on the RICO claims"). For example, in *Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG*, the court considered whether disclosure of LIBOR inaccuracies in a market report (i.e., the injury) were sufficient to toll the statute of limitations for antitrust and racketeering claims. 277 F. Supp. 3d 521, 567-68 (S.D.N.Y. 2017). The court held that the doctrine of fraudulent concealment tolled the statute of limitations until the first regulatory settlement against a defendant (i.e., a wrongdoer's identity) was publicly announced. *Id.* at 568 ("[D]efendants' alleged collusion and manipulation by its very nature was concealed from the public, which prevented plaintiffs from having notice of their claims fee.").

As in *Sonterra*, "deception was an essential element of" Brown's involvement in the fraud, and Brown's deception was essential to furthering the scheme, not just "cover[ing] up the act." *In re Catfish Antitrust Litig.*, 826 F. Supp. at 1030. The Trustee has alleged facts to support tolling the statute of limitations based on the affirmative acts that Alliance and Brown took to hide the Questionable Business Practices and their participation in the wrongdoing. The Amended Complaint alleges that Brown assisted  Alliance in disguising its elaborate scheme from PBM's by helping design its independent pharmacy network to hide from PBMs, (SAC ¶¶ 144-61),

recommending Alliance redact NDC information from invoices, (*id.* ¶¶ 171-77), plotting to hide information from independent auditors, (*id.* ¶¶178-79,201-202), providing details to Alliance employees on how to redact key information from documents requested by PBMs, (*id.* ¶¶ 183-85), and recommending Alliance have independent pharmacies change their email addresses to further distance Alliance from the pharmacies and the fraud. *id.* ¶ 194. These facts are sufficient to establish that Brown concealed the RICO conspiracy and Brown's involvement in it until at least Brown's production of documents in mid-2020, tolling the RICO claims until that date, which is well within the four-year limitations period. See *Allan Constr. Co., Inc.*, 851 F.2d at 1529-33.

Finally, the Fifth Circuit has adopted the "separate accrual" doctrine for civil RICO claims. Under the separate accrual doctrine, each fraudulent insurance claim submitted by an Alliance-affiliated entity accrues separately. *Love*, 230 F.3d at 775. At this stage, Brown simply cannot show beyond doubt—as required at the motion to dismiss phase—that the Manufacturers in 2014 and 2015 were aware of each and every false insurance claim that Alliance would ever submit. *See Morgan*, 629 F. Supp. 3d at 623 ("[T]the live pleading must show 'beyond doubt' that the plaintiff cannot overcome the statute of limitations defense.") (citing *Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 320 (5th Cir. 2022)). Indeed, making such a showing would be an impossibility as Alliance continued to submit fraudulent claims until it ceased operations in 2017. Accordingly, dismissal based on statute of limitations is not proper.

## VI.   THE FRAUD CLAIM (IV) IS FULLY AND PROPERLY PLEADED.

### A.   The fraud claim is not barred by attorney immunity.

Brown argues that it is insulated from liability based on Texas's attorney immunity doctrine. MTD at ¶¶ 91–94. But this argument fails. That Brown was acting on behalf of and in concert with a Utah-based company means that Utah law, not Texas law, governs. Brown makes no attempt to argue that Utah law would bar this suit, nor could it—Utah does not recognize an

attorney immunity defense.[24] On that basis alone, Brown's attorney immunity defense should be disregarded.

Moreover, even under Texas law, Brown is not immune. "[N]ot just any action taken when representing a client qualifies for immunity." *Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 47 (Tex. 2021). Rather "[s]ome conduct by attorneys remains actionable even if done on behalf of a client." *Id*. at 52 (internal quotation marks omitted) (quoting *Youngkin v. Hines*, 546 S.W.3d 675, 683 (Tex. 2018)). "[A]ttorney immunity will not protect a lawyer when his acts are entirely foreign to the duties of an attorney." *Id*.; *see also Catney Hanger, LLP v. Byrd,* 467 S.W.3d 477, 483 (Tex. 2015); *Youngkin,* 546 S.W.3d at 681 (same). Instead, attorney immunity applies only "when attorneys act in the uniquely lawyerly capacity of one who possesses the office, professional training, skill, and authority of an attorney." *Landry's Inc. 631 S.W.3d* at 47. Furthermore, "the defense does not extend to fraudulent conduct that is outside the scope of an attorney's legal representation of his client, just as it does not extend to other wrongful conduct outside the scope of representation." *Haynes & Boone, LLP v. NFTD, LLC*, 631 S.W.3d 65, 77 (Tex. 2021) (quoting *Cantey Hanger,* 467 S.W.3d at 484). Accordingly, "[w]hen an attorney personally participates in a fraudulent business scheme *with* his client, as opposed to on his client's behalf, the attorney will not be heard to deny his liability." *Id.*

