# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### (HOUSTON DIVISION)

| | |
|---|---|
| In re:<br><br>UPLIF RX, LLC,[1]<br><br>      Debtors. | CASE NO. 17-32186, *et seq.*<br>CHAPTER 11<br>(Jointly Administered) |
| ~~YVETTE AUSTIN, Liquidating~~ MICHAEL E. FOREMAN, Trustee of the Alliance Health Liquidating Trust,<br><br>      Plaintiff,<br><br>vs.<br><br>BROWN & FORTUNATO, P.C., a Texas professional corporation,<br><br>      Defendant. | ADV. CASE NO. 21-03936<br><br><br>~~SECOND~~THIRD AMENDED ADVERSARY COMPLAINT FOR DAMAGES AND FOR OTHER RELIEF AND DEMAND FOR JURY TRIAL |

---

[1] At case inception, the Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, as applicable, were: Uplift Rx, LLC (9306); Belle Pharmacy, LLC (0143); Alliance Medical Holdings, LLC (5945); Geneva Pharmacy, LLC (1929); Ohana Rx, LLC (1722); Benson Pharmacy, Inc. (6606); Kendall Pharmacy, Inc. (0825); Richardson Pharmacy, LLC (9566); Innovative Rx, LLC (9986); Charleston Rx, LLC (5852); On Track Rx, LLC (9021); Uinta Rx, LLC (7157); Goodman Pharmacy, LLC (9373); BrooksideRx, LLC (5927); Osceola Clinic Pharmacy, LLC (4886); Oak Creek Rx, LLC (9722); Waverly Pharmacy, LLC (7342); Newton Rx, LLC (9510); Lone Peak Rx, LLC (5973); Improve Rx, LLC (9120); New Jersey Rx, LLC (0035); Berkshire Pharmacy, LLC (9197); Health Saver Rx, LLC (7810); Best Rx, LLC (0346); Delaney Pharmacy, LLC (7497); New Life Pharmacy, LLC (8292); Skyline Health Services, LLC (6876); Stonybrook Pharmacy, LLC (7700); Woodward Drugs, LLC (2385); Bridgestone Pharmacy, LLC (5294); Brookhill Pharmacy, LLC (5296); Burbank Pharmacy, LLC (5227); Canyons Pharmacy, LLC (1744); Cheshire Pharmacy, LLC (6370); Conoly Pharmacy, LLC (0367); Cottonwood Pharmacy, LLC (5131); Galena Pharmacy, LLC (0672); Garnett Pharmacy, LLC (6505); Hawthorne Pharmacy, LLC (5345); Hazelwood Pharmacy, LLC (1088); Medina Pharmacy, LLC (8987); Raven Pharmacy, LLC (5671); Glendale Square Rx, Inc. (1022); Lockeford Rx, Inc. (1853); Pinnacle Pharmacy Solutions, LLC (9760); Riverfront Rx, LLC (7152); Riverbend Prescription Services, LLC (1862); Raven Pharmacy Holdings, LLC (2464); Bridgestone Pharmacy Holdings, LLC (2840); Crestwell Pharmacy Holdings, LLC (1503); Galena Pharmacy Holdings, LLC (8609); Geneva Rx Holdings, LLC (8247); Hawthorne Rx Holdings, LLC (9531); Woodward Rx Holdings, LLC (2173); Philadelphia Pharmacy Holdings, LLC (8526); Health Rx Holdings, LLC (0909); Canyon Medical, LLC (4915); Alliance Medical Administration, Inc. (2899); Ollin Pharmaceutical, LLC (9815); Alta Distributors, LLC (7407); Eat Great Café, LLC (2314); Alliance Health Networks, LLC (1815).

The Plaintiff ~~Yvette Austin~~Michael E. Foreman (the "Trustee" or "Plaintiff"), Liquidating Trustee of the Alliance Health Liquidating Trust (as successor to the respective estates of the above-captioned debtors) (sometimes collectively referred to herein as the "Debtors,") and as assignee of claims as described herein, files this ~~Second~~Third Amended Adversary Complaint for Damages and for Other Relief and Demand for Jury Trial (the "Complaint"), against the Defendant Brown & Fortunato, P.C., a Texas professional corporation (the "Defendant" or "Brown"), and alleges:

## PRELIMINARY STATEMENT

1.      Alliance Medical Holdings, LLC and certain of its affiliated Debtor and non-debtor business entities (collectively referred to herein as "Alliance" or the "Company") perpetrated a straightforward and yet massive fraud under the cover provided by Defendant. Alliance hired Brown as its counsel. Brown almost immediately concluded that Alliance's conduct was fraudulent and illegal, and yet Brown conspired with Alliance to perpetuate and hide the fraud for seven years, choosing profit over its professional ethics and duties.

2.      For seven years, Brown attorneys assisted and advised Alliance's management, directors, and executives (collectively, "Insiders") as well as certain Alliance employees (together with the Insiders, and with the exception of certain Innocent Insiders defined below, the "Scheme Participants") in carrying out blatant insurance fraud from Alliance's Utah headquarters.

3.      The Scheme Participants conspired to obtain not-for-retail ("NFR") blood glucose test strips manufactured and packaged by LifeScan, Inc. ("LifeScan"), Roche Diagnostics Corp., and Roche Diabetes Care, Inc. (collectively, "Roche") (LifeScan and Roche shall sometimes collectively be referred to herein as the "Test Strip Manufacturers" or "Manufacturers"). These NFR strips were intended for sale by mail-order or other non-retail channels only to beneficiaries of insurance plans that cover fulfillment through those mail-order or other channels. The Scheme Participants then arranged

for Alliance-affiliated pharmacies to dispense these test strips to beneficiaries of pharmacy-benefit insurance plans that covered only retail test strips. They then submitted fraudulent insurance claims to the pharmacy-benefit plans, falsely representing that they had dispensed retail strips. Brown knew this was fraudulent and conspired with the Scheme Participants to hide the fraud.

4.     This is an action by the Plaintiff, a court appointed fiduciary, against Defendant seeking damages for, aiding and abetting/knowing participation in breach of fiduciary duty, fraudulent misrepresentation, fraud (including aiding and abetting fraud and conspiracy to commit fraud), turnover and/or disgorgement of fees, violation of the federal RICO statute, and for other relief.[2]

5.     The Trustee brings this lawsuit on behalf of the post-confirmation Liquidating Trust and as assignee of the claims of its three largest creditors – the Test Strip Manufacturers.[3]

6.     The claims alleged herein involve the acts and omissions of Brown, a Texas law firm, and its attorneys (licensed to practice in Texas and other states), while they performed extensive legal and non-legal services from 2010 to 2017 to and on behalf of its client, Alliance Medical Holdings, LLC, a Utah-based company, and certain of its affiliated Debtor and non-debtor business entities (collectively referred to here as "Alliance" or the "Company"). The wrongful conduct and services were provided to Alliance at its Utah headquarters. The Manufacturers, in turn, are based in Indiana and Pennsylvania, and sustained the injuries in those states.

7.     Brown's services enabled and provided cover to the Company's deceitful management,

---

[2] On August 21, 2023, the Court dismissed with prejudice Plaintiff's claims for legal malpractice and aiding and abetting fraudulent or negligent misrepresentation. Pursuant to that Order, Plaintiff does not re-allege those claims here. Plaintiff reserves the right to appeal the dismissal of those claims to the district court or court of appeals.

[3] By written stipulation and agreement approved by the Order of this Court dated June 20, 2020 [Doc. No. 1403], the Test Strip Manufacturers assigned and conveyed to the Liquidating Trustee all of their potential claims against Brown, including, without limitation, aiding and abetting negligent misrepresentation, aiding and abetting fraudulent misrepresentation, fraud, conspiracy to commit fraud, negligent misrepresentation, claims under the Racketeer Influenced and Corrupt Organizations (RICO) Act, and claims reflected in or that in any way arise out of the allegations set forth in this Amended Complaint.

directors, and executives (the "Insiders") and others working in concert with them (collectively, the "Scheme Participants") to operate, manage, and finance a sophisticated fraud insurance scheme intertwined with a panoply of improper and deceptive business practices (collectively, the "Questionable Business Practices") that caused more than $100 million in damages to the Debtors, the estates of the Debtors, the Trust Estate, and the assignors, the Test Strip Manufacturers.

8.      At all relevant times, (i) Alliance retained and primarily used the legal services of three law firms as its dedicated "outside counsel" – Baker Hostetler LLC ("Baker"), a national firm based in Ohio, Bennett Tueller Johnson & Deere, LLC ("Bennett"), a local firm based in Salt Lake City, Utah, and the Defendant, Brown – each of which enabled the company to continue to perpetrate, propagate, and otherwise engage in the Questionable Business Practices; and (ii) Baker, Bennett, and Brown each continuously represented Alliance through and including the Petition Date, with each firm having never terminated, or requested the termination of, Alliance as a client at any time prior to the Petition Date.[4]

9.      Brown and its attorneys had intimate knowledge of the scheme as a result of the direct knowledge they gained of the Questionable Business Practices while performing legal and non-legal services on behalf of Alliance and its affiliates.

10.      Through certain Debtor business entities within the Alliance Healthcare Network (defined below), several of which at all relevant times were represented by Brown as its outside "health care regulatory" counsel, Alliance and the Scheme Participants gained illicit profits by making materially inaccurate representations to various third parties with the full knowledge, active participation, and assistance of Brown, which provided a broad array of legal and non-legal services to Alliance that permitted the Debtors to continue to engage in such practices.

11.      In so doing, Brown played a material role in permitting Alliance and certain of its

---

[4] The Trustee has settled its claims with Bennett, and has brought claims against Baker in a separate adversary proceeding.

management to engage in a business model that caused millions of dollars of damages to Alliance, the estates of the Debtors and their creditors, and the Trust Estate.

12.     According to the sworn testimony of former Alliance executives, dispensing NFR strips and submitting improper insurance claims for retail strips was the "foundational practice" of Alliance and an "integral part of [Alliance's] business model."  The practice was openly discussed among all or certain of Alliance's senior management, its Board of Directors, its key investors and, most importantly for purposes of this lawsuit, Brown.

13.     In so doing, Alliance and the Scheme Participants improperly exploited the substantial difference in wholesale list price and insurance reimbursement rates between the NFR strips intended for medical beneficiaries and the retail strips intended for pharmacy beneficiaries. As was known to Brown, an expert in the healthcare industry, the difference in reimbursement pricing was funded by rebates paid by the Test Strip Manufacturers.

14.     Brown had direct knowledge of the Questionable Business Practices no later than February 2011.  Alliance often asked Brown for advice on the legal implications of its Questionable Business Practices; Brown concluded no later than December 2012 that the practices were illegal and exposed Alliance to civil, and possibly criminal, liability.  Nevertheless, Brown continued to represent and aid Alliance for years, including by counseling it on the best ways to conceal information about the Questionable Business Practices from suspicious third-parties and by actually concealing such information.

15.     In a November 2015 memorandum to Alliance Medical Holdings' Board of Directors, Alliance's general counsel acknowledged that Alliance's Questionable Business Practices were "facts" of its business model that gave rise to legal risks. The memorandum concluded, however, that the Insiders did not want to stop it, because Alliance profited massively by receiving the higher reimbursement for retail product while dispensing NFR product that Alliance purchased in the

secondary market. Alliance continued to engage in the Questionable Business Practices at the direction and with the assistance of the Scheme Participants until the bankruptcy filings in April 2017.  Notably, Brown was provided this memorandum and asked for feedback on it before it was distributed to the full Board of Directors.

16.     By carrying out their scheme through Alliance, the Scheme Participants caused the Test Strip Manufacturers to wrongfully pay over $100 million in rebates, and to lose a similar amount in sales of retail strips.

17.     Brown's advice, failure to abide by its ethical and professional duties, and conduct proved fatal to the company and harmed the Manufacturers.

18.     On February 23, 2017, the Federal Bureau of Investigation and U.S. Postal Inspection Service executed search warrants at Alliance's headquarters, its warehouses, and multiple Alliance pharmacies as part of an investigation into potential criminal wrongdoing.

19.     The FBI also seized the accounts belonging to the Debtors and affiliates maintained with their secured creditor, ZB, N.A. ("Zions Bank"), and issued damming warrants to seize  incoming receivables, which precipitated the bankruptcy filings and ultimate demise of Alliance.

20.     By early April 2017, it was over for Alliance.  Alliance declared bankruptcy and obtained confirmation of the Chapter 11 Plan that resulted in the formation of the Liquidating Trust under which Ms. Austin is the Liquidating Trustee with authority to prosecute the claims alleged herein.

21.     At all relevant times, the Questionable Business Practices: (i) provided no benefit to the Debtors in that they caused, *inter alia*, material liabilities to be incurred; and (ii) certain members of the Debtors' management or board had no knowledge of the extent of and/or the improper nature of the Questionable Business Practices or, in the alternative, all members of the  board and management adversely dominated Alliance by virtue of their knowledge of the extent, scope, and nature of the Questionable Business Practices.

## THE PARTIES, JURISDICTION & VENUE

22.     On April 7-9, 2017 (collectively, the "Petition Date"), each of the Debtors filed a voluntary petition for relief (the "Bankruptcy Petitions") under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in Houston, Texas Bankruptcy Court.[5]

23.     On April 10, 2017, the Court entered an order directing the joint administration of the Debtors' cases [Doc. No. 4].

24.     By Order dated April 18, 2017, the Court ordered the appointment of a Chapter 11 Trustee, with Ronald L. Glass of GlassRatner Advisory & Capital Group, LLC being appointed Chapter 11 Trustee of the Debtors' estates on May 18, 2017 [Doc. No. 37].  On May 25, 2017, Mr. Glass accepted his appointment [Doc. No. 320].  Post-petition, the Debtors operated their businesses in the ordinary course pursuant to Bankruptcy Code Sections 1107 and 1108.

25.     By Order dated August 8, 2019 (the "Confirmation Order"), the Court confirmed the Debtors' Chapter 11 Amended Plan (the "Plan") [Doc. No. 1267], implementing an Effective Date of September 13, 2019. Pursuant to Paragraph 6.2 of the Plan, entry of the Confirmation Order constituted approval, pursuant to section 105(a) of the Bankruptcy Code effective as of the Effective Date, of the substantive consolidation of the Corporate Debtors, with (i) all assets and liabilities of the Corporate Debtors merged, so that all of the assets of the Corporate Debtors will be available to pay all of the liabilities of the Corporate Debtors under the Plan; (ii) no distributions to be made under the Plan on account of Intercompany Claims (as defined in the Plan) between the Corporate Debtors; (iii) all guarantees by any of the Corporate Debtors of the obligations of any other Corporate Debtor to be eliminated so that any Claim against any Corporate Debtor and any guarantee thereof executed by any of the Corporate Debtors are to be one obligation of the substantively consolidated entity; and (iv) each

---

[5] Prior to and after the Petition Date, the Debtors operated their businesses in conjunction with certain non-debtor affiliates (collectively, the "Affiliates").

and every Claim filed or Allowed (as defined in the Plan), or to be filed or Allowed, in the case of any of the Corporate Debtors to be deemed filed or allowed against the substantively consolidated Corporate Debtors.  Pursuant to Section 6.3 of the Plan, confirmation of the Plan did not result in any substantive consolidation of the Pharmacy Debtors (as defined in the Plan and below).

26.     By Order of the Bankruptcy Court dated July 1, 2020 [Doc. No. 1407], 13 debtor Chapter 11 cases were dismissed, with the caveat that such dismissals "shall not affect or alter any of the terms or provisions of the Plan and the Confirmation Order, including, without limitation, the transfer by the Subject Debtors of all of their Estate Assets, Causes of Action, and Liquidating Trust Assets to the Liquidating Trust."

27.     Pursuant to Section 6.4 of the Plan, as of the Effective Date, the Debtors transferred and assigned all Liquidating Trust Assets to the Alliance Health Liquidating Trust ("Liquidating Trust"), which assets include, *inter alia*, tort, breach of contract, and avoidance claims under Chapter 5 of the Bankruptcy Code, along with the claims that are the subject of this adversary proceeding.  Mark Shapiro was initially appointed the Liquidating Trustee, thereafter, Plaintiff Yvette Austin replaced Mr. Shapiro. Michael E. Foreman is the current Liquidating Trustee.

28.     Under the confirmed Plan, the Plaintiff, Yvette AustinMichael E. Foreman ("Plaintiff" or the "Trustee") is the Liquidating Trustee of the Liquidating Trust, and is therefore the duly appointed, authorized, and acting fiduciary of the Liquidating Trust with standing and authority to prosecute the claims that are the subject of this action.  By Order dated June 20, 2020 [Doc. No. 1403], the Bankruptcy Court approved a Stipulation and an Amended Liquidating Trust Agreement which, *inter alia*: (i) assigned all claims of the Test Strip Manufacturers against Brown to the Trust Estate; and (ii) reduced the number of committee members from three to two and designated the Test Strip Manufacturers as the Trust Committee members.

29.     The Defendant, Brown, is a Texas professional corporation operating as a law firm with

locations in multiple cities in Texas, including Amarillo.

30.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), 1331, and 1334.

31.     This is a core and non-core proceeding pursuant to 28 U.S.C. § 157(b)(A), (E), and (O).

32.     The Trustee consents to the entry of final orders and judgment by the Bankruptcy Court pursuant to Fed. R. Bankr. P. 7008(a), but does not consent to a jury trial by the Bankruptcy Court.

33.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## FACTS COMMON TO ALL COUNTS

### I.     ALLIANCE AND THE FRAUDULENT SCHEME

#### A.     Background on the Debtors

34.     Prior to the Petition Date, the Debtors owned and operated a network of pharmacies across the United States that specialized in providing prescriptions to patients with chronic health conditions, including diabetes (the "Alliance Healthcare Network").

35.     The origins of the Alliance Healthcare Network began in July, 2007, when Jeffrey Smith (who would later become Alliance's Chief Executive Officer) purchased a majority interest in Fames Enterprises Corporation d/b/a Medsource-Direct, a Utah corporation, which later changed its name to Medsource-Direct, Inc.

36.     On February 22, 2010, Debtor Medsource Rx Pharmacy, LLC ("Medsource" or "Medsource RX Pharmacy") was formed in Utah as a sister company to Medsource-Direct, Inc. with the same ownership structure. In September 2011, Medsource-Direct, Inc. discontinued its wholesale business operations and began acting as the "purchasing arm" for Medsource, changing its name to SP Diabetic, Inc.

37.     During October 2011, Ingram Medical, LLC was formed as a wholly-owned subsidiary of Warner Diabetic, LLC.  Thereafter, Medsource consummated a restructure in which its members

contributed their membership interests to holding company Warner Diabetic, LLC, formerly known as Medsource Pharmacy 2, LLC.

38.     In February 2012, Ingram Medical, LLC acquired 100% of the stock of Western Diabetic Supply Corporation and Warner Diabetic, LLC began branding itself as "Ingram Medical," under certain with "trade name" license agreements with its affiliates.

39.     On March 22, 2012, SP Diabetic, Inc. sold its business to SP Diabetic Acquisition, LLC causing all aspects of the business to be under the ownership of Warner Diabetic, LLC, with SP Diabetic Acquisition, LLC subsequently being renamed to SP Diabetic, LLC.

40.     In March 2012, the name of SP Diabetic, Inc. was changed to OSD Capital, Inc., in January 2013, the name of Ingram Medical, LLC was changed to WDSC Holdings, LLC, and in December 2013, the name of IM Pharmacy, LLC was changed to New Life Pharmacy, LLC ("New Life Pharmacy").

41.     On January 1, 2014, Warner Diabetic, LLC consummated a restructure in which the members of Warner Diabetic, LLC contributed their membership interests to a new parent company called Alliance Medical Holdings, LLC.

42.     Thereafter, on January 17, 2014 a subsidiary of Alliance Medical Holdings, LLC, Alliance Health Networks, LLC (formerly known as Alliance Health Acquisition, LLC), acquired all of the assets of Alliance Health Networks, Inc., with Alliance Health Networks, LLC also doing business as Alliance Health and Diabetic Connect; Western Diabetic Supply Corporation also doing business as Western Medical Supplies; Ingram Medical Administration, Inc. also doing business as Ingram Medical; Medsource Rx Pharmacy, LLC also doing business as Medsource Rx, Medsource Diabetic, and Your Diabetic Pharmacy; and Warner Diabetic, LLC also doing business as YourDiabetic Source.

43.     The parent, Debtor Alliance Medical Holdings, LLC, was a Delaware limited liability holding company formed on November 26, 2013 based in Utah that owned, controlled, and operated a

network of over 100 Debtors and Affiliates, including pharmacies across the country – in addition to providing an online Internet resource center that connected people with chronic conditions to experts. Within the Alliance Healthcare Network, Debtor Alliance Medical Holdings, LLC, a Delaware limited liability company, Debtor Alliance Medical Administration, Inc., a Utah corporation, Debtor Alliance Health Networks, LLC, a Delaware limited liability company (successor to Alliance Health Network, Inc., a Delaware corporation), MedSource-Direct, Inc., a Utah corporation, Warner Diabetic, LLC, a Utah limited liability company, SP Diabetic, LLC, a Utah limited liability company, Ingram Medical, LLC, a Utah limited liability company, SP Capital Holdings, LLC, a Delaware limited liability company, Medsource Rx Pharmacy, LLC, a Utah limited liability company, and Western Diabetic Supply Corporation, a Utah corporation (collectively, the "Corporate Entities") provided marketing, accounting, administrative, and legal functions of the Alliance Healthcare Network in Utah, during the period of the Questionable Business Practices.

44.     Other Debtors, including Alta Distributors, LLC, a Delaware limited liability company, and, Ollin Pharmaceutical, LLC a Utah limited liability company, assisted in distribution for the Debtors (the "Distribution Company Debtors") in Utah.

45.     The remainder of the Debtors, including Stonybrook Pharmacy, LLC, a Nebraska limited liability company, either owned and operated or managed pharmacies within the Alliance Healthcare Network in Utah and other states (the "Pharmacy Debtors").

46.     During the period of Brown's representation of Alliance, the corporate structure of Alliance encompassed a web of dozens of subsidiaries underneath an evolving set of parent companies, including MedSource-Direct, Inc., Warner Diabetic, LLC, and Alliance Medical Holdings, LLC.[6]

---

[6] These entities included AHN Holding Company, LLC; Alameda Rx Holdings, LLC; Alameda Rx, LLC; Alliance Health Networks, LLC; Alliance Medical Administration, Inc.; Alta Distributors, LLC; Baytree, Rx, Inc.; Baytree Rx, LLC; Belle Pharmacy, LLC; Benson Pharmacy, Inc.; Berkshire Pharmacy, LLC; Best Rx Holdings, LLC; Best Rx, LLC; Better Care Rx Holdings, LLC; Bridgestone

47.     Within the Alliance Healthcare Network, patients were identified by the Corporate Entities and distributed among the Pharmacy Debtors.  The Corporate Entities would often transfer patients from one Pharmacy Debtor to another Pharmacy Debtor.  The Pharmacy Debtors did not play an active role in deciding which patients they would supply with diabetic testing supplies; rather, the Corporate Entities would distribute patients with the goal of balancing patient populations across the Pharmacy Debtors to avoid disruption to their fraudulent scheme.

---

Pharmacy Holdings, LLC; Bridgestone Pharmacy, LLC; Brighton Pharmacy, LLC; Brookhill Pharmacy, LLC; BrooksideRx Holdings, LLC; BrooksideRx, LLC; Bubba's Rx Holdings, LLC; Burbank Pharmacy, LLC; Canyon Medical, LLC; Canyons Pharmacy, LLC; Central Medical, LLC; Charleston Rx Holdings, LLC; Charleston Rx, LLC; Cheshire Rx Holdings, LLC; Cheshire Pharmacy, LLC; Chronic Care Health Foundation, LLC; Cloud Management, LLC; Conoly Pharmacy Holdings, LLC; Conoly Pharmacy, LLC; Cordele Pharmacy, LLC; Cottonwood Pharmacy, LLC; Crestwell Pharmacy Holdings, LLC; CSL Capital Holdings, LLC; Cure Rx, LLC; David Pharmacy, LLC; Delaney Pharmacy, LLC; Eat Great Café, LLC; El Dorado Pharmacy, LLC; El Dorado Rx Holdings, LLC; Everest Pharmacy, LLC; Galena Pharmacy Holdings, LLC; Galena Pharmacy, LLC; Garnett Pharmacy, LLC; Genesee Pharmacy, LLC; Geneva Pharmacy, LLC; Geneva Rx Holdings, LLC; Genshai Holdings, LLC; Glendale Square Rx, Inc.; Good Wave, LLC; Goodman Pharmacy, LLC; Hawkins Pharmacy Holdings, LLC; Hawkins Pharmacy, LLC; Hawkins Rx, LLC; Hawthorne Pharmacy, LLC; Hawthorne Rx Holdings, LLC; Hazelwood Pharmacy, LLC; Health Rx Holdings, LLC; Health Saver Holdings, LLC; Health Saver Rx, LLC; Improve Rx Holdings, LLC; Improve Rx, LLC; Ingram Diabetic, LLC; Innovative Rx, LLC; Insight Rx Holdings, LLC; Jefferson Pharmacy, LLC; JTK Medical, LLC; Kendall Pharmacy, Inc.; Living Again Holding Co, LLC; Lockeford Rx Holdings, LLC; Lockeford Rx, Inc.; Lone Peak Rx, LLC; Med Mart Holdings, LLC; Medina Pharmacy, LLC; Medsource Rx Pharmacy, LLC; Namaste Capital Holdings, LLC;  NE Philadelphia Pharmacy, LLC; New Jersey Rx Holdings, LLC; New Jersey Rx, LLC; New Life Pharmacy, LLC; Newton Rx Holdings, LLC; Newton Rx, LLC; Norwood Pharmacy, LLC; Oak Creek Pharmacy Holdings, LLC; Oak Creek Rx, LLC; Ohana Pharmacy Holdings, LLC; Ohana Rx, LLC; Ollin Pharmaceutical, LLC; On Track Rx Holdings, LLC; On Track Rx, LLC; OpusRx, LLC; Osceola Clinic Pharmacy, LLC; Osceola Rx Holdings, LLC; Peach Medical Holdings, LLC; Peterson Rx, LLC; Pharmacare Holdings, LLC; Philadelphia Pharmacy Holdings, LLC; Pineview Rx Holdings, LLC; Pinnacle Pharmacy Solutions, LLC; Pro Rx Holdings, LLC; Raven Pharmacy Holdings, LLC; Raven Pharmacy, LLC; Richardson Pharmacy, LLC; Riverbend Prescription Services, LLC; Riverbend Pharmacy, LLC; Riverfront Pharmacy, LLC; Riverfront Rx, LLC; Rock City Pharmacy, LLC; Rx Pro Holding Co., LLC; Rx Solutions Holdings, LLC; Rx Solutions LLC, Skyline Health Services, LLC; Smart Rx Holdings, LLC; Staley Pharmacy, LLC; Steel Medical, LLC; Stonybrook Pharmacy, LLC; Twin Lakes Pharmacy, LLC; Uinta Rx Holdings, LLC; Uinta Rx, LLC; Uplift Rx Holdings, LLC; Uplift Rx, LLC; Uplift Rx Holdings, LLC; Vitality Holdings, LLC; Waverly Pharmacy, LLC; White Capital Management, LLC; Woodward Drugs, LLC; Woodward Rx Holdings, LLC; and Zonetak Rx Holdings, LLC (together and with other, currently unidentified affiliates). For ease of reference, Alliance predecessor entities, subsidiaries, and Alliance pharmacies will sometimes be referred to simply as "Alliance" throughout this ~~Second~~Third Amended Complaint.