Brown's conduct falls squarely outside the scope of the attorney immunity doctrine. Brown personally participated in the fraudulent scheme alongside the other schemers, benefitting

---

[24] Utah recognizes a "judicial proceeding privilege," but that privilege cannot immunize Brown's actions, as none were committed in the context of a judicial proceeding. *See Moss v. Parr Waddoups Brown Gee & Loveless*, 285 P.3d 1157, 1164–67 (UT 2012). Moreover, the Utah Supreme Court has made clear that "where an attorney has committed fraud or otherwise acted in bad faith, which is inherently acting in a manner foreign to his duties as an attorney, the privilege will not shield an attorney from civil liability." *Id*. at 1166 (internal quotation marks omitted).

enormously in the process.[25] The concrete actions that Brown took to ensure the fraud's success, including doctoring invoices (SAC ¶¶169-185), submitting false appeals to PBMs (*id*. ¶¶ 195-199, 203-204), orchestrating a sham audit to conceal the Questionable Business Practices from the PBMs (*id*. ¶¶ 200-202), constructing a web of sham pharmacies to conceal the fraud (*id.* ¶¶ 144-146), and deceiving auditors, have "little to do with the office, professional training, skill, and authority of an attorney." *Landry's*, 631 S.W.3d at 47. Instead, these acts are akin to the posting of defamatory statements that the Supreme Court held in *Landry* was outside the protection of attorney immunity. Accordingly, attorney immunity is no defense to the Trustee's claims against Brown.

## VII.   THE MANUFACTURERS INDIRECTLY RELIED ON BROWN'S MISREPRESENTATIONS.

In response to the Court's Memorandum Opinion, the Trustee has refined her allegations to better clarify that Brown's conduct in furtherance of the Questionable Business Practices, including affirmative fraudulent submissions to PBMs by Brown, caused fraudulent misstatements to be relayed to and relied upon by the Manufacturers. Nevertheless, Brown reiterates its position that the Trustee did not plead any facts showing reliance by the Manufacturers. MTD at 43. This is untrue, and Brown's argument should be rejected.

The elements of fraud under Utah and Texas law are substantively the same. They include (1) a material representation; (2) that the defendant knew to be false or made recklessly as a positive assertion without any knowledge of its truth; (3) intent to induce another to act upon the representation; (4) actual and justifiable reliance upon the representation by the other party; and

---

[25] Brown's participation in the scheme ensured that it continued to be paid large fees, fees that would have (and did) dry up upon the scheme's exposure. That Brown's portion of the scheme's proceeds was paid in the form of fees does not change the fact those proceeds were totally dependent on the fraudulent scheme, a fact that Brown knew and accepted.

(5) damages. *See CBE Grp., Inc. v. Lexington Law Firm*, 993 F.3d 346, 350 (5th Cir. 2021) (citing *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018)); *Cardon v. Jean Brown Research*, 2014 UT App 35, ¶ 6, 327 P.3d 22, 24 (Utah App. 2014).

The Second Amended Complaint pleads each of these elements. Namely, that Brown submitted *and* aided in the submission of material misrepresentations that Brown knew to be false with the knowledge and intention that the Manufacturers would rely on same,[26] causing actual and justifiable reliance by the Manufacturers,[27] which resulted in damages in the form of rebates paid on fraudulent invoices.[28]

Nevertheless, Brown argues that the Trustee has failed to show Brown's intent that the Manufacturers rely on Brown's and Alliance's fraudulent misstatements and actual reliance by the Manufacturers. As explained below, the Manufacturers indirectly relied on misstatements both made and assisted by Brown, and their argument must be rejected.