48.     As the Pharmacy Debtors collected revenue, cash was "swept" from each Pharmacy Debtor's account on a daily basis and distributed to the Corporate Entities, where it was pooled together with the contents of other Pharmacy Debtors. From their central account, the Corporate Entities would directly pay certain expenses of the Pharmacy Debtors and/or send money back down to the appropriate Pharmacy Debtors to pay other expenses.

49.     As a pretext, the company claimed that new pharmacies were constantly being formed and/or acquired to "keep up" with leads generated by the Corporate Entities when, in fact, pharmacies were being opened and closed as part of Alliance's ongoing fraudulent scheme.

50.     At all relevant times, the Debtors and their Affiliates were collectively owned, managed, operated, and/or controlled by the same group of overlapping managers, officers, directors, and/or control persons, and were formed and/or otherwise operated within the Alliance Healthcare Network as alter egos of one another and/or of the company's owners as evidenced by, *inter alia*, almost nonexistent meeting minutes among numerous Debtors and Affiliates other than Alliance Medical Holdings, LLC, as well as the failure of the Debtors and the Affiliates to ever account for obligations amongst themselves or keep any type of ledger showing "due to and due from" among any of them.

**B.     Background on the Fiduciaries**

51.     Alliance recycled a cadre of officers and directors throughout its many subsidiaries, and Brown knew Jeff Smith was the primary fiduciary among them. Starting in 2007, Jeff Smith was founder, CEO, and a member of the Board of Directors of MedSource-Direct, Inc. After MedSource-Direct's restructuring in 2012, Jeff Smith continued as CEO and member of the Board of Directors of Warner Diabetic, LLC d/b/a Ingram Medical. After Warner Diabetic's restructuring in 2014, Jeff Smith continued as CEO and member of the Board of Directors of Alliance Medical Holdings, LLC d/b/a Alliance Health and remained in both positions until its bankruptcy. In addition, Jeff Smith held the following positions in, and owed fiduciary duties to, the following Alliance entities: Alliance Medical

Administration, Inc. (director and officer), AHN Holding Company, LLC (CEO), Alliance Health Networks, LLC (CEO), SP Capital Holdings, LLC (manager), Medsource Rx Pharmacy, LLC (manager), Ingram Medical, LLC (manager), Western Diabetics Supply Corp. (CEO), CSL Capital Holdings, LLC (CEO and board member), Care Health Foundation, LLC (CEO), Steel Medical, LLC (CEO), Ollin Pharmaceutical, LLC (CEO), Ingram Diabetic, LLC (CEO), Alta Distributors, LLC (Manager), White Capital Management, LLC (manager), New Life Pharmacy, LLC (manager), Skyline Health Services, LLC (manager), JTX Medical, LLC (CEO), Cloud Management, LLC (CEO), Central Medical, LLC (CEO), Stonybrook Pharmacy, LLC (manager), Peach Holdings Medical, LLC (manager), Canyon Medical, LLC (manager), Aspire Rx, LLC (manager), Everest Pharmacy, LLC (manager), and Brighton Pharmacy, LLC (manager).

52.     Starting in 2007, Justin Leavitt was the CFO of MedSource-Direct, Inc. After MedSource-Direct's restructuring in 2012, Justin Leavitt continued as CFO of Warner Diabetic, LLC d/b/a Ingram Medical. After Warner Diabetic's restructuring in 2014, Justin Leavitt continued as CFO and also became a member of the Board of Directors of Alliance Medical Holdings, LLC d/b/a Alliance Health. Justin Leavitt left Alliance Medical Holdings' Board of Directors in October of 2015 but remained its CFO until 2016. Justin Leavitt also held positions in, and owed fiduciary duties to, at least the following Alliance subsidiaries: AHN Holding Company, LLC (CFO), CSL Capital Holdings, LLC (CFO), and Steel Medical, LLC (CFO).

53.     Starting in 2008, Blaine Smith was the Executive VP of Sales of MedSource-Direct, Inc. After MedSource-Direct's restructuring in 2012, Blaine Smith continued as Executive VP of Sales of Warner Diabetic, LLC d/b/a Ingram Medical and also became a member of its Board of Directors in June 2013. After Warner Diabetic's restructuring in 2014, Blaine Smith continued as a member of the Board of Directors of Alliance Medical Holdings, LLC d/b/a Alliance Health and also became its CRO in September of 2014. Blaine Smith held both positions at Alliance Medical Holdings, LLC d/b/a

Alliance Health until its bankruptcy. Blaine Smith also held positions in, and owed fiduciary duties to, at least the following Alliance subsidiaries: Alliance Medical Administration, Inc., (board member), Alliance Health Networks, LLC, (board member), and Warner Diabetic, LLC (board member).

54. Sahily Paoline was Alliance Medical Holdings, LLC's Chief Pharmacy Officer, and also owed fiduciary duties to at least Alliance Health Networks, LLC as a board member.

55. Steven Hadlock was Warner Diabetic LLC's Chief Pharmacy Officer.

56. Travis Hughes was a board member of Alliance Medical Holdings, LLC, and also owed fiduciary duties to at least Warner Diabetic LLC as a board member.

57. Alison Wistner was likewise a board member of Alliance Medical Holdings, LLC, and also owed fiduciary duties to at least Warner Diabetic LLC as a board member.

58. Alliance Medical Holdings, LLC itself also had a number of additional board members and officers from the onset of Brown's engagement to the bankruptcy, each of whom owed fiduciary duties, including Geoff Swindle, Travis Hughes, Kassie Thomas, Greg Duncan, Kurt Reintjes, BJ Forsgren, Adam Koopersmith, Matthew Simas, and Lee Rosebush.

59. These entities, each with often overlapping fiduciaries, are herein referred to collectively as the "Fiduciary Entities."

60. Of the above Alliance Insiders, at least Jeff Smith, David Grant, Sahily Paoline, Geoff Swindle, Kassie Thomas, Travis Hughes, Steven Hadlock, Blaine Smith, Alison Wistner, Justin Leavitt, Adam Koopersmith, and Lee Rosebush were involved in or had direct knowledge of Alliance's ongoing fraudulent conduct, and owed and breached fiduciary duties to the Fiduciary Entities (the "Alliance Fiduciaries"), as set forth throughout this Complaint and in Count I and the Appendix.

61. As the corporate structure of Alliance evolved, the primary Alliance Fiduciaries remained the same, and their fiduciary duties passed to successor entities, several of which, including foremost Alliance Medical Holdings, LLC, are amongst the Debtors.

62.     Other directors and/or officers appear to have had no or limited knowledge of the Questionable Business Practices, including Greg Duncan, Kurt Reintjes, and Matthew Simas (the "Innocent Insiders").

63.     Brown understood all of this. Brown knew that the Alliance Fiduciaries owed fiduciary duties to the primary Alliance entities, Alliance Medical Holdings, LLC, MedSource-Direct, Inc., and Warner Diabetic, LLC, as well as, at minimum, Alliance Medical Administration, Inc., AHN Holding Company, LLC, Alliance Health Networks, LLC, SP Capital Holdings, LLC, Medsource Rx Pharmacy, LLC, Ingram Medical, LLC, Western Diabetics Supply Corp., CSL Capital Holdings, LLC, Care Health Foundation, LLC, Steel Medical, LLC, Ollin Pharmaceutical, LLC, Ingram Diabetic, LLC, Alta Distributors, LLC, White Capital Management, LLC, New Life Pharmacy, LLC, Skyline Health Services, LLC, JTX Medical, LLC, Cloud Management, LLC, Central Medical, LLC, Stonybrook Pharmacy, LLC, Peach Holdings Medical, LLC, Canyon Medical, LLC, Aspire Rx, LLC, Everest Pharmacy, LLC, and Brighton Pharmacy, LLC.

64.     Brown also knew that by virtue of their roles as board members, officers, managers and directors, the Alliance Fiduciaries were *breaching* their fiduciary duties to Fiduciary Entities, as alleged herein. By advising and assisting the Alliance Fiduciaries in the fraud, Brown knew it was assisting their breaches of fiduciary duty.

**C.     The Roche and LifeScan Blood Glucose Test Strip Products**

65.     LifeScan and Roche are leading manufacturers of blood glucose test strips. Roche markets and sells under the Accu-Chek® brand, while LifeScan markets and sells under the OneTouch brand®.

66.     Diabetes patients place a drop of blood on a strip and insert the strip into a meter, which provides a blood glucose reading. Millions of people depend on Roche and LifeScan's test strips to monitor their blood sugar.

67.     In the United States, the vast majority of Roche and LifeScan test strips are paid for by health insurance. Some health insurance plans cover test strips under a pharmacy benefit, the same benefit that covers prescription drugs. Other plans cover test strips under a medical benefit (also known as a "durable medical equipment" or "DME" benefit), the same benefit that covers medical equipment such as wheelchairs. Like all major manufacturers, Roche and LifeScan sell their test strips in different packages and through different distribution channels targeted to patients with these different types of insurance coverage.

68.     By way of example, since Roche and LifeScan engaged in similar approaches, Roche Accu-Chek test strips that are intended for patients with DME insurance are packaged and labeled as "not for retail sale" (or "NFR"). Patients with DME insurance typically purchase test strips from mail-order DME distributors. The DME distributors purchase Accu-Chek NFR products under contracts that require them to sell only to patients with DME insurance.

69.     Accu-Chek test strips intended for sale to patients with pharmacy-benefit insurance are packaged and labeled as retail products for distribution to retail pharmacies. Although the vast majority of retail Accu-Chek test strips are paid for by pharmacy-benefit insurance, retail products  may be sold to anyone, including people who do not have insurance and pay cash.

70.     During the relevant time period, Roche sold retail strips to wholesalers at list prices ranging from about $51.25 to $78.07 per 50-strip vial. The wholesalers sell the retail strips to retail pharmacies at a small markup above the wholesale price. When a patient with pharmacy-benefit insurance purchases Roche retail strips, the patient's insurance plan reimburses the pharmacy at an additional markup. Under contracts with the pharmacy-benefit insurers, Roche pays them rebates ranging from about $30 to $70 for every box or retail strips they reimburse. It was and is well known throughout the diabetes product industry that test strip manufacturers paid these rebates to pharmacy-benefit insurers. As a result of these rebates, Roche's net revenue per box of retail strips was

substantially less than the $51.25 to $78.07 wholesale price.

71.     Pharmacy benefit insurers typically contract with pharmacy benefit managers ("PBMs") to manage insurance claims and reimbursements. The PBMs, in turn, have contracts with retail pharmacies that govern the insurance reimbursement process.  Those contracts prohibit pharmacies from receiving reimbursements for sales of NFR strips. In addition, the contracts give PBMs the right to audit pharmacies' compliance and, if breaches are discovered, to seek repayment of reimbursements—called "chargebacks"—and/or terminate the contract outright. The PBMs passed reimbursement claim adjudication data, including NDCs, from pharmacies through to the Manufacturers for the purpose of seeking rebates.

72.     By contrast, Roche sells its NFR strips primarily to mail-order distributors for under $20 per 50-strip vial, and medical-benefit insurance plans reimburse the mail-order distributors at a small markup on this price. Roche does not pay rebates to insurance plans that cover test strips under a medical benefit.

73.     Each of Roche's test strip products has a different National Drug Code ("NDC"). An NDC is a unique numerical identifier recorded by the U.S. Food and Drug Administration, which regulates these devices. As an example, one of Roche's most widely used test strip products is Accu-Chek Aviva Plus, most commonly sold in 50-strip vials. The NDC for the principal NFR version of this product is 65702-0436-10, while the NDC for the retail version is 65702-0407-10.[7] The NDC is printed on each vial's package.

74.     The package for the principal NFR version of Roche's Aviva Plus test strips also features the following warnings, printed in easy-to-read, bolded black lettering on a yellow background: "Not for Sale in Retail Outlets" and "Exclusively for Mail Order Use." These warnings are not printed

---

[7] The NDC for the principal NFR versions of one of LifeScan's most widely-used products, a 50- count vial of OneTouch Ultra strips, are 53885-0000-75 and 53885-0963-50, while the NDC for the retail version is 53885-0244-50.

on the retail package for Aviva Plus test strips.

**D.      Adjudicating Claims for Blood Glucose Test Strips**

75.      When a patient with insurance purchases a box of Roche's test strips, the seller is paid by the patient's insurer. To obtain reimbursement from insurance, the seller must submit a claim. This process is referred to as "adjudication."

76.      When a patient has pharmacy-benefit insurance, the seller—i.e., a pharmacy—adjudicates the claim for reimbursement by submitting the NDC of the dispensed product to the patient's insurance. Submitting the dispensed product's NDC is necessary because pharmacy-benefit plans only cover specific pharmaceuticals and medical devices, listed by NDC, that are on their formularies. Products not listed on the formulary are not entitled to any reimbursement.

77.      Because of the significant differences in how retail strips and NFR strips are sold and paid for, it is crucial for fairness and functioning of the marketplace that the test strips be sold only within their intended channels. Diversion of NFR strips to retail channels not only deprives the Manufacturers of retail sales, it also causes an out-of-pocket loss on each vial of NFR strips that is paid for through a pharmacy benefit. That is because the rebate that the Manufacturer pays on each claim for a box of retail strips is higher than the total price that it receives on the sale of a box of NFR strips.

78.      Because of this harm, the Manufacturers and PBMs have implemented systems to prohibit distributors from dispensing NFR strips to pharmacy beneficiaries. For example, the NDCs for NFR strips are not on pharmacy-benefit plans' formularies.  Reimbursement by a pharmacy-benefit plan thus requires the seller to dispense retail strips and submit reimbursement claims using the NDC for retail strips.

79.      It is an improper and deceptive business practice for a seller to obtain the higher retail reimbursement rate by adjudicating a claim for retail strips (by submitting the retail NDC) when NFR strips had in fact been dispensed to the patient.

E.    **Alliance Builds a Patient Base**

80.    In 2007, Jeffrey Smith purchased Medsource-Direct, a test strip wholesaler. By September 2011, Medsource-Direct discontinued its wholesale business and began operating as the mere "purchasing arm" of Medsource Rx Pharmacy, LLC, an entity created by Jeffrey Smith for the purpose of selling test strips directly to patients.

81.    Medsource Rx Pharmacy LLC was succeeded by Warner Diabetic, LLC ("Warner") in December 2011. Warner began branding itself as Ingram Medical ("Ingram") in February 2012.

82.    To expand its test strip business, Ingram purchased customer leads from vendors that identified diabetes patients. In January 2014, Ingram acquired its largest lead vendor, Alliance Health Networks, Inc. and its affiliates, with Ingram thereafter adopting the "Alliance Health" brand name.

83.    Alliance maintained several websites and online social networks that provided information to diabetes patients. Alliance's primary social network for diabetes patients was called "Diabetic Connect." By asking Diabetic Connect users to sign up for various services and discounts, these websites obtained valuable personal information from users, including names, addresses, medical issues, and insurance information. Alliance had hundreds of employees in call centers who earned commissions by phoning these "leads" and convincing them to purchase their test strips from Alliance. On average, Alliance telephoned a lead within 30 seconds of receiving it.

84.    From among these leads, Alliance pursued specific patients based on their location, insurance carrier, preferred/prescribed brand of test strips, and profitability in order to create a "low risk" customer base. "Low risk," a term frequently used by Alliance in its internal communications, referred to the low risk associated with detection of Alliance's scheme.

85.    If a lead was too risky or insufficiently profitable, Alliance would attempt to sell the lead to another company. As Alliance came under increasing scrutiny from certain manufacturers and insurers, it would adjust its profitability/risk metrics and "fire" large pools of existing patients who did

20

not meet the new standards.

86.     The single most important criterion for Alliance's potential customers was having insurance that covered test strips under a pharmacy benefit that would reimburse for retail strips. The vast majority of Alliance's patients had pharmacy-benefit insurance.

87.     Throughout the years, Alliance won apparent praise from the media, business, and financial markets. Indeed, the company was named to 2016's Inc. Magazine's 5000 fastest- growing companies list at number 1,835, reporting three-year growth of 203 percent, and 2015 revenues of $175.4 million.

88.     In 2015, Alliance was named the fastest-growing company in the state by Utah Business magazine, which in 2016 also tagged it as one of the best places to work. For 2016, Alliance reported $160 million in gross revenues.

**F.     Alliance's Questionable Business Practices are the "Foundation" of Alliance**

89.     At all relevant times, the Scheme Participants were officers, directors, and/or employees of Alliance, with Brown representing the Company as, *inter alia*, outside regulatory and corporate counsel.

90.     Alliance Medical Holdings, LLC was the successor, owner, and/or controlling entity of Warner Diabetic, LLC d/b/a Ingram Medical ("Ingram") and, before that, Medsource and Medsource-Direct. Alliance Medical Holdings, LLC and/or its predecessor entities owned, controlled, or were affiliated with a large network of companies that were used (and abused) to engage the Questionable Business Practices that caused direct harm: (i) to Alliance, and (ii) to test strip manufacturers, including Roche and LifeScan.[8]

---

[8] The Alliance Healthcare Network included entities involved in purchasing test strips, such as Alta Distributors, LLC ("Alta"), Ollin Pharmaceutical, LLC ("Ollin"), SP Diabetic LLC ("SP Diabetic"), Medsource-Direct, Inc., and Western Diabetic Supply Corp. The Alliance Healthcare Network also included operating, managing, and holding entities, such as Alliance Medical Administration, Inc.;

91.     Alliance and its Scheme Participants used various methods to obtain Roche's and LifeScan's NFR strips through Alliance's purchasing entities. Those strips were then sold or distributed to the Alliance pharmacies.  Instead of dispensing NFR strips to DME beneficiaries, the Alliance pharmacies dispensed them to pharmacy beneficiaries. To obtain reimbursement for those NFR strips, the Alliance pharmacies adjudicated over one million insurance reimbursement claims in which they

---

AHN Holding Company, LLC; Alliance Health Networks, LLC; Steel Medical, LLC; Chronic Care Health Foundation, LLC; Skyline Health Services, LLC; White Capital Management, LLC; CSL Capital Holdings, LLC; Ingram Diabetic, LLC; Genshai Holdings, LLC; Namaste Capital Holdings, LLC; Warner Diabetic, LLC; Cloud Management, LLC; and Ingram Medical Administration, Inc. Alliance and/or its predecessor entities also owned, controlled, and/or were affiliated with a large network of pharmacies and their associated holding companies, including: Alameda Rx Holdings, LLC; Alameda Rx, LLC; Aspire Rx, LLC; Baytree Rx, LLC; Belle Pharmacy, LLC; Benson Pharmacy, Inc.; Berkshire Pharmacy, LLC; Best Rx Holdings, LLC; Best Rx, LLC; Better Care Rx Holdings, LLC; Bridgestone Pharmacy Holdings, LLC; Bridgestone Pharmacy, LLC; Brighton Pharmacy, LLC; Brookhill Pharmacy, LLC; BrooksideRx Holdings, LLC; BrooksideRx, LLC; Bubba's Rx Holdings, LLC; Burbank Pharmacy, LLC; Canyon Medical, LLC; Canyons Pharmacy, LLC; Central Medical, LLC; Charleston Rx Holdings, LLC; Charleston Rx, LLC; Cheshire Rx Holdings, LLC; Cheshire Pharmacy, LLC; Conoly Pharmacy Holdings, LLC; Conoly Pharmacy, LLC; Cordele Pharmacy, LLC; Cottonwood Pharmacy, LLC; Crestwell Pharmacy Holdings, LLC; Cure Rx, LLC; David Pharmacy, LLC; Delaney Pharmacy, LLC; Eat Great Café, LLC; El Dorado Pharmacy, LLC; El Dorado Rx Holdings, LLC; Everest Pharmacy, LLC; Galena Pharmacy Holdings, LLC; Galena Pharmacy, LLC; Garnett Pharmacy, LLC; Genesee Pharmacy, LLC; Geneva Pharmacy, LLC; Geneva Rx Holdings, LLC; Glendale Square Rx, Inc.; Good Wave, LLC; Goodman Pharmacy, LLC; Hawkins Pharmacy Holdings, LLC; Hawkins Pharmacy, LLC; Hawthorne Pharmacy, LLC; Hawthorne Rx Holdings, LLC; Hazelwood Pharmacy, LLC; Health Rx Holdings, LLC; Health Saver Holdings, LLC; Health Saver Rx, LLC; Improve Rx Holdings, LLC; Improve Rx, LLC; Innovative Rx, LLC; Insight Rx Holdings, LLC; Jefferson Pharmacy, LLC; JTK Medical, LLC; Kendall Pharmacy, Inc.; Living Again; Holding Co, LLC; Lockeford Rx Holdings, LLC; Lockeford Rx, Inc.; Lone Peak Rx, LLC; Med Mart Holdings, LLC; Medina Pharmacy, LLC; Medsource Rx Pharmacy, LLC; New Jersey Rx Holdings, LLC; New Jersey Rx, LLC; New Life Pharmacy, LLC; Newton Rx Holdings, LLC; Newton Rx, LLC; Norwood Pharmacy, LLC; Oak Creek Pharmacy Holdings, LLC; Oak Creek Rx, LLC; Ohana Pharmacy Holdings, LLC; Ohana Rx, LLC; On Track Rx Holdings, LLC; On Track Rx, LLC; OpusRx, LLC; Osceola Clinic Pharmacy, LLC; Osceola Rx Holdings, LLC; Peach Medical Holdings, LLC; Peterson Rx, LLC; Pharmacare Holdings, LLC; Philadelphia Pharmacy Holdings, LLC; Pineview Rx Holdings, LLC; Pinnacle Pharmacy Solutions, LLC; Pro Rx Holdings, LLC; Raven Pharmacy Holdings, LLC; Raven Pharmacy, LLC; Richardson Pharmacy, LLC; Riverbend Prescription Services, LLC; Riverbend Pharmacy, LLC; Riverfront Pharmacy, LLC; Riverfront Rx, LLC; Rock City Pharmacy, LLC; Rx Pro Holding Co., LLC; Rx Solutions Holdings, LLC; Smart Rx Holdings, LLC; Staley Pharmacy, LLC; Stonybrook Pharmacy, LLC; Twin Lakes Pharmacy, LLC; Uinta Rx Holdings, LLC; Uinta Rx, LLC; Uplift Rx Holdings, LLC; Uplift Rx, LLC; Vitality Holdings, LLC; Waverly Pharmacy, LLC; Woodward Drugs, LLC; and Woodward Rx Holdings, LLC.

misrepresented that they had dispensed retail strips.

92.     In sworn deposition testimony given on July 19, 2017, two Alliance employees readily admitted to Alliance's improper business practices, with one describing it as "the foundational practice" of the company. A third employee testified in a deposition that "delivering one product but billing for another . . . was an integral part of [Alliance's] business model."

### G.     Test Strip Manufacturers Rely on Alliance's Misrepresentation when Paying Rebates

93.     Because test strip manufacturers paid rebates to PBMs for adjudicated retail claims, it was well known in the industry, and to Brown at the time, that test strip manufacturers relied on information provided to the PBMs and PBM auditors when paying (or withholding) rebates based on sales of retail strips. This was the case with the Test Strip Manufacturers, LifeScan and Roche, who relied on information provided to, and passed to them through, the PBMs regarding Alliance pharmacies. This includes both the original adjudication information (which was fraudulent) and the information the PBMs received from their audits (which was also fraudulent). In fact, the Manufacturers communicated with PBMs regularly regarding rebate claims on suspected fraudulent invoices from pharmacies, including many Alliance pharmacies.

94.     For example, Roche was notified by a PBM auditor that three pharmacies, Medsource Rx Pharmacy, Aspire Rx, and Everest Pharmacy (later revealed to be Alliance-owned pharmacies) might be engaging in fraudulent billing, and Roche conveyed its suspicions about these pharmacies to the PBM OptumRx. At that time, after investigating the pharmacies, Optum was unable to verify that the pharmacies were actually committee fraud. Accordingly, Optum informed Roche that the pharmacies would remain contracted with Optum, and that Roche would still be obligated to pay rebates on the pharmacies' invoices.

95.     As healthcare regulatory experts specializing in PBMs and with notable PBM contacts, Brown understood that PBMs relayed information to test strip manufacturers by directly passing on the

claims information and informing the test strip manufacturers of the results of their investigations, which informed whether the test strip manufacturers paid rebates. Thus, as explained below, Brown knew, and it was Brown's intention, that Alliance's misrepresentations to the PBMs would result in the continued adjudication of claims by Alliance pharmacies and the payment of rebates and that Brown's own misrepresentations to PBMs on behalf of Alliance, including the fraudulent invoices and other misrepresentations about the validity of invoices and Alliance's corporate ownership structure (as described below), would be communicated to and relied on by the Manufacturers when calculating and making their rebate payments to PBMs. Moreover, Brown knew that it was the PBM's role to determine a pharmacy's eligibility to submit claims, which determination would cause the Manufacturers to continue paying fraudulent rebates.

### H.  Brown Learned of Alliance's Questionable Business Practices Shortly After Brown was Engaged by Alliance

96.    Starting in August 2010, Brown commenced performing legal services for and on behalf of Alliance with billing records reflecting client billings directed to "Alliance Health Networks, Inc.," "Ingram Medical, LLC," "Medsource Rx Pharmacy, LLC," "SP Capital Holdings, LLC," and "Western Diabetic Supply Corporation."  However, as alleged above, Alliance was operated without regard to corporate distinctions, and Brown performed services for additional entities.  Copies of Brown's invoices and detailed billing records were attached as Exhibit 2 to the prior Amended Complaint.

97.    Of these entities, Alliance Health Networks, Inc., Ingram Medical, LLC, SP Capital Holdings, LLC, Medsource Rx Pharmacy, LLC, and Western Diabetic Supply Corporation were "Corporate Entities" that served as the administrative and financial locus of the entire Alliance Healthcare Network.

98.    Brown attorneys Jeffrey Baird, Bradley Howard, Lisa Smith, Elizabeth Jepson, and Nathan Fish performed legal and non-legal services on behalf of Alliance in furtherance of the Questionable Business Practices.

99.     On August 18, 2010, Baird, a shareholder of Brown and the Chairman of its Health Care Group, met with Jeffrey Smith, the Chief Executive Officer of Alliance, to pitch him on making Alliance a Brown client.