As discussed above, the Second Amended Complaint pleads misrepresentations that Brown caused to be made to and indirectly relied upon by the Manufacturers; namely, additional submissions made by Brown on behalf of Alliance that Brown *knew* would be relayed to and relied on by the Manufacturers. *E.g.*, SAC at ¶¶ 195-204. For example, as early as October 2011, after PBM CVS Caremark suspended Medsource RX for fraudulent billing, Brown submitted its first appeal on behalf of the Alliance-affiliated entity. In the appeal, Brown disputed the claims of fraudulent billing, despite knowing that MedSource RX had committed fraudulent billing. *Id.* at ¶

---

[26] *See, e.g.*, SAC at ¶¶ 195-204 (Brown advise on and made fraudulent submissions to PBMs, acknowledging that Roche would be related the information.).

[27] *See, e.g.*, SAC at ¶¶ 196-97, 251-52, 300-312 (The Manufacturers relied on fraudulent information submitted to PBMs in paying rebates on fraudulent invoices.).

[28] *See, e.g.*, SAC at ¶¶ 252, 307, 320 (These rebates constitute the Manufacturers damages.).

197. Brown explicitly acknowledged in this appeal that information from the audit by Caremark would likely be relayed to Roche. *Id*. And a CVS Caremark auditor notified Alliance that it was in contact with Roche, which notification was forwarded to Brown as it drafted PBM appeals. *Id*. at ¶ 199. In 2012, Brown continued making submissions to Caremark on behalf of Alliance pharmacies concealing the relationship between the pharmacies. *Id*. at ¶ 198. As part of that appeal process, Alliance later submitted redacted Roche and "non-Roche" invoices and product quantities, and Brown advised Alliance how to do so in an attempt to hide the Questionable Business Practices from Caremark and to prevent Roche from learning of them. *Id*.[29] As alleged, Brown knew all of this information was relayed to and relied on by the Manufacturers. *Id.* at ¶ 196.

Thus, the Second Amended Complaint clearly pleads that the Manufacturers indirectly relied on fraudulent information provided with the knowing assistance of Brown, satisfying the reliance element for the Trustee's fraud claim.[30] Brown argues that it did not mislead Alliance, but that misses the mark because the Manufacturers were the party that relied on the misrepresentations.

Under an indirect reliance theory, a "maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the

---

[29] Brown's conduct was not isolated to this example. In subsequent audits, Brown also advised Alliance CEO and fiduciary Jeff Smith on an outline of topics that he should conceal from CVS Caremark during in-person meetings. SAC at ¶ 201. Brown also hired Ernst & Young to conduct a sham audit that would deter CVS Caremark from continuing its investigation. *Id*. at ¶ 202. In 2013, Brown drafted appears for two Alliance pharmacies, and during the process directed Alliance employee Candace Czerny not to respond to requests for information and appointed another Alliance employee to do so in order to hide the fact that Alliance was drafting appeals on behalf of the ostensibly independent pharmacies. *Id*. at ¶ 203. As Brown knew, the Manufacturers justifiably relied on this information in, for example, the payment of its rebates on fraudulent invoices. *Id*. at ¶¶ 300-312.

[30] Both Utah and Texas law recognize the theory of indirect reliance. *Russell/Packard Dev., Inc. v. Carson*, 2003 UT App 616, 625 n.12 (Utah CA 2003) (quoting RESTATEMENT (SECOND) OF TORTS § 533 (1965)); *Hawkins v. Upjohn Co.*, 890 F. Supp. 609, 612 (E.D. Tex. 1994).

misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved." *Carson*, 2003 UT App 616 at 625 n.12 (quoting the Restatement (Second) of Torts § 533 (1965)). The allegations in the Second Amended Complaint thus fulfill the requirements of the theory. Brown (the "maker") intentionally and recklessly caused to be made misrepresentations to the PBMs (the "third person"). As Brown understood, the PBMs would submit the fraudulent misrepresentations to the Manufacturers (the "other"), which would cause the Manufacturers to pay rebates (the "influence [to] conduct") based on invoices validated to the Manufacturers and PBMs by Brown's misrepresentations.