100.    Brown learned of Alliance's Questionable Business Practices soon after its representation of Alliance began.  In January 2011, Howard, a shareholder and director of Brown, spoke with Candace Czerny, a senior Alliance employee, about "NRS" (not-for-retail sale) issues.  Around this time, Roche had asked Alliance to provide information about its purchases of Roche products, including the NDC numbers of the products it was purchasing. Howard drafted an email for Czerny to send to Roche.  The email provided a pretextual reason for refusing Roche's request for information about Alliance's purchases.  The email, which Czerny sent to Roche, reads as follows:

> Jeffrey Smith and I have conferred, and we do not believe it is necessary or appropriate for our company to provide its sales and order data to other companies. We believe it is important to maintain confidentiality about the terms and conditions of our business relationships with other manufacturers, wholesalers, and patients, including sales and order data. We normally do not disclose such information to other companies in the industry absent some very compelling need.

101.    A few days later, Howard asked his colleague Lisa Smith, another shareholder of Brown, to speak to Jeffrey Smith.  Howard sent an email to Jeffrey Smith wherein he wrote, "I spoke with Lisa Smith, another attorney in our Health Care Group, about the NRS questions you raised at the end of our conversations last week.  She is better equipped to address those questions. . . ." Jeffrey Smith responded a few hours later and asked Lisa Smith to call him the next day, February 4.

102.    On the afternoon of February 4, Jeffrey Smith emailed Lisa Smith and said, "My understanding is that you will be helping us with the following: 1. Look into our NDC issue in billing the PBM's [pharmacy benefit managers] with Retail with one ND[C] but shipping another ND[C] (sent info on spreadsheet). 2. Look at our contracts in regards to: a. restrictions on mail order for our contracts signed b. NDC issues per each contract."  Lisa responded that Jeffrey's "understanding is correct."

103.    On February 9, Jeffrey Smith followed up with Lisa Smith to "see when we will be able to review your findings."  They scheduled a call for the next day.

104.    The next day, February 10, Czerny sent Lisa Smith an email.  The email read: "Attached are the NDC's we are billing vs the ones we are shipping out.  As you can see the majority (90% of our volume) of the alternate packaging we sent out have the exact same AWP [average wholesaler price] as the NDC we are billing the insurance."

105.    Attached to the email was the following spreadsheet:

| Item Description | NDC Billed | AWP LISTED | NDC shipped | AWP LISTED |
|---|---|---|---|---|
| Accu-chek Aviva 50 | 65702010310 | $61.50 | 65702010610 | $61.50 |
| Accu-chek Compact 51 | 50924098850 | $61.50 | 50924027201 | $61.50 |
| One touch Ultra 50 | 53885024450 | $61.80 | 53885000075 & 53885096350 | |
| Ascensia Breeze 2 50 | 00193146550 | $58.80 | SAME AS BILLED | $58.80 |
| Ascensia Contour 50 | 00193708050 | $62.40 | SAME AS BILLED | $62.40 |
| Freestyle Lite 50 | 99073070822 | $68.39 | 99073070819 | $68.39 |

This spreadsheet showed that Alliance was billing insurance companies for products different than the ones they were shipping to patients.  Of particular note, the "NDC Billed" and "NDC Shipped" columns indicated that Alliance was shipping NFR Roche and LifeScan diabetic test strips to patients but billing the patients' insurance companies for retail Roche and LifeScan strips.

106.    Thus, *no later than* February 10, 2011, Brown knew that Alliance was engaged in the Questionable Business Practice of shipping NFR products but billing them as if they were retail products. In other words, Brown *knew* Alliance was submitting false insurance claims.

### I.    Brown Concludes Alliance's Questionable Business Practices are Illegal

107.    On August 2, 2011, Justin Leavitt, the Chief Financial Officer of Alliance, emailed Lisa Smith and wrote regarding a contract Medsource had with Roche: "[W]e realized after the fact that

we're supposed to only sell the product through a DME benefit and not through a Pharmacy Benefit as we originally intended.  In your opinion, if we were to be audited and they saw that some product was billed through a pharmacy benefit, what would be their recourse?  I assume they would just cancel the contract.  Thanks in advance for your input."  Smith responded that if Medsource "did use this product and send it to end users by billing it through a pharmacy benefit [Medsource] would be in breach of contract."

108.    On September 19, 2011, Leavitt reached out to Lisa Smith again.  He wrote:

> From both a practical and a 'letter of the law' perspective, what would be our exposure, if any, if one of our pharmacies were to only bill the Retail NDC to the PBM, but physically mail out the Mail- order NDC because we can't procure enough Retai" [*sic*] product to meet our necessary volume requirements?  We've also been able to verify that the reimbursement rates are identical for both NDC's. How would the PBM audit for this kind of compliance? Is this just a PBM compliance/contractual issue, or are there potentially other legal ramifications?

It is unclear if Lisa Smith ever responded, but an undated set of handwritten notes maintained by Brown state: "NDC Issues . . . pharm sending mail order product; couldn't get retail.  Same products, same reimbursement.  Lisa said not fraudulent; can't buy retail product & make profit."

109.    On November 23, 2012, Jeffrey Smith asked Howard if there "[a]re [] any cases with PBM's [*sic*] VS. a Pharmacy or Manufacturers' (e.g., Abbott or Roche) vs. a Pharmacy for billing PBM for the Retail Pharmacy billion [*sic*] the Retail NDC but shipping the Mail order version?"  In an internal Brown email sent four days later, Howard asked Jepson, an associate attorney working in Brown's Health Care Group, "who do you think could best research this."

110.    On November 29, 2012, Howard emailed Jeffrey Smith  a "quick question," asking whether "the third party payer reimbursement rate [was] different for the mail order and retail strips?  I just want to get a better sense of what would concern the PBMs if they knew exactly what was occurring."

111.    By email dated November 29, 2012, Leavitt asked Howard to look at the "False Claims

Act . . . and how Medicare Part D claims . . . may or may not come into play?"

112.    An associate attorney at Brown, Mahlberg, was chosen to research the question.  In an internal memorandum from Mahlberg to Howard dated December 3, 2012, Mahlberg concluded that the company's "NDC Issue"—Alliance's Questionable Business Practice of shipping of NFR products while billing retail products—constituted fraud:

> Question: What are the risks associated with charging a pharmaceutical benefit manager (PBM) for retail diabetic testing supplies (DTS) when the equivalent mail-order DTS was actually delivered?
>
> Answer: For deliveries to federal beneficiaries, the described practice is a violation of the False Claims Act.  For all other beneficiaries, state law may prevent the practice.  Additionally, the described practice may result in misbranding charges under the Food, Drug and Cosmetic Act.

113.    By email dated December 3, 2012, Jeffrey Smith again confirmed in an email to Howard that the company is engaged in fraudulent billing practices:

> I may be able to give a little more color on the Abbott issue. One of our leads vendors works with Abbott. Abbott buys leads from them and sends the leads to pharmacies to fulfill. Abott's [sic] frustrated that they send leads to pharmacies and the pharmacies will switch the patients to to [sic] another product in some cases, so they were looking to work with someone like us to keep the patients on the Abbott product. they looked up our history and noticed we were billing the retail ndc, but didn't have any record of us buying the product anywhere. They want to work out a direct deal, but we will lose our shirt. So they seem to want us to buy in a more normal way from them as opposed to second sourcing product. They don't really believe we can get that much retail product second source, so i think they believe we are probably using the Mail order SKU.

114.    On December 11, Baird recounted in an email to Howard a conversation he had with Jeffrey Smith on December 10.  According to Baird, Smith "swayed from 'panic' to 'we can work this out.'"  Smith admitted, again, that the Alliance entities "are billing under one NDC when they should be billing under another NDC."  Smith said he wanted to "fix the problem," but he does not want to "act in haste" or "overact," which could make the problem worse because "PBMs/commercial insurers will start cancelling contracts with the entities."  Smith considered selling all the entities and closing down

shop.  He also considered only continuing the operations "that are <u>not</u> suspect from a legal standpoint," but Smith "doubt[ed] he can afford to do this."

115.    Jeffrey Smith called Baird again on December 11, 2012; according to an email written by Baird about the conversation, Smith was "bouncing all over the place."  Smith told Baird it was "common in the marketplace for diabetic supplies" to ignore restrictions like "not for retail" affixed to packages.  Smith told Baird that "if he cannot bring the entities into compliance in 90 days, then he wants to go ahead and sell the entities.  Smith does not think he can bring the entities into compliance within 90 days."

116.    Though Brown ***knew*** their client was engaged in Questionable Business Practices that ***Brown itself concluded were illegal***, it did not disengage from its representation of Alliance.  Instead, it continued representing and performing services for Alliance, and through that representation and those services, helped Alliance perpetuate its Questionable Business Practices.

**J.    Alliance Acquires Roche and LifeScan NFR Test Strips on the Secondary Market**

117.    After developing a base of patients with pharmacy-benefit insurance that reimbursed for the sale of retail strips, Alliance needed test strips to dispense.  Alliance recognized that purchasing retail strips through legitimate channels and dispensing them to pharmacy beneficiaries would result in lower profit margins—especially given that Alliance often did not collect co-pays.  Seeking the highest profit margins possible, Alliance opted to purchase low-cost NFR strips, dispense them to pharmacy beneficiaries, and submit improper insurance claims falsely stating that they had dispensed retail strips.

118.    Jose Vargas, Alliance's Director of Procurement, testified that Jeffrey Smith instructed him to buy as many NFR strips as possible from unauthorized distributors.  In an e-mail to a business partner, Vargas stated that Alliance "only buy[s] MO or NRS strips."  "MO" (mail order) and "NRS" (not for retail sale) strips are NFR strips.

119.    Alliance purchased the vast majority of its NFR strips from third-party "diverters."

Diverters obtain NFR strips from distributors willing to breach their contracts with manufacturers and sell NFR strips on the "secondary" or "gray" market, where they can obtain a higher price from parties like Alliance as part of its Questionable Business Practices. The secondary market for diabetes test strips consists almost entirely of NFR strips, because the high wholesale price at which manufacturers like Roche sell retail strips into the market leaves little opportunity for diverters to make a profit. Buying NFR strips from the secondary market was so commonplace for Alliance that its employees used "secondary product" as a synonym for NFR strips.

120.    Alliance did not purchase Roche or LifeScan NFR strips under Alliance's own name, but instead purchased them through its subsidiary purchasing entities. The first such entity was Medsource-Direct, Inc., which changed its name to SP Diabetic in September 2011. At some point, health insurers refused to reimburse Alliance pharmacies for sales of Roche test strips that they "purchased" from SP Diabetic, so Alliance began purchasing through Alta and Ollin.

121.    After Alliance purchased NFR strips from the secondary market, it improperly identified them in its inventory management system using the NDC number for retail strips. As a result, the purchase orders ("POs"), invoices, and other inventory reports generated by Alliance's inventory management system improperly displayed the retail NDC for the corresponding brand of test strips, even though Alliance was purchasing NFR strips.

122.    Alliance's use of the retail NDC on its POs and invoices was crucial to hiding its scheme. When auditors demanded proof from Alliance-affiliated pharmacies that they had purchased sufficient retail strips to support their thousands of adjudications, the pharmacies would produce phony invoices from Medsource-Direct, SP Diabetic, Alta, or Ollin purporting to show that the strips purchased by the pharmacies were retail strips. The auditors were not told that these purchasing entities—like the pharmacies themselves—were part of the same corporate family. Nor were auditors told that the records generated by the purchasing entities improperly displayed retail NDCs despite the fact that the strips

being dispensed by the pharmacies were NFR strips.

### K.    Alliance Builds a Network of Pharmacies to Execute and Mask Its Misconduct

123.    Because of the role played by PBMs in adjudicating insurance claims, it was essential that the Alliance pharmacies deceive PBMs into believing they were dispensing retail strips at brick-and-mortar retail locations, when they were in fact dispensing NFR strips exclusively by mail. As the scheme grew, however, the Scheme Participants could not hide the massive number of diabetic test strips (and relative lack of other items) purportedly being dispensed to walk-in customers at these locations. As PBMs began to question Alliance pharmacies' claim submissions, Alliance's senior management expanded their enterprise beyond a single corporate-owned pharmacy—the MedSource Rx Pharmacy—to additional corporate-owned pharmacies with independent branding. These included Aspire Rx Pharmacy, Everest Pharmacy, and Brighton Pharmacy.

124.    Thereafter, numerous PBMs audited, claimed chargebacks, and cancelled their contracts with these Alliance-owned pharmacies. For example:

- Prime, a PBM, claimed a $1,860,423 chargeback against Medsource Rx Pharmacy, LLC, and the PBM Catamaran claimed a $3,200,000 chargeback against Medsource.

- Prime claimed a $519,170 chargeback against Aspire Rx, LLC, and Catamaran claimed an $83,883 chargeback against Aspire.

- Prime claimed a $653,207 chargeback against Everest Pharmacy, LLC, and Express Scripts Inc. ("ESI"), another PBM, asserted Everest breached its contract. A third PBM, OptumRX, claimed a $1,466,725.60 chargeback against Everest. A fourth, Caremark, claimed a $583,974 chargeback against Everest.

- OptumRX suspended payments and claimed a $1,422,379 chargeback against Brighton Pharmacy, LLC. Prime claimed a $560,717.86 chargeback against Brighton. ESI claimed a $3,337,693 chargeback against Brighton.

Nevertheless, by operating through multiple pharmacies, each with multiple PBM contracts, Alliance was able to absorb the losses of particular PBMs terminating their contracts with particular pharmacies,

and Alliance could simply shift patients to other pharmacies.

125.    Nevertheless, Alliance Insiders became concerned that PBMs were beginning to notice common ownership and locations of Alliance's corporate-owned pharmacies, and that they were cutting off multiple Alliance pharmacies at once rather than one pharmacy at a time. This sort of systemic PBM risk was devastating to Alliance's business. Despite Brown's help in continuing to mislead PBMs and fight their audits, Medsource Rx Pharmacy was forced to close on May 1, 2014; Aspire Pharmacy closed by May 30, 2014; Everest Pharmacy closed by June 30, 2014; and Brighton Pharmacy closed by August 2015.

126.    To mitigate the risk of being discovered and shut down *en masse*, Alliance with the knowledge, intention, and assistance of Brown, began operating through a network of nominally "independent" pharmacies throughout the United States. These pharmacies each had separate contracts with PBMs, and they each had their own National Provider Identifiers ("NPI"), unique ten-digit numbers assigned to pharmacies and other healthcare providers by the Federal Government and used in adjudication of insurance claims. The pharmacies also had independent branding and ostensibly independent ownership—usually a friend, neighbor, or business associate of Jeffrey Smith. In substance, however, these "independent" pharmacies acted as fronts for Alliance's Questionable Business Practices.

127.    Years after it began, a May 15, 2016 memo prepared for Alliance Medical Holdings' Board of Directors succinctly summarized the "independent" pharmacy strategy:

> In late 2013, the company determined to grow its fulfillment capability not by adding new internally owned pharmacies, but by adding pharmacies owned by independent investors owning pharmacies managed by the company. The PBMs cancelled contracts and imposed chargebacks against the internally owned pharmacies because the pharmacies had retail contracts but were fulfilling by mail. Based on updated "transparency" requirements that mandated reporting ownership structure, the PBMs were able to tie all of the internal pharmacies together. The independent pharmacy model was an attempt to diversify and shift risk.

128.    As the May 15, 2016 memo makes clear, the "independent" label was a ruse—Alliance's affiliated pharmacies operated under its direct control.

129.    Alliance required the "independent" pharmacies to use its proprietary software called Pharmacy Patient Management System ("PPMS"), which managed patients' prescriptions and insurance information, as well as the costs, profit margins, and shipment of test strips. Using the PPMS software's insurance tracking capability, Alliance would assign specific patients to each "independent" pharmacy, depending on whether that pharmacy had a contract with the patient's PBM. The PPMS software also tracked the prescription and usage data for the patients assigned to each "independent" pharmacy, which Alliance then used to determine the number and brands of test strips the pharmacy would need to fill its assigned patients' prescriptions. Alliance's purchasing entities then "sold" the requisite number of NFR strips to the pharmacy.

130.    Alliance also required the "independent" pharmacies to use software (called "FSI") that allowed for real-time, electronic adjudication of insurance claims over the Internet. Alliance trained the pharmacists and pharmacy technicians at its pharmacies to adjudicate claims in FSI by entering a "short code" or "quick code" for the corresponding brand of test strips. Unbeknownst to the pharmacists, Alliance had modified FSI so that entering the "short code" caused the software to adjudicate an insurance claim using the NDC for retail strips—even though NFR strips were being dispensed. For example, when adjudicating a 50-count box of Roche's Accu-Chek test strips, pharmacists were instructed to input the short code "ACCU50" regardless of the NDC on the box dispensed to the patient. The ACCU50 short code acted as a stand-in for the NDC of a retail box of Accu-Chek test strips.

131.    Use of short codes resulted in the uniform adjudication of all test strips as retail strips at all of Alliance's pharmacies. In sworn testimony, Alliance's former Director of Pharmacy Operations, Amy McMurtry, stated that "[a]ny adjudication that went through was for the retail NDC regardless of the box received in or dispensed out" and that she could not "think of any exception to that." Former

Alliance pharmacist Masum Amin likewise agreed at her deposition that when she "delivered DME test strips to a patient, their insurance would be billed for retail test strips." "DME" test strips are NFR strips.

132.    The use of short codes in FSI also had the benefit of hiding Alliance's Questionable Business Practices from its own pharmacists and technicians. Those employees did not themselves have to enter incorrect NDC numbers into Alliance's software—they simply entered a short code, and the software provided by Alliance would automatically bill the patients' insurance using the retail NDC.

133.    The pharmacies remitted the resulting insurance reimbursements to Alliance. Importantly, Alliance's name was divorced from the entire transaction with the PBM, which would have no way of knowing of Alliance's involvement. In this way, Alliance reduced the risk that a PBM discovering problems at one Alliance pharmacy would respond by cutting off the entire Alliance network of pharmacies. Alliance's former Director of Pharmacy Operations Amy McMurtry testified that Alliance's network of "independent" pharmacies was intentionally structured "so that … in the event of a contract loss, it would not be across the entire network of pharmacies."

134.    Isolating contract cancellations to a single pharmacy was key to Alliance's Questionable Business Practices. By employing a network of nominally "independent" pharmacies, Alliance could mitigate the impact of PBM contract terminations by simply shifting patients to another pharmacy. Because Alliance's PPMS software tracked patients by insurance plan, that software could easily reassign patients to a different Alliance pharmacy that still had a contract with that PBM (because the PBM had not yet discovered that the new pharmacy was affiliated with Alliance and engaging in the Questionable Business Practices). Alliance shifted its patients in this way on numerous occasions.

135.    The Insiders went to great lengths to conceal that its "independent" pharmacies were affiliated with each other or with Alliance, including by instructing the pharmacists at its affiliated pharmacies to deny association with other Alliance pharmacies.

136.    For example, in a July 31, 2014 e-mail from former Director of Pharmacy Operations

34

McMurtry to Paoline and the pharmacists in charge of Alliance-affiliated Oak Creek Pharmacy, David

Pharmacy, River Front Pharmacy, Cure Pharmacy, Hawkins Pharmacy, Peterson Pharmacy, Norwood

Pharmacy, and Stonybrook Pharmacy, McMurtry wrote:

> Team,
>
> I know that many of the Independent locations have sheets containing information about the other Independent sites (Name, Address, NPI, etc.). In an effort to reduce confusion, I am asking that you take down all site information sheets. Please either file them away for future reference or place them in a HIPAA container. The information on these sheets was probably not useful to most of you anyways, as it was mostly just information. We are making the change for a couple of reasons:
>
> Each site is an Independent site with a separate owner. There is no correlation or tie between the two sites.
>
> When a site is asked questions like: "are you a chain or an independent?"; "Are you linked to any other pharmacies?" I think it gets confusing if you do have the other sites information, and gives an inaccurate sense of connection to each other.

137.    McMurtry agreed in sworn testimony that pharmacists at Alliance's "independent"

pharmacies "were instructed to not tell anyone that they were affiliated with Alliance or affiliated with

other pharmacies." She further testified that one reason they were instructed to do so was because a

"PBM could cut contracts at more than one pharmacy."

138.    Despite these various safeguards designed to avoid detection by PBMs and mitigate risk,

Alliance knew that the massive quantities of improper adjudications running through each

"independent" pharmacy would eventually be noticed and that the pharmacies were operating on

borrowed time.  The May 15, 2016 memorandum to Alliance Medical Holding, LLC's Board of

Directors stated that Alliance had anticipated that the independent pharmacies would have a "three year

life span" before the Questionable Business Practices were detected and shut down, but that this had

turned out to be too generous of an estimate:

> The company anticipated a three year life span for the independent pharmacies. Unfortunately, the PBMs have been cancelling contracts at

a faster rate than anticipated, and have imposed chargebacks, although the company is assisting the independent pharmacies to challenge cancellations where appropriate and chargebacks.

The memorandum further explained that its "independent" pharmacy model had become "extremely difficult" to manage because of potential regulatory issues, the straw owners taking excessive draws and using independent accountants, and questions raised by Alliance's auditors.

139.    To address these problems while preserving its "independent" pharmacy ruse, Alliance began acquiring the formerly "independent" pharmacies as part of a so-called "10% PIC" ownership model. Under this model, Alliance would acquire the pharmacy, but grant the pharmacist-in-charge (the "PIC") a 10% equity stake, allowing the PIC to act as a straw owner. Alliance would then over-charge the pharmacy in fees and wholesale markup "to assure that the pharmac[y] lose[s] money" until the fourth quarter of each year, when Alliance would allow the pharmacy to break even. The 10% equity share thus would be profitless, but would allow Alliance to take advantage of the identity of the PIC as the ostensible owner and appear "as independently owned pharmacies in licensure applications and PBM contracts." As with the "independent" pharmacy model, the 10% PIC model was designed for the express purpose of making the pharmacies appear as independent from Alliance to obfuscate discovery of the Questionable Business Practices.

140.    The use of the independent pharmacy model and the 10% PIC model specifically advanced the fraudulent scheme by preventing the PBMs from understanding the magnitude, scope and true nature of the fraud.  From the perspective of the PBMs, improper claim adjudication appeared to be limited to individual pharmacies, which the PBMs would often terminate following an audit that uncovered fraud.  Hidden from the PBMs was the entire fraudulent scheme that was designed to simply open a new "independent" pharmacy upon the termination of a previous pharmacy.  While the PBMs believed they were identifying and terminating instances of improper adjudication, the scheme—assisted by Brown—allowed Alliance to perpetuate the fraud.

141.    Pursuant to this switch in ownership model, between May 31 and July 1, 2016, Alliance entered into agreements to manage and eventually acquire many pharmacies: Alameda Pharmacy, LLC; Baytree Pharmacy, LLC; Cordele Pharmacy, LLC; CureRx Pharmacy, LLC; David Pharmacy, LLC; El Dorado Pharmacy, LLC; Genesee Pharmacy, LLC; Hawkins Pharmacy, LLC; Jefferson Pharmacy, LLC; Oak Creek Pharmacy, LLC; PetersonRx, LLC; Rock City Pharmacy, LLC; Staley Pharmacy, LLC; and Twin Lakes Pharmacy, LLC.

**L.    Brown Helps Alliance Build Its Fraudulent "Independent" Network While Advising It to Hide its Questionable Business Practices**

142.    Brown knew about Alliance's scheme to deceive PBMs from its inception.  On August 25, 2010, mere days after Alliance became a Brown client, Jeffrey Smith emailed Baird to ask for "help" with "the following questions."  One of these questions was, "Does anyone know what the algorithm is for Medco, Express scripts, and CVS [three PBMs] for determining whether they cut off a pharmacy for mail ordering product?"  Baird forwarded the email to Phuong Nguyen, another attorney in Brown's Health Care Group.

143.    Apparently already suspicious of Alliance's potential business model and motives, Baird asked Nguyen to "read Jeff's email and figure out what he is asking.  Then call Jeff (on his cell phone), get additional information, and the [*sic*] REALLY figure out what he is asking."  Baird told Nguyen that he was "confused about something.   The client sells diabetic supplies to about 2000 commercial patients. Our client (which is a pharmacy) is being paid by the commercial insurers under the 'pharmacy benefit.' Once our client secures its Medicare Part B supplier number, then in addition to selling diabetic supplies to Medicare patients, our client wants to (1) to [*sic*] switch its existing commercial customers from the 'pharmacy benefit' to the 'DME benefit' and (2) bill new commercial patients under the 'DME benefit.' I am not sure what this means."

144.    On September 3, 2010, Baird wrote to Jeffrey Smith (with Nguyen copied) that Baird understands that Alliance "want[s] to know how [it] can increase [its] mail-order diabetic supply

business while limiting the risk of retaliatory action by PBMs."  After listing some options for how to do so, including setting up a division or separate company that solely dealt in DME products, Baird wrote:

> You have also suggested setting up separate pharmacies (under separate legal entities) throughout the country.  These pharmacies will obtain their own Medicare Part B supplier numbers.  The pharmacies will sell diabetic testing supplies to commercial and Medicare patients.  The pharmacies will enter into contracts with PBMs.  If a PBM terminates its contract with a pharmacy, then the PBM contracts with the other pharmacies will remain intact.  This way, you can 'spread the risk[.]'  In my opinion, this scenario is complicated, expensive, and inefficient.  The most efficient course of action is to set up Newco.

145.    Later that day, Jeffrey Smith responded, "We probably need to discuss, since we have already started without setting up NewCo.  So we may need to re-tool depending on our findings[.]"

146.    Thus, *as early as September 2010*, Brown *knew* that Alliance intended to set up a network of "independent" pharmacies to circumvent the legal obligations imposed by its contracts with PBMs.

147.    On February 15, 2011, Jeffrey Smith wrote to Lisa Smith that he "would like to follow up with you on our contract discussions on a retail pharmacy doing mail order for the top PBM's [*sic*]. We need to understand the consequences for doing mail order for each company[.]

Can we get some cases so we can seem some precedence [*sic*] on how the big PBM's [*sic*] have handled these situations?"

148.    When Alliance decided to follow through with this scheme, they turned to Brown for help.

149.    In July 2013, Alliance reached out to Brown to discuss a new business model, where Alliance would "fulfill prescriptions through third-party owned pharmacies" and Alliance would "provide administrative services" to those pharmacies, and those pharmacies would each "obtain a PBM contract."  This plan, of course, echoes the business model Jeffrey Smith first discussed with Brown

within days of retaining Brown as counsel as a way to "spread the risk" of PBM cancellation while

blatantly violating PBM contracts.

150.    Alliance asked Brown whether this structure would raise "federal healthcare law issues"

like whether there could be liability for making "false statement relating to health care matters" for

providing "incorrect answers on PBM applications/contracts?"

151.    A few days later, on July 30, 2013, Baird sent Alliance and Bennett a memo on

Alliance's "Interim Business Model/Permanent Business Model."  The memo noted, *inter alia*:

- The "issue" of "retail contracts vs. mail order contracts" will still exist "assum[ing] that a pharmacy (to which [Alliance] provides services signs a contract with a PBM in which the  pharmacy represents that almost all of its sales of diabetic testing supplies is 'over-the-counter'" though "most of the pharmacy's sales are, in fact, mail-order."