Brown argues that the theory of indirect reliance would require Brown to have misled *Alliance*. *See* MTD at ¶ 43. This argument misconstrues the Court's holding in the Memorandum Opinion and fails to address the direct allegations of indirect reliance that the Court allowed the Trustee to replead. Moreover, the Trustee's fraudulent misrepresentation / fraud claim (Count IV) is brought on behalf of the Manufacturers necessarily damaged by the above-described conduct, and thus, whether Alliance was misled by Brown is irrelevant as to whether indirect reliance applies. *See Hawkins,* 890 F. Supp. at 612 (finding the fourth element of fraud satisfied under theory of indirect reliance where the defendant passed fraudulent misrepresentations to the FDA regarding the safety of a drug, and the plaintiff relied on the FDA's assessment in choosing to use the drugs).

## VIII.   THE CONSPIRACY TO COMMIT FRAUD CLAIM (V) IS FULLY AND PROPERLY PLEADED.

As noted in the Memorandum Opinion, Texas and Utah recognize predominantly the same elements for conspiracy to commit fraud. Doc. 81 at 32-33. In both Utah and Texas, civil

conspiracy requires (i) a combination of two or more persons, (ii) an object to be accomplished, (iii) a meeting of the minds on the object or course of action, (iv) one or more unlawful, overt acts, and (v) damages as a proximate result. *Pohl, Inc. of Am. v. Webelhuth*, 201 P.3d 944, 954 (Utah 2008); *JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 420 (Tex. App.—Hous. [1st Dist.] 2011).[31] As amended, the Trustee's allegations meet both standards.

Brown argues that the Second Amended Complaint still fails to satisfy the elements because: (i) the Trustee does not allege that Brown did anything unlawful in furtherance of the conspiracy;[32] (ii) the Trustee does not allege a "meeting of the minds" or agreement on the course of action;[33] and (iii), notwithstanding, Brown cannot be liable because Brown "must have been aware of the harm from the inception of the fraud of unlawful activity" to be a co-conspirator.[34] Brown is wrong on each count, and the Second Amended Complaint alleges fact supporting each required element of the claim.[35]

Namely, despite knowing no later than February 2011 that the Questionable Business Practices constituted fraud, Brown decided to assist Alliance in the fraud and spent years perpetuating the fraud by, for example, knowingly submitting false appeals to PBMs such as CVS Caremark and others in 2012 and 2013, Second Amended Complaint at ¶¶197-99, with intent that the PBMs would pass the false information to the Manufacturers (in the case of CVS Caremark,

---

[31] As noted in the Memorandum Opinion, Texas also requires an intent to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. Doc. 81 at 32.

[32] MTD at ¶ 106.

[33] MTD at ¶¶ 99-107.

[34] MTD at ¶ 100 (citing *Conceal, L.L.C. v. Looper L. Enf't, LLC*, 917 F. Supp. 2d 611, 617 (N.D. Tex. 2013)).

[35] *See, e.g.,* SAC ¶¶ 185, 195-204, 253, 291, 300-307.

Brown explicitly acknowledged that information from the audit would likely be relayed to Roche),
*id*. at ¶ 197. As part of the same appeal, Brown later conspired with and advised Alliance Insiders
how to fraudulently redact invoices and product quantities in an attempt to hide the fraud from
CVS Caremark and prevent Roche from learning that rebates paid on Alliance's pharmacy's
invoices were fraudulently paid. *Id*. at ¶ 198.[36]

These allegations are made with specificity and clearly satisfy the elements of the Trustee's
conspiracy claim; in particular, that Brown and Alliance committed unlawful acts in furtherance
of the conspiracy,[37] and that Brown and Alliance and/or the Alliance Fiduciaries conspired to
commit the Questionable Business Practices. Moreover, even if the Trustee' allegations did not
contain the "who, what, when, where, why" specificity Brown argues is required of the conspiracy
claim (which they do), the standards as applied to conspiracy to commit fraud are more flexible
than those urged by Brown. *See Off. Stanford Invs. Comm. v. Greenberg Traurig, LLP*, No. 3:12-
CV-4641-N, 2015 WL 13741905, at *3 (N.D. Tex. Feb. 4, 2015) (concluding that complaint that