- Submission of inventory that is "restricted use" could result in liability, especially if the "pharmacy's claims include NDCs that are different than the NDCs initially assigned to the 'restricted use' inventory." Such submissions could constitute "unprofessional conduct/unlawful conduct," and may violate Utah's proscription against "procurement of a drug by fraud, deceit, misrepresentation or subterfuge or concealment of a material fact."

- Brown would research and address the concern of Reed Rawson of Bennett "regarding applicability of federal laws to [Alliance] if it is not servicing any federally funded health care program beneficiaries.   We will also research Reed's questions regarding the liability of the owners of the pharmacies arising from (i) licensure application questionnaire answers and (ii) termination of PBM contracts."

152.    In an email dated August 6, 2013 from Leavitt to Bennett, Brown, and other Alliance

employees, Leavitt wrote that "several times today on our phone call, the following statement was made

[by both law firms], 'we need to make sure that this newly proposed solution (new independent owners)

does not become an even bigger problem than the one it's trying to solve (disclosure of ownership

on PBM applications.)'" (Emphasis in original). Leavitt's email also attached a memo that stated with

respect to "mail order versus retail and billing" that "[t]hese are risks the new pharmacy owner will have

to understand. [Brown is] still researching if there are scenarios where the new owners could

39

individually face liability from these business practices."

153.    On August 9, Alliance and Baird spoke on the phone.  According to an agenda circulated internally at Alliance, one of the issues discussed was that Alliance "recently learned that the we have answered the 'affiliate' questions incorrectly on certain prior PBM applications, which  presents  a concern  that by answering the question 100% correct now, it will become apparent to the PBM that  the  holding  company  we  listed  as  the  sole  owners  before  is  indeed affiliated with other pharmacies, which will possibly result in quicker contract terminations and possible recovery of monies already paid.  As such, we want/need to revisit the independent ownership idea again, but set it up in a legitimate manner."

154.    Following the call between Baird and Alliance, on August 12, Jepson wrote to Baird, "I think we're going to have to drill down on specifics of what Ingram can and can't do. . . I also don't know what you talked about with Jeff [Smith] with respect to the pharmacy continuing to bill under the improper NDC numbers. I think it raises serious questions as to why the pharmacies would enter into all of this with [Ingram] . . . it's supposed to be an 'arm's length' transaction, but it's pretty clearly not. [Ingram] is indemnifying the pharmacy for any trouble they get into with respect to violating the mail order vs. non-mail order provisions of the PBM contracts <u>and</u> for submitting false claims."

155.    On August 14, Baird provided extensive written feedback on a "summary of terms" Alliance intended to use as a term sheet for the new "independent" pharmacies it set up in furtherance of this scheme.  Baird advised Alliance on how a new pharmacy can "honestly take the position that it does not have a direct or indirect ownership/control relationship with Jeffrey Smith, Ingram or related entities" so long as an Ingram does not "take a secured note from [the new pharmacy] in which the collateral securing the note equals 5% or more of the value of [the new pharmacy's] assets."

156.    In that same document, Baird recommended that Alliance fundamentally change a disclosure it intended to provide to the owners of these new pharmacies.  The disclosure initially read:

It is intended that the Pharmacy be licensed as a retail pharmacy because each of the PBMs, with whom the Pharmacy will be contracting, owns its own mail order companies and will not contract with the Pharmacy if the Pharmacy is licensed as a mail order pharmacy. In fact, most of the contracts that the Pharmacy will enter into with PBMs prohibit all mail order fulfillment of prescriptions. Rather, such contracts require that the contracting pharmacy fill and sell prescriptions via a retail, storefront location. However, as contemplated, most, if not all, of the Pharmacy's business will be through mail order fulfillment. In addition, it is contemplated that the Pharmacy will bill the patient's insurance under the retail pharmacy benefit but ship mail order diabetic testing supplies nationwide to the patients. Due to such contemplated practices of the Pharmacy, it is possible that a PBM may terminate its relationship with the Pharmacy and seek contractual and other remedies against the Pharmacy.

Baird wrote: "My advice is for the Ingram Entity not to give this disclosure. My advice is for the Ingram Entity (i) to inform [the new pharmacy] regarding its obligations/representations under its PBM contracts and (ii) to inform [the new pharmacy] of its obligations to correctly bill the commercial insurers."

157.    Baird also recommended removing an indemnification clause promising that Ingram would indemnify the pharmacy for "damages, liabilities," etc. resulting from "the contemplated practices of the Pharmacy set forth in the 'Disclosures' Section above." Baird noted that this provision would not be needed "[i]f the Ingram Entity gives the disclosure that I have suggested above."

158.    Alliance and Brown started executing on this plan to hide the fraud almost immediately. On August 20, 2013, Bennett forwarded to Baird transaction documents that would spin off an Alliance-owned pharmacy, Hawkins Pharmacy, LLC, into an "independent" pharmacy. Bennett said that Jeffrey Smith "asked [Bennett] to send such documents to you for your review." Smith said to Baird that he had "some issues with it. For example the highlighted area in yellow (5.3) on MPA."

159.    The highlighted area of concern was a disclosure that stated, under the heading "Acknowledgment of Purchaser:" "Such companies may purchase and ship diabetic testing supplies labeled with a mail order NDC but bill the patient's insurance for such diabetic testing supplies under

a retail pharmacy NDC, which practices may subject such companies or their owners to criminal liability."

160.    Jeffrey Smith then wrote to Leavitt and Czerny that "the highlighted area…needs to be pulled.  This is nutso and I don't believe is even true.  What a crazy thing to ask or suggest. Jeff Baird [a Brown attorney] is going to flip a gord [*sic*]."  Smith then forwarded this exchange to Baird.

161.    That same day, Baird wrote back to Smith (copying the Alliance and Bennett teams) and said that this "section of the [agreement] should be removed entirely.  As we have stated before, it is not appropriate to include a discussion of potentially-improper business practices in any of the transaction documents.  If anything, the documents should state that the pharmacy is required to comply with state and federal laws, as well as PBM contract provisions."

### M.    With Brown's Help, Alliance Actively Conceals its Misconduct

162.    In addition to using a network of ostensibly independent pharmacies to disguise their Questionable Business Practices, Alliance, with Brown's knowledge and assistance, devoted constant attention to the task of hiding its Questionable Business Practices and mitigating the fallout when they were detected.

#### 1.    Alliance's "Productive Paranoia"

163.    One of the foundational "disciplines" of Alliance was "Productive Paranoia." A May 9, 2012 slide presentation to Warner Diabetic's Board of Directors described "productive paranoia" as "The Company's plan for 'protecting the golden goose.'" As the source of over 90% of Alliance's revenue, the "golden goose" was the improper adjudication of NFR strips as retail strips.

164.    As Jeffrey Smith stated in an April 10, 2013 e-mail to Alliance senior management, "the biggest concern under Productive Paranoia is PBM/Payor Risk." Smith was referring to the ever-present risk that PBMs would cancel their contracts with the Alliance pharmacies as a result of Alliance's deceptive practices. This risk was perennially one of Alliance's biggest business concerns.

165.    The Insiders created a "Productive Paranoia Committee" dedicated to mitigating the risks associated with its Questionable Business Practices. The Productive Paranoia Committee operated as Alliance's clearing house for new and innovative ways to deceive PBMs, hide its practice of submitting insurance claims containing inaccurate NDC numbers, and continue growing Alliance's "golden goose." Alliance senior management and others regularly participated in "Productive Paranoia" discussions.

166.    The Insiders developed a number of methods for mitigating the risks of PBM contract cancellations. As alleged above, the primary method was by maintaining a constant flow of new "independent" pharmacies to which Alliance could shift patients in the event of contract cancellations. For example, on January 31, 2015, Paoline e-mailed a "Productive Paranoia" slide deck to, among others, Jeffrey Smith, Justin Leavitt, Blaine Smith, and David Grant. On a slide labeled "Challenges/Concerns," the deck listed cancellation of contracts by two PBMs, ESI and CVS/Caremark, at four separate Alliance pharmacies. A later slide showed that Alliance was mitigating the risks of such cancellations by opening ten new "independent" pharmacies in Iowa, Texas, Michigan, North Carolina, Nevada, Illinois, Florida, and California.

167.    Alliance also addressed the risk of contract cancellation by establishing high "profit thresholds" for new patients whose claims for test strips had to be adjudicated to "high-risk" PBMs— i.e., PBMs that were more likely to audit Alliance's pharmacies and discover the Questionable Business Practices. In a May 31, 2013 e-mail with the subject "Protect the Golden Goose Issue," Jeffrey Smith wrote to certain Alliance senior management and others that "[w]e are signing up too many of the wrong customers (risky customers)." A slide deck prepared for that quarter's meeting of Warner Diabetics' Board of Directors explained that a "key company objective is to  diversify its payer base away from the largest PBMs," and that it was doing so by implementing "[a]utomated gross profit thresholds." Under those profit thresholds, Alliance would only service risky patients if doing so resulted in a high

profit. For example, in an October 9, 2013 e-mail to Wistner, Jeffrey Smith recalled that Alliance would often abandon patient leads when those patients did "not meet [Alliance's] profit guidelines." "For the big 3" PBMs, Smith continued, "it is a high threshold ($40) to minimize the big three customers we bring on."

168.     Alliance was able to achieve such high profit margins on boxes of Roche and LifeScan test strips only by purchasing low-cost NFR strips and improperly adjudicating them as retail strips. In this way, Alliance's efforts to address the risk of having its Questionable Business Practices discovered actually led to the further entrenchment of these practices. The purpose of Alliance's compliance and risk management efforts was to maximize Alliance's profits, not to avoid engaging in the Questionable Business Practices.

### 2.     Deceiving Auditors and Doctoring Invoices

169.     As part of their efforts to manage the risk of PBMs and others discovering the Questionable Business Practices, the Scheme Participants took active measures to conceal those practices from outside auditors and inspectors. On numerous occasions, the Scheme Participants, with the knowledge and active participation of Brown, worked to prevent auditors and inspectors from discovering its Questionable Business Practices, including that it was shipping NFR strips by mail order and billing PBMs for retail strips and was conducting primarily mail-order business through its "retail" pharmacies.

170.     Below are a few examples of Brown providing both legal and non-legal services and advice to Alliance to help Alliance deceive PBMs so that its Questionable Business Practices could continue unabated and undetected.

171.     In 2011, CVS Caremark conducted an audit of an Alliance pharmacy on the ground that the "drug wholesaler invoices [were] not sufficient to support [the] quantities billed."

172.     On October 18, 2011, Czerny sent Lisa Smith and Howard an email with a report

Alliance generated to respond to CVS's audit requests.  Czerny wrote, "As you can see the Vendor name is not shown, only the vendor #.  The invoice number is not shown, only the PO number. And the big one….the NDC/UPC IS shown on this report."

173.    Howard responded the next day, "Caremark will almost certainly require copies of the product invoices rather than summaries or reports…Would you be able to email us 2-3 examples of invoices in their current form and then redacted copies of the same invoices that exclude the identifying information you want to protect?"

174.    Czerny responded, "I will send you copies of the invoices that you requested, however we would much rather give the summary because then we aren't redacting NDC's (which we feel might look a little incriminating)."

175.    On October 24, 2011, Czerny sent Howard the invoices in an email with the subject line: "consolidator (loose product)." Czerny told Howard that "all of the retail product we did buy came from vendors like these."  In other words, Czerny told Howard that rather than buying through authorized distributors, Alliance was purchasing test strips as "loose product" from unauthorized diverters.

176.    Howard responded with detailed instructions about how to redact the invoices to avoid exposing Alliance's Questionable Business Practices to CVS/Caremark:

- •    Lisa and I spoke about this and think we can offer the following guidelines for your production, though we must emphasize that some of our advice here borders on speculation because we don't know what documentation will satisfy the Caremark auditors:

1.    Be consistent in your redactions.  For example, you should probably use white redaction tape rather than just marking out entire sections such as the UPC# section with a black marker and then using white redaction tape on the other parts, because if you're called on it then it will look like you were altering the invoice rather than redacting it.  Therefore, on the Clint Herman invoice, you'd probably redact with white tape all the UPC# (but you'd leaving the heading up o[n] top), but then for the descriptions you'd probably use white tape to redact all references to "mail order" and also "retail" since leaving "retail" where applicable may indicate that all the others are not, which might be an issue to Caremark. I'd use the thin white redaction tape on the unit price numbers as well as the identity of the sender

and any other info you want to redact.

2. We agree that you should redact non-Roche information, which might make the blotchy looking copies a little more understandable and something we can more readily explain if they ask.

3. Don't you think you'll need to leave the "count" number following the product name? The problem with this redaction is in some cases the count is after the designation for mail order, so your redaction would leave a noticeable white gap in the middle of the description. However, one possible way around this is to include a cover letter with the production explaining that none of the products shipped have less than a 50 count per box, and then you'd need to be sure that the "amount shipped" assuming all boxes were at least 50/ct will satisfy their questions about whether MedSource RX had sufficient quantities to fill the orders. If you leave the 50/ct and 100/ct info in the descriptions then you'll have to redact around them and again that will present questions about large gaps in the middle of the description.

> You will have to make some judgment calls about what information you're willing to provide them at this stage, but if the redactions are consistent enough then with any follow up on their part, we can explain generally the types of information that were redacted and the reasons. We're glad to consider any examples you prepare, if you'd like, or to answer any specific questions you might have after you determine how much information you are willing to disclose with these invoices.

177.    On February 14, 2012, Howard sent Alliance a letter he drafted on Alliance's behalf for Alliance to send to CVS/Caremark.  Howard, speaking for Alliance in the letter, wrote that the invoices Alliance would provide would be "redacted to exclude confidential information, including the company names. Disclosure of this very specific confidential information is precluded by Medsource Direct's business agreements with its suppliers, and it is not required by the Provider Manual." When he wrote this, Howard knew that any Alliance "confidentiality" concerns were pretextual, that there was nothing confidential about NDCs, and that Alliance did not want to provide unredacted invoices because it would expose Alliance's Questionable Business Practices.

178.    In an April 16, 2012, email from Jeffrey Smith to Howard with the subject "CVS Issue and risks to Medsource," Smith stated that he was "worried" about the "NDC Issue" as "potential [f]raud" and inquired about Alliance's options going forward, including "shutting down" pharmacies.

179.    Around this time, Alliance and Brown discussed hiring Ernst & Young to conduct an "independent" audit of Alliance's purchases so that they could provide CVS with certain information about Alliance's products while hiding from CVS information about Alliance's Questionable Business Practices.  In an email dated April 24, 2012, Jepson asked Howard how they could ask Ernst & Young to audit Alliance's supply chain without it looking "shady:"

> Let me know what you think about how to respond [to Jeffrey Smith's email about the E&Y audit] (when you have 2 seconds today)  I've attached the draft audit proposal I put together for Medsource RX with the invoice numbers, the numbers verified through McKesson, and the remaining unaccounted for invoice numbers (which would be the basis of the audit for E&Y). I thought it was important that E&Y have some background about the invoices and know what numbers they were looking to verify. Jeff's email says the opposite - i.e. that we shouldn't give them any invoice numbers. (And, let's be honest, E&Y will work with his schedule.)
>
> I can remove the invoice numbers and just ask for 3 audits, one for each of the companies. OR We can tell Jeff we want to provide the invoice numbers and revise accordingly when we receive the numbers.
>
> My biggest concern is the way we present the information that is to be included with the audit report (so it won't include "retail" or "MO" or NOC numbers in the description) without looking shady.....

The contemplated "audit" by Ernst & Young was not completed.

180.    On July 12, 2012, Howard emailed Jeffrey Smith, "[w]e are working on the research regarding criminal exposure based on the allegation in Brighton's termination letter that you provided false information to CVS Caremark during the enrollment process." Howard asked Smith to provide Brown "with some additional facts on what, if any, information would have been provided to CVS about the percentages of mail order/retail business conducted Brighton." Apparently recognizing that his client might be reluctant to transmit incriminating information in writing, Howard added, "If you don't mind emailing me (attorney-client privileged, of course) rather than discussion, that'd be better since I'll be out of my office and in conference most of today and tomorrow."

181.    In a billing time record entry dated July 16, 2012, a Brown attorney recorded a "[r]eview

[of] federal fraud statutes re[garding] federal health benefits…[and] update state law criminal liability for false information."

182.    In an email sent by Jepson to Howard on July 30, 2012, "it's possible that criminal liability exists under the general federal health care fraud statute" as a result of misrepresentations made by Alliance about "the amount of business conducted via mail order" by Brighton Pharmacy.  In her billing time record for the same date, Jepson recorded that she "[p]repare[d an] email to Jeffrey Smith and Travis Hughes re[garding] criminal liability for providing false information on CVS Caremark application . . ."  Though Jepson drafted this email with the intent that Howard send it to Hughes and Smith, there is no record indicating anyone at Brown ever sent this email to them.

183.    On April 30, 2013, Prime asked Alliance for documentation to substantiate that its test strip purchases were from a "legitimate source."  Czerny reached out to Howard for help, and Howard volunteered to show Czerny how he would "redact confidential information" in the Alliance documents requested by Prime.  Czerny then sent Howard the following invoice from a vendor from whom Alliance bought test strips (excerpted below):

| Customer PO# | Terms | Ship | Via |
|---|---|---|---|
| 25793 | ROG | 4/16/2013 | Truck |

| Quantity | Item Code | Description | Price Each | Ext. |
|---|---|---|---|---|
| 2,016<br>1,008 | 65702-0436-10<br>53885-000-75 | Accu-Chek Aviva Plus NFR Mail Order 50s<br>One Touch Ultra 50s (DME PACK)<br><br>Daylight 24466302 | 22.00<br>28.00 | 44,352.00<br>28,224.00 |

184.    On May 13, Howard sent Czerny a version of this same invoice with redactions he made. He said he redacted things in a certain way to make the redactions "look more legitimate." Below is an excerpt from the redacted invoice Howard sent to Czerny:

185.    As shown above, Howard advised Alliance to redact the "Item Code," "Description," and "Price" fields.  The information in any of these fields may have raised red flags to Prime about Alliance's Questionable Business Practices.  While Howard described the practice as making the redactions look legitimate, those fields were not confidential, and the redactions were intended to hide the Questionable Business Practices.

186.    In an email dated June 26, 2013, Howard advised Alliance that, based on the questions

| | | Customer PO# | Terms | Ship | Via |
|---|---|---|---|---|---|
| | | 25793 | ROG | 4/16/2013 | Truck |
| Quantity | Item Code | Description | | Price Each | Ext. |
| 2,016<br>1,008 | | | | | 44,352.00<br>28,224.00 |

being asked by an auditor from Catamaran, it seemed like the auditor "has enough information now to link all the pharmacies together.  It is clear from her conversation with [an Alliance employee] that she is aware of a 'head office' and the manner in which the pharmacies acquire leads (i.e. through phone surveys).  Furthermore, her email request clearly identifies Ingram Medical and requests information on the associated pharmacies."  Howard advised Alliance to provide the information the auditor requested, but noted, "That's a business decision for you to make, **and it's not a legal opinion**, so we understand if you would prefer not to provide that information."  (Emphasis added.)

187.    On July 25, 2013, Brown finished drafting for Alliance an appeal of Prime's audits of its Aspire and Everest pharmacies.  When Nathan C. Fish, an associate attorney at Brown, forwarded a portion of the appeal to Alliance, Czerny wrote back, "I just realized something….Some of the exhibits listed are items that Prime sent directly to the wholesaler, SP not to Everest.  Since SP and the pharmacies are not the same company, doesn't that draw us to [*sic*] close together?  I think we should add somewhere that some of the exhibits and information provided were given to ___ pharmacy, from its wholesaler SP Diabetic, or something to that effect.  I just think it creates more separation."

188.    Fish responded, "That's a good idea."  He proposed that the appeal be changed to assert that communications between SP Diabetic and Prime "were provided to [Everest/Aspire] by its wholesaler, SP Diabetic, for purposes of this appeal."  This, of course, was false; the pharmacies had access to SP Diabetic's communications because they were all part of the same corporate family.  This sentence was added only to deceive Prime about the true nature of Alliance's operations.

189.    A few weeks later, as Brown assisted Alliance in responding to an audit request from Optum, Jepson advised Alliance that it had the following options:

> (1) Provide none of the requested documentation, and argue that the request exceeds the scope of the auditor's rights under the Participation Agreement and Manual. We do not think this argument is likely to succeed.

> (2) Provide documentation from May 31, 2013, onward.  However, because the invoices show the same address for SP Diabetic and the pharmacy, it will be necessary to redact SP Diabetic's address, as well as any pricing information that might raise concerns. Redacting information is itself likely to raise red flags.

> (3) Provide all documentation and disclose that SP Diabetic and the pharmacies are affiliated companies, in an attempt to explain the limited documentation prior to May 31, 2013.  The problem with this approach is that the Prime audit appeals portray SP Diabetic as unaffiliated with the pharmacies.  This disclosure could therefore undermine the Prime audit appeals, and would put Optum (and others, if it shares the information) on notice that SP Diabetic may be affiliated with your pharmacies.

Jepson asked Alliance to "let us know which way you'd like to go with this response, and we will be happy to draft the response to Optum's request."

190.    After Jeffrey Smith responded that these sounded like a "bunch of bad options," Jepson said, "Unfortunately, none of them are very good.  It's going to be a business decision for you all to make as to which to pursue."  After Smith said he was "leaning towards option 1," but considering option 3," Howard told Jepson, "I know it's a business decision but it's fair for him to ask me which route to go."

191.    It appears Brown counseled Alliance to pursue "option 2," refuse to give Optum the information they requested.  Optum then suspended payments to the pharmacies.  On September 13, 2013, Howard emailed Alliance and said that they now had two remaining options:

> A.    Provide all documentation the pharmacies have, including invoices and any evidence of transfers prior to May 31, 2013. Because these documents would reveal that SP Diabetic and the pharmacies are affiliated companies, this approach could have far- reaching consequences, not only for those pharmacies that remain in Optum's network, but for those in other networks if this information is passed along to other PBMs.  In addition, there is no guarantee that providing this documentation would satisfy Optum.
>
> If not, Optum would likely continue the payment suspension and demand recovery for claims based on failure to provide requested documentation, despite the disclosure of sensitive information.
>
> B.    Provide no additional documentation and argue on appeal that the auditor is not entitled to these records.  This approach would effectively mean the loss of any outstanding amounts owed to the pharmacies, as well as demands for recovery after completion of the audit.
>
> Based on our previous discussions, we assume you will go with option B, since it does not explicitly link the pharmacies to SP Diabetic. However, option B will not clear up the payment suspension or reduce the likelihood of chargebacks.
>
> Please let us know which way you'd like to go.  If you have any questions, feel free to contact us.

192.    On September 24, 2013, Howard drafted an email for Alliance to send to Optum to try

and resolve the audit.  It did not provide Optum with the documentation it requested; rather, Howard's strategy now was to escalate the matter by having a senior person from Alliance reach out to Optum to discuss the audit.  Howard wrote, "you guys should plan to have this new higher level person handle this and make sure they're prepared with how to discuss any response."

193.    Discussions then turned to the topic of who should send the email to Optum. Leavitt proposed having Alliance's Chief Operating Officer send it, but it was ultimately decided that Czerny should send it because she had "the most qualified resume and experience in speaking to these matters." Howard agreed that "this is the best plan."

194.    Czerny then wrote, "I just want to make sure I think about which company they have me linked with, if any where [*sic*].  If they do have info from another PBM, for example ESI, which could be possible due to the UHC connection.  Then they could recognize my name from SP.  I realize it maybe a stretch but I want to think through it and review all info provided tomorrow."  Howard said, "I think you should definitely think that through because it is a risk of your appearance on this matter. If you think the risk is too great perhaps you could get the other guy up to speed with the key talking points?"  Czerny said she could get someone else up to speed, but noted that "his email address will say Ingrammed.com instead of the name of the pharmacy itself."  Howard asked, "is there a way to send an email from him with the pharmacy name on it?" Again, he was advising a cover-up of the fraud.

### N.    Despite knowing the Questionable Business Practices were fraudulent, Brown submitted false appeals to PBMs

195.    Despite knowing no later than February 2011 that the Questionable Business Practices constituted fraud, Brown spent the next several years directing and advising Alliance exactly how to perpetuate the scheme. Brown positioned itself not only as lawyers and advisers to the scheme, but as a willing participant. Brown submitted false appeals to PBMs in 2012 and 2013 that misrepresented and omitted key information that would have led PBMs to the discover the Questionable Business Practices. In doing so, Brown asserted pretextual excuses for why it was redacting or omitting key

information that the PBM auditors requested. For the appeals that Brown itself drafted, Brown took its participation in the scheme one step further and elicited a sham Ernst & Young audit in order to conceal the Questionable Business Practices from the PBMs. And for appeals that Alliance submitted to PBMs itself, Brown advised Alliance exactly how to continue the scheme.

**1.     Brown drafted and submitted appeals directly to PBMs from 2011-2013, fully aware that the Manufacturers were relying upon the PBM audits**

196.     Brown drafted and submitted materials directly to the PBMs—at times communicating directly to the PBMs and at other times advising and directing Alliance on how to do so. Through this work, Brown knew that the Manufacturers were relying on information submitted by Alliance and Brown during the PBMs audits.

197.     As early as October 2011, Brown submitted its first appeal on behalf of an Alliance-affiliated entity, MedSource RX, after PBM CVS Caremark ("CVS" or "Caremark") suspended MedSource RX. Brown submitted this appeal directly to Caremark. Despite already knowing that the Questionable Business Practices were fraudulent, Brown disputed that Caremark had properly suspended MedSource RX and demonstrated that—as early as October 2011—it knew the Manufacturers would rely on information from the PBM audits. In this appeal, Brown explicitly acknowledged that information from the audit would likely be relayed to Roche.

198.     In January 2012, Brown submitted appeal documents to PBM auditors, this time on behalf of both MedSource RX and Medsource Direct. Brown attorney Lisa Smith submitted appeal documents directly to PBM Caremark and failed to disclose that MedSource RX and MedSource Direct were part of the same corporate family. As part of that appeal process, Alliance later submitted redacted Roche and "non-Roche" invoices and product quantities to the PBM. Brown advised Alliance how to do so in an attempt to hide the Questionable Business Practices from Caremark and to prevent Roche from learning of them.

199.     As Brown was working on this set of appeals, Brown was again notified that the PBMs

relayed information to the Manufacturers. In October 2011, a CVS auditor notified Alliance that it was in contact with Roche, and Alliance forwarded this information to Brown as it drafted PBM appeals. On another occasion, in February 2012 Brown attorney Bradley Howard drafted a letter indicating Brown's knowledge that the Manufacturers would ultimately receive the PBM audit results.