---

[36] In addition to the new allegations set forth above, the Second Amended Complaint maintains
other allegations supporting Brown's involvement in the conspiracy. For example, the new
allegations show: when Brown learned of the Questionable Business Practices, SAC ¶¶ 100-06,
290-99, when Brown concluded that Alliance's scheme was unlawful, *id*. at ¶¶ 107-16, 142-43,
when Brown attorney Howard knew of reliance by and damages to the Manufacturers, *id*. at ¶¶
189-91, when Brown participated in the fraud by assisting Alliance in building its independent
pharmacy network, *id*. at ¶¶ 144-61, *see also id*. at ¶¶ 126, 140, 144, when Brown attorney Baird
recommended removing disclosures in independent pharmacy documents, *id*. at ¶¶ 158-61, when
Brown attorney Howard advised on redacting NDC information from invoices requested by CVS,
*id*. at ¶¶ 171-77, when Howard offered to show Czerny how to redact confidential information
from PBM documents, *id*. at ¶¶ 183-86, when Brown plotted to hide information from Ernst &
Young to "look less shady," *id*. at ¶¶ 178-79, when Brown brainstormed ways to hide the
connection of Alliance-owned pharmacies from PBMs, *id*. at ¶¶ 187-91, when Brown drafted and
submitted audit appeals *directly* to investigating PBMs, *id*. at ¶¶ 196-99, 203, and many more
examples, *see, e.g., id.* at ¶¶ 201-02, 211, 252, 300-12.

[37] It is worth noting that the elements only require one or more unlawful, overt acts, *Webelhuth*,
201 P.3d at 954; *JSC Neftegas-Impex,* 365 S.W.3d at 420, and thus Alliance's unquestionable
unlawful conduct alone satisfies the unlawful acts element.

alleged the "duration and depth" of the relationship between law firm and co-conspirator, along with "other allegations pertaining to the [law firm's] knowledge" of the "fraudulent conspiracy", was sufficient to meet the requirements of Rule 9(b)). This is especially true when, as here, the Second Amended Complaint provides extensive details about a complex fraudulent scheme. *See, e.g., United States ex rel. Johnson v. Shell Oil Co*., 183 F.R.D. 204, 206 (E.D. Tex. 1998) ("Where the fraud allegedly was complex and occurred over a period of time, the requirements of Rule 9(b) are less stringently applied."); *see also Seville Indus. Mach. Corp. v. Southmost Machinery Corp*., 742 F.2d 786, 791 (3d Cir. 1984) (noting that "[p]laintiffs are free to use alternative means" besides "allegations of 'date, place or time'" to "inject[] precision and some measure of substantiation into their allegations of fraud").

The allegations also show a meeting of the minds between Brown and Alliance and/or the Alliance Fiduciaries. The abundant allegations and evidence set forth in the Second Amended Complaint (and discussed above) supports a finding that a meeting of the minds took place, and that Brown knowingly committed to violate the law in support of Alliance's Questionable Business Practices. Conspiracy pleadings are sufficient "if they set forth facts from which an inference of unlawful agreement can be drawn" because "[p]laintiffs cannot be required to plead with specificity the very facts which can only be proven by circumstantial evidence." *Brett v. First Fed. Sav. & Loan*, 461 F.2d 1155, 1158 (5th Cir. 1972) ("Actual agreements are seldom capable of proof by direct testimony and thus circumstantial evidence may be allowed to establish an alleged conspiracy."); *see Jernigan v. Wainer*, 12 Tex. 189, 193 (1854) ("When men enter into conspiracies, they are not likely to call in a witness. They resolve their schemes clandestinely and in secret."). Consequently, the element that a meeting of the minds has occurred may be established by "showing *concert of action* or other facts and circumstances from which the natural inference

arises that the unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators." *In re Black Elk Energy Offshore Operations, LLC*, No. 15-34287, 2022 WL 1589190, at *15 (Bankr. S.D. Tex. May 19, 2022) (citing *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex. 1963) (emphasis added). "It is not required that each and every act of a conspirator be shown to have been in concert with the others or that it be established by direct evidence . . . ." *Holloway*, 368 S.W.2d at 582.