### 2.   Brown's work on the PBM audits cemented participation in the concealment of the Questionable Business Practices

200.    Despite being fully aware of the fraud, Brown stepped beyond its role as Alliance's attorneys and into the role of chief obfuscators and concealers in numerous ways over the next few years.  Brown not only concealed the fraudulent claims adjudication, but also concealed the relationship between the Alliance entities so that the investigation by PBMs could not uncover the source of the fraud.

201.    Alliance turned to Brown to dictate exactly what information to reveal (or conceal) from the PBMs. To illustrate Brown's central role in the concealment, after Brown's initial appeal to CVS, CVS notified Medsource in 2012 that it suspected "potential fraud." CVS further "threatened to take us to court and suspect[s] fraud." In response, Alliance CEO Jeff Smith asked Bradley Howard to "determine the direction we take in resolving this."  In another example, Bradley Howard prepared an outline of topics for Jeff Smith that he should conceal from the CVS auditor during an in-person meeting. And when Alliance hit a stumbling block in its concealment of the Questionable Business Practices, it looked to Brown to determine how to proceed For example, when a PBM auditor asked Alliance for "invoices [that] would have to show a trail back to the manufacture[r] (sic)", Alliance immediately forwarded the email to Brown attorney Bradley Howard for help, asking to "speak with you about this ASAP!"

202.    Brown not only directed Alliance to conceal certain information, but Brown itself also undertook affirmative actions to further the Questionable Business Practices. In furtherance of the Questionable Business Practices, as discussed previously, Brown aided Alliance in hiring Ernst &

Young ("E&Y") to conduct a sham audit that would deter CVS from furthering its investigation. In April 2012, Brown drafted the E&Y proposal, requesting that E&Y review unredacted invoices to demonstrate that "Medsource Direct purchased the Items from appropriately licensed wholesalers and in sufficient quantities of the Items to support the quantity of the Items billed by the Pharmacies." Ergo, Brown asked E&Y to certify the precise issue that CVS was auditing and that Brown knew could not be honestly certified. Brown <u>knew</u> that that there were invoice quantity shortages and it was asking E&Y to certify something it <u>knew</u> was false. In an April 24, 2012 email, Brown attorney Elizabeth Jepson sent Alliance a draft E&Y proposal, while simultaneously noting in the same email that she **herself** saw shortages. In other words, Brown **knew** there were shortages but asked E&Y to certify that there were **not.** Brown sought to conceal the real shortages by cleverly asking E&Y to <u>exclude</u> the NDC numbers from its certified audit reports. Brown characterized its own actions and the E&Y audit as "shady." While drafting the proposal, Brown attorney Elizabeth Jepson emailed Bradley Howard asking how to "present the information that is to be included with the [E&Y] audit report (so it won't include "retail" or "MO" or NOC numbers in the description) without looking shady. . ." In other words, Brown knew that it was directing E&Y to exclude relevant information that would have led to the discovery of the fraud, knew that it was asking E&Y to certify a known falsehood, but did so in order to further Alliance's Questionable Business Practices.

### 3.  In 2013 Brown continued drafting PBM appeals denying the Questionable Business Practices while simultaneously telling Alliance not to disclose these fraudulent practices to outside investors

203.    Brown continued its work on PBM appeals for several more years. In May-August 2013, Brown attorney Nathan Fish drafted appeals on behalf of Aspire Rx and MedSource RX. During that appeal process, Brown directed Alliance employee Candace Czerny not to respond to the PBM's request for information and appointed another Alliance employee to do so in order to hide the fact that Alliance was drafting appeals on behalf of allegedly independent pharmacies, knowing that the pharmacies were

not independent. As Ms. Czerny emailed to Brown attorney Howard, she needed to "make sure I think about which company they have me linked with, if any where. . . [T]hey could recognize my name from SP (Diabetic)." In order to hide Ms. Czerny's (and thus Alliance's) association with multiple allegedly independent entities, Howard directed Ms. Czerny to draft pharmacy letterheads for each of the appeals she submitted.

204.    While Brown was drafting bogus appeals to PBM auditors challenging the PBM's audits into the Questionable Business Practices, Brown simultaneously cautioned Alliance insiders not to disclose the exact same practices to potential investors. As alleged in the next section, in May 2013, Brown attorney Bradley Howard cautioned Alliance not to "risk [] memorializ[ing] the above-referenced business practice in writing because the company seems to essentially admit that it operates in violation of its PBM contracts." He further cautioned that failure to admit this practice in a disclosure form would expose Alliance to a "very strong claim against you for fraud and other legal claims." Brown was therefore fully aware that failing to disclose the Questionable Business Practices constituted fraud, but was simultaneously drafting bogus appeals to the PBMs that not only failed to disclose these practices but also denied they were occurring. In fact, Brown itself described their appeals as "creative" because they "had to come up with something to appeal."

### 4.    Disclosures to Potential Investors

205.    When Alliance was in negotiations to sell additional shares to one of its investors, it turned to Brown for help.

206.    On April 26, 2013, Howard spoke to Leavitt and Czerny about the disclosures Alliance would need to complete the transaction.

207.    On April 29, they sent Howard the following proposed disclosure:

> Certain Subsidiaries are licensed as retail pharmacies. Such Subsidiaries applied for such license classification because each of the pharmacy benefit managers, with whom such Subsidiaries have contracted, owns its own mail order companies and will not contract with such Subsidiaries if

such Subsidiaries are licensed as a mail order pharmacy; however, all of such Subsidiaries' business is through mail order. Such Subsidiaries bill patients under the retail pharmacy benefit but ship mail order diabetic testing supplies nationwide. Due to such practices of the Subsidiaries, it is possible that a pharmacy benefit manager may terminate its relationship with such Subsidiary and seek contractual remedies, which could have a material adverse effect on Parent and its Subsidiaries.

208.    Shortly thereafter, Howard asked Jepson to get from Mahlberg the memo she wrote concluding that Alliance's Questionable Business Practices were illegal. Jepson forwarded the memo to Howard the same day.

209.    On April 30, Howard emailed Czerny and Leavitt and told them, "I just now got my hands on something I was looking for," and asked to set up a time to speak later in the week.

210.    On May 2, Howard gave Leavitt and Czerny his advice on the proposed disclosure, telling them that "the business practice that you've outlined above in writing may be contrary to the representation you're making below . . . that the company is not in violation of any health care laws."

211.    Howard strongly advised them against making this disclosure, writing:

> There is considerable risk to memorialize the above-referenced business practice in writing because the company seems to essentially admit that that it operates in violation of its PBM contracts. Having worked against various PBMs including ESI/Medco and CVS in audit matters, I am concerned that if any of those entities obtains a copy of the documentation including this representation, they could seek to terminate your contracts, recoup all monies paid under those contracts, pursue any additional contractual and statutory remedies, and possibly turn you into the government (civil or criminal) for false claims and other violations of state, federal, and various insurance laws. While I think the likelihood of a PBM or some other concerned individual taking this action may not be significant, if this occurred the results for your company could be very problematic. Therefore, you might wish to consider whether it is worth the benefit of obtaining additional financing to make a risky written disclosure that seems to admit the company has been violating its contracts with payors. On the other side of the coin, if you do not make a legally sufficient disclosure and an audit or investigation ensues, then your financier/investor would have a very strong claim against you for fraud and other legal claims. It is problematic to make the disclosure and very risky not to make the disclosure. The only safe option is not to pursue this financing/investment at this time so that it's not necessary to make a decision on these and other risky disclosure issues.

The investor—not Alliance—ultimately withdrew from the transaction.

### O.   Multiple Internal Whistleblowers Call Attention to the Questionable Business Practices

212.    Despite efforts to conceal Alliance's foundational Questionable Business Practices, a number of its pharmacists and employees caught on and became whistleblowers. Having adopted the Questionable Business Practices as their fundamental business strategy, Alliance's senior management did not respond to these whistleblowers by stopping those practices. Rather, they sought to deter and silence the whistleblowers in order to perpetuate Alliance's Questionable Business Practices and enrich themselves.

### P.   Chad Gubler

213.    Chad Gubler was a pharmacy technician who worked at an Alliance - owned pharmacy in Utah. In early 2014, Gubler complained to his superiors at Alliance about Alliance's improper adjudication practices.

214.    On February 10, 2014, Gubler sent an email to Paoline with the subject line "NDC," apprising Paoline of his concern over whether he was "following the laws" when he shipped NFR strips but adjudicated them as retail strips:

> I hope this NDC issue does not cause a lot [of] issues, but I thought that it should be brought to light. I've been aware of the issue for nearly a year now and other technicians have been as well. Corre[c]t me if I am wrong, but do we ship these products for financial gain? Would it be too expensive for the company to ship the correct NDC if purchased from McKesson or another manufacturer? If the NDC issue is a mistake of not updating the correct NDC in FSI [Alliance's adjudication software], then why do we ship products that are labeled "DME beneficiary only," "Not for retail sale," "HMO use only," and "Mail order only?"

215.    Paoline forwarded Gubler's e-mail to a coworker named Alison Humphrey, writing: "WTH?!?!" Humphrey responded later that day: "What are we going to do about this??? I know he probably talks about this to others. I was hoping that we were able to distract him enough in the meeting. This is not good ...."

216. On February 12, 2014, Paoline e-mailed Grant with a draft response to Gubler's e-mail. The response avoided the "NDC issue"—i.e., Alliance's practice of submitting insurance claims that inaccurately stated the NDC on the product that had been dispensed—and attempted to distract and misdirect Gubler with references to Alliance's supply chain. Grant, who had recently been hired as General Counsel of Alliance, opined that the response was "Perfect." Paoline also sought input on her draft response to Gubler from Hadlock, who responded: "Nicely done."

217. Paoline e-mailed her response to Gubler on February 12, 2014. Gubler was not fooled. He forwarded Paoline's e-mail to a personal friend, writing: "This is the response from my pharmacist. I don't think it addresses my concerns or the ndc issue at all." Gubler also forwarded Paoline's response to multiple coworkers.

218. On February 13, 2014, Hadlock met with Gubler and instructed him "not to further this conversation with others unless it is with either me or" Paoline. Hadlock instructed Gubler that "[a]ny further issues are to be brought to us if he has any questions."

219. Gubler ignored Hadlock's demand that he keep his concerns to himself.

Gubler's insistence on discussing those concerns with others earned him a stern rebuke from Alliance management. On March 5, 2014, Hadlock e-mailed Gubler:

Chad,

It has come to my attention that there may or may not have been a cancellation of an insurance at a site.

It has also been mentioned that you are talking about this with other technicians.

When we spoke several days ago, I asked you not to talk about items like this. I requested that you come and speak to me or [Sahily Paoline] if anything like this would occur and not speak to members of any team.

I need to hear from you as to what the issue is and why you would speak to others when you had agreed not to.

220. On March 4, 2014, Gubler e-mailed a hotline for the Utah Department of Professional

59

Licensing ("DOPL"), asking:

> Is it legal to dispense a different NDC than the NDC billed to the insurance company? What if the product being dispensed is an OTC, does that mean you can dispense a different NDC than what you bill the insurance? Is it legal for a retail pharmacy to dispense HMO, DME, or Mail Order only products?

221.     On March 12, 2014, a Utah DOPL employee responded:

> Dear Chad,
>
> I'm sorry for the delay in responding to your email. I suggest you consult with a competent attorney about this, but I think it is illegal to dispense a different NDC than the NDC billed to the insurance company. . .

222.     On April 2, 2014, Gubler forwarded Paoline's February 12, 2014 response e-mail to an attorney. He also sent an e-mail to the same attorney with the subject line "Ndc pictures." Attached to the e-mail were photographs of boxes of mail order blood glucose test strips with close-up photographs of those boxes' NDCs.

223.     Gubler resigned from Alliance in April 2014.

224.     On April 23, 2014, Alliance employee Tammy Hermansen accessed Gubler's work e-mail account and forwarded several of his e-mails to Paoline. Among the emails forwarded to Paoline were Gubler's e-mails to his attorney with the pictures he took of NDCs. Paoline later admitted in an e-mail that she was aware Gubler was working with an attorney on the "NDC issue."

225.     In addressing Gubler's complaints, Paoline, Hadlock, and Grant expressed no surprise concerning Gubler's complaint about the "NDC issue" because they were well aware that Alliance's foundational practice was dispensing NFR strips but submitting improper insurance claims using the NDC for retail strips. Their objective was to deter Gubler from pursuing his complaints and prevent him from hindering Alliance from profiting from its misconduct.

**Q.     Masum Amin**

226.     Masum Amin was the pharmacist-in-charge ("PIC") of the Alliance-affiliated Peterson

Pharmacy in New Jersey. In 2014, Amin raised concerns about Alliance's practice of dispensing NFR strips but adjudicating them using the NDC for retail strips—i.e., the "NDC issue."

227.    On April 8, 2014, Amin e-mailed Paoline (copying Hadlock), writing:

> I have told my shippers that I do not want any DME products on my picking station, as I will not send them out. I am concerned and need much more detailed information on the use of DME products.

Again, "DME products" are NFR strips.

228.    In a follow-up e-mail, Amin asked: "Where do pharmacists stand on a liability standpoint? Every box that goes out has my name on it. How do other dispensing pharmacist[s] feel about this?"

229.    Paoline forwarded Amin's e-mail to McMurtry and wrote, "How in the heck do I answer this?? Ughhh." McMurtry suggested: "Most of the liability falls on the insurance billing and purchasing side, so maybe we try to find a way to emphasize that the patient is getting the right product, the package is just a package."

230.    When Paoline later learned that Amin was withholding shipments of test strips due to her concerns, Paoline contemplated replacing Amin with Robert Bucco, a part-time pharmacist at Peterson. On April 10, 2014, Paoline wrote to McMurtry:

> Do we know where Robert stands on this issue? Is he concerned as well. Just wonder if she's stirring him up. Also, thinking ahead on a possible change in PIC and whether he would be interested.

231.    In May 2016, the PBM ESI sent letters to multiple Alliance-affiliated pharmacies alleging that they were engaged in improper test strip adjudication practices. In a June 13, 2016 email with the subject line "Express investigation" and attaching copies of POs and invoices issued by Alliance's wholesaling subsidiary Alta, Amin, who had recently returned from leave, wrote:

> After getting a little overview of this . . . investigation I wanted to be more thorough in our PO and inventory process and I have come across a few concerns[.]

> As you can see the NDC numbers we are receiv[ing] and what is on the
> Invoice do not match. The product received does not match the ACCU50
> and ULT50 billing NDC #s. How are we to proceed to correct this? . . .

Amin had discovered that Alliance's wholesaling subsidiaries altered invoices to show only retail NDCs

for Roche products, and that the "short codes" she was trained to input into Alliance's adjudication

systems were a stand-in for the retail NDC.

232.    Amy McMurtry forwarded Amin's e-mail to Paoline, writing:

> Masum is back from maternity leave and after reading the letter from ESI
> regarding NDC she has some questions/concerns over the NDC's on
> shipments and invoices not aligning. We have previously had the
> secondary market and DME/Medicare beneficiaries discussion with
> Masum, but we have not discussed the NDC issue or anything
> surrounding adjudications. Knowing Masum, I feel like she may respond
> better to legal having this discussion with her, but before I scheduled a
> call I was hoping to get your opinion. Thoughts?

Paoline responded: "Totally agree, we should enlist Legal from the get go." On June 14, 2016,

McMurtry e-mailed Grant, Alliance's General Counsel, to request his help with addressing "Peterson

PIC NDC concerns." Grant agreed to conduct a conference call with Amin.

233.    On June 16, 2016, Amin sent an e-mail to Grant and McMurtry with the subject line

"Call Follow up Regarding Product selection and dispensing." That e-mail summarized the excuses for

Alliance's improper adjudication practices that Grant had given Amin during their conference call, and

asked Grant to confirm:

> As dispensing pharmacists we are billing PBMs, including medicare-d,
> for retail NDC# which is linked to a specific reimbursement rate, while
> we may be sending out a differently packaged product. Regardless of the
> integrity of the product and the use of FDA's definition of an NDC#, the
> reimbursement rates are established by PMBs [sic] and they are linking
> that rate to the different NDC # numbers on the manufacturers packaging.

234.    A few hours after Amin sent this e-mail, McMurtry forwarded it to Paoline, writing: "Well

she nailed it below." Paoline responded: "She sure did!"

235.    On June 16, 2016, in response to Amin's point-by-point recap of Alliance's improper

adjudication practices, McMurtry wrote to Paoline: "I'm assuming this is her attempt to receive David [Grant]'s buyoff for legal documentation??" Paoline responded: "Not sure of her intention,  do  you have a feel for it?" McMurtry replied: "I am pretty sure she is looking for documentation in writing, and I am pretty sure David [Grant] is not going to give it." Later that night, Grant wrote to Paoline: "I will come over shortly to talk" about Amin's e-mail. The next day, Paoline wrote to McMurtry that Grant was "very apprehensive to respond. He said this would be exhibit A."

236.    Amin subsequently requested Grant's written confirmation that Alliance pharmacists were "expected to knowingly/intentionally dispense different NDC # products while billing the retail NDC#." Amin explained at her deposition that this expectation was imposed by "[a]ll of the management" at Alliance, "starting with my direct management all the way to David Grant." Knowing that Amin's concerns were correct and that there was no legitimate response to them, Grant asked Amin to sign a confidentiality agreement as a condition of providing a response to her concerns in writing. When Amin refused to sign the agreement, Grant declined to give her a written response.

237.    Paoline, Hadlock, and Grant took no action in response to Amin's complaints because they and the other Scheme Participants were well aware that Alliance's "foundational practice" was to dispense NFR strips while adjudicating claims using the NDCs for retail strips. Instead of stopping the Questionable Business Practices, their response was to convince Amin to engage in the Questionable Business Practices or, failing that, to prevent her from expressing her concerns to others.

### R.    David Goldsmith

238.    David Goldsmith, Alliance's Vice President of Corporate Strategy and Business Development, blew the whistle on Alliance's Questionable Business Practices in 2015. Goldsmith's concerns were conveyed to Alliance's management and its Board of Directors.

239.    On October 26, 2015, Goldsmith e-mailed his resignation to Jeffrey Smith, Blaine Smith, and David Grant. Addressing his resignation directly to Jeffrey Smith, Goldsmith wrote:

Dear Jeff,

I appreciate the chance to sit down with you and David Grant on Friday to lay out my concerns regarding our business practices as it relates to the pharmacy fulfillment strategy I have been tasked to execute. As I shared with you two weeks ago after returning from the NCPA conference, I have had growing concerns about the propriety and sustainability of these practices, especially with respect to NDC coding of secondary product for reimbursement purposes and our copay collections. As I explained to you on Friday, I have been wrestling with how to reconcile my current understanding of these practices with the need to protect my professional reputation.

After speaking with you and David about these concerns, I spent the better part of this weekend doing additional due diligence. I consulted with my employment attorney and conferred with two people I know professionally – one with deep expertise in health law and the other in civil litigation. These conversations only heightened my concerns and made it clear that it is untenable for me to continue my employment with Alliance Health. Doing so places my career, my professional reputation, and my livelihood in clear jeopardy. That risk would be only greater given my responsibility for executing a pharmacy fulfillment strategy specifically designed to perpetuate business practices that are without question unethical, and quite possibly illegal. You also expressed your concerns on Friday when you said you are not comfortable with the "morality" of our practices but view them as necessary, at least for the foreseeable future.

When I rejoined Alliance Health in January, I did so with a great deal of enthusiasm. I was excited about the future of the company and optimistic I could play a significant role in its success. In hindsight, had I known last December what I know today about the company's business practices, I can say unequivocally that I would not have accepted my offer of employment. Beyond the risk to my professional reputation, I simply cannot work in an environment so ripe for regulatory and legal scrutiny one in which the risk of civil, and potentially more serious penalties, appears quite significant.

You told me on Friday that if I'm not comfortable in this environment I should move on. After considerable thought and due diligence, I feel compelled to do so, effective immediately.

240.    As further alleged below, Goldsmith expressed these same concerns to Koopersmith, an Alliance Medical Holdings Director, who relayed them to others on Alliance Medical Holdings' Board of Directors including Alison Wistner and Travis Hughes. Instead of putting an end to Alliance's

Questionable Business Practice, such practices continued to maintain Alliance's profit margins.

**S.      Geoffrey Swindle**

241.    Geoffrey Swindle was the founder and President of Alliance Health Networks ("AHN"), a digital marketing and patient lead vendor. In January 2014, AHN was acquired by Ingram. After acquiring AHN, Ingram adopted the "Alliance" brand name and Swindle became Alliance's Chief Revenue Officer, and later its Chief Strategy Officer.

242.    In June 2015, a former employee of AHN notified Swindle that attorneys for Johnson & Johnson ("J&J"), a manufacturer of diabetic test strips, had visited his home to ask questions about Alliance's "product sourcing."

243.    In an October 1, 2015 e-mail, Jeffrey Smith, Blaine Smith, Paoline, and Leavitt discussed "Loyalty concerns" with Swindle arising out of his "Adam k. communication," and also noted that Swindle "said he doesn't agree with our strategy." This e-mail was later forwarded to Wistner.

244.    Swindle resigned from Alliance on October 19, 2015.

**T.      Brown is Consulted to Provide the Board of Directors with Advice about the Questionable Business Practices**

245.    In 2015, LifeScan began to investigate Alliance's billing practices. Counsel for LifeScan (at that time, a subsidiary of Johnson & Johnson) visited former Alliance employees to determine whether Alliance was engaged in the Questionable Business Practices. When Alliance's senior management learned of these visits, they took active measures to obstruct LifeScan's investigation and to prevent LifeScan from obtaining proof of the Questionable Business Practices.

246.    On June 23, 2015, Greg Heaps, one of the former Alliance employees visited by LifeScan's counsel, told Jeffrey Smith about the encounter. Smith notified Alliance outside counsel Bennett as well as David Grant. Grant spoke to Heaps and reported to Jeffrey Smith and others that it "is apparent that they are probing the NDC issue"—i.e., Alliance's foundational practice of dispensing NFR strips but adjudicating claims using the NDC for retail strips.

247.    Instead of recommending that Alliance take action to end the Questionable Business Practices, Grant began to formulate a strategy to thwart LifeScan's investigation. He stated that LifeScan was "ignoring the fact that they are causing former employees to violate their contractual obligations." In other words, Grant suggested that Alliance use confidentiality agreements with its former employees as a pretext for concealing the Questionable Business Practices from the victims of the Questionable Business Practices.

248.    Alliance quickly executed on Grant's plan. Incredibly, on June 24, 2015, Alliance *filed suit* against LifeScan and its outside counsel in Utah state court, seeking an injunction to prevent LifeScan's investigators from questioning former Alliance employees about the Questionable Business Practices. The decision to file suit to affirmatively obstruct LifeScan's investigation was approved by Grant and Jeffrey Smith. In addition, Alliance Medical Holdings' Board of Directors—including Wistner, Koopersmith, and Hughes—was informed of the suit.

249.    On June 25, 2015, LifeScan's counsel e-mailed Alliance outside counsel Bennett stating: "the current allegation is that Alliance is engaged in a massive billing fraud." Later that day, Alliance outside counsel Bennett forwarded this message to Jeffrey Smith, Leavitt, and Grant with the note: "Well—see below.  Looks like we've fleshed out the issue.  It's the billing issue you've discussed with us."

250.    Responding to that e-mail, Leavitt wrote to Grant on June 25, 2015: "What are your thoughts?" Grant replied:

> I had a long call with [outside counsel Barry Johnson of Bennett]. He seemed to agree with my assessment that the risk is a civil risk. The real issue is the means of determining damages of [LifeScan], and the ability to pierce the veil. The email does nothing more than confirm what we already suspected, and validates our filing of the lawsuit.

In other words, Alliance was counseled by Bennett that the "real issue" was how LifeScan's damages could be quantified and who could be held liable for the Questionable Business Practices. Alliance's

66

senior management never questioned—and never received legal advice disputing—that Alliance was pervasively engaged in the Questionable Business Practices, because they knew that it was.

251.    On July 9, 2015, David Grant convened a call with Alliance's outside counsel from multiple law firms, including Brown. Following this call, Grant sent an email to Howard and Bennett to memorialize why LifeScan "has not suffered any loss that can be recovered from the pharmacies that processed a claim for retail product, when sending to the consumer the identical product (the same first five digits of the NDC that identify the product), but packaged for DME, or mail order delivery (with the distinguishing last numbers of the NDC identifying a different intended distribution channel.)"

252.    Howard responded:

> All—
>
> I communicated with a client that received a demand letter from Lifescan last year. I don't know how much I can read into our situation based on theirs, but that client shared with me some Lifescan correspondence that outlines its case for damages, as follows below. . . .
>
> Lifescan says:
>
> . . .
>
> In submitting insurance claims to pharmacy benefit payors using the incorrect NDC number, your company has caused Lifescan to pay rebates to Medi-Cal and managed care organizations for discounted product which was intended for DME beneficiaries only.

Thus Brown knew of the reliance by and damages to the Manufacturers. Alliance was further informed that LifeScan claimed damages from the payment of rebates "which is the difference between the list price of the retail product . . . and the net price of the DME mail order products."

253.    Based upon its strategy with another client engaged in the exact same scheme as Alliance, Brown directed Alliance on how to respond to LifeScan. In an email replying to the email referenced in the preceding paragraph, Brown attorney Bradley Howard indicated he advised this other client to "ignore" LifeScan and to "delay them with questions and arguments." Brown was therefore

fully aware that both Alliance and this other client were engaged in fraudulent billing, and directed both to "delay [LifeScan] with questions and arguments" in order to perpetuate and conceal the Questionable Business Practices from the Test Strip Manufacturers.

254.     On October 22, 2015, after David Goldsmith had discussed his concerns about Alliance's Questionable Business Practices involving billing with Board member Adam Koopersmith, Koopersmith sent an e-mail to Hughes about these practices, noting, among other things, that Alliance was getting higher reimbursements by "illegally billing PBMs for products as if it was retail even though it is mail order."

255.     In response to Koopersmith's email, on October 28, 2015, Grant advised the Board that he was undertaking an in-depth review of the Questionable Business Practices and would seek advice of Alliance's outside counsel on the subject.  In the same message, Grant advised the Board that their emails were potentially discoverable in future litigation, and they should undertake a "regular and documented practice of deleting emails" to avoid creating documents that might contribute to litigation risk:

> Dear Board members:
>
> I am preparing a memorandum addressing the concerns raised in Adam's October 22 email. In order to better achieve completeness and objectivity, I am planning on sending a draft of the memorandum to outside counsel for review before circulating the memorandum to the Board. Accordingly, although I will likely complete the initial draft of the memorandum tomorrow, I am anticipating that outside counsel will require a few days to complete their review.
>
> Let me add an additional note. The attached email is not a privileged communication and potentially is subject to discovery and use against the company in litigation. Communications between Board members can be the subject of a subpoena or discovery during litigation. A clever and thorough attorney will determine the identity of Board members and will directly subpoena those members. Accordingly, the best means to discuss issues that may involve potential liability is by telephone. When analyzing whether a particular action may involve civil or criminal liability, it is best to seek advice from an attorney and include that attorney in any written correspondence sharing the advice from the attorney so that the written documents would be subject to the attorney/client privilege and not be discoverable. The key is to imagine any written

correspondence as an exhibit in court, and if the exhibit could lend weight to an unfavorable ruling, either make sure that the correspondence is privileged or is not sent or maintained.