Here, the concert of action between Brown and the Alliance Fiduciaries, as robustly pled in the Second Amended Complaint, leads to a natural inference that Brown's and Alliance's unlawful acts were committed in furtherance of the Questionable Business Practices. Thus, the Trustee has properly pled a meeting of the minds.

Finally, Brown relies on the Court's citation to *Conceal City* for the proposition that "to be a co-conspirator, a defendant must have been aware of the harm **from the inception of the fraud or unlawful activity**." Doc. 81 at 33 (citing *Conceal City, L.L.C. v. Looper L. Enf't, LLC*, 917 F. Supp. 2d 611, 617 (N.D. Tex. 2013)) (emphasis added). Respectfully, this is not what *Conceal City*, nor any case relied on by the *Conceal City* court, actually said. The opinion in *Conceal City* stated that the defendants must have been "aware of the harm or wrongful conduct at the inception of the **combination or agreement.**" *Conceal City*, 917 F. Supp. 2d at 617 (emphasis added). This is the same language used in the Texas case from which the premise originated:

> The gravamen of [the Plaintiffs'] argument is that the tortfeasors needed only to intend to engage in the conduct that resulted in the injury. We disagree; civil conspiracy requires specific intent. For a civil conspiracy to arise, the parties must be **aware of the harm or wrongful conduct at the inception of the combination or agreement**.

*Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995). Ample case law shows that co-conspirators can join and be liable for pre-existing conspiracies. *See In re Enron Corp. Sec.,*

*Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 822 (S.D. Tex. 2009)("[A] co-conspirator 'may enter into a conspiracy after its formation and while it is in progress and participate in the common design and be responsible for acts done in furtherance of the conspiracy.'")(quoting *Carrion v. State,* 802 S.W.2d 83, 91 (Tex. App.—Austin 1990, no writ); *see also Greenberg Traurig of New York, P.C. v. Moody,* 161 S.W.3d 56, 101 (Tex. App. 2004) ("It is well-settled law that upon joining a conspiracy, a defendant becomes a party to every act previously or subsequently committed by any of the other conspirators in pursuit of the conspiracy.")

Thus, what Brown presents as a categorical bar to any conspiracy claims wherein a co-conspirator agrees to join in on preexisting unlawful conduct (which would apply to many, if not most, instances of civil conspiracy), is really just an explanation that a claim for civil conspiracy requires specific intent. *Riley,* 900 S.W.2d at 719 ("civil conspiracy requires specific intent."). Based on the direct allegations in the Second Amended Complaint, there is no issue of specific intent here; as alleged, Brown knew of the unlawfulness of the Questionable Business Practices and nevertheless agreed to perpetuate the Questionable Business Practices through direct concert of action with the Alliance Fiduciaries.

Finally, Brown's contention that the Trustee's conspiracy claim is barred by the attorney immunity doctrine fails for the same reasons discussed in Section VI. A. above. Because Utah law, not Texas law, governs the Trustee's conspiracy to commit fraud claim, Texas' attorney immunity defense is inapplicable. Moreover, even under Texas law, Brown is not shielded by the attorney immunity doctrine because, as alleged in the Second Amended Complaint, Brown acted outside the scope of its legal representation and personally participated in the scheme with Alliance. *See supra* Section VI.A (discussing Texas attorney immunity law). These actions include doctoring invoices, orchestrating a sham audit, constructing a web of sham pharmacies to conceal the fraud,

and deceiving auditors. *Id*. Thus, Brown cannot escape liability for conspiring to commit fraud even if the attorney immunity doctrine applied.

Accordingly, the Trustee has fully and properly pled its conspiracy claim and all of Brown's arguments to the contrary must be rejected.