With regard to maintenance of emails, it is prudent to have a regular and documented practice of deleting emails after they have been maintained for a period of time and no longer serve a business purpose. Of course, it is important to preserve and maintain emails and other correspondence relevant to a pending or threatened legal action (such as the notice given by Johnson & Johnson). But invariably, it is common for individuals to make imprudent observations based on imperfect data or analysis, and there is nothing improper in having a regular email maintenance practice so long as documents relevant to pending or threatened litigation are preserved.

256.    On October 29, 2015, Grant emailed Wistner, Hughes, Johnson (of Bennett) and Howard

(of Brown), stating:

Attached is a draft of a memorandum that I have prepared with the intention of circulating to the entire Board of Directors after I have received input from outside counsel. I am providing it to you in this form so that you can review the memorandum and let me know if there are additional points you believe I should address in the memorandum. I will appreciate any input you may have. It is my desire to provide a memorandum that is as useful to the Board of Directors as possible. Thank you.

Barry and Brad,

I am circulating this memorandum to you particularly because you are already familiar with the primary given your involvement in dealing the Johnson & Johnson dispute. Please let me know what additional information or disclaimers you would like me to include. I appreciate your assistance. My intention is to provide a document to the Board of Directors that is useful in analyzing any exposure to the Company, particularly in light of a suggestion or what disclaimers you would like added to the document to the extent you will allow reference to your review of the memorandum. Any suggested edits are welcome. Thank you.

257.    Despite having full knowledge of the scope and extent of the Questionable Business

Practices having represented certain Alliance business entities since 2010, Howard reviewed the draft

of the document and provided his redline revisions, to Grant stating:

I have attached our redlined version of your memo and then a revised

version w/comments you can easily delete. I made a few changes to the memo, mostly qualifying language, and then added a few comments for your eyes only just to encourage you to scale back a couple of comments in your memo. Overall I think it is very helpful and explanatory, I just want to encourage you to make slightly less bold statements in a few places sicne [*sic*] we haven't researched those issues thoroughly.

If you need anything else, I'm glad to help however I can. I'll be tied up in meetings for the next hour and a half or so but available after that.

258.    Howard's comments in response Grant's draft memo highlight that Brown failed to fully or properly advise Alliance—and the Alliance Medical Holdings Board of Directors—that the company could face potential criminal exposure and civil liability in respect of its NDC fraud.  In response to a portion of the draft memo which stated, "The fact that manufacturers have assigned the second and/or third segment of the NDC to identify the manufacturers' intended distribution channel . . . does not mean that utilizing an NDC for billing purposes that has been assigned to identical product but packaged for a different distribution channel necessarily violates any state or federal statute or regulation," Howard wrote, "This is a very strong statement, and our firm has not thoroughly researched the issue."

259.    By providing further legal advice to Alliance in October 2015, Brown violated its duties under ABA Model Rule 1.2(d) and/or under applicable state bar rules of professional responsibility: (i) by continuing to assist in "conduct" Brown knew was "criminal or fraudulent"; (ii) by never seeking to "withdraw from the representation of the client in the matter;" and (iii) by never providing Alliance with "notice of the fact of withdrawal and to disaffirm any opinion, document, affirmation or the like." [9]

260.    Notably, Howard never requested to review the final version of the memo before Grant

---

[9] While the Trustee is mindful that these alleged violations taken alone cannot establish *per se* liability, they can be taken into account by the trier of fact as evidence of a violation of an existing duty of care. Here, Brown was not an innocent bystander to Alliance's misconduct, as it had full knowledge of the Questionable Business Practices, and repeatedly crossed the line from legal counsel to scheme participant year-after-year by choosing to assist the enterprise, instead of withdrawing, disengaging from, or otherwise terminating the representation.

transmitted it to the board. In the final version of the memorandum provided to the Board in November 2015, Grant made no attempt to deny the allegations made by Roche, LifeScan, ESI, and others that Alliance was engaged in what was described as a "massive insurance fraud scheme." To the contrary, he confirmed that it was Alliance's practice to submit the improper insurance claims that misstated the NDC number on the products that Alliance had dispensed to customers. Brown had long known that this was Alliance's practice.

261.    The November 2015 memo also assured the Board that Grant had consulted "two separate law firms," one of which was Brown, and that the firms had "found no case law that related to reimbursement for identical products approved for distribution in the United States using different NDCs."

262.    Grant also repeated Howard's anecdote to the Board about another company that had been threatened by Johnson & Johnson "on virtually the identical issue," which Johnson & Johnson had apparently elected not to sue.  He (with Brown's sign-off) reassured the Board that Johnson & Johnson appeared to have "dropped the matter."

263.    Both the version of the memorandum that Brown signed off on and the version ultimately provided to the Board advised that changing Alliance's foundational practice of the Questionable Business Practices would be "extremely difficult if not impossible" because obtaining retail strips through legitimate channels was too expensive. Grant and Brown advised Alliance's Board that purchasing retail strips at their regular price would cause strips to become a "loss leader" rather than a golden goose for Alliance.

264.    Grant and Brown's memorandum stated that none of Alliance's options for eliminating the Questionable Business Practices were "feasibly available in the short term." The memorandum concluded that "[i]n the medium term, the business decision will be based on the perceived risk of further contract loss and/or chargebacks from the PBMs or threat of litigation from the manufacturers

versus the lost revenues resulting from the chosen course of action."

265.    In other words, Grant advised Alliance management and the Board that Alliance had two choices: (1) continue its practice of improper adjudication and accept the risk of liability, or (2) stop improperly adjudicating test strips and accept the resulting loss of revenue, which would not be financially feasible.  Brown gave its stamp of approval to that advice.

266.    In response, Jeffrey Smith, Blaine Smith, Grant, Hughes, and Wistner chose the former option. They therefore made the "business decision" to continue Alliance's Questionable Business Practices, accepting the risk of liability over the devastating loss of net revenue that would result from ceasing the Questionable Business Practices.

267.    In the Grant Memo, Grant made multiple damning admissions in respect of the Questionable Business practices, including:

- •    Describing the company's Questionable Business Practice of improperly adjudicating DME Strips purchased on the gray market as Retail Strips. He noted as a "fact" that "the Company has purchased diabetic testing supplies packaged by [LifeScan] for various distribution channels and regardless of the packaging (with the NDC code affixed), the pharmacies have dispensed the supplies and billed them as if they were packaged for retail distribution." He added that Alliance "takes the same approach with diabetic test strips manufactured by the other major manufacturers."

- •    Acknowledging that Alliance's profitability was the result of its Questionable Business Practices, when he stated that:

    [E]liminating reliance on the secondary market will be extremely difficult if not impossible for so long as the Company-owned and managed pharmacies dispense those supplies. The pricing for diabetic testing supplies for the major manufacturers from their primary distribution channels are such that diabetic testing supplies would be a loss leader. The only means of eliminating reliance on the secondary market for diabetic testing supplies while providing the level of service currently provided by the Company would require direct purchasing contracts with the major manufacturers without significant exclusions (which the Company has been unable to obtain), or to accept losses on each fill of a prescription for diabetic testing supplies from the major manufacturers, or to discontinue dispensing diabetic testing supplies from the major

> manufacturers, thus eliminating the ability to service a major portion of the market. None of these options is feasibly available in the short term. In the medium term, the business decision will be based on the perceived risk of further contract loss and/or chargebacks from the [pharmacy benefit managers] or threat of litigation from the manufacturers versus the lost revenues resulting from the chosen course of action.

- Admitting that, going forward, Alliance was faced with the choice of continuing to accept the risks of the Questionable Business Practices – pharmacy benefit manager cancellations and lawsuits by test strip manufacturers, i.e. LifeScan and Roche, both of which occurred – or foregoing profitability.

### U.    Alliance Considers But Rejects Reporting the Questionable Business Practices to the Authorities

268.    In 2016, as more and more PBMs began to catch on to the Questionable Business Practices at certain Alliance pharmacies, certain of the Scheme Participants considered disclosing Alliance's Questionable Business Practices to federal authorities.

269.    On September 27, 2016, Grant wrote to Jeffrey Smith and Rosebush (at that time, a member of Alliance Medical Holdings' Board of Directors):

Jeff,

> After speaking with Lee Rosebush, I recommend that Alta Distributors, LLC ("Alta") and the pharmacies involved as identified in the Johnson & Johnson draft complaint self-disclose to the federal authorities the practice by Alta of identifying all secondary market product distributed to the network of pharmacies it sells to using the retail NDC on the invoice regardless of the class of trade NDC established by the manufacturer for the particular boxes sold. . . .

Smith responded: "Per our conversation, I completely agree and support the self-disclosure on the timeline you discussed below."

270.    This e-mail triggered an internal audit whereby Alliance gathered and provided documentation regarding its practices to outside counsel Baker. Upon further consideration and consultation with counsel, Alliance's senior management realized that reporting the Questionable

Business Practices to federal authorities would result in enormous financial liabilities that they were unwilling to accept.

271.    On September 28, 2016, Grant e-mailed Jeffrey Smith, Blaine Smith, and Paoline to discuss the possibility of making a voluntary disclosure to the United States Department of Health and Human Services' Office of Inspector General in order to settle any civil claims arising from Alliance's improper adjudication. In the e-mail, Grant noted that self-disclosure would be in Alliance's interests only if the company could promise that it had ended its practice of the Questionable Business Practices:

> With regard to informal settlement with DOJ on the criminal side, we discussed that self-disclosure might make sense later once we have settlement on the civil side and the company can affirmatively state that there will be no more dispensing of secondary market product using a product packaged for other than retail sale.

272.    But these members of Alliance's senior management again became concerned that the consequences of self-disclosure would be financially devastating to Alliance's business. On October 18, 2016, Grant circulated a slide deck titled "Self-Disclosure Analysis." In the third slide, titled "Previous Rational for Self-Disclosure," Grant wrote: "Getting full civil settlement with the federal government on the NDC billing issues would resolve the question for future financing, merger and acquisition sources."

273.    In the fourth slide, titled "New Data," Grant wrote:

- Pharmacy techs have run test claims, and determined that the pharmacies could not have submitted claims on the pharmacies' retail plans for dispensing mail-order, DME or institutional packaged DTS, because the retail plans do not accept the mail order, DME or institutional 'NDC' codes.

- Accordingly, the issue may be whether the pharmacies should be required to disgorge the entire adjudicated amount rather than the amount that the federal government was harmed.

Grant recommended a two-part course of action: first, "Pursue Civil Action Against ESI, Prime and J&J"; and second, "Do Not Self-Disclose."

274.     The eighth slide of Grant's presentation stated:

- After discussion, outside counsel [Baker] recommends and I recommend that the pharmacies and Distribution Company Debtors do not self-disclose.

- Any benefit may only come at the cost of the Company's ultimate survival.

- The potential downside does not justify whatever benefits might come from self-disclosure.

275.     Alliance thus made the business decision to continue committing the Questionable Business Practices and not to disclose them to the federal government.

**V.     The Scheme Collapses**

276.     On or about February 23, 2017, the Federal Bureau of Investigation and U.S. Postal Inspection Service executed search warrants at Alliance's headquarters, its warehouses, and several of the Alliance Pharmacies as part of an investigation into potential criminal wrongdoing.  The FBI also seized the Zions Bank accounts belonging to Alliance and its affiliates and issued damming warrants to seize incoming receivables.

277.     On April 9, 2017, unable to access cash held in its own bank accounts due to the asset freeze, and under increasing government and commercial scrutiny for the Questionable Business Practices, the 62 Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas.

278.     Within weeks after the commencement of the bankruptcy case, Jeffrey Smith was forced by the Board to resign and replaced with an interim CEO. Just a few weeks after that, the Bankruptcy Court entered an order appointing a Chapter 11 Trustee to manage all aspects of the business.

**W.     Prior to the Government Raid, the Debtors are Accused by Whistleblowers and Outside Third-Parties of Engaging in Serious Misconduct.**

279.     From early 2014 through early 2017, certain of the Debtors' primary business practices came under scrutiny involving serious allegations of misconduct raised by multiple whistleblowers

within Alliance.  Notably, such allegations were similar, if not identical, to those being raised by the Government in respect of the Government Raid.

280.    On July 28, 2017, LifeScan sued certain former officers, directors, and employees of the Debtors and their Affiliates in New Jersey federal district court making the same allegations of serious misconduct involving the Debtors' Questionable Business Practices (the "LifeScan Lawsuit").

281.    In the LifeScan Lawsuit, which seeks damages totaling no less than $50 million, LifeScan alleges, *inter alia*, that:

- LifeScan is a manufacturer of medical equipment, including blood glucose test strips, for patients with diabetes.

- The claims of LifeScan arise out of a "years-long, fraudulent racketeering scheme" perpetrated by the named defendants that allegedly "cheated LifeScan out of tens of millions of dollars," and that the named defendants are former officers and directors of Debtor Alliance Medical Holdings, LLC, as well as investors and banks that "knowingly supported Alliance's fraud."

- The purpose "of the fraud was to generate millions of dollars of illicit profits" for Alliance, and its investors and funders, by taking "improper advantage of the fact that LifeScan sells its blood glucose test strips through two insurance regimes for two different prices."

- LifeScan manufactures blood glucose test strips packaged for sale to beneficiaries of healthcare plans that cover them under a so-called pharmacy benefit, defined as "Pharmacy Plans," and it also manufactures test strips packaged for sale to beneficiaries of healthcare plans that cover them under a so-called durable medical equipment benefit, defined as "DME Plans."

- Test strips packaged for sale through Pharmacy Plans, defined as "Retail Strips," have a substantially higher wholesale price than test strips packaged for sale through DME Plans, defined as "DME Strips." LifeScan, however, pays substantial rebates on Retail Strips paid for by Pharmacy Plans, which it does not pay on the lower-priced DME Strips. As a consequence, LifeScan's net revenues on sales of Retail Strips and DME Strips are comparable.

- The Scheme Participants, knowing this price structure and acting through businesses that they controlled and financed, "concocted and perpetrated a scheme wherein they bought millions of boxes of DME Strips on the gray market, sold them to beneficiaries of Pharmacy Plans

by falsely claiming to have sold higher-priced Retail Strips." The Pharmacy Plans paid out on what they did not know to be "fraudulent insurance claims and then claimed and received substantial rebates from LifeScan."

- According to sworn testimony of former Alliance executives, the practice of "fraudulently" claiming to Pharmacy Plans that Retail Strips were sold, when, in fact, DME Strips were sold, was the "foundational practice" of Alliance and an "integral part of [Alliance's] business model." It was known to and facilitated by Alliance's senior management, its Board of Directors and its key investors.

- David Grant ("Grant"), Alliance's general counsel, described the "fraud" as a "fact" in a November 4, 2015 memorandum to Alliance Medical Holdings' Board of Directors. The Grant Memo also stated that Alliance's profitability "depended on the fraud." The fraud continued for more than a year after the memorandum was circulated.

- Through their "fraud," the named Defendants "scammed tens of millions of dollars from Pharmacy Plans and, ultimately, from LifeScan, which was not only deprived of sales of more than one million boxes of Retail Strips but also paid tens of millions of dollars in rebates to Pharmacy Plans on illusory sales of Retail Strips."

282.    On March 19, 2019, Roche sued certain former officers, directors, and employees of the Debtors and their Affiliates in New Jersey federal district court alleging serious misconduct involving the Debtors' Questionable Business Practices (the "Roche Lawsuit") similar to that alleged by LifeScan in the LifeScan Lawsuit, seeking an award in excess of $87 million.

## X.    The Claims of LifeScan and Roche are Allowed in Full by Stipulations and Orders Approving Same

283.    While the Debtors' Chapter 11 cases were pending, LifeScan and Roche filed multiple proofs of claim against the estates of the Debtors (the "LifeScan and Roche Claims") based upon acts and omissions of the Debtors that were the subject of the misconduct alleged in the LifeScan Lawsuit and the Roche Lawsuit, including the Questionable Business Practices.

284.    In bankruptcy schedules filed with the Court, the Debtors disclosed liabilities of $50 million to $100 million, with the top three unsecured creditors, LifeScan, Roche, and the State of

Virginia, all being owed in the aggregate in excess of $97 million.  In reality, their losses were much greater.

285.     Prior to confirmation of the Plan, the Debtors independently entered into separate stipulations with LifeScan and Roche (the "Claim Stipulations") allowing their claims in the amounts of $49,339,603 and $80,054,970, respectively, which the Bankruptcy Court approved by separately entered orders [Doc. Nos. 1233, 1232].  Copies of the Claim Stipulations and Orders approving same were attached as Exhibit 1 to the prior Amended Complaint.

**Y.     The Legal and Non-Legal Services Provided by Brown**

286.     From 2010 to 2017, Brown was retained by Alliance Medical Holdings, LLC and certain other Alliance Debtors and/or their Affiliates to perform legal services involving, per the firm's own invoices, "General Business Matters," "Health Care Regulatory Matters," and "Responding to OIG [Office of Inspector General] Subpoenas," among other matters.

287.     Brown attorneys, paraprofessionals, associates, and other staff provided detailed time entries describing the services provided to Alliance during each invoice period. Defendant's billing records reflect that it acted as outside counsel through at least May 31, 2017, with the firm never withdrawing, disengaging from, or otherwise terminating the representation, nor did it ever advise Alliance that it was withdrawing any of its legal advice or opinions.

288.     Although Alliance Medical Holdings, LLC itself held no license to operate as a pharmacy, multiple entries in Brown's billing records reflect time entries devoted to "pharmacy" operations and structure, all of which involve the structure and operations of the purported "independent" pharmacies within the Alliance Healthcare Network. (*See e.g.*, Brown's detailed time records were attached as Exhibit 2 to the prior Amended Complaint at 000060 ["Work on new issues related to pharmacy claims and DME question'], 000061 ["Analysis of compounding pharmacy issues"], 000065 ["Review issues pertaining to organization and structure of pharmacy operations;

review issues pertaining to accreditation and Medicare enrollment for pharmacies"], 000066 ["research pharmacy benefit managers and pharmacy networks; Review issues pertaining to structuring and organizing pharmacy operations"], 000067 ["Review issues and recommendations pertaining to pharmacy operations"], 000069 ["research relevant Utah laws pertaining to pharmacy practice and medical practice"], 000071 ["Report re: research on Utah law and office visit co-payment reimbursement by pharmacy"]. 000073 ["E-mail to Jeff Smith re: guidance from Utah Board of Pharmacy on reimbursement of physician visit co-pay amounts"], 000092 ["review issues pertaining to switching patients from pharmacy benefits to medical benefits"], 000102 ["review [sic] e-mail from Candace Czerny re: CVS suspension of Aspire pharmacy"], and 000113 ["email to Jeff Smith re: expansion of audit to include Aspire and Everest pharmacies"]. The foregoing entries and alleged facts reflect Brown's assistance in the Questionable Business Practices.

289.    Brown also provided services to certain Alliance Debtors in a non-legal capacity, i.e., activities that did not partake of the office, professional training, skill, or authority of an attorney.

290.    At all relevant times, and as described more fully in the preceding paragraphs of this Complaint, Brown and all or certain of its attorneys knew and/or had reason to know that the Scheme Participants caused Alliance to engage in the Questionable Business Practices and, in violation of its ethical obligations and applicable law: (i) assisted and/or counseled Alliance to engage in conduct, the Questionable Business Practices, that Brown knew was criminal or fraudulent; (ii) failed to make a good faith effort to fully or properly determine the validity, scope, meaning or application of the law to discuss the legal consequences of the Questionable Business Practices; (iii) having obtained confidential information clearly establishing that Alliance was likely to commit a criminal or fraudulent act by engaging in the Questionable Business Practice that was likely to result in substantial injury to the financial interests or property of the Test Strip Manufacturers and others, failed to promptly make reasonable efforts to dissuade Alliance from committing the crime or fraud; and (iv) having obtained

confidential information clearly establishing that Alliance had committed a criminal or fraudulent act by engaging in the Questionable Business Practices in the commission of which Brown's services had been used, failed to make reasonable efforts to persuade Alliance to take corrective action; and (v) having obtained information clearly establishing Brown's actions were furthering a fraud, failed to withdraw from its representation of Alliance.

291.    From and after 2011, Brown knew, and/or had reason to know, of the extent and scope of Alliance's improper business model, including the potentially illegal nature of the Questionable Business Practices, and provided substantial assistance in regard to same, with communications and ongoing legal and non-legal services, as described in detail in the preceding paragraphs of this ~~Second~~Third Amended Complaint. Brown made representations to PBM auditors that were false statements of material fact and/or failed to disclose material facts that were necessary to avoid assisting in the Questionable Business Practices; assisted Alliance in conduct that Brown knew was fraudulent; and committed acts to conceal and perpetuate the Questionable Business Practices in furtherance of fraud. Brown knew of the legal risks created by the Questionable Business Practices and proceeded despite those risks.

292.    On November 10, 2020, Howard gave testimony on behalf of Brown through a Rule 2004 Examination.  Brown's testimony and explanations for its conduct were often implausible and contradicted by contemporaneous documentation.

293.    For example, Brown testified it did not understand what the final version of the Grant Memo stated until after the bankruptcy had been filed, and claimed ignorance of Alliance's Questionable Business Practices until reviewing a complaint of one of the Test Strip Manufacturers, which alleged in detail the acts and circumstance supporting their allegations of fraud.

294.    Brown testified that it was not until late November 2012, when Jeffrey Smith asked Brown to research the legality of "deliver[ing] one NDC product but bill[ing] a PBM for another," that

Brown realized that this "may be Jeffrey Smith's practice."  In fact, Brown knew this was Alliance's practice no later than February 2011.

295.   According to Brown, Howard and Baird told Jeffrey Smith during a phone call in December 2012 that this Questionable Business Practice was illegal.  Brown testified that Smith "freaked out" during the call.  Nonetheless, according to Brown's testimony, it never knew for a fact that Alliance was engaged in this practice.  Again, this testimony is contradicted by contemporaneous documents showing Brown knew this was Alliance's practice no later than February 2011.

296.   According to Brown's testimony, it had "no knowledge" that Alliance was violating its PBM contracts by operating retail pharmacies that primarily operated as mail-order pharmacies.  In fact, Brown knew as early as 2010 that Alliance intended to set up a network of pharmacies to "spread the risk" that its mail-order pharmacy operations would be detected by PBMs, and knew no later than July 2013 that Alliance's network of "independent" pharmacies would misrepresent itself on PBM applications as retail pharmacies.

297.   Brown testified that Howard redacted certain data from invoices that could have tipped PBMs off about Alliance's fraud because Jeffrey Smith told him they could be used to identify Alliance's vendor.  Brown, however, could not explain how disclosure of data like NDC, price, and product descriptions could be used to identify a vendor.  Brown was not relying on its professional training, skill, or authority as an attorney when it performed these redactions; to the contrary, it performed the redactions at Jeff Smith's direction.

298.   Though Brown testified that it did not have actual knowledge that Alliance was engaged in the Questionable Business Practices, Brown also testified that when Alliance first hired David Grant in December 2013 to be their general counsel, Brown attorneys Fish and Jepson spoke to him "about the NDC discrepancies, meaning that [Alliance] had been engaged in providing one product but billing for another.  [Jepson] brought [Grant] up to speed."

299.    Brown testified that it "would never provide advice knowing that it . . . could be used to perpetrate a fraud, nor would I advise a client if I - - I've fired clients before, so if I felt that Mr. [Jeffrey] Smith and his team were engaged in fraud, I would have fired them."  Brown testified that "when we were representing them . . . , I didn't have any – nor did anybody in our firm have any idea that Jeff Smith or his team were engaged in fraud.  Otherwise, I mean, to the point I made about firing them, I mean at a bare minimum you would discontinue the representation if you knew that was going on."  Despite Brown's extensive knowledge of Alliance's fraud, it never did the "bare minimum" of discontinuing the representation.

Z.    **The Manufacturers Justifiably Relied on Misrepresentations Made by Alliance and Brown.**

300.    As set out above, Brown and the Scheme Participants knowingly caused Alliance to make numerous false representations to the PBMs, which were communicated to the Manufacturers, and the Manufacturers relied on that information when paying rebates based on Alliance's fraudulent invoices. The Manufactures had no independent means to verify the information being submitted by Alliance to the PBMs.

301.    Most egregiously, these included submitting reimbursement requests for pharmacy benefit adjudications using incorrect NDC numbers. As Brown knew, these requests were misstatements necessarily relied on by the Manufacturers when calculating and paying rebates to PBMs.

302.    The Scheme Participants and Brown also caused Alliance to make numerous other false or misleading representations to the PBMs for the purpose of concealing their fraud, including representing that it was purchasing and dispensing substantial amounts of retail product, submitting invoices that falsely indicated that test strips purchased by various Alliance entities were retail product, misrepresenting the relationship between the various Alliance entities in the context of numerous separate audits, and misrepresenting the amount of mail order business that its pharmacies did.

303.    Brown made or assisted in making these misstatements, despite knowing them to be

false, including during PBM audits as described above.

304.    Brown thus made direct and knowingly false misrepresentations to PBMs.

305.    For example, as alleged supra, Brown submitted several appeals to CVS/Caremark during audits that included false and/or misleading statements. Similarly, Brown submitted an appeal to Prime relating to Everest/Aspire that made the false assertion that communications between SP Diabetic and Prime "were provided to [Everest/Aspire] by its wholesaler, SP Diabetic, for purposes of this appeal," which assertion was intended to deceive Prime about the true nature of Alliance's operations.

306.    Alliance and Brown knew that the Manufacturers were obliged to pay rebates to the PBMs for invoiced retail test strip amounts and that the PBMs would rely the information submitted by Alliance pharmacies to the Manufacturers regarding the test strips that were purportedly dispensed to trigger these rebate payments. For example, Brown and Alliance were aware that information provided to CVS/Caremark in 2011 was passed on to Roche, discussed supra, and that the Manufacturers were harmed by paying rebates.

307.    Consequently, the Manufacturers—with Brown's knowledge—relied on misstatements made by Alliance and Brown to the PBMs in the adjudication of test strips and during audits, leading them to pay rebates for claims submitted in connection with test strips sold by Alliance-affiliated pharmacies that would not have been paid had the Manufacturers known the truth, namely, that the pharmacies in question were affiliated with Alliance and dispensing NFR product while submitting claims for retail product. This resulted in significant damages to the Manufacturers.

**AA.    Brown Failed to Advise Alliance to Pursue Alternative Revenue Streams.**

308.    Alliance considered alternative business models that were not premised on the Questionable Business Practices, including dispensing alternative drug therapies, opening mail order pharmacies (including through New Life Pharmacy), transitioning away from purchasing test strips on

the secondary market, and other initiatives.