## IX.   THE RICO CONSPIRACY IS FULLY AND PROPERLY PLED AND SUPPORTED UNDER THE LAW.

Brown claims that its involvement in the conspiracy was too "sporadic" to establish it as a part of the RICO conspiracy. The Amended Complaint belies that assertion. A RICO conspiracy merely requires allegations that "(1) that two or more people agreed to commit a substantive RICO offense, and (2) that [Brown] knew of and agreed to the overall objective of the RICO offense." *United States v. Sharpe*, 193 F.3d 852, 869 (5th Cir. 1999). "A defendant need not know exactly what predicate acts the conspiracy intends to perpetrate." *Chaney v. Dreyfus Service Corp.*, 595 F.3d 219, 239 n.17 (5th Cir. 2010). Instead, it is "enough that [Brown] knowingly agreed to facilitate the illegal activities of those who [Brown] knows are operating an enterprise." *Id*. And the Fifth Circuit has observed, "[b]ecause agreement can be inferred from circumstantial evidence, including knowing participation, the only real issue is [Brown's] knowledge." *Id*. at 240, n.19. The Trustee has met that burden.

The allegations regarding Brown's pervasive misconduct provide more than enough basis to infer Brown's knowing, continuous participation in the RICO conspiracy. Brown knew of the fraudulent scheme, (SAC ¶¶ 290–99), and actively aided it through, among other acts, planning a sham audit to better conceal the scheme, (*id*. ¶¶ 178–79, 202), directing Jeff Smith to conceal information from a CVS auditor, (*id*. ¶ 201), making fraudulent misrepresentations to PBMs during audits, (*id*. ¶¶ 196–99, 203), constructing the web of shell pharmacies to conceal the fraud, (*id*. ¶¶ 144–161), and assisting Alliance in creating fraudulent invoices to deceive auditors, (*id*. ¶¶ 171–

77). Brown's protestation that it merely provided "professional services" is plainly belied by the allegations contained in the complaint.

Insofar as Brown is also claiming that it was not a RICO "person," this assertion also fails. The Trustee's claim here relates to whether Brown participated in a RICO conspiracy. Accordingly, Brown's assertions that it was not a RICO "person" and did not participate in the "operation or management of the enterprise," (and the cases cited in support thereof), are irrelevant. MTD at ¶ 114 (citing *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993); *In re Taxable Mun. Bond Sec. Litig.*, No. 90-4714, 1993 WL 534035, at *4 (E.D. La. Dec. 13, 1993)). But even if they were on point, Brown's actions in support of the conspiracy "crossed the line" and became part of the criminal organization itself, as "its consigliere and fixer." *United States v. Farrell*, 921 F.3d 116, 139 (4th Cir.), cert. denied, 140 S. Ct. 269 (2019). Plaintiff's detailed allegations about the involvement of Brown in Alliance's scheme more than satisfy Rule 9(b)'s pleading requirement and establish Brown as a RICO person.

This is very different from *Crowe v Henry,* 43 F.3d 198 (5th Cir. 1995). There, the court found that the law firm was not a RICO person because there were only two actions imputed to the firm in a four-year period. *See id.* at 204. By contrast, the Complaint here alleges numerous actions taken by Brown over the period of its involvement in aid of the RICO conspiracy.

## CONCLUSION

For these reasons, the Court should deny Brown's Motion to Dismiss. The Trustee requests that the Court enter an order denying the Motion to Dismiss and any and all other relief the Court deems appropriate.

Dated: January 29, 2024

Respectfully submitted,

**McKOOL SMITH, PC**

By: _/s/ Joshua J. Newcomer_
Joshua J. Newcomer, Esq. (SBN 24060329)
Attorney-in-charge
John J. Sparacino, Esq. (SBN 18873700)
600 Travis Street, Suite 7000
Houston, Texas 77002
Tel: (713) 485-7300
Fax: (713) 485-7344
E-mail: jnewcomer@mckoolsmith.com
E-mail: jsparacino@mckoolsmith.com

and

Kyle Lonergan
James Smith
**MCKOOL SMITH, PC**
One Manhattan West
395 9th Ave., 50th Floor
New York, NY 10001
Tel: (212) 402-9400
Fax: (212) 402-9444
E-mail: klonergan@mckoolsmith.com
E-mail: jsmith@mckoolsmith.com

***Attorneys for Plaintiff Yvette Austin, Liquidating Trustee for the Alliance Health Liquidating Trust***

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was served by electronic delivery on all persons and entities receiving ECF notice in this case on January 29, 2024.

_/s/ Joshua J. Newcomer_
Joshua J. Newcomer