309.    For example, in February 2016, Alliance CFO Justin Leavitt transmitted "talking points" in advance of a finance committee call.  Those talking points explained that a major obstacle to Alliance was the Questionable Business Practices and the "[c]ontinued PBM concerns," as well as a drop in expected profits. At the end of the "talking points," there was a list of alternative drug therapies that Alliance could have pursued lawfully selling.

310.    In another example, in January 2017, Jose Vargas, then Alliance's Director of Procurement, provided other Insiders with a list of alternative products for Alliance to provide. The list included clobetasol spray, diclogel, steroid cream, lidocaine ointment, lidocaine patches, and zegrid.

311.    In February 2017, just before Alliance's scheme came to an end, Leavitt's replacement, Scott Klossner, informed Zion's Bank (in the context of seeking an additional "equity raise") of new revenue streams from partnerships and diversification.

312.    In sum, Alliance considered shifting away from secondary market purchases at various times, and would have done so had Brown advised Alliance that the Questionable Business Practices were illegal and needed to stop. Instead, Alliance felt no pressure to turn away from the Questionable Business Practices or meaningfully invest in further developing these alternative revenue streams because Brown failed to properly advise Alliance, and Brown, together with the Scheme Participants, successfully hid the Questionable Business practices from PBM auditors and Manufacturers for years. Had Alliance stopped engaging in the Questionable Business Practices prior to February 2017, it would have pursued these alternative business models, including by investing the resources that it used to expand and conceal its Questionable Business Practices into developing these alternative revenue streams.

**BB.    Discovery Rule, Tolling, and Fraudulent Concealment**

313.    On April 23, 2019, the Chapter 11 Trustee caused a statutory turnover demand for

records to be served on Brown, which letter expressly stated in a footnote that the Chapter 11 Trustee

owned and held the attorney client privilege.

314.    In response to the turnover demand, by letter dated May 7, 2019, Brown responded that:

> our [law] firm once represented some of the debtors listed in the case
> styled, In re Uplift RX, LLC, et al. Therefore, our firm's correspondence
> and file materials are privileged under the Attorney-Client Privilege and
> the Attorney Work Product Doctrine. We must respectfully object to
> production of any of our firm's file materials, including all of the
> materials referenced in your letter, and assert our position that the
> applicable privileges are not ours to waive because they belong to our
> former clients, and in the absence of a court order, we believe that we are
> duty-bound to maintain these materials rather than to produce them. We
> will continue to maintain our file materials and will not allow them to be
> compromised or destroyed in any manner.

315.    Notably, the position taken by Brown as part of its refusal to turn records over to the

Trustee was in direct violation of the U.S. Supreme Court's decision in *Commodity Futures Trading*

*Comm'n v. Weintraub*, 471 U.S. 343, 351-354, 105 S.Ct. 1986, 1992- 94, 85 L.Ed.2d 372 (1985)

(holding that trustee of a corporation in bankruptcy owns, controls, and therefore has the power to waive

the corporation's attorney client privilege with respect to pre-bankruptcy communications).

316.    On October 14, 2019, the Trustee and Brown entered into a tolling agreement, which

extended the time for the Trustee to file suit against Brown to January 31, 2020 (the "Tolling

Agreement"). Thereafter, the Tolling Agreement was amended as follows: (i) on January 16, 2020, it was

amended to the extend the time to file suit to July 31, 2020; (ii) on June 19, 2020, it was amended for a

second time to extend the time to file suit to October 31, 2020; and to cover claims held by the Trustee

"as assignee of the claims of [the Manufacturers]" (the "June 19, 2020 Agreement"); (iii) on August

19, 2020, it was amended a third time to extend the time to file suit to January 31, 2021; (the "August

19, 2020 Agreement"); (iv) on January 28, 2021, it was amended a fourth time to extend the time to file

suit to March 31, 2021; (v) on March 15, 2021, it was amended a fifth time to extend the time to file

suit to May 31, 2021; and (vi) on May 4, 2021, it was amended a sixth time to extend the time to file

suit to July 31, 2021; and (vii) on July 26, 2021, it was amended a seventh time to extend the time to file suit to October 31, 2021.

317.    The intent of all of the tolling agreement extensions starting with the one dated June 19, 2020, was for Brown to toll voluntarily the limitation periods for all of the potential claims against it., including the claims subject to assignment from the Manufacturers. The June 19, 2020 Agreement modified the prior tolling agreements to cover claims subject to assignment to the then-Trustee, Mark Shapiro, "as assignee of the claims of LifeScan, Inc., Roche Diagnostics Corp., and Roche Diabetes Care, Inc." From June 19, 2020 onward, the parties intended and understood that the tolling agreements covered the Manufacturer-assigned claims. Brown, and specifically Bradley Howard of Brown, and Brown's attorney Christopher Raney of Gordon Rees Scully Mansukhani, LLP, intended to toll the Manufacturer-assigned claims and was aware that the Trustee intended to toll the Manufacturer-assigned claims.  Howard executed the June 19, 2020 Agreement.

318.    Howard executed and Raney delivered the August 19, 2020 Agreement after being expressly told by the Trustee's former attorney, David Cimo, over emails dated August 4, and August 11, 2020 that the June 19, 2020 Agreement and the August 19, 2020 Agreement were intended to toll the assigned claims.  For example, Cimo explained to Raney in an email dated August 11, 2020 that the intention of the tolling agreements was to "toll the assigned claims" just as "all other professionals [the Trustee was] investigating" had agreed to do. Cimo reiterated the intent of the tolling agreements to toll the assigned claims in emails to Raney later that same day.  Brown's counsel did not dispute the scope of the tolling agreement and instead executed the August 19, 2020 Agreement and delivered it to Cimo on August 19, 2020, thereby acknowledging the intent that they would cover assigned claims.

319.    Raney did not disagree with the Trustee's stated scope of the tolling agreements, and specifically did not dispute that the June 19, 2020 Agreement covered the assigned claims. Raney never expressed to Cimo that the assigned claims could only be tolled by modifying the first October 11, 2019

tolling agreement's definition of "Claims." Nor did Raney suggest any other required modifications necessary to toll the assigned claims.  Instead, he returned to Cimo the August 19, 2020 Agreement, signed by Brown attorney Bradley Howard, acknowledging the intent of the parties that the June 19, 2020 Agreement and the August 19, 2020 Agreement, and thus subsequent tolling extensions, covered the assigned claims.

320.    The Trustee believed and pursued claims against Brown with the understanding that the limitation period for the claims, including the assigned claims, were tolled.  At no point prior to or after the commencement of this litigation, up until the third motion to dismiss—through multiple rounds of motion to dismiss briefing wherein limitations defenses were raised—did Brown claim the tolling agreements did not cover the assigned claims.

321.    As noted herein, Brown knowingly participated in and perpetuated the Questionable Business Practices through at least October 29, 2015, when it signed off on the November 15, 2015 board memorandum.

322.    The earliest limitations deadline for claims carrying a four-year statute of limitations was thus October 29, 2019, to the extent they were not otherwise tolled or subject to discovery rule or fraudulent concealment or other comparable grounds.

323.    The tolling agreements between the Trustee and Brown were effective October 11, 2019.

318.324.    The discovery rule and/or the fraudulent concealment doctrine also applies to delay the accrual of the Test Strip Manufacturers' claims for fraud, aiding and abetting, conspiracy, and RICO violations, and the Trustee's claims for aiding and abetting breach of fiduciary duty and contribution.

319.325.    Despite the Trustee unilaterally owning and holding the attorney client privilege on behalf of Alliance, from and after May 2019, Brown refused to turn any of its records over to the Trustee or the Test Trip Manufacturers until its questionable subpoena objections had been resolved,

with the Trustee having to affirmatively notify Brown that the privilege had been fully waived. Thereafter, it was then and only then that the Trustee and Test Strip Manufacturers both finally obtained access to Brown's files and records.

320.326.      The Test Strip Manufacturers' injuries resulting from the Scheme Participants' submission of false insurance reimbursement claims, while objectively verifiable, were inherently undiscoverable.  As alleged above, the false insurance reimbursement scheme was elaborate and well-concealed, and the nature of the scheme made it extremely difficult for the Test Strip Manufacturers to discover their injuries, notwithstanding their exercise of reasonable diligence. The Test Strip Manufacturers generally sell retail boxes to wholesalers, rather than selling directly to pharmacies. Accordingly, the Test Strip Manufacturers expected to pay rebates as part of non-fraudulent routine business practices and to receive rebate claims for boxes of retail test strips dispensed by pharmacies that had not directly purchased any retail test strips from them. Thus, for the Test Strip Manufacturers to know that they had actually suffered an injury, they had to have known that they paid rebates for test strips for which rebates were not owed and, subsequently, that such fraudulent rebate payments continued following the audit and termination of individual pharmacies, due to the then-unknown fraudulent scheme perpetuated by Brown and the other Scheme Participants.

321.327.      Despite due diligence, the Test Strip Manufacturers did not discover prior to July 19, 2017, that the Scheme Participants had made and caused to be made insurance claims falsely stating that the Alliance pharmacies had sold the Test Strip Manufacturers' retail strips, when in fact they had sold NFR strips, thereby causing the Test Strip Manufacturers injuries.

322.328.      In sworn deposition testimony given on July 19, 2017, two Alliance employees admitted to such wrongful conduct, with one describing it as "the foundational practice" of the company.  Such testimony provided the first concrete and objective verification of the wrongful conduct and the Test Strips Manufacturers' resulting injuries.

323.329.      Prior to July 19, 2017, proof that Alliance pharmacies were dispensing NFR strips, rather than retail strips, was particularly within Alliance—and Brown's—knowledge and control, and Alliance did not allow the Test Strip Manufacturers access to such information.

324.330.      To the contrary, Brown and its co-conspirators, the Scheme Participants, actively and fraudulently concealed facts demonstrating that Alliance pharmacies were dispensing NFR strips while adjudicating claims using the NDCs for retail strips.

325.331.      As alleged above, Brown and its co-conspirators, the Scheme Participants, had actual knowledge that Alliance pharmacies were dispensing NFR strips while adjudicating claims using the NDCs for retail strips.

326.332.      Nonetheless, Brown and the Scheme Participants actively and fraudulently concealed such wrongful conduct through multiple means.

327.333.      First, as alleged above, when auditors demanded proof from Alliance-affiliated pharmacies that they had purchased sufficient retail strips to support their thousands of adjudications, the pharmacies, with the knowledge of and assistance from Brown, produced misleading invoices that hid the true nature of the purchased strips.

328.334.      Second, as alleged above, to mitigate the risk of being discovered and shut down *en masse*, the Scheme Participants, with the knowledge and assistance of Brown, began operating through a network of nominally "independent" and/or PIC pharmacies, which were, in fact, fronts for the false insurance reimbursement scheme.

329.335.      Third, as alleged above, when the Scheme Participants discovered that LifeScan was investigating the false insurance reimbursement scheme, they executed Grant's plan to obstruct LifeScan's investigation by filing a pretextual lawsuit against LifeScan and its outside counsel, which prevented further inquiry by LifeScan and the ability to discover the injury.

330.336.      As a result of these acts of concealment, as well as the nature of the underlying

fraud, the Test Strip Manufacturers did not discover – and could not have discovered with the exercise of reasonable diligence – prior to July 19, 2017, that the Scheme Participants had made and caused to be made insurance claims falsely stating that the Alliance pharmacies had sold the Test Strip Manufacturers' retail strips, when in fact they had sold NFR strips, thereby causing the Test Strip Manufacturers' injuries.

331.337.    However, even the July 19, 2017 deposition testimony failed to reveal Brown's knowing participation in and assistance of the fraud. Brown's participation continued to be concealed from the Manufacturers.

332.338.    Even with the exercise of reasonable diligence, the Trustee and Test Strip Manufacturers could not have discovered prior to July 31, 2020, that Brown had knowingly participated in the fraud, conspired to commit fraud, and aided and abetted the fraud.  As detailed below, the discovery of these facts by the Trustee and the Test Strip Manufacturers was frustrated by Brown's baseless invocation of the attorney-client privilege and attorney work product doctrine.

333.339.    Prior to March 7, 2018, neither Test Strip Manufacturer had access to communications between Brown and the Scheme Participants.  Beginning on March 7, 2018, and continuing through July 27, 2018, Alliance and Upwell Holdings LLC ("UpWell"), the entity that purchased substantially all of Alliance's assets after Alliance declared bankruptcy, produced over one million documents to LifeScan.  Collectively, these productions contained communications demonstrating that Brown had advised Alliance regarding regulatory matters and audits from PBMs. These productions did not disclose the full nature of Brown's role in the fraud, however.

334.340.    After reviewing the productions from Alliance and UpWell, LifeScan and Roche served subpoenas on Brown on October 2, 2018 and September 31, 2019, respectively.  The Test Strip Manufacturers' subpoenas were substantially similar and sought the following categories of documents from Brown: all documents and communications concerning Alliance, including but not limited to

documents and communications concerning Alliance's procurement, sale, use, or Adjudication of Strips, Alliance's use of NDCs in documents or Adjudications, and/or Alliance's misrepresentations to PBMs; and all documents and communications concerning any analysis or due diligence carried out with respect to Alliance, including but not limited to any analysis of potential liabilities, including but not limited to liabilities in contract or in tort, liabilities to PBMs and/or manufacturers of Strips, and enforcement risk from government agencies.

335.341.    Brown served its objections to LifeScan and Roche's subpoenas on October 12, 2018 and October 15, 2019, respectively.  Brown objected to both subpoenas on the grounds that, according to Brown, they sought information protected by the attorney-client privilege and the attorney work product doctrine.

336.342.    Brown's objections clearly lacked a good faith basis, however, because Alliance had effected a broad waiver of attorney-client privilege and work product protection by disclosing substantially all of its communications – including attorney-client communications with Brown – to a third party, UpWell.

337.343.    Brown also knew or should have known that its objections on the grounds of attorney-client privilege and attorney work product were baseless at least as of December 4, 2018, when the Test Strip Manufacturers' outside counsel communicated that fact to Brown. Nonetheless, Brown did not produce any documents in response to the Test Strip Manufacturers' subpoenas until July 31, 2020.

338.344.    On June 23, 2020, counsel for the Trustee of the Alliance Health Liquidating Trust wrote to Brown, confirming that the attorney-client privilege and work-product protection belonging to Alliance had been waived, and directing Brown to produce documents in response to the Test Strip Manufacturers' subpoenas.

339.345.    Approximately one month later, on July 31, 2020, Brown made its first

production to the Test Strip Manufacturers and the Trustee, totaling approximately 7000 documents.

340.346.     Thereafter, Brown made additional productions of approximately 900 documents on December 15, 2020 and 386 pages on March 16, 2022.

341.347.     Collectively, Brown's productions revealed that Brown knowingly participated in the fraud, conspired to commit fraud, and aided and abetted the fraud.

### CC.     Conditions Precedent

342.348.     All conditions precedent to the filing of this action have occurred, been waived, or have expired.

**COUNT I**
**AIDING AND ABETTING/KNOWING PARTICIPATION IN**
**BREACH OF FIDUCIARY DUTY**

The Trustee, for and on behalf of the Trust Estate, the Debtors, and the estates of the Debtors, sues Brown and alleges:

343.349.     The Trustee realleges paragraphs 1 through 342348 above.

344.350.     This is a claim for knowing participation in and/or aiding and abetting breach of fiduciary duty by the Trustee for and on behalf of the Trust Estate, the Debtors, and the estates of the Debtors, against Brown under Utah law and/or other applicable law for knowing participation in and/or aiding and abetting the breaches of fiduciary duty of the Alliance Fiduciaries based upon their acts and omissions as officers and/or members of the board of directors of Fiduciary Entities. Alliance Medical Holdings, LLC was a Delaware corporation, so Delaware statutory and common law governs the breaches of fiduciary duty, but this claim for aiding and abetting is governed by the law of the state with the most significant relationship. *See Janvey v. Adams & Reese, LLP*, 2013 WL 12320921 (N.D. Tex. 2013).

345.351.     During at least the time periods alleged above, the Alliance Fiduciaries were officers, directors, managers, members, employees, and/or control persons of the Fiduciary Entities, as

alleged above, and, as such, owed the Fiduciary Entities a fiduciary duty to discharge their duties in good faith, with the care an ordinarily prudent officer, director or manager in a like position would exercise and in a manner reasonably believed to be in the best interests of the Fiduciary Entities.

346.352.     Specifically, the duty of loyalty and good faith required the Alliance Fiduciaries to put the interests of the Fiduciary Entities above their own interests and those of others, and were not limited to disloyalty in the classic sense, i.e. self-dealing, personal gain, or a cognizable conflict of interest. In addition, in discharging their duty of loyalty and good faith, the Alliance Fiduciaries were required to act in good faith, and would be in breach of the duty of loyalty by acting with a purpose other than that of advancing the best interests of the Fiduciary Entities, and by acting in violation of applicable positive law, or by failing to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities.

347.353.     The Alliance Fiduciaries were also required to ensure that they did not display a lack of diligence that was more culpable than simple inattention or failure to be informed of all facts material to their decisions, such that it was qualitatively more culpable than gross negligence. Additionally, the duty to exercise due care required the Alliance Fiduciaries to use that amount of care which an ordinarily careful and prudent person would use in similar circumstances and to consider all material information reasonably available.

348.354.     In exercising the duty of due care, the Alliance Fiduciaries could not engage in acts or omissions on behalf of the Fiduciary Entities that resulted in a loss arising from decisions that: (i) were ill- advised,  uninformed, undertaken in bad faith,  or that failed to consider material information;  (ii)  constituted  an unconsidered failure of the Alliance Fiduciaries to act in circumstances in which due attention would, arguably, have prevented the loss; (iii) were based upon an unintelligent or unadvised judgment; (iv) were grossly negligent, such as engaging in an irrational decision-making process signifying more than ordinary inadvertence or inattention; or (v) resulted in a

corporate strategy that reflected an indifference to the potential risk of harm to the Fiduciary Entities, such that reasonable businesspersons would have carefully considered the obvious negative consequences. Moreover, the more significant the subject matter of the decision, the greater the requirement to probe and consider alternatives.

349.355.    To further satisfy the duty of due care, a reasonable and informed deliberative process was required by attending meetings, asking questions, reviewing written materials, and otherwise becoming informed of relevant information reasonably available, and to seek the input of experts, such as investment bankers, attorneys, and accountants, and to provide materially accurate information.

350.356.    Based upon the application of the foregoing duties of loyalty, good faith and due care, the Alliance Fiduciaries knew, should have known and otherwise were required to act as follows: (i) to provide or otherwise cause materially accurate information or representations to be disseminated or made within the Alliance Healthcare Network and to third parties; (ii) to implement or follow, or to otherwise cause the implementation and following of, adequate safeguards or controls in regard to financial reporting; (iii) to implement or follow, or to otherwise cause the implementation and following of, adequate safeguards and controls in regard to material business, operational, financial reporting, and regulatory functions; (iv) while the Fiduciary Entities were insolvent or not paying their debts as they became due, to undertake sufficient and adequate measures to ensure that payments to third parties did not constitute preferential or fraudulent transfers which could result in a loss of assets of the Fiduciary Entities; (v) while the Fiduciary Entities were insolvent or not paying debts as they became due, not to cause, allow or otherwise abdicate their duties by allowing the Fiduciary Entities assets and enterprise value  to continue to decrease in value; (vi) while the Fiduciary Entities were insolvent or not paying debts as they became due, to cause the Fiduciary Entities to file bankruptcy or other insolvency proceedings as soon as reasonably practical, necessary, or appropriate; (vii) while the Fiduciary Entities

were insolvent or not paying debts as they became due, to act in the best interests of the Fiduciary Entities and all stakeholders, and not in the interests of themselves or certain insiders of the Fiduciary Entities; (viii) to ensure that the Fiduciary Entities was not engaging in or otherwise permitting corporate waste; and (ix) to ensure that the Fiduciary Entities were not engaging in or otherwise permitting the perpetration of fraudulent conduct.

351.357.    In regard to the facts alleged above involving the Fiduciary Entities' flagrant business, operational, financial reporting, and regulatory compliance deficiencies, and lacking good faith, the Alliance Fiduciaries exhibited a knowing, conscious, grossly negligent or reckless disregard for the best interests of the Fiduciary Entities and, except for their knowing, conscious, grossly negligent or reckless disregard of the facts, they should have known of the risk of damage that ultimately befell the Fiduciary Entities.

352.358.    Specifically, the Alliance Fiduciaries actively engaged in breaches of fiduciary duties, and otherwise abdicated their fiduciary duties of loyalty, good faith, and due care owed to the Fiduciary Entities, with breaches that include, but are not limited to, the following: (i) permitting, causing, or otherwise allowing the Fiduciary Entities to engage in the Questionable Business Practices; (ii) failing to cause or require the implementation of or follow adequate safeguards and controls in regard to financial reporting and other material business, operational, regulatory, and financial reporting functions in respect of the Questionable Business Practices; (iii) permitting the Fiduciary Entities' assets and enterprise value to decrease in value as a result of, *inter alia*, the Questionable Business Practices; (iv) failing to fully or adequately inform themselves in regard to material business, operational, regulatory or financial reporting decisions affecting the Fiduciary Entities in respect of the Questionable Business Practices; (v) when the Fiduciary Entities were insolvent or not paying its debts as they became due, acting with the purpose of furthering the interests of themselves and certain other insiders of the Fiduciary Entities, instead of the best interests of the Fiduciary Entities and all stakeholders, by causing

the  company to engage in the Questionable Business Practices; (vi) permitting, causing, or otherwise allowing corporate waste resulting from the Questionable Business Practices; (vii) failing to implement safeguards to prevent the Fiduciary Entities from engaging in the perpetration of fraudulent conduct; and (viii)  other breaches and proximately caused damages as may be ascertained through discovery.

353.359.      As the result of the vast array of legal and non-legal services Brown provided to the Fiduciary Entities, Brown had knowledge of and rendered substantial assistance regarding the breaches of fiduciary duty of the Alliance Fiduciaries.

354.360.      Among other acts and omissions engaged in by Brown, it knowingly participated in and/or otherwise aided and abetted the Alliance Fiduciaries' breaches of fiduciary duties of loyalty and/or care to the Fiduciary Entities by, *inter alia*: (i) assisting the Alliance Fiduciaries in engaging in, furthering, perpetuating, and concealing the Questionable Business Practices; (ii) failing to fully or properly consult and advise the Alliance Fiduciaries, Innocent Insiders, or the Fiduciary Entities regarding the fraudulent nature or illegality of the Questionable Business Practices; (iii) failing to fully or properly consult and advise the Alliance Fiduciaries, Innocent Insiders or the Fiduciary Entities regarding the potential risks and harm to the Fiduciary Entities in respect of the Questionable Business Practices; (iv) failing to fully or properly advise the Alliance Fiduciaries, Innocent Insiders or the Fiduciary Entities to pursue alternative revenue streams available to the Fiduciary Entities throughout the relevant period and pivot away from the Questionable Business Practices; (v) failing to fully or properly consult and advise the Alliance Fiduciaries, Innocent Insiders or the Fiduciary Entities whether the company was required by law to immediately self-disclose and forthwith cease and desist from engaging in the Questionable Business Practices; (vi) failing to advise or notify the Alliance Fiduciaries, Innocent Insiders or the Fiduciary Entities that Brown was withdrawing its legal advice and opinions, including those related to the Questionable Business Practices, and such advice and opinions could no longer be relied upon by the Fiduciary Entities; (vii) creating the corporate ownership structures with

the aim of perpetuating the Questionable Business Practices; (viii) covering up the Questionable Business Practices through misrepresentations and omissions to PBMs and the Manufacturers; (xi) counseling and assisting the Alliance Fiduciaries in conduct that Brown knew was fraudulent and exposed the Fiduciary Entities to third-party liability; (x) failing to inform the Boards of Directors of the Fiduciary Entities and/or the Innocent Insiders that the Company was engaged in blatantly illegal activity; and (xi) failing to withdraw from its representation of the Fiduciary Entities in light of its continued illegal activities or otherwise advise the Alliance Fiduciaries or the Innocent Insiders that it could not assist in the fraud.

355.361.    Had Brown duly and properly performed its duties and obligations, the bad faith and other questionable acts and omissions of the Alliance Fiduciaries, including the Questionable Business Practices, would have been  discontinued or discovered sooner, thereby preventing such actions  from occurring, mitigating the damage caused by such actions, allowing Fiduciary Entities to pursue non-fraud business opportunities, and/or causing the Fiduciary Entities to be managed and controlled by a non-conflicted fiduciary acting in the best interests of the Fiduciary Entities and their creditors.

356.362.    Each of the above breaches adversely impacted and conferred no benefit to Alliance, and as a direct and proximate result of same, caused damage to the Fiduciary Entities, totaling no less than $129,394,573 owed to the Manufacturers, which represents a partial measure of the aggregate amount of the increased liabilities the Fiduciary Entities faced as a result of Brown's misconduct, as well as the loss of assets of the Fiduciary Entities; the decrease in the asset values and enterprise value of the Fiduciary Entities; the increased insolvency of the Fiduciary Entities; the loss of business opportunities related to the pursuit of alternative business models, such as the sale of alternative drug therapies; and corporate waste. The Fiduciary Entities are liable to the Test Strip Manufacturers pursuant to the Claim Stipulations approved by the Bankruptcy Court were attached as

Exhibit 1 to the prior Amended Complaint, which claims directly arise from the Questionable Business Practices engaged in by the Scheme Participants, including the Alliance Fiduciaries, as aided, abetted, and otherwise assisted in by Brown as the result of: (i) fraudulent adjudication data being passed directly from pharmacy-benefit insurance companies and PBMs to the Test Strip Manufacturers, which served as the sole basis and justification for their payments of rebates to those pharmacy-benefit insurance companies and PBMs; and (ii) the Scheme Participants' repeated and ongoing fraudulent substitution of boxes of NFR strips for boxed of retail strips that were adjudicated, and for which the Fiduciary Entities were reimbursed by pharmacy-benefit insurance companies.  Such substitutions deprived the Test Strip Manufacturers of the sale of a box of Retail Strips that they would have sold absent the fraudulent substitution, thereby supporting their allowed damage claims against the estates of each of the Fiduciary Entities.

WHEREFORE, the Trustee demands the entry of a judgment against Defendant for compensatory damages, consequential damages, and special damages including, but not limited to: (i) the loss of assets of the Debtors; (ii) increased liabilities of the Debtors; (iii) the decrease in the asset values and enterprise value of the Debtors; (iv) the increased insolvency of the Debtors; (v) the loss of business opportunities; (vi) corporate waste; (vii) the value of the allowed claims of the Test Strip Manufacturers; (viii) pre-judgment, post-judgment interest, court costs and expenses; and (ix) for any other relief the Court deems appropriate.

**COUNT II**
**TURNOVER AND/OR**
**DISGORGEMENT OF FEES PAID**

The Trustee, for and on behalf of the Trust Estate, the Debtors, and the estates of the Debtors, sues Brown and alleges:

357.363.    The Trustee realleges paragraphs 1 through 342348 above.

358.364.    This is an action for turnover and/or disgorgement of all fees paid by or on behalf

of the Debtors to Brown.

359.365.       In the event the relief sought in Count I above is granted in whole or in part, the Trustee requests that all fees paid to Brown through the Petition Date (the "Fee Payments") be turned over and/or disgorged to the Trustee under Section 542 or the Bankruptcy Code, the faithless servant doctrine, and/or pursuant other applicable law, whether by statute, common law, or in equity.

WHEREFORE, the Trustee demands the entry of judgment in favor of the Trustee against Brown ordering that Brown disgorge and turn over to the Trustee the Fee Payments, and for any relief the Court deems appropriate.

**COUNT III**
**AIDING AND ABETTING / KNOWING PARTICIPATION IN FRAUD / FRAUDULENT MISREPRESENTATION**

The Trustee, as assignee of the claims of Roche and LifeScan, sues Brown and alleges:

360.366.       The Trustee realleges paragraphs 1 through 342348 above.

361.367.       This is an action for aiding and abetting or knowing participation in negligent and/or fraudulent misrepresentation filed by the Trustee as assignee of the claims of Roche and LifeScan.

362.368.       Alliance, through the Alliance pharmacies and the Scheme Participants, as alleged more specifically above, knowingly and intentionally misrepresented to PBMs that they were selling retail strips when in fact they were selling NFR strips, which they knew would cause those  false insurance reimbursement claims to be passed on to the Manufacturers; knowingly and intentionally misrepresented to the PBMs in response to audits that the claims were correct and backed by supporting documentation, knowing that was false.

363.369.       These statements of fact and material omissions were false and misleading.

364.370.       Alliance did not take any affirmative steps to correct their materially inaccurate or false statements or material omissions.

365.371.     Alliance and Brown knew and intended that the PBMs and insurance companies would rely on their false representations and material omissions in providing reimbursements to Alliance and that the PBMs and insurance companies would only pay such high reimbursements because they received rebates from the Manufacturers based on Alliance's claims.

366.372.     Alliance and Brown further knew and intended, or should have known, that the PBMs pass through fraudulent misstatements about the NDCs invoiced as part of the claims adjudication process to the Manufacturers, communicate information regarding both potential billing fraud and the information provided in the resulting investigations to the Manufacturers, and further that the Manufacturers necessarily rely on the misrepresentations by Alliance and Brown when calculating and paying rebates on fraudulent invoices.

367.373.     Alliance and Brown also knew and intended that their misrepresentations to PBMs—including, among others, (i) the fraudulent invoices for claims adjudication, (ii) assurances that fraudulent invoices were correct, (iii) assurances that Alliance pharmacies had the inventory to support the fraudulent invoices, (iv) fraudulent supplier invoices indicating the purchase of retail NDCs by Alliance pharmacies that were not actually purchased; and (v) misrepresentations about Alliance's entity structure which would have allowed PBMs and Manufacturers to connect fraudulent pharmacies and cease related reimbursements and rebate payments relates to such pharmacies in a timely manner—were communicated to the Manufacturers and relied on by the Manufacturers in calculating and paying rebates.

368.374.     The PBMs, LifeScan, and Roche reasonably relied upon Alliance's misrepresentations and material omissions and were unaware that they were false.

369.375.     Brown intentionally and knowingly participated in the fraud and provided substantial assistance to Alliance in advancing the fraud through intentional and/or negligent misrepresentations to PBMs.

370.376.      Brown aided and abetted, knowingly participated in, and substantially assisted the fraud well beyond its role as advisor to Alliance by helping to create and conceal Alliance's corporate ownership structures for the purpose of perpetuating the fraud.

371.377.      Brown aided and abetted, knowingly participated in, and substantially assisted the fraud by directly covering up the fraud through both misrepresentations and omissions to third parties, including PBMs, pharmacists, auditors, and others regarding the relationship between Alliance and Alliance affiliated or controlled entities, as well as the accuracy of Alliance invoices.

372.378.      Brown aided and abetted, knowingly participated in, and substantially assisted the fraud by counseling and assisting Alliance in conduct Brown knew was fraudulent, perpetrating the fraud, and preventing PBM auditors from uncovering the fraud.

373.379.      Brown aided and abetted, knowingly participated in, and substantially assisted the fraud by failing to inform the entirety of the Boards of Directors of the Fiduciary Entities, and/or the Innocent Insiders that the Company was engaged in blatantly illegal activity.

374.380.      Brown aided and abetted, knowingly participated in, and substantially assisted the fraud by (i) failing to withdraw from representing Alliance in light of its continued illegal activities or (ii) otherwise advising Alliance or the Innocent Insiders that it could not assist in the fraud.

375.381.      With Brown's substantial assistance and knowing participation, Alliance, through the Alliance pharmacies and the Scheme Participants, knowingly and intentionally deprived the Manufacturers of sales of retail strips and caused the PBMs to submit incorrect rebate claims to the Manufacturers based on fraudulent insurance claims by Alliance; made or caused to be made those false representations with the intent of defrauding the Manufacturers; made or caused to be made the misrepresentations with the intent to profit from the higher reimbursements paid for boxes of retail strips; and were personally involved in and approved of the fraudulent scheme knowing that the Manufacturers would and did rely such misrepresentations.

376.382.        Brown knew about the fraud, as well as its role in contributing to the fraud, while it was engaged in and substantially assisted and knowingly participated in the fraud.

377.383.        Alliance could not have perpetrated its fraud without the substantial and material assistance and knowing participation of Brown. Each Scheme Participant and Brown benefited from the success of the fraud.

378.384.        Roche, LifeScan, and the PBMs justifiably relied on Alliance's misrepresentations.  They were unaware of the fraud, and due to Brown's substantial and material assistance and knowing participation, Roche, LifeScan and the PBMs could not have become aware of the fraud through reasonable diligence.

379.385.        As a result of the conduct of Alliance and Brown, the Manufacturers have been injured in an amount not less than $129 million.

WHEREFORE, the Trustee demands the entry of a judgment against Defendant for compensatory damages, consequential damage, and special damages including, but not limited to, (i) damages of not less than $129 million, as reflected in the allowed claims for the Test Strip Manufacturers; (ii) punitive damages; (iii) pre-judgment, post-judgment interest, court costs, and expenses; and (iv) for any other relief the Court deems appropriate.

## COUNT IV
## FRAUDULENT MISREPRESENTATION / FRAUD

The Trustee, as assignee of the claims of Roche and LifeScan, sues Brown and alleges:

380.386.        The Trustee realleges paragraphs 1 through 342348 above.

381.387.        This is an action for fraud, filed by the Trustee as assignee of the claims of Roche and LifeScan.

382.388.        Brown had actual knowledge of the fraudulent scheme to sell NFR strips to pharmacy beneficiaries and obtain insurance reimbursements for fraudulent claims.

383.389.        Brown knowingly, intentionally, and recklessly made and caused to be made

affirmative fraudulent misrepresentations and fraudulently omitted material information concerning presently existing material facts with the purpose of inducing reliance by the PBMs and indirect reliance by the Manufacturers, which proximately caused harm to the Manufacturers.

384.390.    Brown's misrepresentations of fact included but were not limited to misrepresenting the relationship of various Alliance entities to PBMs.

385.391.    Brown intended to deceive the PBMs into relying on the fraud in (1) paying the fraudulent reimbursement claims by Alliance; (2) not charging back claims for fraudulent reimbursements already paid by PBMs; (3) not cancelling the contracts of Alliance-affiliated pharmacies; and (4) not discovering the relationship between Alliance entities.

386.392.    Brown knew and intended that Roche and Lifescan would rely on the fraud when paying rebates to the PBMs for fraudulent reimbursement claims, which Brown knew or should have known funded the higher reimbursement rates to Alliance for the retail strips it was not actually fulfilling.

387.393.    Brown's misrepresentations preserved the ability of Alliance to perpetuate its fraud undetected and Alliance-affiliated pharmacies to continue their practice of submitting insurance claims for retail product while dispensing NFR product and caused the PBMs to continue paying fraudulent reimbursement claims and the Manufacturers to pay rebates.

388.394.    Roche, LifeScan, and PBMs justifiably relied on Brown's misrepresentations and were unaware of Brown's fraud.

389.395.    As a result of Brown's conduct, Roche and LifeScan have been injured in an amount not less than $129 million.

## COUNT V
## CONSPIRACY TO COMMIT FRAUD

The Trustee, as assignee of the claims of Roche and LifeScan, sues Brown and alleges:

390.396.    The Trustee realleges paragraphs 1 through 342348 above.

103

391.397.      This is an action for conspiracy to commit fraud, filed by the Trustee as assignee of the claims of Roche and LifeScan.

392.398.      The Scheme Participants and Brown unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to defraud the PBMs and the Manufacturers and adopted the goal of furthering and facilitating this fraud.

393.399.      Brown knew about the fraud no later than February 2011, and had a meeting of the minds to perpetuate the fraud, as evidenced by its active assistance in Alliance's fraud, and agreed to help hide the fraud.

394.400.      Brown knew these acts were unlawful or wrongful and knew that the wrongful acts injured the Manufacturers by causing them to pay rebates to PBMs and by depriving them of sales of retail strips.  Brown and the Scheme Participants agreed to a course of action regarding both the continued submission of false adjudications to PBMs and how to conceal the fraudulent activity.  The Scheme Participants requested and relied on the advice of Brown regarding concealment of the fraud and the relationship of Alliance entities, Brown advised Alliance how to structure its communications and otherwise mislead PBM auditors to conceal the fraud, and Brown engaged in affirmative acts of misrepresentation as well. Through these and other acts, Brown knowingly agreed to participate in the conspiracy. Brown joined the conspiracy from the inception of the cover-up.

395.401.      The Scheme Participants and Brown committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to knowingly and intentionally making and causing to be made false insurance reimbursement claims to PBMs, which falsely stated that the Alliance pharmacies had sold retail strips to patients, when in fact they had sold NFR strips; misrepresenting and hiding the relationship between Alliance entities; misrepresenting the inventories of retail strips; and using misleading and fraudulent supplier invoices to conceal the improper reimbursement requests.

396.402.    In conspiring with the Scheme Participants, Brown's conduct was foreign to the duties of a law firm and its attorneys, including by engaging in unlawful and fraudulent conduct.

397.403.    As a result of the conduct of the Scheme Participants and Brown, Roche and LifeScan have been injured in an amount not less than $129 million.

WHEREFORE, the Trustee demands the entry of a judgment against the Defendant for compensatory damages, consequential damage, and special damages including, but not limited to, (i) damages of not less than $129 million, as reflected in the allowed claims for the Test Strip Manufacturers; (ii) punitive damages; (iii) pre- judgment, post-judgment interest, court costs, and expenses; and (iv) for any other relief the Court deems appropriate.

### COUNT VI
### CONSPIRACY TO VIOLATE
### FEDERAL RICO, 18 U.S.C. § 1962(D)

The Trustee, as assignee of the claims of Roche and LifeScan, sues Brown and alleges:

398.404.    The Trustee realleges paragraphs 1 through 342348 above.

399.405.    This is an action seeking damages for conspiracy to violate Federal Rico, 18 U.S.C. § 1962(d) filed by the Trustee as assignee of the claims of Roche and LifeScan.

400.406.    At all relevant times, the Test Strip Manufacturers were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

401.407.    At all relevant times, Brown and the Scheme Participants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

402.408.    The Debtor and non-debtor Affiliates of Alliance identified above formed an association-in-fact for the  purpose of obtaining NFR blood-glucose test strips; dispensing them to patients by mail order; submitting false insurance claims representing that they had dispensed retail strips; and concealing the nature of this scheme from insurance companies, PBMs, and manufacturers like the Test Strip Manufacturers.  This association-in-fact was a continuing and cohesive unit with

specific and assigned responsibilities and constituted an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4). This enterprise comprises Alliance Medical Holdings, LLC d/b/a Alliance Health and its predecessor corporations and subsidiaries as well as Alliance's individually operating, nominally "independent" pharmacies that Alliance managed, operated, and/or controlled; Alliance's corporate-owned pharmacies, as well as the "independent" pharmacies that Alliance later acquired; the "10% PIC" pharmacies; Alliance's purchasing and wholesaling subsidiaries; and Alliance's operating, managing, and holding entities.

403.409.    Each Scheme Participant, by engaging in the acts set forth above, knowingly agreed to participate in the operation and management of the enterprise. At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

404.410.    Each Scheme Participant, by engaging in the acts set forth above, conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(1) and (5), in violation of RICO, 18 U.S.C. § 1962(c).

405.411.    The Scheme Participants, on multiple occasions, and in furtherance of their scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be sent and delivered across state lines by commercial interstate carrier shipments of products that were represented to be Test Strip Manufacturers' retail strips but in fact were different products. Each shipment of NFR strips falsely adjudicated using the NDC for retail strips constituted a separate violation of 18 U.S.C. § 1341 and a separate act of racketeering. The Scheme Participants' purchase and receipt by interstate carrier of Test Strip Manufacturer test strips also was integral to the operation and maintenance of the scheme.

406.412.    The Scheme Participants, on multiple occasions and in furtherance of their

scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused

to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs,

signals, pictures, and sounds, in violation of the federal wire fraud statute, 18 U.S.C. § 1343.  Each false

insurance reimbursement claim was transmitted by means of wire communication in interstate or

foreign commerce and constituted a separate violation of 18 U.S.C. § 1343 and a separate act of

racketeering.  The Scheme Participants' use of interstate wire communications to continually upload,

transmit, and receive patient data and information regarding prescriptions to and from Alliance entities,

including via Alliance's proprietary PPMS software; to create and maintain NPI and National Council

for Prescription Drug Programs ("NCPDP") database entries regarding the Alliance entities; and/or to

establish additional Alliance entities was also integral to the scheme and the operation and maintenance

of the enterprise.

407.413.      Each Scheme Participant committed and/or aided and abetted the commission of

two or more of these racketeering acts in violation of 18 U.S.C. §§ 2, 1341, and/or 1343.  In fact, the

Scheme Participants' racketeering acts were multiple and repeated, with tens of thousands of acts

occurring every year from 2011 until Alliance's bankruptcy in 2017.

408.414.      These multiple racketeering acts were related and constituted a "pattern of

racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts alleged were related to each

other by virtue of common participants; common victims (the Test Strip Manufacturers); a common

method of commission; and the common purpose and common result of defrauding the Test Strip

Manufacturers and PBMs, and of enriching the Scheme Participants while concealing their fraudulent

activities.

409.415.      Brown was associated with the Alliance enterprise described above, and agreed

and conspired to violate 18 U.S.C. § 1962(c), that is, knowingly agreed to conduct and participate,

directly and indirectly, in the conduct of the affairs of the enterprise through the pattern of racketeering

activity described herein, in violation of 18 U.S.C. § 1962(d).  Brown consistently committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.  For example, and as set forth above, Brown advised the Alliance enterprise to conceal its scheme from PBMs by stonewalling their requests for information and altering documents they requested.  Brown also helped the Alliance enterprise further its scheme by advising Alliance to omit truthful disclosures about the nature of its business to pharmacies Alliance sought to acquire; the acquisition of pharmacies was essential to furthering the scheme, and the pharmacies likely would not have agreed to be acquired if they understood that the Alliance enterprise was engaged in fraud. Brown also made direct misrepresentations to PBMs regarding, among others, the identity and interconnectedness of various entities within the enterprise in order to ensure continued survival of the enterprise.

410.416.     The fraudulent scheme depended upon, among other things, (a) the Alliance pharmacies serving as false fronts to which fraudulent adjudications could be attributed; (b) the Alliance pharmacies' maintenance of the appearance of independence when contracting with and obtaining reimbursements from PBMs; (c) the submission of fraudulent insurance claims to PBMs for the purposes of obtaining undeserved reimbursements; (d) the collection of the undeserved reimbursements made to each Alliance pharmacy into Alliance's corporate accounts without revealing the pharmacy's affiliation with Alliance; (e) a large credit facility that ensured continued operations despite fluctuations in corporate revenue caused by frequent PBM chargebacks and contract terminations; and (f) a financial institution willing to provide such a credit facility with the assets of Alliance pharmacies serving as collateral, even though such assets frequently would lose substantially all their value as the result of PBM chargebacks and contract terminations.

411.417.     The Test Strip Manufacturers were directly and proximately injured by the pattern of racketeering activity because the fraudulent adjudication data was passed directly from PBMs

to the Test Strip Manufacturers and served as the sole basis and justification for their payments of rebates to those pharmacy-benefit insurance companies and PBMs.

412.418.    The Test Strip Manufacturers were directly and proximately injured by the pattern of racketeering activity because each time the Scheme Participants fraudulently substituted a box of NFR strips for a box of retail strips that were adjudicated, and for which Alliance was reimbursed by PBMs, such substitution deprived the Test Strip Manufacturers of the sale of a box of Retail Strips that they would have sold absent the fraudulent substitution and caused them to a pay a rebate that was not due.

413.419.    As a result of the misconduct, Brown is liable to the Test Strip Manufacturers for these injuries.

414.420.    Pursuant to 18 U.S.C. § 1964(c), the Test Strip Manufacturers are entitled to recover threefold its damages, plus costs and attorneys' fees.

WHEREFORE, the Trustee demands the entry of a judgment against the Defendant for compensatory damages, consequential damages, and special damages including, but not limited to, (i) damages of not less than $129 million, as reflected in the allowed claims for the Test Strip Manufacturers; (ii) punitive damages; (iii) treble damages pursuant to 18 U.S.C. § 1964(c); (iv) attorneys fees and costs pursuant to 18 U.S.C. § 1964(c); (v) pre-judgment, post-judgment interest, court costs, and expenses; and (vi) for any other relief the Court deems appropriate.

**COUNT VII**
**REFORMATION OF THE TOLLING AGREEMENT**

The Liquidating Trustee, for and on behalf of the Trust Estate and the beneficiaries of the Trust Estate, and as assignee of the claims of Roche and LifeScan, sues Brown and alleges:

421.    The Trustee realleges Paragraphs 1 through 348 above.

422.    This is a claim for reformation of the Tolling Agreement based on mutual mistake of the parties, or alternatively based on the Trustee's unilateral mistake and Brown's knowledge of its mistake,

109

misrepresentation, and/or inequities, in reducing the parties' agreement to writing.

423. On October 14, 2019, Brown and the Trustee entered into the Tolling Agreement, which was subsequently amended on January 16, 2020, June 19, 2020, August 19, 2020, January 28, 2021, March 15, 2021, May 4, 2021, and July 26, 2021, extending the time to file suit to October 31, 2021.

424. On May 22, 2020, the Manufacturers filed a motion to assign and convey (the "Assignment") to the Trustee all of their potential claims against Brown, including the claims alleged in this Third Amended Complaint. [Doc. No. 1395].

425. Shortly thereafter, Brown and the Trustee agreed that Brown would toll all of the Trustee's claims, including the claims assigned or to be assigned from the Manufacturers.

426. Brown and the Trustee reduced their agreement to writing when they executed the June 19, 2020 amendment to the Tolling Agreement (the "June 19, 2020 Agreement"), which the Trustee entered into as "Liquidating Trustee of the Liquidating Trust for the estates of the above-referenced jointly administered Debtors . . . **and as assignee of the claims of LifeScan, Inc., Roche Diagnostics Corp., and Roche Diabetes Care, Inc. pursuant to that certain Stipulation by and between Lifescan, Roche, and the Trustee.**" (emphasis added). The terms of the October 14, 2019 tolling agreement, including the definition of "Claims," were sufficiently broad to cover the assigned claims after this modification and extension. The June 19, 2020 Agreement was signed by Bradley Howard of Brown with the intent to toll the assigned claims, as reflected in the inclusion of the above described language in the agreement. Each subsequent tolling agreement was intended by the parties to cover those claims as well.

427. The Court approved the pending Assignment by the Order dated June 20, 2020. [Doc. No. 1403].

428. The subsequent correspondence between the Trustee's former counsel, David Cimo and Brown's counsel Christopher Raney, documented the manifest intent between both parties to toll the

assigned claims. Indeed, Raney returned an executed version of the August 19, 2020 tolling agreement (the "August 19, 2020 Agreement") after being expressly told by Cimo in emails in August 2020 that the June 19, 2020 Agreement and the August 19, 2020 Agreement were intended to toll the assigned claims.

429.    Brown and Brown's counsel did not dispute the scope of the tolling agreements and instead executed the August 19, 2020 Agreement and delivered it to Cimo on August 19, 2020, thereby acknowledging the intent that they would cover assigned claims.

430.    To the extent the June 19, 2020 Agreement did not toll the Manufacturers' assigned claims, this was due to a mutual mistake in the reduction of the parties' agreement to writing. The June 19, 2020 Agreement reflects the parties' original agreement that the Trustee was acting "as assignee of the claims of LifeScan, Inc., Roche Diagnostics Corp., and Roche Diabetics Care, Inc." The parties' agreement to include this language demonstrates their mutual belief, as further evidenced by their August 2020 email correspondence, that the June 19, 2020 Agreement was sufficient to toll the assigned claims, as was the August 19, 2020 Agreement.

431.    To the extent the June 19, 2020 Agreement and/or the August 19, 2020 Agreement did not toll the Manufacturers' assigned claims due to the way the original agreement was reduced to writing, the parties labored under the same misconception that they had agreed to toll the assigned claims. Because both parties labored under the same misconceptions regarding the inclusion of the assigned claims within the tolling agreement, which is a material fact, there was a mutual mistake respecting that fact in reducing the original agreement to writing—specifically whether the June 19, 2020 Agreement or August 19, 2020 Agreement modified the earlier tolling agreement to cover the claims subject to assignment.

432.    As the result of the mutual mistake of fact in reducing the parties' original agreement to writing, reformation of the Tolling Agreement to reflect the original agreement and parties' intent is

warranted.

433.   Alternatively, the Trustee made a unilateral mistake of fact regarding whether the assigned claims were tolled by the June 19, 2020 Agreement and the August 19, 2020 Agreement, when they were reduced to writing, and Brown had knowledge of the unilateral mistake. As is plain from the face of each tolling agreement from June 19, 2020 forward, the Trustee intended to toll the assigned claims. And, as the August 2020 emails between the parties evidence, the Trustee's counsel expressly told Brown's counsel that the intent of both the June 19, 2020 Agreement and the August 19, 2020 Agreement was to toll the assigned claims, and Brown raised no issue or disagreement with the Trustee's view of the scope of the tolling agreements when continuing to extend them. Instead, Brown continued to execute tolling agreement extensions and did not correct the Trustee's mistake.

434.   Thus, to the extent that the Trustee made a unilateral mistake of fact that the parties had an agreement to toll the assigned claims; Brown knew of the Trustee's mistake in believing the June 19, 2020 Agreement tolled the assigned claims and/or that the August 19, 2020 Agreement also tolled the assigned claims; Brown's attorney Christopher Raney, without protest or contradiction, delivered a signed August 19, 2020 Agreement extension after the Trustee's prior attorney expressly indicated an understanding that the assigned claims had been tolled and would continuing to be tolled; and Brown knew that the Trustee was mistaken respecting the fact of reducing the agreement to writing.  The Trustee relied on Brown's continuing tolling agreement extensions in not asserting the claims earlier.

435.   If Brown did not believe the June 19, 2020 Agreement and the August 19, 2020 Agreement were sufficient to toll the manufacturer's claims, then Brown signed each agreement, and the subsequent agreements, with the intent to induce the Trustee to labor under the misconception that it did. The signatures of Brown's attorneys in June 19, 2020 and in August 19, 2020 effectively halted the Trustee's pursuit of asserting the claims the Trustee believed were sufficiently tolled through the language of the tolling agreements.

436.   Alternatively, the unilateral mistake was of so great a consequence (tolling of millions of dollars of claims being actively discussed prior to the filing of suit) that it would be unconscionable not to reform the tolling agreement; the mistake relates to a material feature of the agreement (the scope of claims tolled); the mistake was made despite the exercise of ordinary care (specifically referencing the assigned claims in the agreements); and the parties can be placed in status quo in the equity sense without prejudice to Brown (which never raised that the assigned claims had not been tolled until its third motion to dismiss).

437.   As the result of the Trustee's unilateral mistake of fact, Brown's knowledge of the Trustee's mistake, and Brown's intent, misrepresentations, and inequities in allowing the Trustee to labor under the misconception that the tolling agreements tolled the assigned claims, reformation of the Tolling Agreement to reflect the Trustee's intent to toll the assigned claims is warranted.

WHEREFORE, the Liquidating Trustee demands the entry of a judgment for reformation of the Tolling Agreement.

## APPLICATION OF THE DISCOVERY RULE, EQUITABLE TOLLING, AND/OR THE ADVERSE DOMINATION DOCTRINE AS TO ALL CLAIMS

415.438.      The Trustee pleads the application of the discovery rule, equitable tolling, and/or the adverse domination doctrine as to all claims asserted herein.

## ALTERNATIVE PLEADINGS

416.439.      The foregoing facts, claims, and legal theories are pled cumulatively and alternatively, with no election or waiver of rights or remedies.

## RESERVATION OF RIGHTS

417.440.      The Trustee reserves his right to amend this Complaint, upon completion of his investigation and discovery, to assert any additional claims for relief against Brown as may be warranted under the circumstances and allowed by law.

### DEMAND FOR JURY TRIAL
### AND NON-CONSENT TO A JURY TRIAL
### <u>BY AND BEFORE THE BANKRUPTCY COURT</u>

418.441.      The Trustee hereby: (i) demands a trial by jury on all claims and issues triable by such; and (ii) requests in regard to such demand that the reference to the Bankruptcy Court not be withdrawn, if at all, unless and until all discovery and all pre-trial motions and matters, including case dispositive motions, are disposed of and otherwise adjudicated by the Bankruptcy Court.  The Trustee specifically does not consent to a jury trial by and before the Bankruptcy Court.

Dated: October 20, 2023May 10, 2024.

                                                  **McKOOL SMITH, PC**

                                                  By: /s/ Joshua J. Newcomer
                                                  Joshua J. Newcomer, Esq. (SBN 24060329)
                                                  John J. Sparacino, Esq. (SBN 18873700)
                                                  600 Travis Street, Suite 7000
                                                  Houston, Texas 77002
                                                  Tel: (713) 485-7300
                                                  Fax: (713) 485-7344
                                                  Email: jnewcomer@mckoolsmith.com
                                                  Email: jsparacino@mckoolsmith.com

                                                  -and-

Kyle Lonergan
James Smith
**MCKOOL SMITH, PC**
One Manhattan West
395 9th Ave., 50th Floor
New York, NY 10001
Tel: (212) 402-9400
Email: klonergan@mckoolsmith.com
Email: jsmith@mckoolsmith.com

*Attorneys for Plaintiff Yvette Austin Michael E. Foreman, Liquidating Trustee for the Alliance Health Liquidating Trust*

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 20, 2023 May 10, 2024, a true and correct copy of the foregoing document was electronically filed and served via CM/ECF on all parties that have entered an appearance and requested service in the above-referenced case.

*/s/ Joshua J. Newcomer*
Joshua J. Newcomer